ORIGINAL

FILED-USDC-NDTX-DA
'25 MAR 18 PM4:09

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MATTHEW HAWKINS,

Plaintiff,                **3- 25 CV 0652 - D**

v.

DESOTO INDEPENDENT SCHOOL DISTRICT,

DESOTO INDEPENDENT SCHOOL DISTRICT SCHOOL BOARD,

DR. USAMAH ROGERS (in her official and individual capacities),

JASEN CAMPBELL (in his official and individual capacities),

JOCELYN STARLING (in her official and individual capacities),

KRISTI PRIMUS (in her individual capacity only),

DR. LEON DARDEN (in his official and individual capacities),

GENE MORROW (in his official and individual capacities),

JORGE MEDINA (in his official and individual capacities),

CHRISTOPHER POLK (in his official and individual capacities), and

ALICIA BAILEY (in her official and individual capacities)

ALMA MURPHY-GOSS (in her official and individual capacities)
Defendants.

Case No.:

PLAINTIFF'S ORIGINAL COMPLAINT

AND JURY DEMAND

COMPLAINT

1

I. INTRODUCTION

1. Nature of the Action
   This civil action challenges the unlawful and discriminatory treatment that Plaintiff Matthew Hawkins ("Hawkins"), a Black male educator, endured at DeSoto Independent School District ("the District"). Despite being an award-winning and highly qualified teacher, Hawkins became the target of retaliation, discrimination, and defamatory attacks after he objected to illegal grading practices and refused to indulge in the racial stereotypes voiced by certain parents and staff—namely, that as a Black teacher, he should automatically be more lenient with Black students. These injurious assumptions, along with the District's disregard for due process and breach of contract, culminated in Hawkins' reassignment from the prestigious Early College High School (ECHS) under false pretenses.

2. Alleged "Overwhelming Complaints" and Racial Stereotypes
   The District purported to reassign Hawkins after receiving an "overwhelming number of complaints" from parents. Yet no documented complaints ever surfaced at any level of grievance proceedings, revealing a glaring procedural void. More disturbingly, some parents explicitly communicated that, because Hawkins is Black, he should "understand the struggle" and grant greater leniency to Black students—an assumption grounded in racial stereotypes. Other staff members, also endorsing these lenient practices, effectively turned a blind eye to students flouting attendance and discipline policies. By contrast, Hawkins insisted on adhering to official standards, causing parents and administrators alike to paint him as a problem teacher when he refused to bend his grading or discipline approach along racial lines.

3. Protected Activity and Retaliation
   Hawkins had repeatedly opposed unlawful policies—most notably a "no grades below 50" practice—and consistently sought to hold students accountable in line with state law and District policy. His stance clashed with those who believed Black students should be able to "do as they please," and it exposed him to retaliatory discipline, including a formal write-up, a Teacher in Need of Assistance (TINA) plan, and eventually the abrupt reassignment from ECHS. These actions were not only unjustified but taken in direct response to Hawkins' protected activities, constituting a textbook case of retaliation under both federal civil rights statutes and District policy.

4. Due Process, Breach of Contract, and Defamation
   By citing "an overwhelming number of complaints," Defendants claimed the reassignment served the "best interest of the district." However, no supporting documentation was produced—even after multiple levels of grievance. This omission flouts both Hawkins' contract (which requires a documented rationale and a fair grievance process for any adverse action) and his constitutional right to procedural due process. Hawkins, recognizing the severe reputational harm caused by the reassignment, specifically requested an opportunity to address the complaints during the grievance process. He sought either a formal investigation or, at minimum, an acknowledgment to parents and students clarifying that the reassignment was not based on misconduct or poor performance. The District ignored this request, effectively denying

him the ability to restore his professional reputation. The refusal to allow Hawkins to respond to the alleged complaints amounts to a denial of procedural due process and a deprivation of his liberty interest in his professional standing. Moreover, references to Hawkins' supposed wrongdoing were conveyed to parents and staff, defaming his professional reputation without any factual or investigative basis. The District's actions thus combined to form a hostile and discriminatory environment, undermining Hawkins' career, emotional well-being, and legal protections.

5. Racial Discrimination and Hostile Work Environment
Hawkins further alleges that the District's administrators and certain staff fostered a racially hostile work environment by expecting a Black teacher to be more lenient with Black students, while disciplining him for enforcing consistent academic and behavioral standards. This double standard underlines how race-based assumptions and stereotypes—amplified by parent demands—shaped the District's adverse actions. Hawkins' refusal to conform to these racial stereotypes led to intensified scrutiny and retaliatory measures, thereby violating Title VII, 42 U.S.C. § 1981, and other applicable anti-discrimination laws.

6. Relief Sought and Anticipated Discovery
In this lawsuit, Hawkins seeks injunctive relief, compensatory damages, and other remedies to rectify the ongoing harm caused by Defendants' illegal conduct. Because the District provided no evidence of genuine parent complaints or legitimate reasons for his reassignment, Hawkins anticipates that discovery will reveal:

- The true nature and content of any alleged "complaints";
- Communications among administrators regarding expectations that Black teachers be "understanding" and "lenient";
- Internal memoranda or emails reflecting Defendants' real motives for removing Hawkins from ECHS.
Armed with these facts, Hawkins will further prove that racial stereotypes, retaliation, and contractual violations underpinned the District's adverse actions, leaving him no recourse but to seek redress from this Court.

7. Purpose of This Action
Through this Complaint, Hawkins aims to hold the District accountable for violating his statutory and constitutional rights, to restore his professional reputation, and to ensure that racial bias, retaliation, and unsubstantiated "complaints" do not continue to define the District's treatment of diligent educators who insist on lawfully enforcing academic standards.

II. PARTIES

Plaintiff:

3

2. Matthew Hawkins ("Hawkins")
   618 Blue Chalk Dr.
   Cedar Hill, TX 75104
   (972) 639-4284
   matthewhawkinsus1@gmail.com

3. At all relevant times, Hawkins has been employed by DeSoto Independent School District ("DeSoto ISD") as a teacher. Hawkins brings this action due to discriminatory employment practices, retaliation, due process violations, and a hostile work environment resulting in adverse employment actions.

   Defendants:

4. DeSoto Independent School District
   200 E. Belt Line Rd.
   DeSoto, Texas 75115

5. DeSoto ISD is sued for discriminatory employment practices, retaliation, due process violations, and creating a hostile work environment.

6. DeSoto Independent School District School Board
   200 E. Belt Line Rd.
   DeSoto, Texas 75115

7. The School Board is sued for failure to provide due process, failure to prevent discriminatory actions, and ratifying unlawful employment practices.

8. Dr. Usamah Rogers, Superintendent
   (In her official and individual capacities)
   DeSoto Independent School District
   200 E. Belt Line Rd.
   DeSoto, Texas 75115

9. Dr. Rogers is sued for failing to prevent discriminatory practices, retaliation, and due process violations related to Hawkins' reassignment and grievances.

10. Jasen Campbell, Principal
    (In his official and individual capacities)
    DeSoto Independent School District
    200 E. Belt Line Rd.
    DeSoto, Texas 75115

11. Mr. Campbell is sued for retaliatory reassignment, denial of due process, and contributing to a hostile work environment.

12. Jocelyn Starling
(In her official and individual capacities)
DeSoto Independent School District
200 E. Belt Line Rd.
DeSoto, Texas 75115

13. Ms. Starling is sued for retaliatory discipline, discriminatory oversight, and fostering a hostile work environment.

14. Kristi Primus, Former Associate Principal of Teaching & Learning
(individual capacity only)
Mansfield Independent School District
605 East Broad Street
Mansfield, Texas 76063

15. Ms. Primus is sued for imposing unlawful lesson plan requirements, retaliation, and failure to provide procedural due process.

16. Dr. Leon Darden
(In his official and individual capacities)
DeSoto Independent School District
200 E. Belt Line Rd.
DeSoto, Texas 75115

17. Dr. Darden is sued for failing to ensure a fair grievance process and ratifying discriminatory and retaliatory actions.

18. Gene Morrow
(In his official and individual capacities)
DeSoto Independent School District
200 E. Belt Line Rd.
DeSoto, Texas 75115

19. Mr. Morrow is sued for failure to ensure due process in grievance procedures and upholding discriminatory and retaliatory actions.

20. Jorge Medina
(In his official and individual capacities)
DeSoto Independent School District
200 E. Belt Line Rd.
DeSoto, Texas 75115

21. Mr. Medina is sued for interference with classroom management, undermining authority, and contributing to a hostile work environment.

22. Christopher Polk, Assistant Principal
(In his official and individual capacities)
DeSoto Independent School District
200 E. Belt Line Rd.
DeSoto, Texas 75115

23. Mr. Polk is sued for participation in retaliatory employment actions, interference with grading policies, and failure to enforce district policies.

24. Alicia Bailey
(In her official and individual capacities)
DeSoto Independent School District
200 E. Belt Line Rd.
DeSoto, Texas 75115

25. Ms. Bailey is sued for undermining instructional authority, contributing to a hostile work environment, and supporting retaliation.

26. Alma Murphy-Goss
(In her official and individual capacities)
DeSoto Independent School District
200 E. Belt Line Rd.
DeSoto, Texas 75115

27. Ms. Murphy-Goss is sued for unilaterally removing a special education student without proper procedure, demanding unjustified grade inflation, and contributing to a hostile work environment.

III. JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to:
   a. 28 U.S.C. § 1331 (federal question) because the action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and 42 U.S.C. §§ 1981 and 1983.
   b. 28 U.S.C. § 1343 (civil rights)
   c. 42 U.S.C. § 1983 (deprivation of rights under color of state law)
   d. 28 U.S.C. § 1367 (supplemental jurisdiction) because the state law claims arise from the same facts and circumstances as the federal claims.
9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims1 occurred in this district.

## BACKGROUND

### Plaintiff's Role, 2022–2023 Achievements, and TIA Prospects

1. Longstanding Career at DeSoto ISD
   Plaintiff Matthew Hawkins ("Hawkins") has taught at DeSoto High School since the 2016–2017 school year, primarily focusing on Algebra 1, Algebra 2, and Geometry—most notably Algebra 2. Throughout his tenure, Hawkins has prioritized academic integrity  and consistent policy enforcement (Exhibit 2) & (Exhibit 3).

2. Exemplary 2022–2023 Performance

   - During the 2022–2023 school year, Hawkins's high level of instructional effectiveness earned him the District's "High Flying Eagle" award (Exhibit 4), publicly recognized at the March 27, 2023 School Board Meeting.
   - Hawkins also received top evaluations (Exhibit 5), with at least one parent nominating him for Teacher of the Year (Exhibit 6), underscoring widespread admiration for his dedication to student achievement.

3. Clear Path Toward TIA Eligibility

   - Bolstered by these accolades, Hawkins believed he was firmly on track for the Teacher Incentive Allotment (TIA)—a state initiative rewarding outstanding teachers with considerable additional compensation.
   - Hawkins's rigorous approach in Algebra 2, combined with consistently high evaluation scores, made him a strong TIA candidate prior to the retaliatory or discriminatory conduct described herein.

### District Environment and Inconsistencies (Late 2022–2023 Year)

4. Overcrowding & Substitute Challenges

   - In late 2022–2023, Hawkins was essentially the only qualified Algebra 2 instructor, sometimes teaching in a community room that ballooned to over 100 students. Other Algebra 2 classes were overseen by permanent substitutes with limited training or authority, leading to frequent discipline problems and chaotic conditions.

5. Discipline Referrals and Administrative Undermining

   - One of these permanent substitutes repeatedly faced disruptive student behavior and wrote referrals seeking administrative intervention.
   - Jocelyn Starling, then not Hawkins's direct supervisor but an administrator with oversight duties, refused to process these referrals, insisting that teachers contact parents directly instead.

- ○ Concerned about the substitute's lack of support and the growing behavioral issues, Hawkins brought the matter to Dr. McBride, who ultimately instructed Starling to process the referrals.
- ○ This incident created tension: Starling apparently resented Hawkins for effectively overruling her stance, foreshadowing future conflicts when she gained direct supervisory authority over him.

## 2023–2024: Stricter Dress Code, Shifting Supervisors, and Escalation

6. New Uniform Policy & Inconsistent Enforcement

   - ○ Moving into the 2023–2024 school year, the District introduced a full uniform requirement yet failed to uniformly enforce it. Many staff and administrators allowed dress code violations to slide, while Hawkins attempted to uphold the new policy, prompting renewed parent complaints and administrative scrutiny.

7. Starling Becomes Hawkins's Direct Supervisor

   - ○ During this same school year, Starling replaced Dr. McBride as Hawkins's direct supervisor. Given their previous tension over discipline referrals, Starling now wielded greater influence in evaluating Hawkins and shaping his teaching assignments.

8. Conflict with Official Policies and Grading Guidelines

   - ○ The December 2022 changes to the District's grading policies caused ongoing confusion (Exhibit 7). Educators allowed "no grades below 50" in all situations. Students protested when Hawkins enforced stricter interpretations of the policy that aligned with state law. This led to a sense of entitlement among the students. The administration issued reminders to ensure that no grades below 50 were recorded in the grade book for every progress report and report card (Exhibit 8).

## Early Complaints, Retaliation, and Lost Opportunities

9. Strict Enforcement = Increased Parent Complaints

   - ○ Hawkins's uniform enforcement, disciplinary referrals, and refusal to inflate grades caused certain students and parents to complain. In 2023–2024, these complaints were channeled through Starling, who had already shown animosity from the prior year's referral dispute.

10. Undermined TIA Prospects & Environmental Stress

   - ○ Hawkins, once a strong candidate for TIA based on his 2022–2023 record, saw his prospects crumble under targeted disciplinary measures, contrived evaluations, and a hostile environment.

- The combined effect of being relieved of advanced classes, publicly criticized, and left unsupported in enforcement efforts effectively denied him the performance metrics or consistent teaching environment required for TIA eligibility.

## Foundation of This Lawsuit

11. Retaliatory and Discriminatory Acts

- The 2022–2023 tension over discipline referrals planted the seeds of Starling's personal vendetta. Once Starling gained direct authority in 2023–2024, she and other administrators initiated or approved unjust disciplinary actions, contrived negative evaluations (e.g., TINA plan), and enforced inconsistent policies to isolate and penalize Hawkins.

12. Continuing Hostile Environment

- Hawkins now faces an ongoing hostile and retaliatory climate, fueled by administrators who earlier undermined his legitimate enforcement of District policies. The District's failures to uniformly apply new uniform rules and grading directives, combined with Starling's longstanding resentment, culminated in Hawkins's eventual demotion from DeSoto Early College High School—eroding his professional standing, emotional well-being, and TIA eligibility.

13. Basis of Allegations

- Through this lawsuit, Hawkins seeks to redress these retaliatory and discriminatory practices, highlighting how administrative inconsistencies, personal vendettas, and the District's unwillingness to protect academic standards collectively caused severe reputational harm, emotional distress, and lost professional opportunities, including potential TIA compensation.

IV. FACTS GIVING RISE TO PLAINTIFF'S CLAIMS

1. Reporting of Illegal Grading Practices

10. On September 19, 2023, Hawkins was summoned to a meeting with Assistant Principal Jocelyn Starling regarding calculator usage in his classroom (Exhibit 9). During this meeting, Starling questioned why Hawkins did not allow students unrestricted access to calculators, particularly given their availability on standardized tests. Hawkins explained that his instructional approach emphasized foundational mathematical skills, ensuring that students could perform operations manually before relying on calculators. He further cited research indicating that excessive calculator dependence could hinder

problem-solving abilities and long-term retention of mathematical concepts. Hawkins also noted that standardized tests such as the ACT, SAT, and Texas Success Initiative (TSI) assessments included non-calculator sections, reinforcing the importance of numeracy fluency.

11. Despite these justifications, Starling continued to challenge Hawkins' approach, suggesting that withholding calculator access was an unnecessary hardship for students. She expressed concerns that parents had complained about their children struggling in math without calculators, arguing that Hawkins' method was inconsistent with district expectations. Additionally, Starling cited district grading policies, specifically referencing that "it is not a best practice to assign zeros" and questioning Hawkins' enforcement of academic integrity standards. Hawkins explained that his grading reflected student performance and was aligned with both district policy and academic standards.

12. During this meeting, Hawkins also openly disagreed with the district's minimum grade of 50 policy, arguing that it failed to accurately reflect student mastery and undermined academic accountability. He maintained that students should earn the grades they received based on their work, rather than being given an automatic 50 for missing or incomplete assignments. Starling, however, insisted that the policy was district-mandated and that Hawkins needed to comply, further heightening the tension between administrative expectations and Hawkins' commitment to upholding rigorous academic standards. Hawkins expressed that requiring a minimum grade was illegal but stated he would comply after students and parents were able to see the students' actual performance for the entire marking period, ensuring transparency before any grade adjustments were made.

13. This meeting marked the beginning of a pattern in which Starling scrutinized Hawkins' instructional decisions, often under the pretext of addressing parental concerns. Students began voicing complaints about strict grading, attendance enforcement, and classroom discipline. Hawkins' adherence to academic and behavioral standards increasingly put him at odds with both administrators and students who sought greater leniency.

14. This initial dispute over calculators and grading policies would later be used to justify increased administrative oversight, setting the stage for escalating conflicts that culminated in formal disciplinary actions against Hawkins.

2. Unlawful Lesson Plan Requirements and Initial Retaliation (October 2023 - December 2023):

15. His direct supervisor, Defendant Jocelyn Starling, insisted on a "PowerPoint driven lesson plan" format that exceeded the requirements of Texas Education Code Section 11.164(a)(6) (which prohibits increasing teacher workload beyond the maximum allowed), Board Policy DLB (which governs lesson plan requirements), and the Paperwork Reduction Act. (Exhibit 10)

16. On October 26, 2023, Defendant Starling sent an email to Hawkins stating that his lesson plans were "not in compliance with the Power Point driven lesson plan requirements" and that his lesson plans should contain slides titled "T.O.D.A.Y., DO NOW, 10-minute protocol, I DO, WE DO, YOU DO, and the Exit Ticket." (Exhibit 11).

17. On October 30, 2023, Defendant Starling sent a follow up email to Hawkins regarding information he had provided in his lesson plan, again stating that he "did not have individual slides for the following components of the lesson plan: DO NOW, 10-minute protocol, I DO, WE DO, YOU DO, and the Exit Ticket" and that a "directive was given advising [him] to make the necessary corrections." (Exhibit 11).

18. On October 31, 2023, Hawkins responded to Starling via email, stating "I have also followed the district given template for this information" and "I am confident in my ability to provide a high quality education to my students without submitting a detailed lesson plan." (Exhibit 11).

19. On November 5, 2023, Defendant Starling sent Hawkins an email requesting a meeting on November 7, 2023 "to discuss the campus expectations for lesson plans." (Exhibit 11).

20. On November 7, 2023, during a meeting with Hawkins, Defendant Starling asserted that, "the TEC requirement to provide a brief overview of the lesson was the minimal requirement for lesson planning, but the campus could require additional requirements for lesson planning." She further "followed up using the example of how the state has specific graduation requirements and school districts can add to the requirements, but not take away from them." (Exhibit 11). Defendant Starling further stated that Hawkins "knew how to create a Power Point lesson plan, but [he] was not going to create one because [he] did not use it and it was illegal for the campus to require [him] to do so." (Exhibit 11). Hawkins' objection and refusal to create such a lesson plan was rooted in his belief that the requirement was unlawful. Defendant Primus was also present at this meeting.

21. At the beginning of the 2023-2024 school year, the administration, including Defendants Starling and Primus, stated that PowerPoint-based lesson plans would be created collaboratively during PLC meetings, not individually by teachers. Despite this assurance, no such lesson plans were ever completed during the Algebra 1 PLC meetings.

22. Defendant Starling's interpretation of Texas Education Code Section 11.164(a)(6) was incorrect. The statute sets the maximum requirements for written documentation related to lesson plans, not the minimum. Her analogy to graduation requirements was flawed and inapplicable to lesson plan documentation.

23. Despite providing lesson plans that complied with applicable legal and policy requirements, Hawkins received a Formal Letter of Concern on November 28, 2023, which was initiated and signed by Defendant Starling. (Exhibit 11).

24. The Letter of Concern stated that Hawkins had failed to "comply with the official directive of submitting a Power Point driven lesson plan." (Exhibit 11). It further directed him to "Complete a Power Point driven lesson plan weekly with a slide for each of the following: T.O.D.A.Y., DO NOW, 10-minute protocol, I DO, WE DO, YOU DO, and the Exit Ticket and submit it weekly by 5PM Thursday to the PIT and myself." (Exhibit 11).

25. The Letter of Concern also acknowledged Hawkins as a "valued member" of the staff whose "hard work and dedication is appreciated," yet simultaneously threatened "additional disciplinary actions" for failure to comply with the unlawful directive. (Exhibit 11). This threat created a hostile work environment and demonstrated a retaliatory intent.

26. Hawkins refused to sign the Letter of Concern, indicating his disagreement with its contents and the unlawful directives it contained. (Exhibit 11).

27. While there were no non-Black comparators in the math department, many teachers, who were not Black males and females, did not submit lesson plans at all and did not face similar disciplinary actions, demonstrating a discriminatory application of the lesson plan requirements.

28. On December 14, 2023, Hawkins met with Principal Jasen Campbell to discuss the lesson plan policy dispute and a separate attendance policy concern previously discussed with Starling. Regarding the lesson plans, Campbell stated that shared team PowerPoints were to be developed during Algebra 1 PLCs (Professional Learning Communities). However, Hawkins clarified that such PowerPoints were never created in PLCs. Campbell requested additional time to investigate the PLC lesson plan approach and promised to follow up on the powerpoint lesson plan policy concern. This meeting further illustrated the inconsistencies in policy enforcement and the administration's lack of clarity regarding instructional expectations, reinforcing the pattern of increasing scrutiny Hawkins faced.

29. The Algebra 1 PLCs were initially facilitated by Mrs. Jackson. However, on January 29, 2024, Mrs. Jackson's role was revised, and Defendant Alicia Bailey became the facilitator of the Algebra 1 PLCs. Hawkins perceived this shift in personnel as a tactic used by the administration to increase pressure on him regarding lesson plans and teaching methods.

30. On February 12, 2024, Defendant Bailey conducted a classroom walkthrough and interrupted Hawkins' lesson. During this interruption, she insisted that Hawkins teach students how to use calculators, despite Hawkins' explanation that he was prioritizing foundational skills without calculators because the upcoming assessment required non-calculator solutions. This interruption undermined Hawkins' authority in front of his students.

31. On February 14, 2024, Defendant Bailey led a PLC meeting. During this meeting, she raised her voice and asserted that Hawkins was "hurting" students by not immediately teaching them calculator methods. Hawkins reiterated the district's CCMR (College, Career, and Military Readiness) goals and explained his pedagogical approach, which prioritized building a strong foundation in graphing by hand before introducing calculator techniques. This public criticism by Defendant Bailey, in front of colleagues was unprofessional and humiliating.

32. Furthermore, during PLC meetings, Defendant Bailey repeatedly made remarks about the students in Hawkins' ECHS Honors Algebra 2 classes, stating that "those students are labeled Honors but they are not Honors."

4. First Reassignment (February - March 2024):

33. February 27, 2024, Hawkins received an email from Defendant Kristi Primus, Former Associate Principal of Teaching & Learning, informing him that Ms. Shnell Jackson had been reassigned to his Algebra 1 classes during 1st, 2nd, and 4th periods and that she would "conduct [his] instruction" during those times (Exhibit 12).

34. The email stated that this reassignment was being made "in efforts to get our students ready for the EOC and meet our 90-65-20 goal" (Exhibit 12). The email further stated that Hawkins would "continue to facilitate the aggressive monitoring, provide group or individualized instruction, and all other tasks (attendance, grades, maintaining classroom discipline etc.)" (Exhibit 12).

35. This reassignment effectively removed Hawkins from his primary role as the instructor for his Algebra 1 classes and relegated him to a supporting role. The email provided no prior warning, no explanation of any deficiencies in Hawkins' teaching, and no opportunity for him to be heard before this significant change to his job duties was implemented.

36. The specific mention of the "90-65-20 goal" in the February 27, 2024 email (Exhibit 12) reveals that the reassignment of Ms. Jackson to Hawkins' classroom was motivated by a desire to improve short-term test scores rather than to address any legitimate pedagogical concerns. This focus on test scores at the expense of Hawkins' professional standing and due process rights further supports the inference of pretext and retaliation.

37. Defendant Primus's involvement in sending the February 27, 2024 email (Exhibit 12), coupled with her presence at the November 7, 2023 meeting where the unlawful lesson plan requirements were discussed, demonstrates her knowledge of and participation in the discriminatory and retaliatory actions taken against Hawkins.

38. Primus sent an email to Hawkins on March 8, 2024, instructing him to resume teaching his students. This occurred on the same day that the level 1 grievance was filed.

TINA's Sudden Announcement and Link to Illegal Lesson Plans

39. On March 06, 2024 Hawkins received an email from Jasen Campbell stating he was being placed on a growth plan. (Exhibit 13)

40. Hawkins received no prior notice of alleged instructional problems before March 6; nor did administrators produce any walkthrough documents justifying the Plan. (Exhibit 14)

41. This abrupt action came on the heels of Hawkins' ongoing protests about the unlawfully excessive lesson-plan demands, indicating the TINA was direct retaliation for his speaking out.

March 21 Meeting with Starling: Unsubstantiated Domains and Lack of Evidence

42. During a March 21, 2024 meeting (Exhibit 15), Defendant Starling attempted to explain the TINA Plan's requirements. She cited the "I Do, We Do, You Do" model yet could not

13

explain T-TESS domains listed to legitimate instructional shortfalls. Instead, she criticized Hawkins for not submitting full lesson slides.

43. In her own words:

"…I don't see in the lesson planned out the I do, we do, you do. I don't see what you're putting in front of students. I don't have access to ALEKS…You sent an agenda to me… You never submitted the lesson to me."

44. Hawkins explicitly stated that the TINA Plan "felt like retaliation," emphasizing that the District's push for highly detailed lesson plans was supposed to be resolved or completed "in PLCs," yet no such joint development had ever occurred. Instead, the administration blamed Hawkins for not producing lesson materials that, by state law, he was not obligated to create in the first place.

Starling's Admission of Joint Collaboration with Campbell

45. Starling also acknowledged that she and Principal Campbell "worked on" the TINA Plan together—confirming its coordinated nature rather than a neutral, data-driven intervention.

46. This collaboration, combined with their inability to provide concrete examples of Hawkins' alleged failures, underscores that the Plan was devised not to remedy genuine deficiencies but to punish Hawkins for raising legal objections about excessive paperwork.

Emails and Separate Meeting with Campbell Confirm Pretext

47. In follow-up email exchanges and a separate discussion (Exhibit 13) , Hawkins asked Campbell to identify which specific classroom observations supposedly supported the TINA Plan.

48. Campbell likewise offered no substantive answer, further highlighting that the TINA's cited T-TESS domains lacked any documented basis. Instead, it was another effort to pressure Hawkins into complying with the District's unlawful lesson-plan demands—or face escalating discipline.

Implications Under the First Amendment

49. As a public-school teacher, Hawkins held a First Amendment right to speak on matters of public concern—namely, that District officials were violating state law with their lesson-plan requirements.

50. The District's imposition of a TINA Plan after Hawkins' objections establishes a causal connection between his protected speech and the adverse employment action—an archetypal violation of free speech protections for public employees.

Retaliatory Purpose Confirmed by Lack of Follow-Up

51. Soon after Hawkins challenged the Plan, Campbell rescinded it (Exhibit 13) without explaining whether Hawkins had ever corrected any alleged deficiencies—further evidence the Plan was never intended for real improvement.
52. The abrupt implementation of the TINA Plan, Starling's admission of collaboration with Campbell on the document (with neither able to explain the listed domains' deficiencies), and the lack of documented instructional deficiencies all point to a pretext designed to punish Hawkins for exercising his First Amendment rights.

5. First Level 1 Grievance and Response (March - April 2024)

53. On March 08, 2024, Hawkins filed a Level I grievance (Exhibit 16) challenging the following actions: (1) the imposition of unlawful lesson plan requirements; (2) the issuance of the Formal Letter of Concern (Exhibit 11); (3) the reassignment of Ms. Jackson to his classroom; and (4) the placement on the TINA plan.
54. A Level I Grievance Hearing was held on March 28, 2024, with Principal Jasen Campbell presiding as the hearing officer.
55. On April 8, 2024, Principal Jasen Campbell issued a written response to the Level I Grievance (Exhibit 17).
56. In the April 8, 2024 response, Principal Jasen Campbell acknowledged that the "write-up provided to Mr. Hawkins was based on the lesson plan" and granted the "removal of the write up for the lesson plan from the teacher's file" (Exhibit 17). The decision further stated that "the campus does not require a lesson plan, but an actual lesson which is student facing" (Exhibit 17). This constituted an admission that the disciplinary action against Hawkins was based on an unlawful requirement that violated Texas Education Code Section 11.164(a)(6) and Board Policy DLB.
57. Principal Jasen Campbell also admitted in the April 8, 2024 response that the reassignment of Ms. Jackson to Hawkins' classroom "should not have occurred" and that it was "communicated among administrators for the reassignment not to occur" (Exhibit 17). This admission confirmed that the reassignment was a mistake and not based on any legitimate pedagogical concerns.
58. Despite these admissions, the April 8, 2024 response did not address the underlying issues of discrimination and retaliation, nor did it provide any meaningful remedy for the harm caused to Hawkins by the write-up, the TINA plan, or the reassignment of Ms. Jackson. It also failed to acknowledge or address the violation of Hawkins' due process rights.

15

59. The April 8, 2024, response from Principal Jasen Campbell further confirmed the retaliatory nature of the subsequent reassignment in August 2024. Despite admitting that the reassignment of Ms. Jackson should not have occurred and removing the write up, the district later subjected Mr. Hawkins to a similar form of adverse action.

6. Enforcement of School Policies, Retaliatory Reassignment to DeSoto High School, and Denial of Due Process (August 2024 - Present):

60. During the 2024-2025 school year, Hawkins was subjected to further discriminatory and retaliatory treatment related to his enforcement of school policies, including dress code, ID, and academic integrity.

61. On August 26, 2024, Hawkins met with Dr. Leon Darden, Director of ECHS & P-TECH, to discuss multiple concerns regarding administrative policies and their inconsistent enforcement. The meeting began with a discussion about a student refusing to remove their headphones, highlighting broader issues of student noncompliance. Dr. Darden inquired about the high volume of student schedule change requests from Hawkins' classes, signaling a pattern of students and parents attempting to avoid stricter academic and behavioral expectations.

62. Hawkins' enforcement of policies regarding dress code, IDs, tardiness, and cellphone usage led to students feeling unfairly treated compared to their peers in other classrooms with more lenient teachers. This discrepancy fueled the "it's only you" student movement, highlighting the inconsistent expectations among teachers. He noted that this inconsistency fostered resentment and encouraged students to seek reassignment rather than comply with existing rules. Dr. Darden also questioned Hawkins' grading practices, specifically the frequency of grades assigned. Hawkins defended his approach, emphasizing that warm-ups, demonstrations of learning, and scratch work were all tools to enhance student engagement and accountability.

63. A key issue discussed was academic dishonesty, as Hawkins detailed the lack of integrity checks and consequences for cheating in other classes. He highlighted that this culture of dishonesty was so pervasive that some students who had complained about his grading admitted to cheating themselves. Dr. Darden acknowledged the validity of these concerns and recognized the structured approach Hawkins used to ensure accountability in his classroom. However, this meeting underscored the growing tension between Hawkins and the administration, as it became clear that his enforcement of policies—rather than violations of policy—was the root of parent and student complaints.

64. On August 29, 2024, Hawkins assigned grades of zero to students who engaged in academic dishonesty on the Chapter 1 Test, in strict accordance with Board Policy EIA (Local), which mandates grade penalties for such conduct based on the professional employee's judgment.

65. On August 30, 2024, Defendant Jasen Campbell, acting as the superintendent's designee under Board Policy DK (Exhibit 18), reassigned Hawkins from ECHS Honors Algebra 2 and ECHS Honors Geometry at DeSoto Early College High School to regular Algebra 2 at DeSoto High School. This reassignment was not merely a change in course

16

assignments within the same school; it involved a transfer from DeSoto Early College High School, a distinct and specialized program, to DeSoto High School, two distinct educational organizations within DeSoto ISD. Principal Jasen Campbell cited an "overwhelming" number of complaints as the reason for this drastic action.

66. Mr. Campbell presented a video to Mr. Hawkins. The video showed students lined up outside of Mr. Hawkins' classroom waiting to be admitted. As Mr. Hawkins checked IDs and dress code compliance, students from other classes complained about receiving zeros on their tests as they passed by.

67. DeSoto Early College High School is a separate and distinct educational program within DeSoto ISD, with its own specialized curriculum, student body, and academic goals. It is designed for high-achieving students seeking to earn both a high school diploma and an associate's degree concurrently. Reassignment from DeSoto Early College High School to DeSoto High School constitutes a significant change in teaching environment, and academic expectations, effectively amounting to a demotion.

68. Principal Jasen Campbell indicated that the decision to reassign Hawkins was not his alone and that "higher authorities and the board were involved." This statement suggests that the decision had the approval or involvement of higher-level administrators and potentially even the school board, further supporting the claim that the reassignment was an official action of DeSoto ISD.

69. This reassignment was made without providing Hawkins with any prior notice of the specific complaints, any details about the allegations, or any opportunity to respond to the complaints.

70. Other teachers at DeSoto High School, specifically those who are not Black males, are not held to the same standard of enforcement regarding dress code, ID, and academic integrity and have not faced similar disciplinary actions or reassignments for being more lenient in these areas.

71. The administration, without proper investigation, changed the grades of students who had engaged in academic dishonesty on the Chapter 1 Test to 100 on their progress reports and report cards. This action undermined Hawkins' authority, rewarded academic dishonesty, violated Texas Education Code Section 28.0214 (which prohibits changing a teacher's grade without proper investigation and removing a teacher for the purpose of changing grades), violated Board Policy EIA (Local) (Exhibit 19) and Board Policy EIA (Legal) (Exhibit 20) and further damaged his professional reputation by implying that his grading practices were unfair or inaccurate.

72. The reassignment described in the February 27, 2024 email (Exhibit 12), which effectively removed Hawkins from his teaching duties, coupled with the August 30, 2024 reassignment from ECHS Honors courses to regular Algebra 2, demonstrates a pattern of retaliatory actions taken against Hawkins for his protected activities.

73. Many of these complaints were believed by Hawkins to be frivolous and potentially AI-generated.

7. Parent Email (September 5, 2024)

74. Prior to and independent of Hawkins' second Level 1 Grievance, on September 5, 2024, a parent of a student in Hawkins' ECHS class, sent an email to Defendant Dr. Darden expressing "deep concern and disappointment" regarding Hawkins' removal from his teaching position (Exhibit 21) &  (Exhibit 22).

75. In her September 5, 2024 email, the parent stated that Hawkins had been "a significant asset to [her] daughter's education," helping her achieve a Masters level score on the STAAR exam after years of struggling with math (Exhibit 21).

76. The parent questioned the rationale for the reassignment, stating that she felt Hawkins "should not have been moved based on complaints without exploring alternative solutions" and expressed concern about the qualifications of his replacement (Exhibit 21).

77. The parent also questioned the administration's decision to change the grades of students who had engaged in academic dishonesty, and requested a schedule change to allow her daughter to remain in Hawkins' class (Exhibit 21).

78. The parent's email directly contradicted the administration's claim that the reassignment was justified by an "overwhelming" number of complaints and provided further evidence that the reassignment was retaliatory, arbitrary, and capricious.

79. On November 20, 2024, the parent forwarded her September 5, 2024 email to Hawkins in response to his inquiry about what the administration had told parents regarding his reassignment (Exhibit 21) &( Exhibit 12). In her November 20, 2024 email, the parent stated that Dr. Darden had mentioned the decision to reassign Hawkins was "student-led, student-inspired, and not based on parent complaints," a claim she found confusing given his acknowledgment of cheating by some students (Exhibit 21).

8. Second Level 1 Grievance and Response (September - October 2024)

80. On September 9, 2024, Hawkins filed a second Level 1 Grievance (Exhibit 23) challenging his reassignment from ECHS Honors Algebra 2 and ECHS Honors Geometry at DeSoto Early College High School to regular Algebra 2 at DeSoto High School.

81. In this grievance, Hawkins detailed the retaliatory nature of the reassignment, the lack of due process, the involvement of "higher authorities and the board," the changing of student grades to 100s despite evidence of cheating, and the challenges he faced in establishing classroom expectations with his new students (Exhibit 23). He requested reinstatement to his previous teaching assignment at DeSoto Early College High School, a formal investigation into the complaints against him, and an apology letter to the parents of his students (Exhibit 23).

82. A Level 1 Grievance Hearing was held on September 20, 2024, with Defendant Dr. Leon Darden presiding as the hearing officer.

83. On October 14, 2024, Defendant Darden issued a written response to the Level 1 Grievance (Exhibit 23).

84. In the October 14, 2024 response, Defendant Darden summarized Hawkins' grievance, including his claims regarding the reassignment, the stated reasons for it by Principal Jasen Campbell, the involvement of "higher authorities and the board," the changing of student grades, and the challenges Hawkins faced with his new students (Exhibit 23). Dr.

18

Darden also acknowledged the existence of the video showing students expressing frustration about Mr. Hawkins' enforcement of the dress code and academic integrity policies.

85. Defendant Darden cited Board (Exhibit 18) to support Principal Jasen Campbell's decision to reassign Hawkins, emphasizing the superintendent or designee's authority to reassign personnel when deemed "in the best interest of the district" (Exhibit 23).

86. Defendant Darden denied the grievance "in its entirety," claiming it was "without merit" based solely on Policy DK (Exhibit 23).

87. The October 14, 2024 response provided no explanation or rationale for this decision beyond citing the policy. It did not address whether any investigation into the complaints was conducted, whether the complaints were found to be valid, or whether the reassignment was justified under the "best interest of the district" standard, given the circumstances, particularly Hawkins' prior assignment to the specialized Early College High School program and the negative impact of the reassignment on that program and its students. The response also failed to acknowledge that policy FNG (Exhibit 6) requires that complaints be handled at the lowest level. The response did not address the cheating or grade changes. The response further failed to address the due process violations inherent in the reassignment process, including the lack of notice, the lack of opportunity to respond to specific allegations, and the absence of any meaningful investigation. The response also failed to address or acknowledge the involvement of "higher authorities and the board" as alleged by Principal Jasen Campbell.

88. The October 14, 2024 response failed to provide Hawkins with any meaningful due process. Hawkins was not given details of the complaints against him, an opportunity to respond to the allegations, or any explanation for why his reassignment from the Early College High School to DeSoto High School was deemed to be in the best interest of the district. The decision was based solely on the assertion of Principal Jasen Campbell, without any independent investigation or consideration of Hawkins' perspective.

89. The October 14, 2024 response, authored by Defendant Darden, demonstrates a deliberate indifference to Hawkins' due process rights. By upholding the reassignment based solely on Principal Jasen Campbell's authority under Policy DK, without any inquiry into the merits of the complaints or the best interest of the district, and without addressing the involvement of "higher authorities and the board," Defendant Darden ratified the due process violations and further contributed to the hostile work environment and damage to Hawkins professional reputation. Moreover, Defendant Darden's denial of the grievance, despite the clear evidence of retaliation and the prior admission of error by Principal Campbell, constituted a further act of retaliation against Hawkins for his protected activity of filing grievances and challenging the administration's unlawful actions.

9. Level II Grievance and Response (October - November 2024)

90. On October 15, 2024, Hawkins filed a Level II Grievance (Exhibit 23) appealing the October 14, 2024 denial of his Level I Grievance regarding his reassignment.

19

91. A Level II Grievance Hearing was held on October 25, 2024, with Defendant Gene Morrow, Jr. presiding as the hearing officer.

92. Hawkins asserted during the meeting that the grievance process was a sham. He had requested the level one record from HR Director Larry Davis on October 24, 2024 (Exhibit 24), but Davis told him on the phone that it didn't contain any supplementary documentation about the complaints or the reasoning for the reassignment. This led Hawkins to believe that he would not receive due process and was fighting an "invisible enemy."

93. On November 11, 2024, Defendant Morrow issued a written response to the Level II Grievance (Exhibit 25).

94. The November 11, 2024 response confirmed that a Level II Grievance Hearing was held and that Hawkins represented himself (Exhibit 25).

95. The response reiterated that complaints from parents and students regarding Hawkins had been received by both Principal Jasen Campbell and Dr. Darden, and that some complaints were made to the District Administrative offices (Exhibit 25). It again claimed that these complaints were "validated when campus administrators spoke directly to the parents and students" (Exhibit 25).

96. The November 11, 2024 response, like the Level I response, cited Board Policy DK (Exhibit 18) as the sole justification for the principal's authority to reassign Hawkins (Exhibit 25).

97. Defendant Morrow stated that his decision was based on a "completed independent investigation" (Exhibit 25). However, the response provided no details about this investigation, such as who conducted it, when it was conducted, what methods were used, what evidence was considered, or what specific findings were made. The "independent investigation" was not included in the record provided to Hawkins, in violation of Board Policy DGBA (Local).

98. Defendant Morrow denied the Level II Grievance "in its entirety," upholding the Level I decision and denying all of Hawkins' requested relief (Exhibit 25).

99. The November 11, 2024 response, like the previous grievance responses, provided no explanation or rationale for the decision beyond citing Policy DK. It did not address whether any investigation into the substance of complaints was conducted, whether the complaints were found to be valid, or whether the reassignment was justified under the "best interest of the district" standard, particularly given Hawkins' prior assignment to the specialized Early College High School program and the negative impact of the reassignment on that program and its students. The response also failed to acknowledge that policy FNG encourages that complaints be handled at the lowest level. The response failed to address cheating and the grade changes. The response further failed to address the due process violations inherent in the reassignment process, including the lack of notice, the lack of opportunity to respond to specific allegations, and the absence of any meaningful investigation. The response also failed to address or acknowledge the involvement of "higher authorities and the board" as alleged by Principal Jasen Campbell.

100.    The November 11, 2024 response failed to provide Hawkins with any meaningful due process. The "independent investigation" was not disclosed to Hawkins, and he was not

given any opportunity to respond to its findings, if any. The decision was based solely on the unsubstantiated complaints and the assertion of Principal Jasen Campbell's authority, without any independent investigation or consideration of Hawkins' perspective. The decision also failed to acknowledge or address the fact that Hawkins' reassignment removed him from the specialized Early College High School program, a significant change in his teaching assignment with the implication of wrongdoing.

101.    The November 11, 2024 response, authored by Defendant Morrow, demonstrates a deliberate indifference to Hawkins' due process rights. By upholding the reassignment based solely on Principal Jasen Campbell's authority under Policy DK and an "independent investigation" that was not disclosed or explained, Defendant Morrow ratified the due process violations and further contributed to the hostile work environment and damage to Hawkins professional reputation. Furthermore, Defendant Morrow's denial of the Level II Grievance, in light of the evidence presented by Hawkins and the prior admissions of error, constituted an independent act of retaliation against Hawkins for continuing to pursue his rights through the grievance process.

## "No Failing Grades for Students with Subs" Directive and Escalation of Complaints

102.    On or around September 20, 2024, Principal Jasen Campbell, acting through Assistant Principal Christopher Polk, imposed an unlawful "no failing grades for students in classes with substitute teachers" directive. Defendant Polk openly cited the need for certain "football players to play," illustrating the administration's readiness to sacrifice genuine academic standards for athletic eligibility. This instruction lacked any legitimate pedagogical basis and contributed to widespread grade inflation.

103.    Hawkins' insistence on upholding academic and disciplinary standards, including dress code enforcement, contrasted with the students' expectations of minimal effort and guaranteed passing grades, leading to conflict. Students, aware of the administration's tendency to appease complaints,  requested schedule changes to escape Hawkins' class and rejoin a more lenient environment. This created a hostile environment where students openly cheated and bragged about receiving inflated grades, further undermining Hawkins' authority. The district's disregard for legitimate grading practices and discipline fostered a toxic culture where students felt entitled to effortless grades, making Hawkins' job untenable and reputationally damaging.

10. October 30, 2024 Incident: Classroom Disruptions, Administrative Interference, and Hostile Environment

104.    On October 30, 2024, at approximately 10:45 AM, another incident occurred in Hawkins' classroom that further demonstrated the hostile work environment, the lack of administrative support for his enforcement of school policies, damage to his professional reputation, and the undermining of his authority by other staff members.

21

105. Three students, K.M., N.W. , and J.R., entered Hawkins' classroom out of dress code (Exhibit 26). K.M. had no collar and no ID, N.W. was wearing sweats, and J.R. was wearing athletic pants. These items were specifically prohibited under the 2024-2025 DeSoto ISD Student Handbook (Exhibit 27).

106. Hawkins followed established procedures by sending the students to the counseling office to obtain IDs and receive dress code referrals, in accordance with the procedures outlined by Ms. Fredericka Jackson during class meetings and as outlined in the 2024-2025 DeSoto ISD Student Handbook (Exhibit 27) and the 2024-2025 Campus Employee Handbook (Exhibit 28).

107. However, Defendant Jorge Medina, a counselor at DeSoto High School, intervened and reprimanded Hawkins for sending the students to the office. He instructed Hawkins to allow the students into the classroom without addressing the dress code violations, stating he would only address the ID issue (Exhibit 26). This action directly contradicted the DeSoto High School Handbook, which states that students without IDs should not be allowed in class (Exhibit 27). It also violated the established procedure of allowing students in violation of the dress code to correct the problem or contact their parents, as outlined in the Student Handbook (Exhibit 27).

108. Upon returning to the classroom, K.M. made several disruptive and disrespectful comments to Hawkins, including, "They were talking about you in the office...how you about to get fired...that's why you were removed from the early college side, they can't stand you" (Exhibit 26). K.M. continued to disrupt the testing environment by repeatedly requesting to leave the classroom.

109. Student N.W. also refused to sit in her assigned seat and disrupted the testing environment. Hawkins gave her the option to either return to her seat and work on her test or be removed from the classroom. She chose to leave (Exhibit 26).

110. In an email sent to Defendant Christopher Polk on October 30, 2024, Hawkins documented the incident, cited the DeSoto ISD Student Code of Conduct section regarding "Disregard for Authority," and formally requested intervention (Exhibit 26).

111. Hawkins stated that "The students' blatant disregard for school policies and my authority as their teacher, coupled with Mr. Medina's apparent unwillingness to enforce or assist with policies, has created a hostile learning environment" (Exhibit 26).

112. Defendant Medina's interference with Hawkins' enforcement of school policies, his failure to follow established procedures as outlined in the Student Handbook (Exhibit 27), and his undermining of Hawkins' authority in front of students directly contributed to the hostile work environment and emboldened students to defy Hawkins and disrupt the learning process.

113. This incident further demonstrates the hostile work environment that Hawkins was subjected to, the lack of administrative support for his enforcement of school rules, and the undermining of his authority by other staff members. It also provides further evidence of retaliation, as K.M.'s comments directly referenced Hawkins' prior reassignment from the Early College High School and suggested that further adverse actions were being planned.

114.    Defendant Medina's actions also violated the procedures outlined in the 2024-2025 Campus Employee Handbook (Exhibit 28), which contributed to the inconsistent and arbitrary enforcement of school policies and further undermined Hawkins' authority.

115.    Defendant Medina, in his capacity as a counselor, had a duty to uphold school policies and support teachers in their enforcement. His actions on October 30, 2024, directly contravened this duty and contributed to the hostile work environment.

## H. Gender-Based Discriminatory Reassignment and Administrative Awareness of Bias

### 1. Replacement by a Less Qualified, Uncertified Female Teacher Despite Plaintiff's Experience

116.    On February 7, 2025, Plaintiff Matthew Hawkins learned that his replacement for the Honors Algebra 2 classes at DeSoto Early College High School (ECHS) was a female teacher who, while qualified to teach, had not yet obtained her full state certification.

117.    Plaintiff was directly informed by the replacement herself that she was assigned only three classes with four conference periods daily, despite receiving a full-time teacher's salary.

118.    In contrast, Plaintiff—a fully certified, highly experienced, and award-winning educator—had carried a full teaching load before being reassigned.

119.    While the replacement may have met minimum qualifications to teach, she lacked full certification, which raises serious concerns about whether the decision to replace Plaintiff with an uncertified teacher was truly in the best interest of students.

120.    The decision to reduce the replacement's workload so significantly also calls into question whether this reassignment was based on student needs or whether it was an example of preferential treatment benefiting a female educator over a male one.

121.    The disparity in treatment and workload assignments raises the strong inference that Plaintiff's gender was a motivating factor in his reassignment. Rather than retaining a fully certified and proven educator, the administration chose to replace him with an uncertified teacher under far more favorable conditions.

### 2. Administration's Acknowledgment of Gender-Based Disparities in Leadership

122.    Evidence that the administration itself recognized that male staff members were being treated unfairly comes directly from a mandatory, men-only meeting ordered by Principal Jasen Campbell.

123.    On January 6, 2025, Principal Campbell required all male staff to attend a mandatory meeting called "Men's 33." (Exhibit 29)

124.    The meeting's stated purpose was to address perceived gender-based disparities in leadership and professional opportunities for male employees.

23

125. During the meeting, Principal Campbell made direct statements acknowledging that men were being sidelined in leadership roles and that: (Exhibit 30)
   a. "Society has forgotten about the brother."
   b. "We have to come together as men and lead the campus."
   c. "We love our women, we love our children, but it's a man's world."
126. This explicit acknowledgment that men on campus were facing professional disadvantages is highly relevant because it shows:
   a. The administration was aware that gender-based discrimination against male educators was occurring.
   b. Rather than correcting it, the administration continued to engage in and reinforce discriminatory practices, including Plaintiff's reassignment.
127. If the administration openly recognized that men were being marginalized, why did it then take an adverse employment action against Plaintiff in favor of a less certified female teacher?
128. This undermines the credibility of any claim that Plaintiff's reassignment was based on performance or best interest and instead strongly supports an inference of gender bias.

## 3. Procedural Irregularities and Disparate Treatment in Administrative Decision-Making

129. Further undermining the legitimacy of Plaintiff's reassignment are multiple procedural failures and top-down directives that bypassed standard decision-making channels.
130. At the time of Plaintiff's reassignment, Dr. Leon Darden—the Director overseeing ECHS—was out on sick leave and did not participate in the decision-making process.
131. Despite Dr. Darden's absence, the reassignment was executed, raising concerns about who truly made the decision and whether proper protocol was followed.
132. ECHS Principal Joslyn Starling was the highest-ranking administrator present on the day the decision was implemented, raising questions about whether she played a role in carrying out a directive to remove Plaintiff, despite his qualifications.
133. During the Level 1 Grievance, Principal Jasen Campbell stated that "higher administrators" above him were responsible for the decision and implying that his hands were tied.
134. At the Level 3 Grievance Hearing, Superintendent Dr. Usamah Rogers further ensured that Plaintiff was denied a meaningful opportunity to challenge the reassignment, introducing new, unsubstantiated claims to justify the decision—claims that had never been raised in prior proceedings.
135. This lack of due process and shifting justifications is consistent with pretextual reasoning often used in discriminatory employment decisions. If the reassignment had been based on legitimate concerns, proper documentation, procedural fairness, and transparency would have been present.

## Hawkins Faced Racially Biased Expectations and a Double Standard in Policy Enforcement

136.  Throughout his tenure at DeSoto ISD, Matthew Hawkins was subjected to racially discriminatory treatment, culminating in repeated adverse employment actions based not on performance, but on racial stereotypes, parental bias, and administrative ratification of these biases.

137.  As a Black male educator, Hawkins faced a double standard in his enforcement of school policies, academic integrity, and classroom discipline. Parents, students, and school administrators repeatedly communicated an expectation that Hawkins should be more lenient toward Black students simply because of their shared racial identity.

138.  When Hawkins refused to conform to these racially biased expectations, he became the target of manufactured complaints, unsubstantiated allegations, and retaliatory disciplinary actions, including formal write-ups, increased administrative scrutiny, and reassignments.

139.  Rather than addressing the racial bias inherent in these complaints, the DeSoto ISD administration instead validated and acted upon them—leading to Hawkins' first reassignment, subsequent punitive oversight, and ultimately, his removal from his position at DeSoto Early College High School.

## Ms. R Complaint (September 17, 2024) – Expecting Leniency for Black Students (Exhibit 31)

140.  On September 17, 2024, Hawkins received a phone call from Ms. R, the mother of student E.J.C., regarding referrals issued to her son for dress code violations.

141.  Ms. R explicitly racialized the issue by stating, "First of all, those are Black children that go to that school."

142.  Ms. R further stated that Hawkins was being "overbearing" for enforcing dress code policies, implying that he should overlook these violations for Black students. When Hawkins questioned whether Ms. R believed Black students should not be held to dress code expectations, she insisted that he was "looking for reasons" to issue referrals rather than enforcing school policy.

143.  This expectation—that Hawkins, as a Black educator, should ignore behavioral and policy violations by Black students—was not placed on non-Black educators. It reinforced a racialized assumption that Black teachers should excuse noncompliance rather than hold students accountable.

144.  Ms. R also referenced Hawkins' previous reassignment, stating, "I heard that you got removed from the other whatever. Was it the STEM or something? Or they sent you back, they sent you to the high school because of your overbearing."

145.  Rather than recognizing the racial bias in Ms. R statements, school administrators continued to validate similar complaints against Hawkins, reinforcing a pattern of discrimination.

## 2. J.R Father's Complaint (November 11, 2024) – Rejecting Structure and Academic Responsibility  (Exhibit 32)

146.    On November 11, 2024, Hawkins received an aggressive complaint from the father of student J.R., who objected to Hawkins holding his daughter accountable for completing work during class time rather than allowing her to watch Netflix.

147.    Robinson's father criticized Hawkins for "treating these kids like it's an institution," further stating, "That's why I put schools up now. Public schools are trash." His argument was not based on any claim of unfairness but rather an objection to the expectation that students should use class time productively.

148.    Robinson's father made it clear that he viewed classroom discipline and structure as oppressive, rather than educationally necessary. When Hawkins explained that allowing students to remain off-task during class would only create problems later, Robinson's father dismissed academic structure altogether, stating, "Y'all need to stop treating these kids like they can't do nothing."

149.    This complaint mirrors the logic behind previous grievances—namely, that Hawkins was expected to prioritize racial identity over his professional duty as an educator. Rather than addressing the clear bias in these complaints, DeSoto ISD continued to treat them as legitimate concerns, further justifying adverse actions against Hawkins.

150.    J.R., the same student from the Medina incident, was given a lateral schedule change to the sub's room. She now roams the hallways out of dress code during class time. J.R. knocks on my door and gloats to the students who remain.

## 3. CD's Complaint (October 17, 2024) – Community Bias and the Expectation of Special Treatment (Exhibit 33)

151.    On October 17, 2024, Hawkins was made aware that the parent of student C.D. had scheduled a meeting with administrators to request a schedule change. Prior to the meeting, C.D. had been openly complaining about Hawkins' enforcement of dress code policies and classroom attendance expectations, particularly Hawkins' refusal to allow him to roam freely between classrooms.

152.    C.D. became more rebellious as the meeting date approached, bragging to other students that he would soon be transferred to a substitute-led classroom where he would not be held accountable for attendance or behavior.

153.    C.D.'s mother later admitted that she had initially been discouraged from speaking directly with Hawkins by school coaches and other parents, who had pushed her toward requesting a schedule change instead of addressing any concerns with Hawkins.

154.    On the day of the meeting, C.D.'s mother began the process of transferring her son out of Hawkins' class without ever having heard Hawkins' side of the issue.

26

155. When Hawkins arrived the parent stated he was no longer needed. However, after Mr. Polk facilitated a discussion and Hawkins was allowed to present the full context of C.D.'s behavioral and academic struggles, C.D.'s mother realized that her son's complaints were misleading and that allowing him to transfer would enable his negative behavior.

156. C.D.'s mother ultimately reversed her decision, stating that Hawkins was "just a teacher that wants the best for his students" and that the way her son described the situation had been completely false.

157. She also acknowledged that her perception of Hawkins had been shaped by external influences and misinformation spread by others in the school community. She denied her son's request for a schedule change and reaffirmed that he needed a "strong Black man to guide him," given that he had recently lost his father.

## 4. D.T Family Complaint (January 2025) – Racialized Expectations of Male Educators (Exhibit 34)

158. During a parent-teacher meeting in January 2025 regarding student D.T., T's parents expressed concerns about Hawkins' disciplinary approach, particularly his enforcement of dress code and classroom policies.

159. T's father framed the discussion within a broader racial context, stating that "we all Black men in here" and emphasizing a village-like responsibility for raising young Black males. His expectation was that Hawkins should take on a mentorship role rather than an authoritative one, reinforcing the stereotype that Black male educators should be father figures rather than enforcers of institutional rules.

160. T's mother further expressed dissatisfaction with Hawkins' strict policy enforcement, stating that she felt his approach was overly rigid. However, after a full discussion facilitated by Mr. Polk, T's father acknowledged that Hawkins was ultimately trying to prepare his students for the real world and that D.T needed to take more responsibility for his actions.

161. Despite the resolution of the D.T family's concerns, the complaints against Hawkins—centered around the belief that Black male educators should be nurturing rather than enforcing rules—exemplify the ongoing racial biases shaping the parental grievances that led to Hawkins' reassignments.

## Administrative Ratification of Racial Discrimination

162. Instead of addressing the racial bias driving these complaints, DeSoto ISD administrators legitimized them through repeated adverse employment actions against Hawkins.

163. By taking employment actions based on the unfounded, racially biased complaints of parents, DeSoto ISD violated Title VII of the Civil Rights Act, 42 U.S.C. § 1981, and the Fourteenth Amendment's Equal Protection Clause.

164. Instead of standing by Hawkins' lawful enforcement of school policies, Defendants ratified the racial discrimination by appeasing parents who objected not to Hawkins' performance but to his refusal to conform to race-based expectations.

165. Hawkins was not targeted for failing to fulfill his duties as an educator—he was targeted for refusing to conform to racial stereotypes about Black teachers and Black students.

166. By allowing race-based parental complaints to dictate employment decisions, DeSoto ISD engaged in a clear pattern of racial discrimination and retaliation, violating Hawkins' constitutional and statutory rights.

# INCONSISTENT POLICY ENFORCEMENT, RETALIATION, AND HOSTILE WORK ENVIRONMENT

## A. Disparate Enforcement of ID and Dress Code Policies at ECHS

167. Throughout the 2023–2024 school year at Early College High School (ECHS), administration persistently failed to enforce the official DeSoto ISD ID policy. Under district guidelines, students without ID cards had to purchase a temporary ID for $1 or face consequences. Yet, at ECHS, students regularly received free temporary IDs with no penalty. This practice effectively undercut the policy's intent, signaling that enforcement was a matter of administrative whim rather than a binding rule.

168. By refraining from uniformly applying ID rules while Hawkins attempted to comply with them, ECHS administrators fostered an environment where students viewed his enforcement efforts as petty or intrusive. Instead of perceiving Hawkins' stance as professional adherence to district mandates, students came to resent him because "it's only you". Whether Defendant Starling deliberately sanctioned this free-ID approach or simply disregarded the policy is unclear. In either scenario, ECHS's inconsistent enforcement damaged Hawkins' authority and disrupted his ability to maintain classroom discipline.

## B. Hawkins' Transfer and Expectation to Enforce Policy Without Administrative Support

169. After reassigning Hawkins from ECHS to DeSoto High School, Assistant Principal Christopher Polk told Hawkins to admit all students—even those flagrantly violating dress code—into class, contradicting official DeSoto ISD policy. Under that policy,

students out of dress code should phone home for proper attire or be assigned to In-School Suspension (ISS) (Exhibit 28).

170. Polk justified this deviation by pointing to staff shortages and an unavailable ISS room, effectively shifting the entire burden onto Hawkins. Instead of imposing discipline or seeking alternative strategies, Polk directed Hawkins to compile a list of out-of-dress-code students, contact parents, and submit the information for later review—a process that proved both ineffective and a departure from standard procedure. As a result, students continued violating dress code with impunity, fully aware that Hawkins had no real authority behind his directives.

171. By insisting on strict enforcement yet refusing to endorse Hawkins' measures, the District essentially set Hawkins up for failure and permitted students to defy rules without consequence. Unsurprisingly, this tension encouraged further disrespect from students, who realized Hawkins had no real support in enforcing policy. The mismatch between official policy and actual practice magnified Hawkins' frustrations, undermining his role and fueling a retaliatory environment.

## C. Administrative Contradictions as Evidence of Hostile Work Environment and Retaliation

172. Conflicting Approaches Across Campuses
The inconsistent directives Hawkins encountered epitomize both a hostile work environment and retaliatory intent:
   a. At ECHS, administration refused to apply ID rules, giving out free temporary IDs with no penalty. Yet, Hawkins was expected to enforce policy in isolation—leading students to see him as the only "stickler" for rules ("it's only you").
   b. After transferring Hawkins to DeSoto High, administrators demanded firm enforcement of IDs and dress code, only to undercut him by letting non compliant students remain in class.

173. Aware of this inconsistency, students challenged Hawkins' efforts, ridiculing his enforcement while receiving implicit reassurance from administrators that consequences would be minimal. This culture of selective or nonexistent policy enforcement contributed to an ongoing hostile work environment, making it nearly impossible for Hawkins to maintain order. When Hawkins persisted in applying district rules—such as ID requirements or the refusal to reward cheating—he faced further isolation and penalties, consistent with retaliation for upholding standards that the District itself ignored.

174. By selectively enforcing rules and never backing Hawkins, administrators degraded his credibility, enabling students to defy him without fear of discipline. In short, the District's contradictory stance—demanding compliance from Hawkins yet undermining his enforcement—represents a broader pattern of retaliation against Hawkins for insisting on academic integrity, fair grading, and adherence to school policy. This pattern not only harmed Hawkins' professional standing but also demonstrated a deliberate disregard for consistent educational standards, reinforcing a hostile atmosphere that targeted Hawkins in retaliation for doing his job.

## Lateral Reassignments After the Three-Week Deadline

### Relevant Schedule Change Policy

175.    According to the 2024–2025 DeSoto High School Staff Handbook, no schedule change should occur after the third week of school unless absolutely necessary, such as for legitimate leveling purposes or extenuating circumstances. All changes require the principal's final approval, and teachers cannot initiate changes on their own. Likewise, parents or students requesting a change must submit a written request during the third week, which the principal may approve or deny based on valid educational grounds.

### Arrival After the Third-Week Cutoff

176.    Hawkins was reassigned from Early College High School to the general education side only after the third-week deadline had elapsed. Under normal circumstances, the District's own policy would bar further schedule modifications except in rare, documented cases (Exhibit 35). Yet, in blatant contradiction, dozens of students in Hawkins' new classes later obtained lateral schedule changes—despite the fact that August 26 (the posted cutoff) had already passed.

177.    A total of twenty-three (23) students were moved from Hawkins' class. Six (6) were transferred to a first-year teacher, and seventeen (17) more went into a permanent sub's classroom (Exhibit 36). These moves served no legitimate "leveling" purpose, nor did they address genuine scheduling conflicts (e.g., overlapping classes). Instead, they solely switched which teacher was assigned, leaving the rest of each student's schedule unaltered. Such purely lateral moves are explicitly prohibited under DeSoto ISD's policy unless the principal finds a bona fide reason that does not adversely affect other classes.

178.    Because each schedule change requires final approval by the building principal, these mass transfers could not occur unless administration or the counselors were given free rein to accommodate any students who complained about Mr. Hawkins. On information and belief, administrators knowingly bypassed the District's rules or encouraged counselors to shift students out of Hawkins' classes whenever those students objected to his strict enforcement of dress code, ID requirements, and academic standards. Essentially, the District green-lighted post-deadline reassignments, even though the policy forbade them, to appease disgruntled students.

179.    Retaliatory Motives and Undermined Authority
        a.    Retaliation: These transfers were not random or aimed at balancing class loads; they specifically targeted Hawkins' sections in response to students complaining. This retaliatory approach rewarded students for resisting Hawkins' disciplinary measures, thereby punishing him for doing his job.

b. Encouraging Noncompliance: Word spread among students that complaining about Mr. Hawkins—or refusing to abide by dress code and ID rules—could secure a quick class change to a more lenient environment, typically one taught by a permanent sub. This effectively undermined Hawkins' authority, and reinforced a hostile environment.

c. Contravention of Policy: The District's policy plainly states that no schedule change is allowed after the third week "unless absolutely necessary." Yet none of these 23 moves were accompanied by legitimate documentation or an actual need, indicating the District's willingness to sacrifice its own guidelines to retaliate against Hawkins' strict but lawful teaching and discipline.

180.    By allowing or facilitating these unauthorized reassignments, District administrators validated students' refusal to comply with discipline measures. Many of these students now roam the hallways, habitually break dress code, and receive "free grades" under more permissive instructors—all with no consequences. This disorganized and unprofessional practice not only degrades the educational experience but also cements a retaliatory stance against Hawkins, who tried to maintain academic and behavioral standards consistent with District policy.

181.    These mass schedule changes—occurring well after the third-week cutoff—demonstrate that administration either directed or permitted counselors to accommodate any student or parent complaint about Mr. Hawkins' classroom enforcement. As a result, Hawkins was singled out and further undermined, reinforcing a hostile work environment while violating the District's own scheduling rules for the retaliatory purpose of removing students from Hawkins' classes.

## THE "STUDENT S.C." INCIDENT: UNILATERAL SCHEDULE CHANGE, DEMAND FOR GRADE INFLATION, AND NON-ATTENDANCE

182.    On or about February 10, 2025, Ms. Alma Goss—the SPED Department Head functioning in an administrator-level capacity—unilaterally removed a special education student, referred to as "Student S.C.", from Hawkins' math class (Exhibit 37). This switch occurred without consulting Hawkins or convening an appropriate IEP meeting, and no attempt was made to resolve the student's underlying academic or behavioral issues prior to altering her schedule.

183.    Immediately after the schedule change, Ms. Goss informed Hawkins by email that he must retroactively raise S.C.'s failing semester grade to 70% so S.C. could purportedly "start fresh" in her new math class. Ms. Goss cited noncompliance with S.C.'s inclusion support by the inclusion teacher as justification for the forced grade increase. However, the District never arranged any formal conference to address S.C.'s lack of adherence to classroom rules, nor did it provide documentation explaining how a 70% accurately reflected her actual performance or mastery of the material.

184.    Hawkins reviewed S.C.'s  record of defiance, including her refusal to remove headphones and dismissing dress code requirements (Exhibit 38). Because the

student's poor average stemmed primarily from her missing her Final Examination—rather than any demonstrable lack of inclusion support—Hawkins refused to alter her failing grade without assessment. He concluded that awarding an artificial 70% would violate sound educational principles and further enable the District's pattern of inflating failing marks.

185.    After Ms. Goss' unilateral schedule change, Hawkins learned that S.C. rarely attends her new math class. Despite the District's claim that the reassignment and retroactive 70% would facilitate a more successful outcome, S.C. has continued to miss instruction. This underscores how the District's approach—simply moving the student rather than addressing her misconduct or providing meaningful intervention—did not resolve the core issue, nor did it uphold any genuine academic standard.

186.    Evidence of a Hostile, Retaliatory Environment

    a.  Undermining Hawkins' Professional Judgment: By compelling Hawkins to raise a failing grade after transferring S.C., Ms. Goss (as SPED Department Head) effectively overrode Hawkins' legitimate assessments without discussing alternative instructional or behavioral strategies.

    b.  Retaliation for Enforcing Standards: The District's expectation that Hawkins "fix" the grade, ignoring valid performance deficiencies, fits into a broader pattern of penalizing him whenever he maintains academic rigor or discipline.

    c.  Continuation of Policy Contradictions: Much like other situations where Hawkins was pressured to accommodate students refusing to follow rules, the District's handling of S.C. further demonstrates inconsistent or nonexistent policy enforcement. Rather than supporting Hawkins' stance, administrators chose a temporary, superficial fix—thereby reinforcing a hostile environment and deterring Hawkins from insisting on academic integrity in future cases.

187.    In short, Student S.C.'s removal and the subsequent demand that Hawkins raise her failing mark epitomize the District's arbitrary decision-making. The District sidestepped legitimate methods to assist a struggling student, favoring a "quick fix" that both subverted Hawkins' authority and perpetuated the cycle of retaliation for his refusal to engage in unwarranted grade inflation.

## V. Level III Hearing: A Sham Proceeding with Shifting, Contradictory Justifications

188.    Following the denial of his Level II Grievance, Hawkins appealed to the DeSoto ISD Board of Trustees. On February 24, 2025, the Board convened a Level III grievance hearing (Exhibit 39) where Hawkins, members of the Board, District counsel, Superintendent Dr. Usamah Rogers, and Defendant Dr. Leon Darden were present.

Rather than providing a fair, impartial review of Hawkins' claims, the hearing featured new, unsupported defenses, procedural irregularities, and contradictory narratives from the District.

## Expanded Record Without Notice and Policy Violations

189.    At the hearing's start, Hawkins discovered the District had augmented the Level II record with documents he had never seen, although HR had previously told him he already had the "complete" file. This indicates a violation of DeSoto ISD grievance procedures (DGBA (Local)) and the three-day notice requirement for new evidence at Level III. The District offered no clear explanation, limiting Hawkins' ability to refute or investigate any new material.

190.    When asked, the Board's counsel insisted only prior evidence was included, yet Hawkins pointed out specific items that had not been part of his earlier records. Board policy states that "if the administration intends to rely on evidence not included in the Level Two record, the administration shall provide the employee notice…at least three days before the hearing." Failure to do so further denied Hawkins any meaningful opportunity to review and adequately prepare.

## Administration Counsel's Claim of "No Reason Required" Under (Exhibit 18)

191.    Next, the District's counsel repeatedly cited Board Policy DK (Exhibit 18) to argue Hawkins could be reassigned "for no reason at all" and that doing so did not imply wrongdoing or punishment. According to counsel, the reassignment was simply a "clean slate" and "not punitive or disciplinary," requiring no investigation or documentation of complaints. The administration insisted Hawkins' removal from Early College was presumably "in the best interest of the District," even if no one produced any written evidence to support that conclusion.

192.    At one point, counsel excused the lack of a formal investigation by saying, "They [the complaints] may not have been reviewed to his [Hawkins'] liking, but I want to remind you all that the accused is not to choose the method of investigation." This language blatantly conflicts with counsel's other statement that the reassignment was not a disciplinary measure. Labeling Hawkins as "the accused" inherently implies wrongdoing—contradicting the District's assertion that no misconduct was ever established.

193.    Despite Hawkins highlighting that students caught cheating had their failing scores overturned to perfect 100s—demonstrating a lack of academic integrity and retaliatory erosion of Hawkins' authority—the administration and counsel never directly addressed or justified this grade-changing practice. Counsel evaded the matter by saying any grade-related concerns were "unrelated" to the reassignment.

194.    While counsel insisted no blame or implication of misconduct attached to Hawkins' transfer, wiping out Hawkins' failing grades for cheating and awarding 100s to those

33

students implied that Hawkins' grading decisions were at fault—thus stigmatizing him. This blatant contradiction remained unresolved during the hearing.

195.    Students subsequently boasted in hallways about how complaints forced Hawkins' removal and netted them free grades, further eroding Hawkins' reputation and classroom authority. This, in turn, deepened the hostile environment faced by Hawkins when he was reassigned to a new, disorganized setting.

## Dr. Rogers' Improper Insertion of New Evidence and Excuses

196.    Throughout the hearing, Superintendent Rogers was neither listed nor introduced as the District's official presenter—yet she interjected herself into the proceeding when the administration and counsel struggled to answer basic questions. This contravened standard practice, as only designated representatives are typically responsible for presenting evidence or justifications on behalf of the District.

197.    Dr. Rogers introduced an alleged "major campus disruption" involving "~50 students" and parents threatening to riot over Hawkins' grading, a claim that no one had mentioned at Levels I or II. She also asserted, for the first time, that ECHS students supposedly should not have the same teacher two years in a row—contradicting the fact that other ECHS teachers commonly keep the same cohorts for consecutive years without incident. None of these justifications were documented or raised in earlier stages, underscoring their post-hoc and pretextual nature.

198.    Despite painting Hawkins' class as a near-riot environment, Dr. Rogers provided zero contemporaneous emails, incident reports, or discipline logs to substantiate such an extreme event. These last-minute narratives, introduced by a superintendent who was not officially presenting for the administration, further exposed the District's lack of transparency and apparent willingness to improvise new excuses to justify Hawkins' removal.

199.    During the Level III hearing, Superintendent Dr. Usamah Rogers offered yet another explanation for Hawkins' reassignment—referencing an abandoned "growth plan" or TINA from the previous school year. According to Dr. Rogers, an administrator who has since left the District "missed some steps with the growth plan," causing Hawkins to "return to the position" despite ongoing concerns. She admitted that, at the start of the new school year, "there were conversations about reassignments" with Dr. Darden—signaling that Hawkins was, in effect, placed on thin ice from day one.

200.    Superintendent Rogers (Level III hearing transcript, ~46:37) (Exhibit 39) "Last year, there was a growth plan… Mr. Hawkins mentioned he filed a grievance about the evaluation… There was an administrator that is no longer with us that missed some steps… Hawkins returned to the position, however there were conversations at the beginning of the year regarding the expectations that were held with Dr. Darden. So there were conversations about reassignments… And this incident and the change occurred early in the school year because these

students would have had Mr. Hawkins for two consecutive years and they started the year expressing concerns."

201.    Predetermined "Thin-Ice" Status

    a.  Dr. Rogers' admission shows the District had already entertained reassigning Hawkins well before any concrete complaints arose in the 2024–2025 school year—directly contradicting claims that his abrupt removal was merely in the "best interest of the District."

    b.  Instead, the District held residual dissatisfaction from an unfinished or improperly administered TINA/growth plan, never informing Hawkins that he remained under scrutiny or offering a clear path to remedy any alleged concerns.

202.    Inconsistent and Shifting Explanations

    a.  Initially, administrators insisted Hawkins was reassigned for an "overwhelming number of complaints." Then they called it a "clean slate," later citing a phantom "riot" or "campus disruption." Now, Dr. Rogers' testimony reveals that from the outset of the new year, Hawkins was in jeopardy of being moved—regardless of any legitimate cause.

    b.  This patchwork of shifting rationales underscores that no bona fide investigation or "best interest" determination occurred. Rather, Hawkins' transfer was the predictable outcome of a District leadership group that had already decided he was disposable.

203.    Casual Link to Prior First Amendment Speech

    a.  Notably, the abandoned growth plan (or TINA) from the previous year arose after Hawkins' First Amendment-protected objections to illegal lesson-plan mandates. Dr. Rogers' reference to that incomplete plan—and her own acknowledgment that "some steps were missed"—strongly suggests the District carried lingering animosity toward Hawkins.

    b.  When Hawkins again challenged grading directives and unwarranted paperwork at the start of the new school year, the District seized on any student or parent complaints, however unverified, to effectuate the reassignment they had already been "documenting" and discussing with Dr. Darden.

204.    Disregard for Due Process

    a.  Dr. Rogers' statements further confirm Hawkins received no notice of these behind-the-scenes talks about moving him from ECHS, nor any opportunity to respond or improve, despite the District's prior missteps in administering a growth plan.

    b.  Board members questioned the educational rationale for removing an award-winning teacher from a specialized program, yet got only vague allusions to "disruptions." Hawkins testified no factual inquiry was ever conducted—and

35

none of the alleged long-standing complaints was produced—again violating basic fairness and Tex. Educ. Code § 26.003(a)(2).

205.   Through Dr. Rogers' own words, the District inadvertently revealed that Hawkins' transfer was not the product of valid grievances or sudden performance issues. Instead, it was the culmination of longstanding internal discussions—rooted in animus from Hawkins' earlier TINA/growth-plan challenge—designed to remove him as soon as any superficial complaint emerged. This candid admission cements the causal link between Hawkins' First Amendment speech and his eventual, cavalier reassignment out of ECHS.

## Outcome: Automatic Denial and Ratification of a Sham Proceeding

206.   After hearing these shifting explanations and acknowledging the District's admitted lack of documentation, the Board ultimately reached a tie vote, resulting in the Level II decision being upheld by default. This tie outcome effectively denied Hawkins any relief and ratified the unlawful conduct, including Dr. Rogers' unsubstantiated claims and her improper role in introducing new evidence. The Board's failure to demand accountability, combined with the Superintendent's extralegal participation, demonstrated a sham process aimed at rubber-stamping a predetermined result rather than objectively evaluating Hawkins' concerns.

207.   The Level III hearing further illustrated how due process and Board Policy DK (Exhibit 18) were abused to engineer Hawkins' removal without legitimate cause or documentation. While Dr. Rogers was not formally part of the administration's presentation team, she nonetheless injected new, unverified allegations and alternative rationales into the record, contradicting earlier claims and leaving the Board to rely on incomplete or last-minute evidence. This charade featuring shifting stories and Superintendent Rogers' improper intervention underscored the District's continued disregard for Hawkins' rights and the hollow nature of the grievance process.

## Failure to Follow "Best Interest of the District" Clause and Grievance Procedures

### Contractual Reassignment Standard

208.   Hawkins' written employment contract (Exhibit 40) with Defendant DeSoto Independent School District (the "District") provides that any reassignment of a teacher must be determined to be "in the best interest of the District." In addition, Board Policy [DK(Local)] Desoto ISD Employee Handbook (Exhibit 41)and the District's grievance

36

procedures (Policy [DGBA(Local)](Exhibit 42) or as otherwise incorporated by reference in Hawkins' contract) require the District to (a) document the reasons for any such reassignment and (b) permit the teacher to challenge the decision through a multi-level grievance process.

## Property Interest in Fair Process

209.    By specifying that reassignment is permissible only if it is in the District's best interest, and by granting teachers a right to file a grievance regarding reassignment decisions, the District's policies and Hawkins' contract create a legitimate expectation that any reassignment will be supported by objective, documented reasons. This expectation forms a property interest in Hawkins' continued teaching assignment absent a bona fide determination that reassignment is in the District's best interest—particularly when the reassignment is disciplinary or materially adverse in nature.

## District's Failure to Document or Justify "Best Interest"

210.    Despite citing "an overwhelming number of complaints" as the purported basis for Hawkins' reassignment from the Early College High School program, Defendant District never produced any written complaints or documented why reassignment served the District's best interest. At each stage of Hawkins' grievance proceedings (Levels I, II, and III), District officials failed to provide any substantiating records, witnesses, or evidence. As a result, the school board, acting as the final decision-maker, had no meaningful basis on which to conclude the reassignment satisfied the "best interest of the District" standard.

## Violation of Grievance Procedures

211.    The District's own policies require that, upon a teacher's grievance, the administration must present the reasons for the reassignment and permit the teacher to respond before a neutral or higher-level reviewing body. Here, no such procedure was followed. Hawkins repeatedly requested disclosure of the complaints or findings of any investigation, but the District refused or neglected to provide them. Consequently, neither Hawkins nor the Board could evaluate whether any legitimate rationale supported the reassignment—thus nullifying the contractual and policy-based assurance that reassignment decisions would be fair, documented, and reviewable.

## Resulting Harm and Due Process Implications

212.    Because Defendants effectively circumvented both the contractual "best interest" requirement and the mandated grievance process, Hawkins was denied a fair opportunity to contest an adverse job action that materially impacted his teaching responsibilities and professional reputation. The District's failure to adhere to its own contractual standards and grievance protocols deprived Hawkins of his property interest and right to a meaningful review, in violation of both the express terms of his contract

(breach of contract) and the procedural due process protections under the Fourteenth Amendment (enforceable via 42 U.S.C. § 1983).

H. DeSoto ISD Board Policy EIA (LOCAL) - Grading/Progress Reports to Parents

213. DeSoto ISD Board Policy EIA (LOCAL) (Exhibit 19) outlines the district's policy regarding grading and academic dishonesty.

214. The policy states that "assignments, tests, projects, classroom activities, and other instructional activities shall be designed so that each student's performance indicates the level of mastery of the designated District objectives" (Exhibit 19).

215. Regarding academic dishonesty, the policy states that "a student found to have engaged in academic dishonesty shall be subject to grade penalties on assignments or tests and disciplinary penalties in accordance with the Student Code of Conduct" (Exhibit 19).

216. The policy further clarifies that "the determination that a student has engaged in academic dishonesty shall be based on the judgment of the classroom teacher or another supervising professional employee, taking into consideration written materials, observation, or information from students" (Exhibit 19).

217. On August 29, 2024, Hawkins assigned grades of zero to students who engaged in academic dishonesty on the Chapter 1 Test, in strict accordance with Board Policy EIA (LOCAL).

218. The administration, without proper investigation and without making a determination that Hawkins' determination of academic dishonesty was incorrect, changed the grades of students who had engaged in academic dishonesty on the Chapter 1 Test to 100 on their report cards and progress reports.

219. This action directly violated Board Policy EIA (LOCAL) by overriding the classroom teacher's judgment regarding academic dishonesty and failing to impose the mandated grade penalties.

220. By changing the grades, the administration undermined academic standards, rewarded cheating, and further damaged Hawkins' professional reputation by implying that his grading practices were unfair or inaccurate.

221. This violation of Board Policy EIA (LOCAL) also contributed to the hostile work environment and further demonstrated the arbitrary and capricious nature of the administration's actions.

I. DeSoto ISD Board Policy EIA (LEGAL) - Grading/Progress Reports to Parents

222. DeSoto ISD Board Policy EIA (LEGAL) (Exhibit 20) further outlines the district's policy regarding grading and incorporates relevant provisions of the Texas Education Code.

223. The policy states that "a district shall adopt a grading policy" that "must require a classroom teacher to assign a grade that reflects the student's relative mastery of an assignment" and "may not require a classroom teacher to assign a minimum grade for

an assignment without regard to the student's quality of work" (Exhibit 20, citing Education Code 28.0216).

224. Regarding the finality of grades, the policy states that "an examination or course grade issued by a classroom teacher is final and may not be changed unless the grade is arbitrary, erroneous, or not consistent with the district grading policy applicable to the grade, as determined by the board" (Exhibit 20), citing Education Code 28.0214). It further specifies that "determination by the board is not subject to appeal" (Exhibit 20).

225. The administration's action of changing the grades of students who engaged in academic dishonesty from zeros to 100s directly violated Board Policy EIA (LEGAL) and Texas Education Code Section 28.0214. Hawkins, as the classroom teacher, assigned grades that reflected the students' lack of mastery due to cheating, and these grades were final under the policy.

226. The administration did not have the authority to change these grades unless they were determined by the board to be "arbitrary, erroneous, or not consistent with the district grading policy" (Exhibit 20). No such determination was made by the board, nor was any such process initiated.

227. By unilaterally changing the grades, the administration undermined Hawkins' authority as a teacher, violated district policy and state law, and further damaged his professional reputation.

228. This violation of Board Policy EIA (LEGAL) also contributed to the hostile work environment and demonstrated the arbitrary and capricious nature of the administration's actions.

J. Relevant Texas State Law

229. In addition to the DeSoto ISD Board Policies cited above, several provisions of the Texas Education Code are relevant to this case.

230. Texas Education Code Section 28.0216 ("Grading; Academic Achievement Record") states that a school district's grading policy:

231. "(1) must require a classroom teacher to assign a grade that reflects the student's relative mastery of an assignment;7

232. (2) may not require a classroom teacher to assign a minimum grade for an assignment without regard to the student's quality of work; and

233. (3) may allow a student a reasonable opportunity to make up or redo a class assignment or examination for which the student9 received a failing grade."

234. Texas Education Code Section 28.0214 ("Finality of Grade") states that "an examination or course grade issued by a classroom teacher is final and may not be changed unless the grade is arbitrary, erroneous, or not consistent with the district10 grading policy applicable to the grade, as determined by the board of trustees of the school district in which the teacher is employed."11

235. Texas Education Code Section 11.164(a)(6) (already mentioned in previous sections) limits the written documentation a district can require from teachers regarding lesson plans.

236. Texas Education Code Section 37.0012 provides that "a teacher may remove from class a student" "who has been documented by the teacher to repeatedly interfere with

39

the teacher's ability to communicate effectively with the students in the class or with the ability of the student's classmates to learn," who is "so unruly, disruptive, or abusive that it seriously interferes with the teacher's ability to communicate effectively," or whose "behavior the teacher determines is a serious or continuing disruption of the learning process."

237.    Texas Education Code Section 37.0023 states that, "a teacher's removal of a student from class under Section 37.0012 must be based on sound professional judgment that takes into consideration the requirements of other law, including this chapter and any applicable rules of the State Board for Educator Certification, commissioner, and the agency."

238.    Texas Education Code Section 26.003(a)(2) grants parents the right to "reasonable access to the school principal, or to a designated administrator with the authority to reassign a student, to request a change in the class or teacher to which the parent's child has been assigned, if the reassignment or change would not affect the assignment or reassignment of another student."

## K. Violation of Implied Right Under Texas Education Code § 26.003(a)(2)

239.    Texas Education Code § 26.003(a)(2) grants parents the right to request a change in their child's class or teacher, provided that such a change "would not affect the assignment or reassignment of another student." This condition ensures that a parent's personal preference for moving their child does not disrupt the educational placement of other students or upend the legitimate staffing decisions of the district.

Implied Protection for Teachers

240.    By limiting parental requests to scenarios that do not interfere with other students' assignments, § 26.003(a)(2) implicitly recognizes a broader principle: teachers should not be arbitrarily or retaliatory removed from their positions based solely on parental demands. If parents could unilaterally trigger a teacher's reassignment, the teacher's performance, qualifications, or contractual rights would be rendered meaningless—subject entirely to unsubstantiated complaints or subjective dissatisfaction.

Preventing Arbitrary Teacher Reassignments

241.    Allowing a parent's request to automatically force a teacher's removal would foster instability and undercut a district's obligation under Board Policy DK to act "in the best interest of the district." Teachers who enforce campus policies or maintain rigorous academic standards could be moved at the whim of disgruntled families, irrespective of the teacher's effectiveness, the school's staffing needs, or the due process rights of educators.

Hawkins' Reassignment in Violation of § 26.003(a)(2)

242.    In this matter, Principal Jasen Campbell cited an "overwhelming" number of parent complaints as the sole reason for Mr. Hawkins' reassignment from the Early College High School to DeSoto High School. These complaints were never shown to Hawkins, nor were they ever meaningfully investigated or substantiated. Instead, the District simply transferred Hawkins to appease the loudest voices, disregarding:
   a.  Hawkins' contractual rights and implied due process guarantees;
   b.  Any thoughtful consideration of the best interests of students—particularly those in the Early College program who lost a qualified and experienced teacher; and
   c.  The spirit and intent of § 26.003(a)(2), which prohibits parental requests from dictating assignments in a way that adversely affects other students or staff.

Evidence of Misuse of Parent Complaints

243.    An email from a parent, dated September 5, 2024 (Exhibit 21), underscores that Hawkins was removed primarily to placate complaints—rather than for any valid educational rationale. This parent expressed alarm that the District was "bowing to the loudest voices in the room" without exploring constructive alternatives, criticizing the District for failing to act in the broader educational interest of students or staff. That same email reveals that Dr. Darden acknowledged cheating among certain students, yet administrators later boosted these students' grades to 100s, suggesting the complaints were motivated by a desire to avoid accountability.

Arbitrary and Capricious Action

244.    By reassigning Mr. Hawkins based on these unsubstantiated complaints, without any semblance of proper inquiry or due process, Defendants acted arbitrarily and capriciously. Such a transfer—prompted solely by parental pressure—subverts the implied right in § 26.003(a)(2) that neither students nor teachers be displaced simply because some parents demand it. It further violated Hawkins' Fourteenth Amendment rights, depriving him of substantive due process by disregarding any legitimate reason for removal, implying wrongdoing, and ignoring the educational harm inflicted on students who benefited from his teaching.

245.    In stripping Mr. Hawkins of his ECHS assignment to placate parent complaints, Defendants flouted the statutory framework designed to protect educators and students from arbitrary disruptions. Section 26.003(a)(2) reflects the Legislature's intent that parental requests not culminate in the reassignment of another student—or, by logical extension, the displacement of a teacher—absent a valid, well-supported rationale. Defendants' unilateral, complaint-driven move violated both Hawkins' rights and the District's own obligation to act "in the best interest of the district," thus cementing the conclusion that this reassignment ran afoul of Texas Education Code § 26.003(a)(2).

L. DeSoto ISD Board Policy FNCA (LOCAL) - Student Conduct: Dress Code

146.    DeSoto ISD Board Policy FNCA (LOCAL) (Exhibit 43) governs student conduct, including the dress code.

41

147. The policy states that the purpose of the dress code is to "teach grooming and hygiene, instill discipline, prevent disruption, avoid safety hazards, and teach respect for authority"16 (Exhibit 43).

148. The policy prohibits clothing or grooming that, "in the principal's judgment, may reasonably be expected to cause disruption of or interference with normal school operations"17 (Exhibit 43).

149. The policy also states that "the student and parent may determine the student's personal dress and grooming standards, provided that they comply with the general guidelines" and the student handbook (Exhibit 43).

150. Hawkins' enforcement of the dress code, as documented in the October 30, 2024 email (Exhibit 26), was consistent with the stated purpose of the policy and his role as a teacher in instilling discipline and teaching respect for authority.

151. The actions of Defendant Medina, in instructing Hawkins to disregard the dress code violations, directly undermined the policy's goals and contributed to a disruptive classroom environment.

## M. DeSoto ISD Board Policy FNG (LOCAL) - Student and Parent Complaints

152. DeSoto ISD Board Policy FNG (LOCAL) outlines the procedures for student and parent complaints.

153. The policy requires that complaints be handled at the lowest possible administrative level, which in this case would have been with the teacher first then the Principal, not with higher authorities or the board.

154. The administration's failure to follow the procedures outlined in FNG (LOCAL) when handling the complaints that led to Hawkins' reassignment further demonstrates the lack of due process and the retaliatory nature of the actions taken against him.

## N. DeSoto ISD Board Policy DGBA (LOCAL) - Personnel-Management Relations

155. DeSoto ISD Board Policy DGBA (LOCAL) (Exhibit 40) outlines the procedures for the grievance process.

156. The policy requires the Level 1 and Level 2 hearing officers to maintain a complete record of the proceedings, including all documents submitted and relied upon in reaching their decisions.

157. Defendants Darden and Morrow violated this policy by failing to include in the official record any documents related to the "independent investigation" or any other evidence relied upon in their decisions. This failure prevented Hawkins from understanding the basis of the decisions and mounting an effective defense, thereby violating his due process rights.

## O. DeSoto ISD Board Policy DK (LOCAL) – Employment Practices: Assignment and Reassignment

DeSoto ISD Board Policy DK (LOCAL) (Exhibit 18) governs the assignment and reassignment of district employees. While it delegates authority to the Superintendent or designee to reassign

personnel "when deemed in the best interest of the District," that discretion is neither absolute nor unfettered. It must be exercised:

158.　Consistently with State and Federal Law
The "best interest" language does not override the District's obligations under Title VII, 42 U.S.C. § 1981, the Texas Education Code, or any other applicable statute. Defendants cannot use Policy DK (LOCAL) to circumvent laws protecting employees from retaliation, discrimination, or due process violations.

159.　In Compliance with Other District Policies
Board Policy DK (LOCAL) does not exist in isolation; it interlocks with the District's grievance procedures and Board Policies DGBA (Local) and FNG (Local). Any reassignment decision must reflect fair and reasoned administrative processes and thorough investigation, not arbitrary or complaint-driven action.

160.　Honoring Contractual Rights
The District is bound by the terms of each teacher's employment contract and by implied rights not to be reassigned in a manner that is retaliatory or otherwise unlawful. The "best interest of the District" clause cannot serve as a blanket authorization to sidestep contractual guarantees.

## Abuse of Policy DK (LOCAL) in Hawkins' Reassignment

161.　In Mr. Hawkins' case, Defendants invoked Policy DK (LOCAL) to justify reassigning him from the Early College High School (ECHS) to DeSoto High School. Rather than demonstrating how removing a highly qualified, successful teacher from a specialized program served any legitimate district interest, they relied on unsubstantiated complaints and superficial claims—never documented or investigated—leading to the unlawful reassignment of Hawkins.

162.　No Genuine "Best Interest" Determination
　　a.　Defendants failed to show that displacing Hawkins—an award-winning educator who excelled in advanced coursework—was in fact "in the best interest of the District."
　　b.　By removing Hawkins from ECHS, Defendants compromised academic standards for students seeking challenging coursework, undermining genuine pedagogical priorities.

163.　Pretext for Retaliation and Discrimination
　　a.　Hawkins' reassignment was driven by complaints the District never validated, nor disclosed to him, suggesting Policy DK (LOCAL) was simply a pretext for either appeasing these complaints or retaliating against Hawkins for adhering to strict grading and discipline standards.
　　b.　This distorted application of the "best interest" clause enabled administrators to circumvent procedural safeguards, harming Hawkins professionally and depriving students of effective instruction.

164.　Contrary to District Obligations

43

   a. Properly applying Policy DK (LOCAL) would require thorough documentation, transparent rationale, and alignment with state and district laws protecting employees from arbitrary or capricious actions.

   b. Defendants' choice to invoke "best interest of the District" while ignoring due process requirements, teacher input, and legitimate programmatic needs contravened the policy's spirit and purpose.

165.   In essence, Policy DK (LOCAL)—intended to support legitimate, educationally sound staffing decisions—was abused to effect Hawkins' transfer without factual basis, procedural fairness, or genuine consideration of students' academic welfare. What should have been a reasoned determination of the District's best interests became a vehicle for unlawful reprisal, undermining both Hawkins' rights and the District's own educational mission.

## U. Waiver of Immunity and District Liability for Due Process Violations

166.   Defendant DeSoto ISD, as a local government entity, is generally not entitled to sovereign immunity for claims brought under Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983, the Texas Whistleblower Act, or the Texas Labor Code Chapter 21. Any immunity under state law for breach of contract, defamation, and intentional infliction of emotional distress has been expressly waived by statute or does not apply under the facts of this case, as explained further herein.

167.   Title VII expressly abrogates state sovereign immunity, and school districts are subject to suit under this statute.

168.   Local government entities, including school districts, are not entitled to sovereign immunity under 42 U.S.C. § 1981.

169.   While states and state officials sued in their official capacity for damages are generally immune from suit under Section 1983, local government entities like DeSoto ISD are not. Moreover, sovereign immunity does not bar claims for injunctive relief against state officials.

170.   The Texas Whistleblower Act expressly waives sovereign immunity for local government entities, including school districts, that violate its provisions (Tex. Gov't Code § 554.0035).

171.   The Texas Commission on Human Rights Act (TCHRA), part of the Texas Labor Code, waives sovereign immunity for employment discrimination claims against government entities.

172.   DeSoto ISD lacks immunity for breach of contract claims arising from violations of Texas Education Code 28.0214 and 26.003(a)(2) as well as express or implied contracts for employment.

173.   While the Texas Tort Claims Act generally excludes defamation and IIED from its waiver of sovereign immunity, the specific facts of this case, including the constitutional due process violations and the context of the defamatory statements, fall within the scope of the waiver. Furthermore, individual defendants sued in their individual capacities are not entitled to sovereign immunity for these claims.

44

174. To the extent that any individual defendants are named in this suit in their official capacities, they are named only for the purpose of obtaining injunctive relief, to which qualified immunity does not apply.

175. To the extent that any individual defendants are named in this suit in their individual capacities, they are not entitled to qualified immunity because their actions, as alleged herein, violated clearly established statutory or constitutional rights of which a reasonable person would have known.

176. Defendant DeSoto ISD is liable for the due process violations committed by Principal Jasen Campbell because, under Board Policy DK, he was the final policymaker with respect to teacher reassignments, acting as the superintendent's designee.

177. Principal Jasen Campbell's decision to reassign Hawkins without any semblance of due process, including the lack of notice, opportunity to be heard, and a fair grievance process, constitutes an official policy or custom of DeSoto ISD.

178. Principal Jasen Campbell acted with deliberate indifference to Hawkins' clearly established constitutional rights to procedural and substantive due process, knowing that his actions would likely result in a violation of those rights.

179. Defendant DeSoto ISD is also liable for the due process violations committed by Defendants Darden and Morrow, the Level 1 and Level 2 hearing officers. As agents of the district responsible for administering the grievance process, their deliberate indifference to Hawkins' due process rights, including the failure to maintain a complete record and to provide a meaningful opportunity to be heard, constitutes a failure to uphold the policies and procedures of DeSoto ISD for which the district is liable under 42 U.S.C. § 1983.

180. The grievance process provided by DeSoto ISD was inadequate, did not provide Hawkins with due process, and failed to address his concerns regarding violations of law and district policy. The failure of Defendants Darden and Morrow to maintain and provide a complete record, as required by Board Policy DGBA (Local), was a deliberate attempt to obstruct Hawkins' ability to defend himself and rendered the grievance process meaningless. The process also failed to address the violation of Hawkins' implied right under Texas Education Code Section 26.003(a)(2) not to be reassigned based solely on parent complaints.

181. The Superintendent of DeSoto ISD, Defendant Dr. Usamah Rogers, is liable for failure to adequately supervise Principal Jasen Campbell and the individuals responsible for administering the grievance process, and for failing to implement policies and procedures that would ensure due process for teachers facing disciplinary action or reassignment, including the maintenance of a complete record as required by Board Policy DGBA (Local). The Superintendent's failure to supervise constituted deliberate indifference to the constitutional rights of teachers, including Hawkins.

182. Defendant Dr. Usamah Rogers, as Superintendent of DeSoto ISD, was aware or should have been aware of the involvement of "higher authorities and the board" in the decision to reassign Hawkins, as indicated in the Level 1 Grievance Response dated October 14, 2024 (Exhibit 23). Despite this knowledge, Defendant Dr. Rogers failed to ensure that the decision-making process complied with due process requirements,

applicable state law, and district policies. This failure to act constitutes deliberate indifference to Hawkins' rights and further establishes the district's liability.

## V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

223.    On or about December 12, 2024, Hawkins filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission Civil Rights Division.

224.    The EEOC issued a Notice of Right to Sue to Hawkins on or about February 26, 2025. A copy of the Notice of Right to Sue is attached hereto as (Exhibit 1).

225.    Prior to filing this lawsuit, Hawkins exhausted all required internal administrative remedies under the Texas Whistleblower Act by initiating and participating in the grievance procedures of DeSoto ISD, as required by Board Policy DGBA (Local).

226.    (a) Level I Grievance (March 28, 2024): Hawkins filed a Level I grievance on March 28, 2024, regarding the lesson plan disputes, the Teacher in Need of Assistance plan, and the reassignment of Ms. Jackson to his classroom. (Exhibit 16). The grievance was partially granted on April 8, 2024, with Principal Jasen Campbell acknowledging the write-up was based on an unlawful requirement and that the reassignment of Ms. Jackson should not have occurred. (Exhibit 17). However, the response did not address the underlying issues of discrimination, retaliation, or due process violations.

227.    (b) Level I Grievance (September 9, 2024): Hawkins filed a Level I grievance on September 9, 2024, regarding his retaliatory reassignment. The grievance was denied on October 14, 2024, without explanation, without Hawkins being informed of what he was accused of doing, by whom, or when. The Level 1 hearing officer, Defendant Darden, failed to include any supporting documentation or evidence in the official record, as required by DGBA (Local). (Exhibit 23).

228.    (c) Level II Grievance (October 15, 2024): Hawkins filed a Level II grievance on October 15, 2024, appealing the denial of his Level I grievance regarding the reassignment. The grievance was denied on November 11, 2024, without explanation, without Hawkins being informed of what he was accused of doing, by whom, or when. The Level 2 hearing officer, Defendant Morrow, failed to include any supporting documentation or evidence in the official record, as required by DGBA (Local), and failed to address the incomplete record from Level 1. (Exhibit 23) and (Exhibit 25).

229.    (d) Level III Hearing (February 24, 2025): Hawkins appealed the Level II denial to the DeSoto ISD Board of Trustees. A Level III hearing was held on February 24, 2025 (Exhibit 39). At this hearing, the administration, through its counsel and Dr. Rogers, presented shifting and contradictory justifications for the reassignment, admitted to a pre-existing plan to remove Hawkins, and failed to provide any credible evidence to support their claims. Despite the evidence presented, the Board of Trustees reached a tie vote, effectively upholding the Level II denial and denying Hawkins any relief.

226.    The grievance process provided by DeSoto ISD was inadequate and did not provide Hawkins with due process. At no point was Hawkins provided with specific details of the complaints against him, given a meaningful opportunity to respond to allegations before adverse actions were taken, or presented with a complete record of the proceedings, as required by Board Policy DGBA (Local). The grievance process failed to address the

systemic violations of law and policy, the retaliatory nature of the actions, and the damage to Hawkins' reputation. The tie vote by the Board of Trustees, after being presented with substantial evidence of wrongdoing, demonstrates the futility of pursuing further internal remedies within DeSoto ISD.

## VI. CAUSES OF ACTION

# COUNT I: RACE, COLOR, NATIONAL ORIGIN, AND SEX DISCRIMINATION UNDER TITLE VII

(Against Defendant DeSoto ISD)

227.   Incorporation of Allegations.
Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference all preceding paragraphs of this Complaint, including but not limited to ¶¶ 1–226, as if fully set forth herein.

228.   Statutory Basis.
This cause of action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., which prohibits discrimination in employment on the basis of race, color, national origin, and sex.

229.   Protected Classes and Status.
Hawkins is a Black/African American male, thus placing him within multiple protected classes under Title VII. His race, color, national origin, and sex all fall under the Act's protections.

230.   Adverse Employment Actions.
Defendant DeSoto ISD—acting through its agents and administrators, including Principal Jasen Campbell, Associate Principal/Administrators Jocelyn Starling and Kristi Primus, and others—subjected Hawkins to disparate treatment because of his race (Black), color (Black), national origin (African American), and sex (male). These adverse employment actions include, but are not limited to:

   a.  Excessive Scrutiny and Unwarranted Discipline: Hawkins was subjected to disproportionate supervision of his classroom practices, culminating in unfounded reprimands and a Formal Letter of Concern.
   b.  Pretextual TINA Plan: Defendants imposed a Teacher in Need of Assistance (TINA) plan without legitimate instructional deficiencies, stigmatizing Hawkins among colleagues and superiors and undermining his professional standing.
   c.  Retaliatory and Discriminatory Reassignment: Hawkins was removed from the prestigious Early College High School ("ECHS")—a specialized program for high-achieving students—and reassigned to regular Algebra II at DeSoto High

School. This demotion not only diminished his professional stature but also cut him off from the advanced student cohort and potential leadership opportunities.

d. Targeted Student Removals and Post-Deadline Schedule Changes: Defendants orchestrated or permitted repeated class-schedule alterations beyond the District's own cutoff date, isolating Hawkins and eroding his authority. This toxic dynamic both fostered a hostile environment and set the stage for additional discriminatory measures.

231. Replacement by Less Qualified Teacher & Gender-Based Disparities.
Hawkins—an award-winning, fully certified, and highly qualified educator—was replaced in his ECHS Honors Algebra 2 classes by a female intern teacher lacking full state certification. This individual was given a lighter workload (three classes and four conference periods) yet received a full teacher's salary. By contrast, Hawkins had carried a full or overloaded schedule. This stark disparity underscores that his removal was driven by bias relating to his race and sex rather than a legitimate performance-based rationale.

232. Racially Tinged Complaints & Administrators' Endorsement.
a. Discriminatory Parent Statements: On or about September 17, 2024, a parent (Ms. R) explicitly invoked Hawkins's race, stating he should be more lenient with Black students, criticizing him for "overbearing" enforcement of ID and dress-code policies. When Hawkins refused to comply with such racial stereotypes, additional complaints were lodged, prompting further administrative scrutiny.
b. Endorsing Race-Based Stereotypes: Multiple parents similarly argued that Hawkins, being Black, should "understand the struggle" and reduce academic or behavioral standards for Black students. Rather than reject these unlawful viewpoints, District officials legitimized them by penalizing Hawkins for holding all students equally accountable.

233. Evidence of Male Disadvantage in Leadership Roles.
In early 2025, Principal Campbell convened an all-male staff meeting—termed "Men's 33"—to acknowledge the marginalization of male employees and the scarcity of men in leadership roles. Nevertheless, no effective remedy followed. Hawkins's abrupt removal and replacement by a less-qualified female teacher confirms that male staff were, in practice, disfavored and treated inequitably.

234. Hostile Work Environment & Constructive Discharge Concerns.

a. Hawkins was exposed to repeated racially charged complaints, baseless scrutiny, and the District's tacit approval of parents' and students' bias-laden demands.
b. Administrators enabled repeated schedule changes to placate those objecting to Hawkins's strict and fair enforcement of district policies. This isolated him, undermining his classroom authority and heightening the hostile atmosphere.
c. By catering to racially tinged or gender-based grievances—rather than supporting Hawkins's legitimate educational standards—the District created conditions that a

48

reasonable person would interpret as deliberately pushing Hawkins toward resignation. These adverse acts collectively foretell an attempted constructive termination if not remedied.

235. TIA Opportunity Disrupted.

   a. As part of his professional development, Hawkins was on track to enhance his performance metrics and potentially qualify for the Texas Teacher Incentive Allotment ("TIA"), which offers significant salary supplements to top-performing educators.
   b. By abruptly removing him from advanced ECHS courses, imposing punitive personnel measures, and poisoning the work environment, the District impaired Hawkins's ability to meet or surpass TIA eligibility criteria.
   c. Hawkins was thus denied a fair chance at higher compensation, stalling his professional progression and exacerbating the harm from the discriminatory reassignment.

236. Intent and Reckless Indifference.

The District's discriminatory practices were intentional, as demonstrated by:

   a. Persistent Reliance on Unfounded Complaints: Defendants justified severe disciplinary steps without producing any substantive documentation, knowing the complaints stemmed from racial or gender stereotypes.
   b. Knowledge of Racial Stereotypes: Administrators conceded that certain parents insisted on more lenient treatment for Black students solely because Hawkins is Black, yet they still penalized Hawkins for refusing to lower standards.
   c. Adoption of Extreme Punitive Measures: Defendants took disciplinary actions and reassignments disproportionately affecting Hawkins, revealing a reckless or callous indifference to his protected rights.

237. Injury and Damages.

As a direct and proximate result of Defendant DeSoto ISD's discriminatory conduct, Hawkins has suffered:

   a. Lost Wages and Benefits: Removal from ECHS obstructed potential stipends, merit-based awards, or other advancement opportunities, including TIA.
   b. Emotional Distress: Ongoing hostility, baseless scrutiny, and the looming threat of forced resignation have caused significant stress, anxiety, and humiliation.
   c. Reputational Harm: Parents and staff, misled into believing Hawkins was incompetent or "overly strict," tarnished his once-sterling professional reputation.
   d. Constructive Discharge Risks: The toxic environment, if left unaddressed, stands to force Hawkins out of his position, further compounding his emotional and financial harm.

238. Violation of Title VII.

By engaging in the conduct described above—discriminating against Hawkins on the basis of race, color, national origin, and sex—Defendant DeSoto ISD violated 42 U.S.C.

§ 2000e-2(a).

239.   Prayer for Relief on Count I.
WHEREFORE, Hawkins respectfully requests that this Court enter judgment in his favor on Count I and award such relief as set forth in the Prayer for Relief, including but not limited to:

   a.  Compensatory Damages covering lost wages, back pay, front pay (or reinstatement), and lost TIA or other bonus opportunities.
   b.  Emotional Distress Damages addressing the mental anguish caused by discrimination and a hostile work environment.
   c.  Injunctive or Equitable Relief to remedy the discriminatory practices, restore Hawkins to his rightful position, and prevent further harm.
   d.  Any Other Relief the Court deems just and appropriate, including attorneys' fees and costs.


# COUNT II: RETALIATION UNDER TITLE VII

(Against Defendant DeSoto ISD)

240.   Incorporation of Allegations.
Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference all preceding paragraphs of this Complaint, including but not limited to ¶¶ 1–239, as if fully set forth herein.

241.   Statutory Framework.
This cause of action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., which prohibits employers from retaliating against employees who engage in protected activity—such as reporting or opposing unlawful employment practices or participating in internal grievance proceedings.

242.   Protected Activities.
Hawkins engaged in numerous protected activities under Title VII, including but not limited to:
a. Reporting Illegal Grading Practices (around September 15, 2023), opposing the "no grades below 50" practice and a "no failing grades for students with substitutes" directive he believed violated state law and District policy.
b. Challenging Unlawful Lesson Plan Requirements (October–December 2023), refusing to comply with "PowerPoint-driven lesson plans" that exceeded statutory limits under Tex. Educ. Code § 11.164(a)(6).
c. Exposing Inconsistent Standards (around August 26, 2024), highlighting selective enforcement of dress code, ID, and grading policies that he believed unfairly targeted

certain teachers and students.

d. Filing Internal Grievances on March 28, 2024; September 9, 2024; and October 15, 2024, in which he formally opposed and challenged adverse actions he reasonably believed were discriminatory, retaliatory, or otherwise unlawful.

243.    Adverse Employment Actions.

In direct retaliation for the above protected activities, Defendant DeSoto ISD—through its officers and agents, including but not limited to Defendants Starling, Primus, Campbell, Darden, Morrow, Polk, and Medina—took adverse actions against Hawkins that would deter a reasonable employee from engaging in protected conduct. Such actions include:

a. Formal Letter of Concern: Citing Hawkins's noncompliance with unlawful lesson-plan directives.

b. Pretextual TINA Plan: Jacksons reassignment and removal of teaching duties. Imposing a Teacher in Need of Assistance (TINA) plan, unsupported by actual evidence of poor performance, branding Hawkins as deficient and harming his professional reputation.

c. Retaliatory Reassignment: Stripping Hawkins of his advanced ECHS courses and demoting him to regular Algebra II at DeSoto High School—undercutting his specialized expertise and professional standing.

d. Undermining Classroom Authority: On October 30, 2024, Defendant Medina openly contradicted Hawkins's enforcement of District rules, fostering student defiance and weakening Hawkins's control over his classroom.

e. Maintaining Unlawful Grading Practices: Even after Hawkins's reports, the District persisted in questionable or illegal grading policies, punishing Hawkins for pressing compliance.

f. Elective Schedule Change Approval: Schedules changes were approved without following policy.

g. Sham Grievance Denials: Levels 1, 2, and 3 grievances were repeatedly denied without meaningful investigation or disclosure of supposed "complaints," further retaliating against Hawkins for pursuing lawful redress.

244.    Causal Nexus Between Protected Activity and Retaliation.

a.  The Letter of Concern explicitly refers to Hawkins's objection to "PowerPoint-driven" lesson plans.

b.  The timing of Hawkins's reassignment closely followed his challenges to unlawful grading mandates and his formal grievances.

c.  At the Level III hearing (February 24, 2025), Superintendent Rogers admitted the District intended to remove Hawkins from ECHS even before certain parent complaints, underscoring that retaliation for Hawkins's protected activities was the driving force behind his removal.

245.    Retaliatory Hostile Environment & Constructive Discharge Concerns.

    a. Defendants' collective retaliation—baseless discipline, artificial investigations, public undermining of Hawkins before students and parents, and reassignments tantamount to demotion—fostered a hostile atmosphere.

    b. This ongoing hostility placed Hawkins in an untenable position, threatening his long-term professional viability and increasing the likelihood that a reasonable person would feel compelled to resign, i.e., constructive termination.

    c. The District's refusal to correct these retaliatory practices further heightens the risk that Hawkins's working conditions would deteriorate to the point of forcing his exit.

246. Evidence Undermining the District's Stated Justifications.

    a. The District repeatedly cited vague "complaints" to explain Hawkins's reassignment yet never produced credible documentation or followed due process.

    b. A parent email dated September 5, 2024 (Exhibit 21), refuted claims of "overwhelming" parent discontent, suggesting the District's proffered reasons were mere pretext.

    c. Defendants disregarded valid concerns about students' cheating and teacher qualifications, buttressing the inference that the actual motive was to penalize Hawkins for engaging in protected conduct.

247. TIA Opportunity Disrupted.

    a. Hawkins was diligently improving his performance metrics to qualify for the Texas Teacher Incentive Allotment (TIA), which can yield substantial compensation for top-performing educators.

    b. By punishing Hawkins for protected activities—via adverse evaluations, demotions, and contrived discipline—the District significantly impaired his TIA eligibility.

    c. Although TIA funds are not guaranteed, this retaliatory environment derailed Hawkins's legitimate path to potentially enhanced income and career growth.

248. Intent and Reckless Indifference.
Defendant DeSoto ISD's actions were intentional or carried out with reckless disregard for Hawkins's protected rights, demonstrated by:

    a. Targeting him with formal discipline and reassignment soon after he reported unlawful or questionable practices.

    b. Continuing illegal or problematic grading directives despite Hawkins's repeated efforts to bring the District into compliance.

    c. Persisting in procedures (e.g., Level 1–3 grievances) that denied Hawkins a fair chance to refute allegations, thus displaying indifference to the clear legal prohibitions against retaliation.

249. Injury and Damages.
As a direct and proximate result of Defendant DeSoto ISD's retaliatory conduct,

Hawkins has suffered:

- Economic Harm: Loss of wages and diminished prospects for stipends, specialized teaching roles, or TIA incentives.
- Emotional Distress: Ongoing anxiety, humiliation, and fear of being pushed out of his career due to unlawful retaliation.
- Professional Reputational Damage: The District's negative portrayal of Hawkins and his forced removal from ECHS have undermined his standing among peers, parents, and potential future employers.
- Constructive Discharge Risk: The retaliatory hostility poses a serious threat that Hawkins may be forced to resign, compounding both financial and emotional losses.

250.    Violation of Title VII.

By subjecting Hawkins to adverse employment actions in direct response to his protected activities, Defendant DeSoto ISD violated Title VII's anti-retaliation provisions, 42 U.S.C. § 2000e-3(a).

251.    Prayer for Relief on Count II.

WHEREFORE, Hawkins respectfully requests that the Court enter judgment in his favor on Count II and award such relief as warranted under Title VII and as set forth in the Prayer for Relief, including but not limited to:

- Compensatory Damages for lost earnings, back pay, front pay (or reinstatement), and impaired TIA opportunities;
- Emotional Distress Damages to address the mental anguish caused by retaliation;
- Declaratory and Injunctive Relief halting the District's retaliatory practices and ensuring Hawkins is protected from further harm;
- Any Other Relief the Court deems fair and appropriate, including attorneys' fees and costs.

# COUNT III: HOSTILE WORK ENVIRONMENT UNDER TITLE VII

(Against Defendant DeSoto ISD)

252.    Incorporation of Allegations.

Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference all preceding paragraphs of this Complaint, including but not limited to ¶¶ 1–251, as if fully set forth herein.

253. Basis of Claim.
This claim arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., which prohibits discrimination and retaliation affecting the terms, conditions, and privileges of employment. Hawkins contends that DeSoto ISD subjected him to a severe and pervasive hostile work environment on the basis of his race, color, national origin, sex, and in retaliation for his protected activities.

254. Perpetrators of Hostile Conduct.
DeSoto ISD's employees and agents—including Defendants Starling, Primus, Campbell, Darden, Morrow, Medina, Bailey, and Polk—collectively contributed to creating and perpetuating a hostile work environment. They did so through direct acts of harassment and by tacitly approving harassing conduct from students, parents, or other staff members.

255. Specific Harassing Acts.
The hostile work environment arose from a coordinated series of actions and omissions, including but not limited to: a. Lack of Support & Excessive Scrutiny: Demands exceeding Tex. Educ. Code § 11.164(a)(6), resulting in unwarranted reprimands and punitive lesson-plan requirements.
b. Public Undermining & Humiliation: Classroom interruptions (e.g., Ms. Bailey on February 12, 2024) and harsh criticism delivered openly before colleagues or students, eroding Hawkins's authority and credibility.
c. Unfair Targeting & Intimidation: Imposing a contrived TINA plan and orchestrating surprise reassignments, including the sudden placement of Ms. Jackson into Hawkins's class.
d. Retaliatory Demotion: Forcing Hawkins out of ECHS Honors Algebra II and into a regular Algebra II role, depriving him of the prestigious program he had legitimately earned.
e. Defamatory or Undermining Statements: Telling parents and staff that Hawkins was "overbearing" or incompetent, often based on racial or gender stereotypes, damaging his professional reputation.
f. Pressure to Inflate Grades: Mandating "no grades below 50" and "no failing grades for students with subs," pitting Hawkins's commitment to academic integrity against administrative demands and encouraging parent/student backlash.
g. Interference with Classroom Enforcement: For instance, on October 30, 2024 (Exhibit 26), Defendant Medina openly overrode Hawkins's discipline efforts, encouraging student defiance.
h. Discriminatory Parental Harassment: Parents explicitly invoked Hawkins's race (e.g., the September 17, 2024 call), insisting he grant Black students greater leniency, and administrators validated these biases by punishing Hawkins for consistent rule enforcement.

256. Severity and Pervasiveness of Harassment.
The above conduct was sufficiently severe and pervasive that it:

   a. Interfered with Hawkins's Teaching: Constant interruptions, lack of administrative support, and undermining by colleagues rendered it difficult to maintain order or uphold consistent academic standards.
   b. Created Fear, Intimidation, & Isolation: Hawkins was singled out, scrutinized, and deprived of the collaboration and support his peers enjoyed, causing ongoing emotional distress.
   c. Encouraged Further Hostility: Students, parents, and staff viewed Hawkins as a "problem teacher," emboldening them to disregard his authority.
   d. Magnified Vulnerability: Hawkins's efforts to resolve issues through official channels (e.g., grievances) were met with additional hostility or dismissiveness, intensifying the hostile environment.

257. Link to Protected Classes and Activities.

   a. Race, Color, and National Origin: Parents and colleagues expected Hawkins, as a Black educator, to be "more lenient" with Black students. Instead of defending Hawkins's fair enforcement of standards, administrators tacitly endorsed these racial stereotypes by disciplining him for not complying.
   b. Sex (Male): Hawkins experienced further marginalization in a context where District administrators openly acknowledged "men on campus" faced disadvantages but took no corrective action.
   c. Retaliation for Protected Activities: Hawkins's complaints about illegal grading practices and his filings of internal grievances led to heightened scrutiny and more severe harassing measures.

258. Connection to Constructive Termination.
The cumulative effect of persistent undermining, contrived disciplinary actions, and refusal to address Hawkins's valid concerns created conditions so intolerable that a reasonable person would consider resignation to be the only escape. Despite Hawkins's attempts to seek fair treatment and file grievances, the District's hostility only deepened, exacerbating the risk of forced resignation (i.e., constructive discharge).

259. Impact on Professional Advancement & TIA Opportunity.

   a. Damaged Professional Growth: Hawkins's reputation was tarnished among peers, students, and potential future employers.
   b. Jeopardized TIA Eligibility: The Teacher Incentive Allotment ("TIA"), a merit-based compensation program, became far less attainable for Hawkins due to negative evaluations, contrived discipline, and removal from ECHS, where higher-level coursework could have showcased his teaching excellence.
   c. Long-Term Career Harm: Although TIA funds are not guaranteed, the District's hostile environment severely undermined Hawkins's prospects for achieving the performance metrics required for such career-advancing opportunities.

260. Intent and Reckless Indifference.

The District's creation or tolerance of this hostile work environment was intentional or, at best, carried out with reckless indifference to Hawkins's rights. Despite being alerted to the racial, gender-based, and retaliatory aspects of the harassment, administrators failed to intervene, remedy the conditions, or offer any genuine support.

261. Harm and Damages.

As a direct and proximate result of Defendants' maintenance of a hostile work environment, Hawkins has suffered:

- Emotional Distress: Continuing stress, anxiety, and a sense of humiliation stemming from relentless scrutiny and undermining.
- Reputational Harm: Peers, students, and the wider school community now view Hawkins as a problematic figure, curbing his influence and respect as an educator.
- Lost or Diminished Opportunities: Hawkins lost access to potential TIA allotments and other avenues for professional advancement.
- Increased Constructive Discharge Risk: If the hostility remains unresolved, Hawkins may have no choice but to leave his employment to preserve his well-being.

262. Violation of Title VII.

By subjecting Hawkins to a hostile work environment grounded in race, color, national origin, sex, and in retaliation for engaging in protected activities, Defendant DeSoto ISD violated 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a).

263. Prayer for Relief on Count III.

WHEREFORE, Hawkins respectfully requests that this Court enter judgment in his favor on Count III and award:

- Compensatory Damages for lost wages, back pay, front pay or reinstatement, emotional distress, and reputational harm;
- Equitable and Injunctive Relief mandating that DeSoto ISD take immediate measures to eliminate the hostile work environment, provide Hawkins the support and resources necessary to succeed, and ensure no further retaliation;
- Any Additional Relief the Court deems just and proper to remedy the hostile environment and restore Hawkins's professional standing.

# COUNT IV: RACE DISCRIMINATION UNDER 42 U.S.C. § 1981

(Against DeSoto ISD; Principal Jasen Campbell; Jocelyn Starling; Kristi Primus; Dr. Leon Darden;

Gene Morrow; Jorge Medina; Alicia Bailey;
and Christopher Polk, in Their Individual & Official Capacities)

264.   Incorporation of Allegations.
   Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference all preceding paragraphs of this Complaint, including but not limited to ¶¶ 1–263, as though fully set forth herein.

265.   Statutory Basis and Protected Right.

   a.   42 U.S.C. § 1981 prohibits race-based discrimination in the creation, performance, modification, and termination of contracts, as well as all benefits, privileges, and conditions of the contractual relationship.
   b.   As a Black male educator, Hawkins is entitled to full and equal treatment under his employment contract with Defendant DeSoto ISD, including non-discriminatory practices in assignments, promotions, pay, and discipline.

266.   Employment Contract and Applicability.

   a.   Hawkins held a valid employment contract with Defendant DeSoto ISD for his role as a classroom teacher.
   b.   Under § 1981, Hawkins is entitled to be free from race discrimination that affects any aspect of his contractual employment rights, such as his position, salary potential, or discipline.

267.   Defendants' Discriminatory Conduct.
   Defendants DeSoto ISD, Principal Jasen Campbell, Jocelyn Starling, Kristi Primus, Dr. Leon Darden, Gene Morrow, Jorge Medina, Alicia Bailey, and Christopher Polk (collectively "Defendants") intentionally subjected Hawkins to race-based discrimination by: a. Targeted Discipline & Unfair Scrutiny: Imposing a Formal Letter of Concern, a pretextual TINA plan, and other disproportionate oversight—far exceeding what similarly situated non-Black employees experienced.
   b. Discriminatory Reassignments: Removing Hawkins from the prestigious Early College High School ("ECHS") classes despite his success, and replacing him with a less qualified, non-Black or non-male candidate.
   c. Endorsing Racial Stereotypes: Penalizing Hawkins for refusing to grant racial leniency (e.g., ignoring dress code and attendance violations for Black students), thereby supporting parents and staff who believed Hawkins "should understand the struggle" simply because he is Black.
   d. Fostering a Racially Hostile Environment: Failing to address or actively encouraging racially charged parental complaints (e.g., the September 17, 2024 call), undermining Hawkins's authority, and stigmatizing him based on race.

268.   Connection to Constructive Discharge.

    a. Defendants' race-based disparate treatment combined with ongoing hostility made Hawkins's working conditions increasingly intolerable.

    b. These actions included repeated sabotage of his discipline efforts, removal of students from his classes at parents' whim (especially after racially tinged complaints), and the District's refusal to confront underlying stereotypes.

    c. A reasonable employee in Hawkins's position would feel compelled to consider resignation to escape an environment permeated by unremedied racial discrimination.

269. Missed Teacher Incentive Allotment (TIA) Opportunity.

    a. Hawkins's high performance and award recognitions placed him on track to qualify for the TIA—a program offering additional compensation for top-tier educators.

    b. By demoting Hawkins from advanced ECHS classes, tarnishing his record with negative or unwarranted disciplinary notes, and allowing ongoing racial hostility, Defendants severely undermined Hawkins's ability to meet TIA requirements.

    c. Although TIA funds are not guaranteed, Defendants' discriminatory conduct directly diminished Hawkins's likelihood of attaining this career and financial benefit.

270. Intentional, Malicious, and Reckless Indifference.

    a. Defendants' acts and omissions were deliberate and carried out with at least reckless disregard for Hawkins's federally protected rights.

    b. Each Defendant knew or should have known that subjecting Hawkins to negative evaluations, transfers, and heightened scrutiny based on race was unlawful.

    c. Defendants' unwillingness to address racially biased parental demands or correct race-driven disciplinary measures demonstrates a conscious disregard for Hawkins's § 1981 rights.

271. Damages.

As a direct and proximate result of Defendants' race discrimination, Hawkins has suffered:

    a. Economic Losses: Including back pay, potential TIA bonuses, and lost professional opportunities stemming from his forced removal from ECHS.

    b. Emotional Distress & Reputational Harm: Caused by stigmatization linked to his race and unwarranted insinuations of incompetence or "overbearing" conduct.

    c. Constructive Discharge Implications: The intolerable racial climate, if uncorrected, risks forcing Hawkins to resign to preserve his dignity and well-being.

272. Violation of 42 U.S.C. § 1981.

By engaging in the above-mentioned racially discriminatory practices that altered or denied the benefits of Hawkins's employment contract, Defendants violated 42 U.S.C. § 1981.

273.   Prayer for Relief on Count IV.
WHEREFORE, Hawkins respectfully requests that this Court:

   a. Find Defendants Liable under 42 U.S.C. § 1981 for intentional race
      discrimination;
   b. Award Compensatory Damages for lost wages, back pay, front pay, emotional
      distress, harm to reputation, and diminished TIA opportunities;
   c. Grant Equitable Relief such as reinstatement (or a substantially equivalent
      position), alongside measures ensuring a non-discriminatory environment; and
   d. Provide Any Other Relief the Court deems just and proper, including attorneys'
      fees and costs.

# COUNT V: RETALIATION UNDER 42 U.S.C. § 1981

(Against DeSoto ISD; Principal Jasen Campbell;
Jocelyn Starling; Kristi Primus; Dr. Leon Darden;
Gene Morrow; Jorge Medina; Alicia Bailey;
Christopher Polk; and Alma Murphy-Goss,
in Their Individual & Official Capacities)

274.   Incorporation of Allegations.
Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference all preceding
paragraphs of this Complaint, including but not limited to ¶¶ 1–252, as if fully set forth
herein.

275.   Protected Activities Under § 1981.
Hawkins engaged in protected activities by:

   a. Opposing Racially Discriminatory Practices: Challenging the District's race-based
      double standards, including parental/admin expectations that he, as a Black
      teacher, be more lenient with Black students.
   b. Enforcing Contractual Rights: Filing grievances and objecting to unlawful grading
      directives, selective discipline, and reassignments infringing on his contractual
      entitlements.
   c. Demanding Due Process: Pursuing multiple grievance levels (I, II, and III),
      insisting on transparent investigations and proper documentation, which are
      protected under § 1981 when aimed at eliminating race discrimination or
      retaliation.

276.   Retaliatory Adverse Actions.
In response to Hawkins's protected activities, Defendants DeSoto ISD; Principal

59

Campbell; Starling; Primus; Darden; Morrow; Medina; Bailey; Polk; and Murphy-Goss took adverse actions, including but not limited to: a. Formal Letter of Concern: Citing Hawkins's refusal to comply with illegal or excessive lesson-plan mandates as "noncompliance," thus chilling his protected advocacy.

b. Pretextual TINA Plan: Imposed absent documented deficiencies, undermining Hawkins's credibility and tarnishing his teaching record.

c. Reassignment from ECHS to Regular Algebra II: Removing Hawkins from advanced courses and diminishing his professional prestige, despite his prior success.

d. Denial of Grievances in Sham Hearings: At Levels 1, 2, and 3, administrators weaponized the grievance process to punish Hawkins for asserting his rights, rather than address valid race-based or contractual claims.

e. Refusal to Provide Due Process: Blocking or dismissing Hawkins's efforts to see or respond to complaints, further deterring him—and others—from contesting discriminatory practices.

f. Additional Undermining of Authority: Including unilateral classroom or grade-related decisions by some Defendants, such as Ms. Murphy-Goss removing a student from Hawkins's class and demanding retroactive grade changes, thereby retaliating against Hawkins for maintaining consistent academic standards in line with his opposition to racially motivated leniency.

277.    Connection to Constructive Discharge.

   a.   The cumulative effect of these retaliatory measures, combined with the lack of due process, fosters conditions so intolerable that a reasonable person would see resignation as the only escape.
   b.   Abrupt punitive acts—like the TINA plan, denied grievances, forced removal from ECHS—heighten the risk of a constructive discharge scenario if unremedied.

278.    Causation and Burden-Shifting Framework.

   a.   Temporal Proximity: Hawkins's protected activities (grievance filings and objections to race-based standards) closely preceded adverse actions, suggesting retaliatory motive.
   b.   Pretext: The District's failure to substantiate alleged complaints, along with procedural irregularities, show that the stated reasons are pretextual.
   c.   Legitimate vs. Illegitimate Rationale: Even if Defendants claim a legitimate reason, the abrupt timing, flawed investigations, and contradictory justifications confirm retaliation under § 1981.

279.    Impact on Teacher Incentive Allotment (TIA) Eligibility.

   a.   Hawkins's removal from high-performing ECHS classes and negative personnel records eroded his capacity to meet TIA's rigorous performance metrics.
   b.   As a result, Defendants' retaliation cost Hawkins not just immediate wages but also substantial future opportunities for merit-based compensation.

60

280. Intentional and Reckless Indifference.

   a. Defendants acted knowingly, or at least with reckless disregard for Hawkins's rights under § 1981, by punishing him for challenging racially discriminatory treatment.
   b. The sham nature of the grievance process, unwarranted discipline, and refusal to address legitimate race-based grievances illustrate Defendants' deliberate indifference.

281. Damages.
   As a direct and proximate result of Defendants' retaliatory actions:

   a. Economic Harm: Hawkins lost wages, potential TIA funds, and career growth prospects.
   b. Emotional Distress & Reputational Damage: He endured heightened stress, anxiety, and harm to his professional standing.
   c. Risk of Constructive Discharge: Hawkins's hostile and retaliatory work environment threatens to force his resignation if uncorrected.

282. Violation of 42 U.S.C. § 1981.
   By subjecting Hawkins to adverse employment actions in direct response to his exercise of rights under § 1981—especially his opposition to race-based discrimination—Defendants violated the anti-retaliation prohibitions of 42 U.S.C. § 1981.

283. Prayer for Relief on Count V.
   WHEREFORE, Hawkins respectfully requests that this Court:

   a. Enter Judgment in his favor on this Count;
   b. Award Compensatory Damages (including emotional distress, reputational harm, back pay, and front pay or reinstatement);
   c. Grant Special Damages reflecting lost or diminished TIA eligibility and other career-advancement opportunities;
   d. Provide Attorneys' Fees and Costs as allowed by law; and
   e. Issue Any Additional Relief deemed just and proper to remedy Defendants' retaliatory conduct.

# COUNT VI: DEPRIVATION OF RIGHTS UNDER COLOR OF STATE LAW

## (42 U.S.C. § 1983 – EQUAL PROTECTION)

(Against DeSoto ISD; Principal Jasen Campbell;
Jocelyn Starling; Kristi Primus; Dr. Leon Darden;

Alicia Bailey; Gene Morrow; Jorge Medina;
Christopher Polk; and Alma Murphy-Goss,
in Their Individual & Official Capacities, and
the DeSoto ISD Board of Trustees in Its Official Capacity)

284.    Incorporation of Allegations
Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference all preceding paragraphs of this Complaint, including but not limited to ¶¶ 1–___, as if fully set forth herein.

285.    Color of State Law
At all relevant times, Defendants—DeSoto ISD, its Board of Trustees, and its employees (including Principal Jasen Campbell, Starling, Primus, Darden, Morrow, Bailey, Medina, Polk, and Murphy-Goss)—acted under color of state law. Their decisions and conduct regarding Hawkins's employment, discipline, and reassignment were carried out pursuant to authority conferred by state law and District policy.

286.    Fourteenth Amendment's Equal Protection Clause
The Equal Protection Clause of the Fourteenth Amendment prohibits state and local government entities and officials from discriminating on the basis of race, color, national origin, or sex, among other protected characteristics.

287.    Defendants' Intentional Race and Sex Discrimination
Defendants intentionally discriminated against Hawkins because of his race (Black), color (Black), national origin (African American), and sex (male) in violation of the Fourteenth Amendment's Equal Protection Clause. Illustrative examples include:

a. Disparate Discipline & Scrutiny

   a.  Imposing a TINA Plan and issuing a Formal Letter of Concern with minimal factual basis, while similarly situated non-Black and/or female colleagues were not subjected to such contrived disciplinary measures or heightened scrutiny.

288.    b. Inequitable Reassignment / Demotion

   a.  Reassigning Hawkins from DeSoto Early College High School ("ECHS") to a less prestigious post at DeSoto High School with no legitimate pedagogical rationale—whereas non-Black and/or female teachers were spared similar punitive reassignments despite comparable or greater performance issues.

289.    c. Endorsement of Racial Stereotypes

   a.  Penalizing Hawkins for refusing to accommodate race-based demands that a Black teacher should be more lenient with Black students—thereby validating discriminatory stereotypes and blaming Hawkins for uniformly enforcing rules.

62

290.    d. Other Instances of Preferential Treatment

    a.  Granting certain non-Black or female educators exemptions from District policies (e.g., grading or discipline protocols) with no repercussions, yet singling out Hawkins under the guise of "complaints" or "noncompliance."

291.    Motivation by Improper Animus

Defendants acted with purposeful discrimination and/or reckless disregard for Hawkins's federally protected rights. Their selective enforcement of rules, reliance on unverified complaints, and refusal to rectify Hawkins's unequal treatment confirm a race- and sex-based motive.

292.    Individual & Official Capacity Liability

    a.  Individual Capacity

        Principal Campbell, Starling, Primus, Darden, Morrow, Bailey, Medina, Polk, and Murphy-Goss personally participated in, approved, or ratified discriminatory actions. They are not entitled to qualified immunity because it is clearly established that government officials may not discriminate on the basis of race or sex.

    b.  Official Capacity / Municipal Liability

        a. DeSoto ISD Board of Trustees as Final Policymaker

            i.   The DeSoto ISD Board of Trustees is the District's governing body with ultimate policymaking authority. Despite knowing of Hawkins's claims of racial and sex-based discrimination—through the formal grievance process culminating in Level III—the Board affirmed or failed to remedy Principal Campbell's decisions, thereby ratifying the unconstitutional conduct.

            ii.  This ratification makes the Board's action (or inaction) an official policy of DeSoto ISD, subjecting the District to liability under Monell.

    c.  b. Principal Campbell's Delegated Authority

            i.   Even if Campbell is not deemed a "final policymaker" in general, Board Policy DK (or equivalent policies) delegated to him near-complete authority over teacher assignments and reassignments. Because there was no meaningful review or reversal by higher officials, Campbell's discriminatory acts carried the force of official policy for teacher reassignments.

    d.  c. Resulting Liability

            i.   Through either direct delegation to Principal Campbell or explicit ratification by the Board at Level III, DeSoto ISD adopted and sanctioned

the discriminatory acts alleged herein, violating the Equal Protection Clause.

293.  Injury & Damages

As a direct and proximate result of Defendants' intentional discrimination, Hawkins has suffered:

a.  Lost Wages & Benefits: Demotion or reassignment to a non-ECHS position, forfeiting prestige and additional compensation.
b.  Emotional Distress & Reputational Harm: Sustained humiliation and erosion of professional standing.
c.  Reduced Professional Advancement: Exclusion from advanced teaching responsibilities, undermining opportunities for leadership roles, merit pay, or Teacher Incentive Allotment (TIA) eligibility.

294.  Prayer for Relief

WHEREFORE, Plaintiff Matthew Hawkins respectfully requests that this Court:

a.  Declare that Defendants' acts and omissions violated Hawkins's Fourteenth Amendment right to Equal Protection;
b.  Award Compensatory Damages for lost wages, emotional distress, reputational injury, and all other losses arising from the discrimination;
c.  Grant Punitive Damages against the individual Defendants in their personal capacities for malicious or recklessly indifferent violations of Hawkins's constitutional rights;
d.  Issue Injunctive and Declaratory Relief enjoining further discriminatory practices and restoring Hawkins to a position free from race- or sex-based disadvantages; and
e.  Grant Such Other and Further Relief as this Court deems just and equitable.

# COUNT VII: DEPRIVATION OF RIGHTS UNDER COLOR OF STATE LAW

(42 U.S.C. § 1983 – PROCEDURAL DUE PROCESS)
(Against DeSoto ISD; DeSoto ISD Board of Trustees;
Superintendent Dr. Usamah Rogers; Principal Jasen Campbell;
Jocelyn Starling; Kristi Primus; Dr. Leon Darden;
Alicia Bailey; Gene Morrow; Christopher Polk;
Alma Murphy-Goss, in Their Individual & Official Capacities)

295.    Incorporation of Allegations.
Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference all preceding paragraphs of this Complaint, including but not limited to ¶¶ 1– 293, as though fully set forth herein.

296.    Property Interest in Employment & Fair Process.

    a.  Under Texas law and District policies, Hawkins held a constitutionally protected property interest in his continued employment and in being free from arbitrary or discriminatory discipline or reassignment.
    b.  He also reasonably expected (a) to enforce academic standards without retaliation, (b) to receive meaningful notice of any complaints, and (c) to have a fair opportunity to respond before being stripped of significant teaching duties or professional standing.

297.    Systemic Denial of Procedural Due Process.
Acting under color of state law, Defendants deprived Hawkins of his Fourteenth Amendment right to procedural due process via repeated failures to provide timely notice, an opportunity to be heard, or fair investigations:

a. Unsubstantiated Letter of Concern & TINA Plan

    a.  Defendants Starling and Campbell imposed a Formal Letter of Concern and a Teacher in Need of Assistance (TINA) Plan on Hawkins without first investigating or giving him a real chance to dispute alleged performance issues.
    b.  These actions served as a paper trail, undermining Hawkins's record from the outset and paving the way for more severe adverse measures.

298.    b. Surprise Reassignment of Ms. Jackson

    a.  On or about February 27, 2024, Hawkins learned via email (Exhibit 12) from Defendant Primus that Ms. Jackson would "conduct [his] instruction," removing him from primary teaching duties without prior notice or any process allowing him to contest this abrupt decision.

299.    c. Retaliatory Reassignment from ECHS to Regular Algebra II

    a.  Hawkins was transferred from specialized ECHS Honors Algebra II/Geometry to a regular Algebra II position at DeSoto High School—effectively a demotion—again absent specific complaints or an opportunity to respond.
    b.  Defendants cited vague "overwhelming parent complaints" but never documented or disclosed them, violating Tex. Educ. Code § 26.003(a)(2) (prohibiting reassignments based solely on parent requests) and Hawkins's right to due process.

300.    d. Sham Grievance Proceedings (Levels I & II)

a. Defendants Darden (Level I) and Morrow (Level II) presided over fundamentally unfair grievance hearings:
    i. Hawkins lacked details on who complained or the evidence prompting discipline or reassignment.
    ii. He was blocked from calling witnesses or examining records.
    iii. Mandatory documentation was absent from the official record, breaching Board Policy DGBA.
    iv. Both decisions justified adverse actions under "Policy DK" or "best interest of the District," with no supporting investigation or evidence.

301. e. Level III Hearing & Final Ratification

a. At the final grievance stage (February 24, 2025), Superintendent Dr. Usamah Rogers and the DeSoto ISD Board of Trustees could have rectified due process failures but instead:
    i. Offered new, unsubstantiated allegations of a "major campus disruption."
    ii. Reached a tie vote or effectively upheld the prior denials, leaving Hawkins without a legitimate forum to counter accusations or cross-examine witnesses.
    iii. Echoed counsel's stance that "the accused is not to choose the method of investigation," revealing a misunderstanding of constitutionally required procedural safeguards.

302. f. Additional Procedural Failures (Murphy-Goss)

a. Defendant Murphy-Goss unilaterally removed a special education student from Hawkins's class, demanding retroactive grade changes without Hawkins's input or an IEP-related conference, contributing to the broader pattern of disregarding Hawkins's procedural rights.

303. Procedural Denials as Retaliation & Pretext.

a. These due process violations compound the retaliatory motives alleged elsewhere.
b. By refusing to disclose or investigate the alleged grounds for disciplinary actions, Defendants effectively silenced Hawkins's protected oppositions to illegal grading practices and discrimination, cloaking their true motives behind opaque "complaints."

304. Constructive Termination Consequences.

a. The persistent denial of fair procedures left Hawkins with no viable means to defend himself or correct the record.
b. The resulting hostility and futility of the grievance process—culminating in the Board's ratification—rendered Hawkins's situation so intolerable that resignation might appear the only option, i.e., constructive discharge.

305. Cumulative Harm, Including TIA Setback.

    a. As a direct result of these procedural due process failings, Hawkins suffered reputational harm, emotional distress, and a compromised professional standing.

    b. His chance to qualify for the Teacher Incentive Allotment (TIA) likewise eroded, because TIA metrics hinge on consistent instruction, performance data, and an untarnished professional record that Defendants' actions upended.

306. Liability of Final Policymakers.

    a. Principal Campbell, acting as the Superintendent's designee for reassignments, held final policymaking authority within the District.

    b. The Board of Trustees and Superintendent Dr. Rogers, by affirming adverse actions or offering new, unsubstantiated justifications, ratified the constitutional violations. Under Monell, this institutional ratification imposes liability on DeSoto ISD.

    c. Individual Defendants (Campbell, Starling, Primus, Darden, Morrow, Bailey, Polk, Rogers, and Murphy-Goss) are personally liable for knowingly or recklessly depriving Hawkins of notice and a fair hearing, thus violating clearly established law.

307. Qualified Immunity Not Applicable.

    a. It has long been clearly established that a public employer cannot demote or reassign an employee without due process—especially when refusing to disclose accusations and blocking an employee's right to defend himself.

    b. A reasonable official in each Defendant's position would know these practices contravene Fourteenth Amendment safeguards.

308. Damages & Relief.

    a. Compensatory Damages: Lost wages, emotional distress, reputational harm, and hindered TIA eligibility.

    b. Declaratory & Injunctive Relief: Mandating that DeSoto ISD adopt or adhere to constitutionally sound procedures for discipline and reassignment.

    c. Punitive Damages: Against those individual Defendants who acted maliciously or with reckless disregard for Hawkins's procedural rights.

    d. Other Appropriate Relief: As deemed just by this Court.

# COUNT VIII: DEPRIVATION OF RIGHTS UNDER COLOR OF STATE LAW

(42 U.S.C. § 1983 – SUBSTANTIVE DUE PROCESS)
(Against DeSoto ISD; DeSoto ISD Board of Trustees;
Superintendent Dr. Usamah Rogers; Principal Jasen Campbell;
Jocelyn Starling; Kristi Primus; Dr. Leon Darden;
and Gene Morrow, in Their Official & Individual Capacities)

309.    Incorporation of Allegations.
Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference the allegations in paragraphs 1 through 282 as if fully set forth herein.

310.    Substantive Due Process Under the Fourteenth Amendment.

   a. The Fourteenth Amendment's Due Process Clause protects against governmental actions that are arbitrary and capricious, shock the conscience, or unjustifiably infringe upon fundamental rights and liberty interests.
   b. Hawkins's right to continued employment under fair and non-retaliatory conditions—particularly his ability to teach at DeSoto Early College High School without baseless interference—falls within the scope of substantive due process when such interference is so arbitrary it "shocks the conscience."

311.    Arbitrary and Capricious Actions.
Defendants DeSoto ISD; Principal Jasen Campbell; Starling; Primus; Darden; and Morrow acted arbitrarily and capriciously by:

   a. Illegitimate Reassignment: Reassigning Hawkins from ECHS to DeSoto High School solely due to unsubstantiated parent complaints, violating Tex. Educ. Code § 26.003(a)(2) (which bars reassignments solely based on parental demands) and lacking any legitimate pedagogical purpose.
   b. Unwarranted Discipline & Plans: Imposing a Formal Letter of Concern and TINA Plan without a factual basis, thus manufacturing a negative record to facilitate Hawkins's removal from his specialized post.
   c. Ignoring Evidence of Success & Support: Dismissing Hawkins's established record of success at ECHS, as well as a parent's explicit desire (Exhibit 21) for Hawkins to remain, confirming the lack of a rational connection to any legitimate government interest.
   d. Enforcing Unlawful Grading Directives: Such as "no grades below 50" or blanket prohibition on failing students with substitutes, further exemplifying the arbitrary nature of Defendants' actions.

312.    Protected Property and Liberty Interests.

   a. Property Interest: Hawkins had a right, arising under Texas Education Code and District policies, to serve out his teaching contract free from arbitrary or retaliatory demotions.
   b. Liberty Interest in Reputation: By reassigning Hawkins under a cloud of alleged wrongdoing, publicly hinting that his removal was necessary, and implying

misconduct tied to student grade changes, Defendants tarnished Hawkins's reputation and signaled he was unfit to teach high-achieving students—thus infringing on his liberty interest to pursue his chosen profession.

313. Shocking the Conscience.

    a. The extent of Defendants' conduct—removing Hawkins from the ECHS program without legitimate basis, altering student grades without justification, and conducting "sham" grievance proceedings—was so egregious and outrageous that it "shocks the conscience."

    b. Such extreme misconduct violates contemporary standards of decency, as it involved purposefully undermining Hawkins's career in bad faith, motivated by improper retaliation and discrimination.

314. Improper Motive: Retaliation and Discrimination.

    a. Defendants Campbell, Starling, Primus, Darden, and Morrow acted with an improper motive: to retaliate against Hawkins for protected activities (e.g., filing grievances, opposing illegal grading practices) and to discriminate against him based on race and sex.

    b. Their disregard for Hawkins's success at ECHS and their reliance on mere "complaints" reveal an agenda unrelated to educational goals or legitimate District interests.

315. Principal Campbell & Board of Trustees as Final Policymakers

    a. Principal Campbell exercised final authority for teacher reassignments under Board Policy DK, making his arbitrary removal of Hawkins from ECHS an official policy of DeSoto ISD.

    b. DeSoto ISD Board of Trustees possessed ultimate policymaking authority; through the Level III grievance hearing, the Board effectively ratified Campbell's arbitrary decision. Its tie vote (or final denial) of Hawkins's appeal affirmed the unconstitutional course of action, making it the official policy or custom of the District.

316. Level 1 & Level 2 Hearing Officers (Darden & Morrow).

    a. Defendants Darden (Level 1) and Morrow (Level 2) upheld Hawkins's reassignment without proper investigation, rationale, or record maintenance, ratifying Campbell's arbitrary decision.

    b. Their refusal to address the due process or substantive issues raised constituted an official policy or custom of the District, thereby imposing § 1983 liability on DeSoto ISD.

317. Sham Grievance Process & Extreme Conduct.

    a. The absence of any meaningful review or analysis—coupled with the District's shifting justifications at the various grievance levels—further demonstrates how Defendants acted intentionally, maliciously, and with reckless disregard.

    b. These actions culminated in a "shocks the conscience" scenario, depriving Hawkins of fair employment free from retaliatory or discriminatory interference.

318. Damages & Relief.

As a direct and proximate result of Defendants' actions, Hawkins suffered:

- Lost Wages & Benefits: Including the high-value ECHS position and potential leadership or merit-based compensation.
- Emotional Distress & Reputational Harm: Public stigmatization and the insinuation he was unfit to teach advanced students.
- Diminished Professional Growth: Impaired future prospects from being removed, without cause, from a specialized and prestigious program.

319. Qualified Immunity Not Available.

- Reassigning a teacher from a specialized program with no legitimate basis—violating Texas Education Code § 26.003(a)(2)—and denying him a fair or documented grievance process are clearly established constitutional violations.
- A reasonable official in each Defendant's position would understand that acting arbitrarily and capriciously to damage an educator's career could violate the Fourteenth Amendment's substantive due process protections.

320. Prayer for Relief on Count VIII.

WHEREFORE, Plaintiff Hawkins requests that the Court:

- Declare that the actions of DeSoto ISD, Principal Campbell, Starling, Primus, Darden, and Morrow violated Hawkins's substantive due process rights;
- Award Compensatory Damages for lost wages, emotional distress, reputational harm, and other losses caused by these arbitrary and conscience-shocking acts;
- Grant Punitive Damages against the individual Defendants in their personal capacities to punish malicious or reckless conduct and to deter similar misconduct; and
- Order Any Additional Relief the Court deems just and proper.

# COUNT IX: FAILURE TO TRAIN AND SUPERVISE UNDER 42 U.S.C. § 1983

(Against Defendant DeSoto ISD; the DeSoto ISD Board of Trustees in Its Official Capacity; and Dr. Usamah Rogers in Her Official and Individual Capacities)

321. Incorporation of Allegations

Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference all preceding paragraphs of this Complaint, including but not limited to ¶¶ [1–320], as though fully set forth herein.

322. Supervisory Duties and Standards
    a. DeSoto ISD Board of Trustees

      a. As the governing body of DeSoto ISD, the Board of Trustees possesses final policymaking authority over District-wide practices, including employee training and supervisory standards.

      b. By establishing, approving, or neglecting policies for educator training and grievance procedures, the Board shapes the legal and constitutional compliance obligations of all District administrators.

323. b. Superintendent Dr. Usamah Rogers

      a. Dr. Rogers, as Superintendent, has the day-to-day responsibility to ensure subordinate employees—such as Principal Jasen Campbell, Starling, Primus, Darden, Morrow, and others—are trained and supervised in accordance with federal and state law, as well as District policy.

      b. Dr. Rogers must also implement Board-approved training protocols and oversee compliance with constitutional standards.

324. Failure to Train & Supervise on Constitutional and Statutory Requirements
Defendants DeSoto ISD, the DeSoto ISD Board of Trustees, and Dr. Rogers failed to provide or mandate adequate training regarding:

    a. Due Process Requirements

      a. Proper investigation of teacher complaints;
      b. Notice and a meaningful opportunity to be heard before adverse actions;
      c. Compliance with the Fourteenth Amendment and Board Policy DGBA (Local).

325. b. Proper Grievance Procedures

      a. Maintenance of a complete, accurate record at each level;
      b. Fair and impartial hearings, particularly for high-stakes reassignments like removal from the Early College High School program.

326. c. Non-Retaliation

      a. Federal and state law prohibitions (Title VII, 42 U.S.C. § 1981, Texas Whistleblower Act) on punishing employees for reporting or opposing unlawful conduct.

327. d. Non-Discrimination

      a. Protections against race, color, national origin, and sex discrimination under Title VII, 42 U.S.C. § 1981, and other relevant statutes.

328. e. Compliance with State Law

71

    a. Adherence to Tex. Educ. Code §§ 11.164(a)(6), 28.0214, 28.0216, and 26.003(a)(2), including the implied right not to be reassigned solely on the basis of parental complaints.

329. f. Enforcement of School Policies

    a. Uniform and fair application of dress code and ID rules, ensuring consistent discipline, clear communication, and respect for teachers' classroom authority.

330. Deliberate Indifference

a. Board of Trustees

    a. The Board, as DeSoto ISD's final policymaker, was on notice that improper or non-existent training could lead to constitutional violations. This awareness is evidenced by repeated grievances, complaints of discriminatory and retaliatory acts, and admissions of error in March 2024.

    b. Despite such warnings, the Board failed to adopt or enforce proper training measures, showing deliberate indifference to the risk of constitutional harm to District employees, including Hawkins.

331. b. Superintendent Rogers

    a. Dr. Rogers was aware—or should have been aware—of the risk that subordinates would violate employees' constitutional rights, as reflected in Hawkins's multiple grievances, parent emails (Exhibit 21), and the District's own admitted procedural failures.

    b. Even with this knowledge, Dr. Rogers did not rectify the flawed training or supervision practices, allowing Level 1 and Level 2 hearings to remain inadequate and certain administrators (e.g., Defendant Medina) to undermine Hawkins's classroom authority.

332. Causation of Constitutional and Statutory Violations

Defendants' failure to train and supervise directly caused or substantially contributed to:

    a. Procedural Due Process Violations, including sham grievance proceedings;

    b. Retaliatory Actions against Hawkins for reporting unlawful directives;

    c. Discriminatory Practices infringing Hawkins's rights under federal and state law.

333. By not instituting proper oversight or corrective measures, the Board and Dr. Rogers fostered an environment in which repeated deprivations of Hawkins's constitutional rights occurred.

334. Individual Capacity and Qualified Immunity (Dr. Rogers)

    a. Dr. Rogers is sued individually and in her official capacity.

    b. She is not entitled to qualified immunity because failing to supervise or train subordinates—despite clear notice that such omissions would result in constitutional violations—contravenes established due process,

72

non-discrimination, and non-retaliation principles. A reasonable superintendent would know these standards.

335.   Dr. Rogers's Conduct at the Level III Hearing

   a.   Dr. Rogers's introduction of shifting, unsubstantiated rationales for Hawkins's reassignment and her admission of a "pre-existing plan" to remove him from ECHS illustrate her deliberate indifference.

   b.   No evidence of the alleged "major campus disruption" was produced, underscoring the systemic deficiency in training/supervision and reaffirming the arbitrary, retaliatory nature of the District's actions.

336.   Damages

As a direct and proximate result of Defendants' failure to train and supervise, Hawkins suffered:

   a.   Lost Wages and Benefits resulting from wrongful disciplinary measures and a punitive reassignment;

   b.   Emotional Distress and Reputational Harm inflicted by the District's unconstitutional and retaliatory environment;

   c.   Professional Damage limiting future career prospects and eligibility for specialized programs like TIA.

337.   Prayer for Relief on Count IX

WHEREFORE, Plaintiff Hawkins respectfully requests that the Court:

   a.   Find that Defendants DeSoto ISD, the DeSoto ISD Board of Trustees (in its official capacity), and Dr. Rogers (in her official and individual capacities) violated 42 U.S.C. § 1983 by failing to train and supervise employees with deliberate indifference to Hawkins's constitutional rights;

   b.   Award Compensatory Damages for Hawkins's economic losses, emotional distress, and reputational injuries;

   c.   Grant Punitive Damages against Dr. Rogers in her individual capacity to punish malicious or recklessly indifferent behavior; and

   d.   Order Any Further Relief the Court deems just and proper.

# COUNT X: VIOLATION OF THE TEXAS WHISTLEBLOWER ACT

(Against Defendant DeSoto ISD)

338.   Incorporation of Allegations.

Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference the allegations in

paragraphs 1 through 337, as though fully set forth herein.

339.   Statutory Basis.

   a.   This cause of action arises under the Texas Whistleblower Act, Texas Government Code Chapter 554, which prohibits a local governmental entity from retaliating against a public employee who in good faith reports a violation of law to an appropriate law enforcement authority.

340.   Good-Faith Reports of Legal Violations.
   Hawkins made multiple good-faith reports of what he reasonably believed to be violations of law, including but not limited to:

   a.   Texas Education Code:
       i.   Section 11.164(a)(6) (illegal paperwork requirements),
       ii.   Section 28.0216 (unlawful grading practices),
       iii.   Section 28.0214 (improperly changing grades without proper investigation), and
       iv.   Section 26.003(a)(2) (implied right barring reassignment based solely on parent complaints).
   b.   DeSoto ISD Board Policies:
       i.   DLB, EIA (LOCAL), and EIA (LEGAL), addressing grading rules, teacher documentation limits, and related standards.
   c.   Inconsistent Enforcement of Local Policies:
       i.   Hawkins reported that teachers who were not Black males had different, more lenient enforcement of dress code, ID rules, and academic integrity, violating DeSoto ISD's own regulations (which count as "law" under the Whistleblower Act).

341.   Protected Activity and Link to State Law.

   a.   By raising these concerns in good faith—both internally, formally in grievance process,  and to the District's designated administrators (e.g., Dr. Darden) who had enforcement authority—Hawkins engaged in protected whistleblower activity under Texas Government Code § 554.002(a).
   b.   Hawkins's disclosures pertained to statutory or regulatory mandates that DeSoto ISD is required to uphold, firmly placing his actions within the scope of the Whistleblower Act.

342.   Adverse Employment Actions, Including Due Process Violations.
   In retaliation for Hawkins's protected reports, Defendant DeSoto ISD, through its employees and agents, took adverse actions such as:

   a.   Issuance of a Formal Letter of Concern:
       i.   Publicly stigmatizing Hawkins for refusing to comply with directives he believed violated the law.
   b.   Placement on a TINA Plan (Teacher in Need of Assistance):

      i.   Imposed without valid instructional deficiencies, serving primarily to label Hawkins a "problem teacher" and deter further whistleblowing.

  c.  Reassignment from ECHS Honors to Regular Algebra II:

      i.   Depriving Hawkins of a prestigious teaching role after he reported illegal grading and policy breaches.

  d.  Systemic Due Process Violations:

      i.   Failing to disclose alleged complaints, preventing Hawkins from calling witnesses, and conducting sham grievance proceedings—thereby denying Hawkins a meaningful opportunity to defend against the retaliatory actions. These procedural shortfalls added to the hostile environment and had a chilling effect on Hawkins's willingness to continue reporting legal violations.

343.   Burden-Shifting Framework and Pretext.

  a.  Protected Activity: Hawkins's detailed complaints about unlawful grading practices, illegal paperwork demands, and improper reassignments constitute protected whistleblowing.

  b.  Adverse Actions: DeSoto ISD imposed disciplinary measures, negative performance records, demotions, and obstructed due process—shortly after Hawkins reported violations.

  c.  Causal Connection: The temporal proximity and the District's departure from normal procedural safeguards strongly suggest the real reason for these adverse actions was Hawkins's whistleblowing, not any legitimate performance concerns.

  d.  Pretext: Even if DeSoto ISD claims a non-retaliatory justification (e.g., "complaints from parents"), the District's refusal to follow due process underscores that these reasons are mere pretext to mask unlawful retaliation.

344.   Intent and Damages.

  a.  DeSoto ISD's retaliatory acts were intentional, deliberate, and malicious, carried out after Hawkins raised legally protected concerns.

  b.  As a direct and proximate result of the District's retaliation, Hawkins suffered:

      i.   Lost Wages and Benefits (due to being moved from a specialized, advanced program to a less prestigious post),

      ii.  Emotional Distress and Reputational Harm from being mischaracterized as uncooperative or incompetent, and

     iii.  Professional Detriment as the sham grievance proceedings further dissuaded Hawkins from exposing additional violations.

345.   Prayer for Relief on Count X.

WHEREFORE, Hawkins respectfully requests that this Court:

  a.  Declare that Defendant DeSoto ISD violated the Texas Whistleblower Act by retaliating against Hawkins for his good-faith reports of legal violations;

b. Award Compensatory Damages for lost wages, emotional distress, reputational harm, and other economic and non-economic losses caused by DeSoto ISD's retaliatory conduct;

c. Grant Equitable Relief such as reinstatement to Hawkins's ECHS assignment (or a substantially equivalent position) and an injunction barring further retaliation; and

d. Provide Any Additional Relief deemed just and proper, including attorneys' fees and costs, consistent with Texas Government Code Chapter 554.

# COUNT XI: VIOLATION OF THE TEXAS LABOR CODE CHAPTER 21

(Against Defendant DeSoto ISD)

346. Incorporation of Allegations.
Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference the allegations in paragraphs 1 through 345 as if fully set forth herein.

347. Statutory Basis.

a. This cause of action arises under Texas Labor Code Chapter 21 (the Texas Commission on Human Rights Act, "TCHRA"), which prohibits discrimination and retaliation in employment based on race, color, national origin, sex, and opposition to unlawful practices.

b. DeSoto ISD is an "employer" covered by TCHRA, and Hawkins is an "employee" protected by the statute.

348. Protected Classes and Activities.

a. Protected Classes: Hawkins is a Black/African American male, placing him in protected categories of race, color, national origin, and sex.

b. Protected Activity: Hawkins opposed and complained about discriminatory treatment and grading policies that disparately impacted Black students and Black male educators. He also engaged in internal grievance procedures to protest these unlawful practices.

349. Discrimination Based on Race, Color, National Origin, and Sex.

a. DeSoto ISD, through its administrators and agents, subjected Hawkins to adverse employment actions, including unwarranted discipline, a pretextual TINA plan, and a demotion/reassignment from ECHS to a regular Algebra II position.

b. These actions were motivated at least in part by Hawkins's protected characteristics. Non-Black or female teachers committing similar or greater infractions were treated more favorably, evidencing disparate treatment.

350. Retaliation for Opposing Unlawful Practices.

   a. Hawkins engaged in protected activity under Chapter 21 by objecting to discriminatory grading directives (including leniency for certain students based on race) and by filing internal grievances challenging unfair discipline and reassignment.
   b. Shortly after Hawkins's complaints, DeSoto ISD escalated adverse actions against him, including the imposition of contrived performance measures and the removal from his prestigious ECHS role—a clear causal connection indicating retaliation under the TCHRA.

351. Burden-Shifting and Pretext.

   a. Prima Facie Case: Hawkins's membership in protected groups, his protected activity (opposing discrimination), subsequent adverse actions, and a causal link between the two establish a prima facie case.
   b. Pretext: Although DeSoto ISD may assert a non-discriminatory and non-retaliatory reason—such as vague "parent complaints"—the District's failure to disclose such complaints or follow proper procedures, as well as its disparate treatment of other teachers, reveals that these justifications are mere pretext.

352. Intentional and Malicious Conduct.

   a. DeSoto ISD's discriminatory and retaliatory actions were deliberate and willful, taken with reckless disregard for Hawkins's protected rights under the TCHRA.
   b. The adverse actions inflicted on Hawkins have caused significant harm to his career, financial stability, and emotional well-being.

353. Prayer for Relief on Count XI.
    WHEREFORE, Hawkins respectfully requests that this Court:

   a. Declare that Defendant DeSoto ISD violated Texas Labor Code Chapter 21 by discriminating against Hawkins on the basis of race, color, national origin, and sex, and by retaliating against him for opposing discriminatory practices;
   b. Award Compensatory Damages to Hawkins for lost wages, emotional distress, and reputational harm;
   c. Grant Equitable Relief, including reinstatement to his former or an equivalent position (e.g., ECHS Honors Algebra II) and an injunction prohibiting further discrimination or retaliation;
   d. Provide Attorney's Fees and Costs as authorized under Texas Labor Code Chapter 21; and
   e. Issue Any Other Relief the Court deems just and proper to remedy DeSoto ISD's violation of the TCHRA.

# COUNT XII: BREACH OF CONTRACT

(Against Defendant DeSoto ISD)

354.   Incorporation of Allegations.
         Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference all preceding paragraphs of this Complaint, including but not limited to ¶¶ 1–353, as though fully set forth herein.

355.   Existence of a Valid Employment Contract.

      a.   For the 2024–2025 school year, Hawkins and Defendant DeSoto ISD entered into an employment contract (Exhibit 9).
      b.   This contract governed the terms and conditions of Hawkins's employment, including assignments, reassignments, and the District's obligation to comply with state law and its own policies.

356.   Material Terms.

      a.   The contract's language allowed the District to reassign Hawkins or modify his duties, but explicitly subject to "all applicable…state laws, rules, and regulations" and District policies. (See Exhibit 9 )
      b.   It did not waive Hawkins's right to due process or protection against unlawful discrimination and retaliation.
      c.   Texas Education Code § 26.003(a)(2) bars reassigning a teacher "solely due to parent complaints," reflecting one of many relevant constraints on the District's contractual powers.

357.   Breach of Contract by DeSoto ISD.
         DeSoto ISD materially breached the parties' agreement by:

      a.   Subjecting Hawkins to Discriminatory and Retaliatory Treatment in violation of state law and District policies;
      b.   Failing to Follow Its Own Policies, including Board Policies DK (Reassignment), FNG (Complaints), DLB (Lesson Plans), and EIA (Grading), when disciplining or reassigning Hawkins;
      c.   Denying Hawkins Due Process in disciplinary and grievance procedures, contrary to the contract and District policy requirements;
      d.   Changing Student Grades Illegally, in violation of Tex. Educ. Code § 28.0214, Board Policy EIA (LOCAL), and EIA (LEGAL), undermining Hawkins's professional autonomy and breaching the mutual trust and obligations of the contract; and
      e.   Reassigning Hawkins Contrary to Tex. Educ. Code § 26.003(a)(2), disregarding the statutory prohibition against reassigning a teacher "solely due to parent complaints."

358.   Interpretation Within Texas Law and District Policy.

a. While the contract states the District "may reassign" Hawkins, it must do so in accordance with "all applicable…state laws, rules, and regulations."

b. The District's unilateral decision to remove Hawkins from ECHS Honors courses, without valid documentation or a legitimate educational basis—and allegedly in response to parent complaints—exceeded the scope of permissible reassignments allowed under the contract and state law.

359. Damages.

  a. As a direct and proximate result of DeSoto ISD's breach of contract, Hawkins has incurred damages, including but not limited to:

   i. Lost Wages and Benefits (e.g., reduced opportunities for advanced course stipends, leadership roles, or professional growth);

   ii. Emotional Distress from being demoted or improperly reassigned without fair process; and

   iii. Reputational Harm, as the District's actions implied wrongdoing and compromised Hawkins's professional standing.

360. Prayer for Relief on Count XII.
WHEREFORE, Hawkins respectfully requests that this Court:

  a. Find that DeSoto ISD's acts and omissions constitute a breach of contract;

  b. Award Damages to compensate Hawkins for lost wages, benefits, emotional distress, and reputational harm proximately caused by the breach;

  c. Grant Any Additional Equitable Relief necessary to enforce the contract's valid provisions, including reinstatement or similar remedies, if appropriate; and

  d. Provide Such Other Relief as this Court deems just and proper.


# COUNT XIII: DEFAMATION

(Against Defendant Principal Jasen Campbell, in His Official & Individual Capacities; Joselyn Starling, in Her Official & Individual Capacities; and Dr. Leon Darden, in His Official & Individual Capacities)

361. Incorporation of Allegations.
Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference the allegations in paragraphs 1 through 360, as if fully set forth herein.

362. Defamatory Statements.

  a. False Imputations about Hawkins's Reassignment:

   i. Defendants DeSoto ISD, Principal Jasen Campbell, Joselyn Starling and Dr. Leon Darden made or caused to be made statements implying

                Hawkins's removal from his teaching assignment was justified by "overwhelming complaints" or wrongdoing on Hawkins's part.

      ii.  In fact, these "complaints" were never substantiated, and Hawkins was not afforded due process, rendering the implication that Hawkins had engaged in misconduct or was unfit to teach false and defamatory.

363. Publication to Third Parties.

    a. These false statements were communicated to parents and potentially other members of the school community—such as staff or administrators—through emails, reassignment notices, or oral statements implying that Hawkins's reassignment arose from legitimate complaints or misconduct.

364. Falsity and Fault Standard.

    a. Falsity: The statements were untrue, as Hawkins's reassignment was not grounded in valid complaints but was retaliatory, discriminatory, and unsupported by any documented evidence.

    b. Actual Malice or Reckless Disregard: Defendants knew or should have known these statements were false and unsubstantiated. Despite their knowledge, they disseminated the information or allowed it to be disseminated, disregarding the truth and the absence of due process.

365. Injury to Reputation and Emotional Distress.

    a. Hawkins's reputation was harmed because these statements cast him as a problematic or incompetent teacher.

    b. As a result, Hawkins suffered emotional distress, humiliation, and damage to his professional credibility, impeding his ability to maintain respect from parents, students, and colleagues.

366. Prayer for Relief on Count XIII.

WHEREFORE, Hawkins respectfully requests that this Court:

    a. Declare that the defamatory statements made by or on behalf of DeSoto ISD, Principal Campbell, and Dr. Darden violated Hawkins's rights under Texas defamation law;

    b. Award Compensatory Damages for harm to Hawkins's reputation, emotional distress, and any other actual losses attributable to Defendants' defamatory conduct;

    c. Grant Punitive Damages against Principal Campbell and Dr. Darden in their individual capacities, to the extent allowed by law, in order to punish their malicious or reckless disregard for the truth; and

    d. Provide Any Other Appropriate Relief that this Court deems just and proper to redress the harm caused by Defendants' defamatory acts.

## COUNT XIV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(Against Defendant Principal Jasen Campbell,
Jocelyn Starling, Kristi Primus, Dr. Leon Darden,
Gene Morrow, Jorge Medina, and Christopher Polk,
in Their Individual & Official Capacities)

367.    Incorporation of Allegations.
    Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference all preceding paragraphs of this Complaint, including but not limited to ¶¶ 1–366, as if fully set forth herein.

368.    Extreme and Outrageous Conduct.

   a.   Defendants DeSoto ISD; Principal Jasen Campbell; Starling; Primus; Darden; Morrow; Medina; and Polk engaged in actions that were extreme and outrageous, exceeding all bounds of decency in a civilized community.
   b.   Such conduct included, but was not limited to:
      i.   Unwarranted Disciplinary Actions: Issuing baseless write-ups and imposing a pretextual TINA plan that demeaned Hawkins's professional competence.
      ii.  Retaliatory Reassignment: Removing Hawkins from advanced ECHS courses—despite his proven record—in retaliation for his lawful enforcement of policies and reporting of illegal practices.
      iii. Due Process Denials: Conducting sham grievance procedures, withholding evidence of any legitimate "complaints," and preventing Hawkins from defending himself effectively.
      iv.  Defamatory Statements: Disseminating or approving remarks implying Hawkins was incompetent or wrongfully removed from ECHS, severely harming his reputation.
      v.   Creating a Hostile Work Environment: Repeatedly undermining Hawkins's authority, endorsing racially biased parental complaints, and prompting ongoing humiliation and fear.
      vi.  Changing Student Grades Improperly: Altering grades without Hawkins's consent to mask administrative failings and discredit Hawkins's legitimate academic standards.

369.    Intentional or Reckless Conduct.

   a.   Defendants knew or should have known that their behavior would likely result in severe emotional distress to Hawkins.
   b.   Despite this knowledge, they persisted in extreme and outrageous conduct, demonstrating either an intent to harm Hawkins or a reckless disregard for the impact on his mental and emotional well-being.

370. Severe Emotional Distress.

    a. As a direct and proximate result of the Defendants' actions, Hawkins suffered significant emotional distress, including but not limited to severe anxiety, stress, loss of sleep, humiliation, and damage to his self-confidence and professional standing.

371. Prayer for Relief on Count XIV.
WHEREFORE, Hawkins respectfully requests that this Court:

    a. Declare that Defendants' actions constitute intentional infliction of emotional distress under Texas law;

    b. Award Compensatory Damages to Hawkins for the emotional pain, suffering, and mental anguish caused by this extreme and outrageous conduct;

    c. Grant Punitive Damages against the individual Defendants in their personal capacities, to punish their malicious or reckless behavior and deter similar future conduct; and

    d. Provide Any Other Appropriate Relief deemed just and proper by this Court.

# COUNT XV: RETALIATION IN VIOLATION OF THE FIRST AMENDMENT (42 U.S.C. § 1983)

(Principal Jasen Campbell, Jocelyn Starling, Kristi Primus, Dr. Leon Darden, Gene Morrow, Jorge Medina, and Christopher Polk, in Their Individual & Official Capacities, DeSoto ISD, and the DeSoto ISD Board of Trustees in Its Official Capacity)

372. Incorporation of Allegations
Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference all preceding paragraphs of this Complaint, including but not limited to ¶¶ 1–371, as if fully set forth herein.

373. Protected Speech on Matters of Public Concern
Hawkins engaged in First Amendment-protected speech by:

    a. Objecting to Illegal Lesson-Plan Mandates: Challenging the District's "PowerPoint-driven" lesson-plan requirements as exceeding lawful paperwork limits under Tex. Educ. Code § 11.164(a)(6).

    b. Opposing Unlawful Grading Practices: Protesting the "no grades below 50" directive and other policies he reasonably believed violated Tex. Educ. Code § 28.0216.

    c. Highlighting Inconsistent Enforcement: Communicating, internally and publicly, concerns about selective discipline, grading disparities, and overall fairness—issues of broader public import.

82

    d. Filing Grievances: Formally pursuing administrative remedies and raising District-wide compliance concerns, thus engaging in constitutionally protected petition and free-speech activity.

374. Sequence of Adverse Actions (Retaliation)

Defendants subjected Hawkins to a pattern of retaliatory actions—including a Formal Letter of Concern, a TINA Plan, insertion of Ms. Jackson into Hawkins's class, and ultimately forcible reassignment from ECHS to a regular Algebra II position—directly following or in response to his protected speech.

375. Link Between Speech and Retaliation

    a. Temporal Proximity: Each adverse measure closely followed Hawkins's continued objections to unlawful District mandates, supporting an inference of retaliatory motive.

    b. Sham Grievance Procedures: Defendants withheld alleged complaints, denied Hawkins meaningful process, and "rubber-stamped" decisions as further retaliation for his protected activities.

376. Municipal Liability (DeSoto ISD and Board of Trustees)

a. Board of Trustees as Final Policymaker

    a. The DeSoto ISD Board of Trustees wields ultimate policymaking authority for District operations, including oversight of disciplinary actions and grievance outcomes.

    b. Despite having notice of Hawkins's First Amendment claims—through the multi-level grievance process culminating at Level III—the Board failed to remedy or prevent the retaliatory acts, thereby ratifying the unconstitutional retaliation.

    c. This ratification constitutes official policy under Monell, subjecting DeSoto ISD to liability for the violation of Hawkins's First Amendment rights.

377. b. Principal Campbell's Delegated Authority

    a. Alternatively, to the extent that Board Policy DK or related regulations vest final authority in Principal Campbell for teacher reassignments, his retaliatory actions effectively represent District policy.

    b. No higher authority meaningfully reviewed or reversed Campbell's decisions before they took effect, reinforcing that Campbell functioned as a final policymaker within that domain.

378. c. Resulting Municipal Liability

    a. Either through delegation to Campbell or Board-level ratification, DeSoto ISD stands liable under 42 U.S.C. § 1983 for retaliating against Hawkins's First Amendment-protected expression.

379. Individual Defendants' Liability

    a. Defendants Campbell, Starling, Primus, Darden, Morrow, Bailey, Medina, Polk, Rogers, and Murphy-Goss personally participated in or sanctioned the retaliatory measures.

    b. They are not entitled to qualified immunity because the right to be free from retaliation for speaking on matters of public concern is clearly established.

380. Causation and Pretext

    a. Defendants' references to vague or nonexistent parent complaints, the contrived TINA Plan, and shifting justifications for Hawkins's reassignment reveal a pretext to punish him for protected speech.

    b. The abandonment of the TINA Plan and the "sham" grievance proceedings confirm that the District's purported reasons lacked credibility, underscoring a primary motive of retaliation.

381. Damages and Harm

As a direct and proximate result of this unconstitutional retaliation:

    a. Lost Wages & Benefits: Removal from ECHS honors courses and associated prestige diminished Hawkins's compensation and professional standing.

    b. Emotional Distress & Reputational Harm: Being branded "noncompliant" or "overbearing" significantly damaged Hawkins's future employment prospects and caused mental anguish.

    c. Punitive Damages: Individual Defendants' malicious or recklessly indifferent disregard of Hawkins's First Amendment rights justifies the imposition of punitive damages.

382. Prayer for Relief on Count XV

WHEREFORE, Hawkins respectfully requests that this Court:

    a. Declare that Defendants' imposition of adverse actions—including the Letter of Concern, TINA Plan, misuse of the grievance process, and reassignment from ECHS—violated Hawkins's First Amendment rights;

    b. Award Compensatory Damages for lost wages, emotional distress, reputational harm, and all other injuries arising from this unconstitutional retaliation;

    c. Grant Punitive Damages against individual Defendants in their personal capacities for malicious or reckless indifference to Hawkins's free-speech rights;

    d. Enjoin Further Retaliation, ensuring that the District and its officials do not continue to penalize Hawkins for lawful objections to District mandates; and

    e. Grant Such Other Relief as the Court deems just and proper.

## COUNT XVI: MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983 – DELIBERATE INDIFFERENCE, FAILURE TO SUPERVISE, & RATIFICATION

(Against Defendant DeSoto ISD School Board)

383.    Incorporation of Allegations.
Plaintiff Matthew Hawkins ("Hawkins") re-alleges and incorporates by reference all preceding paragraphs of this Complaint, including but not limited to ¶¶ 1–382, as if fully set forth herein.

384.    Color of State Law.

   a.   At all times relevant, the DeSoto ISD School Board ("the Board") acted under color of state law.
   b.   The Board has ultimate authority over District policies, hiring, supervision, and disciplinary processes affecting teachers like Hawkins.

385.    Duty to Supervise and Ensure Compliance.

   a.   The Board bears the responsibility to oversee the Superintendent and other high-level administrators to guarantee that their actions adhere to federal and state constitutional and statutory requirements.
   b.   This includes preventing or correcting known violations of employees' due process rights, freedom from retaliation, and a workplace free from discrimination.

386.    Knowledge of Constitutional Violations and Policy Breaches.

   a.   During the Level III hearing and through additional communications, the Board was notified of multiple constitutional and policy violations committed by Superintendent Dr. Rogers, Principal Campbell, and other administrators concerning Hawkins's reassignment and adverse employment actions.
   b.   The Board received evidence of:
      i.    Shifting, Pretextual Justifications for Hawkins's removal from ECHS;
      ii.   Lack of Investigation or Documentation supporting the administration's claims;
      iii.  Dr. Rogers's Admission of a pre-existing plan to reassign Hawkins;
      iv.   Due Process Failures, including the denial of notice and meaningful grievance proceedings; and
      v.    Potential Retaliatory Motive, indicating that Hawkins's protected activities and complaints triggered the adverse actions.

387.    Failure to Take Corrective Action & Resulting Tie Vote.

85

a. Despite clear evidence of likely constitutional infractions, the Board took no meaningful steps to remedy the violations at the Level III hearing or thereafter.

b. The Board's tie vote effectively upheld the unlawful reassignment, legitimizing the wrongful acts of Dr. Rogers, Principal Campbell, and other administrators.

388. Deliberate Indifference as Moving Force.

a. By failing to act, the Board exhibited deliberate indifference to Hawkins's established constitutional rights, including due process and freedom from unlawful retaliation and discrimination.

b. This inaction served as a moving force behind the ongoing violations against Hawkins, making the Board's deliberate indifference a direct cause of the harm he experienced.

389. Ratification of Unconstitutional Conduct.

a. The Board's inaction and refusal to overturn the unlawful reassignment or mandate a proper investigation effectively ratified Dr. Rogers's and Principal Campbell's unconstitutional decisions.

b. This ratification signals a custom, policy, or practice of tolerating or endorsing administrators' retaliatory or discriminatory actions, as well as disregard for teachers' due process rights.

390. Failure to Adequately Train and Supervise.

a. The Board's deliberate indifference is further evidenced by its failure to implement or enforce policies ensuring that District administrators are trained and supervised on critical legal obligations:
    i. Due Process for employees facing reassignment or discipline,
    ii. Anti-Retaliation protections under state and federal law, and
    iii. Academic Integrity practices that comply with Texas Education Code requirements and District policies.

391. Damages.

a. As a direct and proximate result of the Board's deliberate indifference, failure to supervise, and ratification of unlawful conduct, Hawkins suffered:
    i. Lost Wages and Benefits, owing to his demotion from ECHS to a less prestigious teaching role;
    ii. Emotional Distress, arising from ongoing retaliation, denial of fair procedures, and the hostile work environment;
    iii. Damage to Professional Reputation, stemming from the Board's complicity in stigmatizing Hawkins's reassignment; and
    iv. Other Injuries, including diminished career prospects and professional relationships.

392. Prayer for Relief on Count XVI.

WHEREFORE, Hawkins respectfully requests that this Court:

a. Declare that the DeSoto ISD School Board's deliberate indifference, failure to supervise, and ratification of unconstitutional conduct violated 42 U.S.C. § 1983;

b. Award Compensatory Damages for Hawkins's economic losses, emotional distress, and reputational harm;

c. Grant Equitable or Injunctive Relief to correct the District's policies or practices, require proper supervision, and ensure no further constitutional violations occur; and

d. Provide Any Other Appropriate Relief the Court deems just and proper.

# COUNT XVII: CONSTRUCTIVE TERMINATION / CONSTRUCTIVE DISCHARGE

(In Violation of Title VII of the Civil Rights Act of 1964,
Against Defendant DeSoto Independent School District)

393. Incorporation of Allegations
Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference all preceding paragraphs of this Complaint, including but not limited to ¶¶ 1–392, as if fully set forth herein.

394. Statutory Basis

a. This claim arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., which prohibits discrimination and retaliation that culminate in adverse employment actions, including constructive discharge.

395. Constructive Discharge Standard

a. A constructive discharge occurs when working conditions become so intolerable that a reasonable employee in the same position would feel compelled to resign.

b. Although Hawkins has not actually resigned, the conditions created by Defendant DeSoto ISD have escalated to an objectively intolerable level that would force a reasonable person to quit.

396. Intolerable Working Conditions
Defendant DeSoto ISD, through its administrators, supervisors, and agents, subjected Hawkins to a pattern of hostile, retaliatory, and discriminatory acts that would lead any reasonable teacher to conclude he had no option but to leave. These acts include, but are not limited to:

a. Unlawful Retaliation and Discrimination: Targeting Hawkins after he reported or opposed illegal grading directives and discriminatory practices, in violation of Title VII's anti-retaliation provisions.

b. Baseless Disciplinary Measures: Imposing a contrived TINA plan, Formal Letter of Concern, and other punitive actions without legitimate cause, thereby eroding Hawkins's professional credibility.

c. Demotion from ECHS: Stripping Hawkins of his advanced teaching position at DeSoto Early College High School, undermining his career advancement and damaging his prospects (e.g., eligibility for higher compensation or Teacher Incentive Allotment).

d. Sham Grievance Process: Withholding evidence of supposed complaints, denying Hawkins a fair opportunity to defend himself, and ratifying adverse actions despite clear indications of retaliation.

e. Hostile Work Environment: Tolerating or endorsing acts of harassment, changing student grades to discredit Hawkins, and undermining his authority, thus intensifying the stress and humiliation he endured.

397. Defendant's Knowledge and Intent

a. DeSoto ISD was aware, or should have been aware, that these extreme conditions and retaliatory practices would drive a reasonable person to resign.

b. By continuing these measures or failing to remedy them, Defendant acted with knowledge and reckless disregard of the likelihood Hawkins would be forced out.

398. Continuing Employment Despite Intolerable Conditions

a. Hawkins, through personal resilience, has so far refused to resign. Nonetheless, the conditions DeSoto ISD created remain so hostile and detrimental that they meet the legal definition of constructive discharge.

b. Hawkins pleads this in the alternative, asserting that the environment effectively constitutes a forced separation under Title VII standards.

399. Damages and Harm

a. As a direct and proximate result of the intolerable conditions, Hawkins has suffered or is at imminent risk of suffering:
   i. Emotional Distress and Reputational Injury: Ongoing anxiety, stress, and reduced professional standing.
   ii. Lost or Diminished Earnings: Stunted career growth and eligibility for advanced roles or incentive programs (e.g., TIA).
   iii. Other Financial and Non-Financial Harm: Including but not limited to mental anguish, lost future earning capacity, and damage to professional relationships.

400. Prayer for Relief on Count XVII
WHEREFORE, Hawkins respectfully requests that this Court:

a. Declare that DeSoto ISD's actions and omissions constituted an unlawful constructive termination in violation of Title VII, creating a working environment so intolerable that a reasonable educator would be compelled to resign.

    b.  Award Compensatory Damages to Hawkins for emotional distress, reputational harm, and lost wages or benefits—past and future—resulting from the hostile and retaliatory environment.

    c.  Grant Equitable Relief, including potential reinstatement to any advanced teaching roles and an injunction against further acts that perpetuate the severe hostility and retaliation.

    d.  Provide Injunctive Measures mandating policy reforms, anti-retaliation training, and oversight to ensure no other teacher faces similarly intolerable conditions.

    e.  Award Reasonable Attorneys' Fees and Costs pursuant to 42 U.S.C. § 2000e-5(k) or other relevant fee-shifting statutes.

    f.  Grant Such Other and Further Relief as this Court deems just, proper, and necessary to fully redress the constructive discharge environment orchestrated by DeSoto ISD.

## COUNT XVIII: CONSTRUCTIVE TERMINATION / CONSTRUCTIVE DISCHARGE

(42 U.S.C. § 1983 – Constitutional Violations)
(Against DeSoto Independent School District; the DeSoto ISD School Board; Dr. Usamah Rogers, Principal Jasen Campbell, Jocelyn Starling, Kristi Primus, Dr. Leon Darden, Gene Morrow, Jorge Medina, and Christopher Polk, in Their Official & Individual Capacities)

401.    Incorporation of Allegations

Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference all preceding paragraphs of this Complaint, including but not limited to ¶¶ 1–400, as if fully set forth herein.

402.    Statutory Basis and Constitutional Grounds

    a.  This claim arises under 42 U.S.C. § 1983, which provides a cause of action against state actors who, under color of law, deprive individuals of rights secured by the United States Constitution.

    b.  Hawkins alleges that the Defendants—through retaliatory, discriminatory, and unconstitutional conduct—created working conditions so intolerable that a reasonable teacher would be forced to resign, thereby constituting constructive termination or constructive discharge under the First Amendment and/or Fourteenth Amendment (due process, equal protection).

403.    Legal Standard for Constructive Discharge

    a.  Constructive discharge occurs when an employer, through its acts or omissions, deliberately makes working conditions so objectively intolerable that an employee reasonably feels compelled to resign.

b.  Although Hawkins has not actually resigned, he pleads this cause of action in the alternative, contending that Defendants' actions effectively constitute forced separation under constitutional standards.

404.   Intolerable Conditions Created Under Color of Law

Defendants, acting under color of state law, engaged in the following conduct—individually and collectively—making Hawkins's position untenable:

a.  Persistent Retaliation for Constitutionally Protected Speech
    i.  Punishing Hawkins through contrived discipline (TINA plan, formal write-ups) and unwarranted reassignments after he spoke out on matters of public concern (e.g., illegal grading policies, excessive lesson-plan mandates).

b.  Discriminatory Practices Violating Equal Protection
    i.  Subjecting Hawkins, a Black male educator, to heightened scrutiny, harsher discipline, and adverse actions—while similarly situated colleagues not in his protected classes received preferential treatment.

c.  Due Process Violations in Discipline and Grievance Procedures
    i.  Holding sham hearings, withholding evidence, preventing Hawkins from defending himself, and rubber-stamping unconstitutional decisions at every grievance level.

d.  Hostile and Retaliatory Environment
    i.  Changing student grades without justification to undermine Hawkins's professional standing, endorsing or ignoring racially tinged parent complaints, and isolating Hawkins within the District.

e.  Demotion from Advanced ECHS Assignments
    i.  Stripping Hawkins of his prestigious ECHS role, damaging his prospects for career growth, professional reputation, and eligibility for merit-based pay (e.g., Teacher Incentive Allotment).

405.   These actions, individually and cumulatively, created an environment so hostile that a reasonable teacher would have no choice but to resign to escape further humiliation and retaliation.

406.   Municipal Liability: Policy, Custom, and Final Policymakers

a.  DeSoto ISD and the DeSoto ISD School Board are liable under Monell v. Dep't of Social Servs., 436 U.S. 658 (1978), because the unconstitutional conduct was carried out or ratified by officials with final policymaking authority (e.g., Principal Campbell as Superintendent's designee, Superintendent Dr. Usamah Rogers, and the Board itself through a tie vote or inaction).

b.  By failing to correct or by explicitly endorsing these unconstitutional acts, the District and the Board established or ratified a custom of deliberate indifference to constitutional rights, thus making them liable under § 1983.

407.   Individual-Capacity Liability

a. Defendants Campbell, Starling, Primus, Darden, Morrow, Medina, Polk, and Rogers also face individual-capacity liability under § 1983 for personally participating in or knowingly facilitating the unlawful acts that rendered Hawkins's job intolerable.

b. Their creation or endorsement of hostile policies, retaliatory discipline, and sham grievance proceedings reflect a willful or reckless disregard for Hawkins's constitutional rights.

408.  Causation and Damages

a. By intentionally subjecting Hawkins to or knowingly permitting unconstitutional practices, Defendants inflicted ongoing emotional distress, professional harm, and lost career opportunities.

b. Hawkins has suffered and continues to suffer economic damages (e.g., inability to earn advanced teaching stipends, diminished future earnings), emotional distress, reputational harm, and other compensable injuries.

c. A reasonable teacher in Hawkins's position would have been compelled to resign under these intolerable conditions, satisfying the legal test for constructive termination—even though Hawkins remains employed out of personal resilience.

409.  Qualified Immunity Not Applicable

a. The individual Defendants are not entitled to qualified immunity because it is clearly established that public officials cannot retaliate against or discriminate against an employee for exercising constitutional rights, nor can they deny basic procedural due process.

b. A reasonable public official would understand that making conditions so unbearable as to force a constructive discharge violates well-settled constitutional protections.

410.  Prayer for Relief on Count XVIII

WHEREFORE, Hawkins respectfully requests that this Court:

a. Declare that Defendants' collective actions created working conditions so intolerable as to constitute constructive termination or constructive discharge in violation of the First and/or Fourteenth Amendments, actionable under 42 U.S.C. § 1983.

b. Award Compensatory Damages, including back pay, front pay (or reinstatement), emotional distress, reputational harm, and lost future earnings or opportunities (e.g., TIA eligibility).

c. Grant Punitive Damages against individual Defendants in their personal capacities where their conduct was malicious or recklessly indifferent.

d. Enjoin Further Constitutional Violations, ordering the District and its Board to cease and remedy any policies, customs, or practices that contributed to these intolerable conditions.

e. Provide Attorneys' Fees and Costs pursuant to 42 U.S.C. § 1988 or any other applicable law.

f.   Order Such Other and Further Relief as the Court deems just and proper to fully compensate Hawkins and to prevent any future unconstitutional treatment of District employees.

# COUNT XIX: CONSPIRACY TO VIOLATE CONSTITUTIONAL RIGHTS UNDER 42 U.S.C. § 1983

(Against DeSoto ISD; The DeSoto ISD Board of Trustees,
Dr. Usamah Rogers, Principal Jasen Campbell,
Jocelyn Starling, Kristi Primus, Dr. Leon Darden,
Gene Morrow, Jorge Medina, and Christopher Polk,
in Their Official & Individual Capacities)

411.   Incorporation of Allegations
Plaintiff Matthew Hawkins ("Hawkins") incorporates by reference all preceding paragraphs of this Complaint, including but not limited to ¶¶ 1–410, as if fully set forth herein.

412.   Statutory Basis & Elements

a.   Under 42 U.S.C. § 1983, any person acting under color of state law who conspires to deprive another of constitutionally protected rights is liable for resulting harm.
b.   To establish a conspiracy, Plaintiff must show: (1) two or more state actors, (2) an agreement or "meeting of the minds" to violate constitutional rights, (3) overt acts taken in furtherance of that agreement, and (4) injury caused by those acts.

413.   Defendants' Agreement & Coordination

a.   Joint Creation of the TINA Plan: Principal Jasen Campbell and Jocelyn Starling allegedly concocted a Teacher in Need of Assistance (TINA) plan specifically targeting Hawkins, despite negligible or contrived grounds.
b.   Predetermined Reassignment: Superintendent Usamah Rogers and Dr. Leon Darden, on information and belief, discussed reassigning Hawkins from ECHS before any legitimate complaints materialized—showing a foregone conclusion rather than a neutral disciplinary review.
c.   Additional Participation: Defendants Kristi Primus, Gene Morrow, Jorge Medina, and Christopher Polk contributed to or knowingly advanced these overt acts—whether by drafting contrived evaluations, blocking due process, or endorsing unfounded discipline and reassignments.

414.   Constitutional Rights Violated

92

    a. First Amendment: Hawkins's right to speak out on unlawful grading practices, excessive paperwork demands, and other policy breaches was unlawfully curtailed by orchestrated punishments in retaliation.

    b. Fourteenth Amendment: Hawkins was denied fair grievance procedures and singled out for discriminatory or arbitrary scrutiny, infringing Due Process and, if race-based, Equal Protection.

415. Overt Acts & Resulting Harm

    a. TINA Plan & Unjust Discipline: Starling and Campbell initiated a pretextual TINA Plan, while other administrators (Primus, Morrow, Polk, Medina) ratified or refused to question its baseless foundation.

    b. Preexisting Removal Scheme: Rogers and Darden admitted or implied that Hawkins's removal from ECHS was planned regardless of actual performance or complaints, revealing an anti-Hawkins agenda.

    c. Widespread Endorsement: Collectively, Defendants advanced or ratified these measures, causing Hawkins to lose his specialized ECHS position, suffer emotional distress, reputational damage, and other compensable injuries.

416. Intra-Corporate Conspiracy Doctrine – Personal Stake & Ultra Vires Acts

    a. Although Defendants are employees or officials of the same District, they exceeded legitimate policy boundaries and acted with personal animus to deprive Hawkins of his constitutional rights, thus removing them from mere intra-corporate activity.

    b. Defendants' actions were undertaken for retaliatory or discriminatory reasons, outside the legitimate scope of their official duties, forming a malicious agreement.

417. The Role of the DeSoto ISD Board of Trustees – Knowledge & Ratification

    a. Final Policymaker: As the District's governing body, the Board of Trustees wields ultimate policymaking authority, including the power to oversee discipline, reassignments, and grievance outcomes.

    b. Awareness of Collusion: On information and belief, the Board, during Hawkins's Level III grievance and other District reviews, received evidence that multiple administrators had coordinated or "pre-decided" disciplinary measures against Hawkins with no legitimate basis.

    c. Failure to Investigate or Correct: Despite these indications of collusion—e.g., abrupt TINA imposition, conflicting justifications, Dr. Rogers's acknowledgment of a "pre-existing plan"—the Board took no remedial action and upheld the conspiratorial outcome.

    d. Ratification Under Monell: By consciously ignoring or declining to rectify the scheme, the Board ratified the conspiratorial conduct, rendering it an official policy or custom of DeSoto ISD under 42 U.S.C. § 1983.

418. Concealment in the Grievance Process

a. Defendants never disclosed their underlying agreement during Levels I–III, preventing Hawkins from fully exposing the conspiracy at the administrative level.

b. Hawkins alleges on information and belief that discovery (including internal communications) will confirm a meeting of the minds among administrators to punish him for protected speech and to deprive him of due process—awareness of which the Board either had or deliberately ignored.

419. Damages & Prayer for Relief

a. As a direct and proximate result of this conspiratorial scheme, Hawkins has experienced:

    i. Lost Wages & Benefits, having been wrongfully removed from ECHS and stigmatized by an unjust TINA Plan.
    ii. Emotional Distress & Reputational Harm, as the District's contrived discipline labeled him an unfit educator.
    iii. Future Career Limitations due to being cast as "problematic" or "noncompliant," undermining potential promotions, leadership roles, or specialized programs like TIA.

420. WHEREFORE, Hawkins respectfully requests that this Court:

a. Declare that Defendants engaged in a conspiracy, under color of state law, to violate Hawkins's constitutional rights;

b. Award Compensatory Damages (including lost wages, emotional distress, reputational damage, and associated losses);

c. Grant Punitive Damages against individual Defendants who acted with malice or reckless disregard for Hawkins's constitutional rights;

d. Impose Injunctive and Declaratory Relief preventing continuation of conspiratorial retaliation or discrimination, and requiring transparency in future disciplinary processes;

e. Grant Further Relief as the Court deems just and proper, including attorneys' fees and costs under 42 U.S.C. § 1988.

f.

# COUNT XX: CONSPIRACY UNDER 42 U.S.C. § 1985(3)

(Against DeSoto ISD, Dr. Usamah Rogers, Principal Jasen Campbell,
Jocelyn Starling, Kristi Primus, Dr. Leon Darden,
Gene Morrow, Jorge Medina, and Christopher Polk,
in Their Official & Individual Capacities)

94

421.  Incorporation of Allegations

Plaintiff Hawkins incorporates by reference all preceding paragraphs of this Complaint, including but not limited to ¶¶ 1–420, as if fully set forth herein.

422.  Statutory Basis & Elements

a.  Under 42 U.S.C. § 1985(3), a plaintiff must prove: (1) a conspiracy of two or more persons, (2) to deprive him of equal protection or equal privileges and immunities, (3) an act in furtherance of the conspiracy, (4) class-based invidious discriminatory animus, and (5) resultant injury.

423.  Class-Based Animus

a.  Hawkins, a Black male educator, alleges that certain administrators (including Starling, Campbell, and others) harbored racial stereotypes that he should be more lenient with Black students and penalized him for not conforming to such demands.

b.  The advanced plan to remove him from ECHS, despite his demonstrated success, indicates a racial or class-based animus in targeting Hawkins's educational role and undermining his authority.

424.  Agreement & Overt Acts

a.  Superintendent Rogers's statement about early-year "documented" reassignment plans, plus Starling & Campbell jointly drafting the TINA plan, reveal an intentional agreement to degrade Hawkins's position.

b.  By imposing unwarranted discipline, demoting him to a regular Algebra II course, and orchestrating sham hearings, Defendants carried out overt acts depriving Hawkins of his equal protection rights.

425.  Intra-Corporate Conspiracy Exception

a.  Typically, employees of the same entity are not considered separate "persons" for conspiracy. However, where they act out of personal racial animus or beyond legitimate District policy, the intracorporate conspiracy doctrine does not bar the claim.

426.  Resulting Injury

a.  Hawkins suffered denial of advanced assignments, emotional distress, reputational harm, and potential constructive discharge conditions.

b.  § 1985(3) permits recovery of compensatory and punitive damages, plus attorneys' fees under § 1988.

427.  Prayer for Relief

a.  Hawkins seeks a declaration that Defendants' conspiracy violated § 1985(3), compensatory damages for emotional distress and economic harm, punitive

damages for malicious or recklessly indifferent acts, and injunctive relief to prevent further racial or class-based targeting.

## COUNT XXI: TEXAS COMMON-LAW CONSPIRACY

(Against Principal Jasen Campbell, Dr. Usamah Rogers, Jocelyn Starling, Kristi Primus, Dr. Leon Darden, Gene Morrow, Jorge Medina, and Christopher Polk, in Their Individual Capacities)

428.  Incorporation of Allegations
Plaintiff Hawkins incorporates by reference all preceding paragraphs of this Complaint, including but not limited to ¶¶ 1–427, as if fully set forth herein.

429.  Elements of Texas Civil Conspiracy
Under Texas law, civil conspiracy requires:

a. Two or more persons,
b. An agreement to accomplish an unlawful purpose or a lawful purpose by unlawful means,
c. A meeting of the minds,
d. One or more overt acts in furtherance, and
e. Proximate cause of injury.

430.  Underlying Unlawful Acts (Defamation, IIED, Retaliation)

a. Hawkins has alleged defamation (false statements damaging his reputation), and intentional infliction of emotional distress (extreme and outrageous conduct), among other tortious acts.
b. By forming or participating in an agreement to degrade Hawkins's reputation, inflict emotional harm, or retaliate against him for whistleblowing, Defendants used unlawful means to achieve a malicious purpose.

431.  Meeting of the Minds & Overt Acts

a. Starling & Campbell collaborated on the TINA plan intending to sabotage Hawkins.
b. Rogers and Darden documented early plans to remove him.
c. Morrow, Medina, Polk ratified or furthered these acts, culminating in damage to Hawkins's professional standing and mental well-being.
d. These collective steps show an agreement and overt acts designed to undermine Hawkins.

432.  Intra-Corporate Conspiracy Doctrine

a. While these individuals are within the same district, Hawkins pleads they acted with personal malice or outside the legitimate scope of their official duties,

       thereby exceeding standard "employment actions" to commit tortious wrongdoing.

433. Damages

    a. The conspiracy resulted in emotional distress, reputational harm, potential lost wages, and other compensable injuries.

    b. Defendants are thus jointly and severally liable for the underlying torts to which they conspired.

434. Prayer for Relief

    a. Hawkins seeks compensatory damages for all injuries proximately caused by this conspiracy, punitive damages due to malice, and any equitable relief the Court deems just, including a retraction of defamatory statements and correction of official records.

# VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Matthew Hawkins ("Hawkins") respectfully requests that the Court enter judgment in his favor and against Defendants DeSoto ISD, the DeSoto ISD School Board, Dr. Usamah Rogers, Principal Jasen Campbell, Jocelyn Starling, Kristi Primus, Dr. Leon Darden, Gene Morrow, Jorge Medina, and Christopher Polk, and further prays for relief as follows:

1. Declaratory Relief
   a. Declaration of Illegality

       ○ A declaratory judgment that the actions, practices, policies, and customs of Defendants, as alleged, violate the United States Constitution, Title VII, 42 U.S.C. §§ 1981 & 1983, Texas Labor Code Chapter 21, the Texas Whistleblower Act, the Texas Education Code, and other applicable state and federal laws.
   b. Specific Statutory Violations
       ○ A declaration that Hawkins's reassignment violated Texas Education Code § 26.003(a)(2) by reassigning him solely due to parent complaints.

2. Injunctive & Equitable Relief
   a. Immediate Reinstatement

       ○ An order reinstating Hawkins to his prior teaching assignment at DeSoto Early College High School (ECHS) for Honors Algebra 2 and Honors Geometry or an

equivalent advanced teaching position, with no loss of seniority, status, or pay.

b. Expungement of Negative Records

○ An order requiring Defendants to remove and permanently expunge all negative or disciplinary documents from Hawkins's personnel file—including the Formal Letter of Concern and the TINA plan—and prohibit use of these documents in any future evaluations.

c. Compliance with Policies & Law

○ An order compelling Defendants to comply with all relevant board policies, state statutes (including Tex. Educ. Code §§ 11.164(a)(6), 28.0214, 28.0216, and 26.003(a)(2)), and federal anti-discrimination/retaliation provisions, as well as to cease any practices that undermine academic integrity (e.g., unlawful grading policies).

d. Policy Overhaul & Procedures

○ An order requiring Defendants to create and implement clearly written procedures for teacher reassignments, grading guidelines, complaint-handling, and due process during grievances, ensuring compliance with due process, anti-discrimination, anti-retaliation, and academic integrity laws.

e. Mandatory Training

○ An order requiring Defendants to provide ongoing, mandatory training to all board members, administrators, and relevant staff on (1) due process rights, (2) anti-discrimination and anti-retaliation laws, (3) grading integrity and Texas Education Code compliance, (4) ethical investigation and grievance procedures, and (5) appropriate handling of parent complaints.

f. Monitoring & Reporting

○ An order appointing a monitor or requiring periodic compliance reports to the Court for a specified time, detailing policy revisions, trainings completed, and any additional measures taken to ensure lawful and consistent enforcement of District rules.

3. Remedial Measures for Grading & Reputation

a. Grade Policy Rectification

○ An order prohibiting Defendants from implementing or enforcing any grading policies that violate Tex. Educ. Code § 28.0216 or undermine teachers' professional judgment, and requiring a review and revision of any contradictory guidelines or practices.

b. Investigation & Apology

○ An order mandating that Defendants conduct a proper, independent investigation of the complaints lodged against Hawkins—affording him full due process rights—and issue a public apology to Hawkins for any reputational harm and procedural failures.

c. Record Correction

○ An order requiring Defendants to expunge references to the adverse actions or reassignment from Hawkins's personnel file and confirm this expungement in writing.

4.  Damages
    a. Compensatory Damages

    - An award of compensatory damages, including but not limited to:
        1.  Lost Wages & Benefits: Past and future back pay, front pay (if reinstatement is deemed impracticable), and any lost opportunities for stipends or advanced teaching roles.
        2.  TIA/Performance Compensation: Damages reflecting Hawkins's lost or diminished chance to qualify for Teacher Incentive Allotment (TIA) or similar merit-based earnings due to the adverse actions.
        3.  Emotional Distress: For anxiety, stress, humiliation, and harm to Hawkins's mental well-being caused by the hostile and retaliatory environment.
        4.  Reputational Harm: For any stigmatization preventing Hawkins from pursuing future career opportunities or undermining his professional credibility.
            b. Punitive Damages
    - An award of punitive damages against individual Defendants in their personal capacities to punish malicious, willful, or recklessly indifferent conduct and deter such behavior in the future.

5.  Attorneys' Fees & Costs

    - An award of reasonable attorneys' fees, expert witness fees, and litigation costs under 42 U.S.C. § 1988 and any other applicable fee-shifting statutes.

6.  Nominal Damages

    - An award of nominal damages should the Court or jury find that Hawkins's rights were violated but no substantial monetary harm is proven.

7.  Board-Level Directives
    a. School Board Accountability

    - That the Court hold the DeSoto ISD School Board liable for any damages flowing from its deliberate indifference, failure to supervise, and ratification of unconstitutional acts against Hawkins.
        b. Reconsideration of Grievance
    - That the Court order the DeSoto ISD School Board to revisit Plaintiff's Level III Grievance under constitutionally adequate procedures, ensuring a fair hearing, proper documentation, and a reasoned decision free from prior unlawful motives.

8.  Public Apology & Restorative Measures

    - An order requiring public acknowledgment by the District of Hawkins's contributions as an educator, a statement exonerating him of any wrongdoing, and a formal apology for the harm caused by unwarranted investigations, disciplinary actions, and misleading communications to parents or staff.

9. Further or Other Relief

   ○ Such other and further relief—legal, equitable, or otherwise—as this Court deems just, equitable, and proper under the circumstances.


## VIII. EXHIBITS


The following exhibits are attached to and incorporated into this Complaint:

- **Exhibit 1: EEOC Notice of Right to Sue Letter**
- **Exhibit 2: Hawkins' Record of Academic Integrity Enforcement**
- **Exhibit 3: Confirmation of Superintendent Meeting**
- **Exhibit 4: High Flying Eagle Award Recognition (March 27, 2023)**
- **Exhibit 5: Teacher Evaluations**
- **Exhibit 6: Parent Nomination for Teacher of the Year**
- **Exhibit 7: December 2022 Grading Policy Changes**
- **Exhibit 8: No grades below 50 reminder**
- **Exhibit 9: September 19, 2023, Meeting Regarding Calculator Usage**
- **Exhibit 10: Texas Education Code § 11.164(a)(6) – Lesson Plan Requirements**
- **Exhibit 11: Emails and Formal Letter of Concern (October-November 2023)**
- **Exhibit 12: February 27, 2024, Email from Kristi Primus Reassigning Ms. Jackson**
- **Exhibit 13: March 6, 2024, TINA Plan and Subsequent Correspondence**
- **Exhibit 14: TINA Plan**
- **Exhibit 15: March 21, 2024, Meeting Transcript with Jocelyn Starling**
- **Exhibit 16: Hawkins' Level I Grievances (March 8 and September 9, 2024)**
- **Exhibit 17: Principal Campbell's Level I Grievance Response (April 8, 2024)**
- **Exhibit 18: DeSoto ISD Board Policy DK (Local)**
- **Exhibit 19: DeSoto ISD Board Policy EIA (Local) - Grading Policy**
- **Exhibit 20: DeSoto ISD Board Policy EIA (Legal)**
- **Exhibit 21: September 5, 2024 Parent Email Regarding Hawkins' Reassignment**
- **Exhibit 22: Additional Parent Correspondence Regarding Hawkins' Reassignment**
- **Exhibit 23: Hawkins Grievance Record**
- **Exhibit 24: Email to HR Director Larry Davis (October 24, 2024)**
- **Exhibit 25: Level II Grievance Response (November 11, 2024) by Gene Morrow**
- **Exhibit 26: October 30, 2024 Incident Documentation (Disruptive Students, Medina Intervention)**
- **Exhibit 27: DeSoto ISD Student Handbook (2024-2025) p 50-52**
- **Exhibit 28: 2024-2025 DHS Campus Employee Handbook p 24-25**
- **Exhibit 29: "Men's 33" Meeting Announcement (January 6, 2025)**
- **Exhibit 30: Principal Campbell's Statements from "Men's 33" Meeting**
- **Exhibit 31: Ms. R Complaint (September 17, 2024)**

- Exhibit 32: J.R.'s Father's Complaint (November 11, 2024)
- Exhibit 33: C.D.'s Complaint and Subsequent Resolution (October 17, 2024)
- Exhibit 34: D.T. Family Complaint (January 2025)
- Exhibit 35: Schedule Change Policy (2024–2025 DHS Staff Handbook)p42-43
- Exhibit 36: Schedule Change Documentation (23 students moved post-deadline)
- Exhibit 37: SPED Student S.C.'s Schedule Change & Grade Inflation Request (February 10, 2025)
- Exhibit 38: Documentation of Student S.C.'s Behavioral and Academic Record
- Exhibit 39: Level III Grievance Hearing Transcript (February 24, 2025)
- Exhibit 40: Hawkins' Employment Contract with DeSoto ISD
- Exhibit 41: DeSoto ISD Employee Handbook (Policy DK Local) p14-15
- Exhibit 42: DeSoto ISD Board Policy DGBA (Local) - Grievance Procedure
- Exhibit 43: DeSoto ISD Board Policy FNCA (Local) - Student Dress Code

IX. JURY DEMAND

Plaintiff Hawkins demands a trial by jury on all issues so triable.

Respectfully submitted,

Matthew Hawkins

Matthew Hawkins, Pro Se

618 Blue Chalk Dr. Cedar Hill, TX, 75104

972-639-4284

matthewhawkinsus1@gmail.com

Date: 03-18-2025

Docusign Envelope ID: 1B8DFE5C-A008-42D9-A6BD-35DAF5AC055D

# Texas Workforce Commission

A Member of Texas Workforce Solutions

Exhibit 1 - Page 1 of 2

Bryan Daniel, Chairman
Commissioner Representing the Public

Alberto Treviño, III
Commissioner Representing Labor

Joe Esparza
Commissioner Representing Employers

Edward Serna
Executive Director

Tue Feb 25 00:00:00 EST 2025

Matthew A. Hawkins
618 Bluechalk Dr
Cedar Hill, TX 75104

RE:     **LETTER OF EXPEDITED NOTICE OF RIGHT TO FILE CIVIL ACTION**

TWCCRD: 1A25229                          EEOC: 31C-2025-00223
RE: Matthew A. Hawkins v Desoto Independent School District

Dear Matthew A. Hawkins:

Charging Party alleges that they have been subjected to Terms/Conditions and Discipline based on their Color, National Origin, Race and Retaliation. This letter certifies you have submitted a request for a Notice of Right to File Civil Action to the Texas Workforce Commission Civil Rights Division.

As stated in Texas Labor Code Chapter 21 Sec. 21.253, our agency may issue a notice to file civil action in the event that the Executive Director certifies that administrative processing of the complaint cannot be completed before the 181st day after the date the complaint was filed.

This is to certify that our office will be unable to complete an investigation before the 181st day and thus may issue a Notice of Right to File Civil Action.

The Notice of Right to File Civil Action is on page 2 of this letter and will be sent to the parties electronically at the addresses on file.

Exhibit 1 - Page 1 of 2

## NOTICE OF RIGHT TO FILE CIVIL ACTION

Pursuant to Sections 21.208, 21.253 and 21.254 of the Texas Labor Code, as amended, this notice is to advise you of your right to bring a private civil action in state court in the above referenced case. **PLEASE BE ADVISED THAT YOU HAVE SIXTY (60) DAYS FROM THE RECEIPT OF THIS NOTICE TO FILE THIS CIVIL ACTION.** The time limit for filing suit based on a federal claim may be different.

On behalf of the Division,

*Angela Zoch for Bryan Snoddy*
_____                    _____2/26/2025_____
Bryan Snoddy                                        Date
Division Director

cc:
Cynthia Rincon
O'Hanlon, Demerath & Castillo
209 W. 8th Street
Fort Worth, TX 76102

EXHIBIT 1

1 E. 15th Street, Room 154 • Austin, Texas 78778-0001 • (512) 463-2642 (T) • (512) 463-2643 (F) • Relay Texas: 800-735-2989 (TDD) 800-735-2988 (Voice) • www.twc.texas.gov
Equal Opportunity Employer / Program
Auxiliary aids and services are available upon request to individuals with disabilities

**TEXAS**
**WORKFORCE SOLUTIONS**
· * ★ * ·                                                    Exhibit 1 - Page 2 of 2

Case 3:25-cv-00652-D-BT     Document 3     Filed 03/18/25     Page 104 of 292     PageID 108
Exhibit 2 - Page 1 of 5



**Matthew Hawkins <matthew.hawkins@desotoisd.org>**

## Post Convocation What is wrong with DISD?

**Matthew Hawkins** <matthew.hawkins@desotoisd.org>                          Thu, Jan 17, 2019 at 6:46 AM
To: DeSoto ISD Superintendent <superintendent@desotoisd.org>

Awesome! Please let me know what time/date work for you.

On Wed, Jan 16, 2019 at 10:01 PM DeSoto ISD Superintendent <superintendent@desotoisd.org> wrote:
I thought I saw this...wound love to have you come in and chat...

Sent from my iPhone

On Jan 9, 2019, at 4:27 PM, Matthew Hawkins <matthew.hawkins@desotoisd.org> wrote:

Dr. Weaver,

I have been reflecting over your presentation during our mid-year convocation and felt it would be appropriate to share some of my observations of Desoto ISD as it appeared that you really wanted to improve this district. I can only currently speak for Desoto High School because that is where I currently work but I can speak on the General Academic and the Collegiate Academy populations of students.

I have found that the biggest issue in Desoto ISD is academic dishonesty. I have spoken with all of my classes about this issue and they agree that this one area is the root of many of DISD's major academic struggles. The past few months I have given numerous 0's to students for cheating on work. I have had several parent meetings after a student received a zero on an assignment and the parent was shocked when the student confessed to cheating and not progressing for years. These parents would tell me their student never had these issues and they were never notified by the school of this before.

Students in DISD are open about their academic dishonesty and the student culture is accepting too. A large majority of the 32% of on level students see nothing wrong with furnishing the rest with work or answers. They air drop homework tests and quizzes to one another. There may be a generational disconnect as they are brought up being taught to lookup the answer and may feel getting something on the paper is what education is all about as they call this "doing their work". I have had very smart capable students come to me defeated and ask why they should try on their work. They look at the majority of the student body and say they all cheat and still get the grade. I have been in too many meetings were the staff talk about how much the students are cheating and the only remedy is to make it harder for them to cheat by making multiple versions of a test. Cheating can occur on all assignments but merely trying to make it more inconvenient is not enough.

I know in colleges the consequences for academic dishonesty are severe including expulsion but this shows how detrimental this activity is to the culture of a school. If we are preparing our students for the real world or higher education, we need to be more intentional creating and enforcing a culture of academic integrity by making a more complete outline in our policy and practicing it consistently throughout all DISD.

I have been looking at the DISD High student handbook to see how we are to deal with this issue as I have been dealing with it so much. There is not much here.

**Desoto High School Student Handbook 2018-2019 pg 24 & 25**

**CHEATING/PLAGIARISM Cheating shall be defined as receiving or giving unauthorized information or assistance on tests, examinations, homework, projects, or other assignments intended for individual completion. According to the Merriam-Webster Online Dictionary, plagiarism means: 1. to steal and pass off (the ideas and words of another) as your own 2. to use (another's production) without crediting the source 3. to commit literary theft 4. to present as new and original an idea or project derived from an existing source.**

Exhibit 2 - Page 1 of 5

Plagiarism is an act of fraud. The penalty for cheating and/or plagiarism will be a grade of zero on the work involved for all parties involved. This grade will be recorded in the grade book; the situation will be documented; and a referral will be made to the appropriate house principal. Teacher notification of the student's parents is required.

I looked at other districts and one I feel we need to look more like.

Troy High School CA

**Academic Dishonesty**
The following actions are reflective of academic dishonesty and are subject to disciplinary action by teacher, school, and/or district. Some offenses may be criminal in nature and therefore prosecutable under local, state, or federal laws.

- Using dishonest, deceptive or fraudulent means to obtain or attempt to obtain credit for academic work;

- Using notes, aids, or another student's assistance to complete a test, a project or other assignment in a way other than that expressly permitted by the teacher. Unless otherwise directed by the teacher, students should accomplish all assignments individually;

- Looking at another student's test, answer sheet, or other materials;

- Talking during a test. The teacher cannot be expected to determine the content of a private conversation between students, therefore, all talking during tests is considered cheating;

- Copying from or allowing another student to copy from a test, homework, or other course work-which is not intended to be collaborative in nature; Tampering with an instructor's records of grades or scores; Abusing the privilege of Internet access as stated in Troy High School's Policy for Use of the Internet;

- Accessing, deleting, modifying, transferring, or receiving of computerized files without authorization of the teacher. Although a student may authorize another student to copy or transfer electronic files, this action is considered cheating if effected without teacher permission;

- Plagiarizing materials; that is taking the specific or general substance of another person's work and offering it

Exhibit 2 -Page 2 of 5

Case 3:25-cv-00652-D-BT     Document 3     Filed 03/18/25     Page 106 of 292     PageID 110

Exhibit 2 - Page 3 of 5

as one's own work without giving credit to the original author. Plagiarizing encompasses omitting quotation marks for directly quoted material, omitting bibliographic references either in the text or on a source page appended at the end of the assignment, and/or paraphrasing an author without giving credit to that author for use of his or her ideas. Paraphrasing is the student's use of an author's idea by rewording and/or rearranging that author's original text;

## Responsibilities of Students, Parents Teachers and Administrators

**The student** is expected to uphold the spirit and the letter of this policy both philosophically and behaviorally in completing all school-related tests, quizzes, projects, reports, homework assignments or in-class assignments. No assignment is exempted from this policy.

**The parent** is expected to adopt the philosophical wholesomeness of this policy and uphold the spirit and the letter of it by reviewing it with his or her student and encouraging the student to practice academic honesty throughout the student's years at Troy High School.

**The Teacher** is expected to review with the students the policy of academic honesty at the beginning of each semester and other times during the year as he or she deems it appropriate. The teacher is also expected to enforce the policy in all instances of academic dishonesty following the process as outlined below.

**The administrator** is expected to support the spirit of academic honesty with students, parents, counselors, teachers and other staff members in conferences and in each classroom. Disciplinary action taken with students concerning the Academic Honesty Policy will follow the process as outlined below.

## Process for Disciplinary Action

The process whereby a student will be punished for infraction of the Academic Honesty Policy shall include the following steps:

- The student will be confronted by the teacher of the class where the infraction occurs.
- The administration will be alerted.

106

Exhibit 2 - Page 3 of 5

3/3/25, 8:18 AM    DeSoto ISD Mail - Post Convocation-What is wrong with DISD?

Case 3:25-cv-00652-D-BT    Document 3    Filed 03/18/25    Page 107 of 292    PageID 111

Exhibit 2 -Page 4 of 5

- The teacher or administrator will contact the parent to state the issue, review this policy, and explain disciplinary consequences.

- Disciplinary action will be effected by the school. Any disciplinary action, which the parent may choose to take, is separate from the disciplinary action taken by the school or district.

- Infractions will be recorded on the student's permanent discipline file.

- Local, state or federal law enforcement officials will be alerted in the event that the infraction is of a criminal nature.

**Disciplinary Action For Student Violation Of the Academic Honesty Policy**

Note: A teacher may choose to handle the academic honesty infraction himself or herself or refer it in written form to the administrative office. If referred, however, the infraction becomes a permanent part of the student's disciplinary record and appropriate discipline will be enforced. Teachers and administrators reserve the right to respond to the wrong doing with punitive action of varying severity including temporary suspension or permanent removal of the student from the class, school, or special program depending on the nature of the infarction and the number of previous infractions. Consequences for a student's involvement in an act of academic dishonesty will include one or more of the following actions:

- The student will receive an automatic zero (failing grade) on the assignment or test; no make-up work will be offered to compensate for the zero.

- The student will be dropped from the class with no credit if the student is involved in an act of academic dishonesty in the class where he or she is a student aide;

- The student will serve a 4-hour Saturday School. The student will receive a "U" (unsatisfactory) in citizenship on the semester grade report;

- The student will be dropped from the National Honor Society (NHS) if the student is a member of that organization;

- The student will be dropped from the California Scholarship Federation (CSF) if the student is a member of that organization;

107

Case 3:25-cv-00652-D-BT    Document 3    Filed 03/18/25    Page 108 of 292    PageID 112

Exhibit 2 -Page 5 of 5

- The student may face suspension from extra-curricular activities including sports programs;

- The student may face suspension from Troy High School;

- The student may face expulsion from the Fullerton Joint Union High School District;

- The student may be removed from the course with a grade of "F" (failure).

Thank you for your time and willingness to take on this challenge.

--

**Matthew Hawkins**
Desoto High School
*Academic Academy*
Algebra II
Rm 226
(972) 230-0726 ext 3279



--

**Matthew Hawkins**
Desoto High School
*Academic Academy*
Algebra II
Rm 226
(972) 230-0726 ext 3279



Exhibit 2 -Page 5 of 5



Matthew Hawkins <matthew.hawkins@desotoisd.org>

## Meeting: Dr. Weaver and Mr. Hawkins

**Matthew Hawkins** <matthew.hawkins@desotoisd.org>                Tue, Jul 9, 2019 at 10:50 AM
To: Zina Bean <zina.bean@desotoisd.org>

> On Tue, Jul 9, 2019 at 10:48 AM Zina Bean <zina.bean@desotoisd.org> wrote:
> Good afternoon Mr. Hawkins,
>
> Please answer the following questions for your meeting with Dr. Weaver that is scheduled for Thursday, July 18, 2019 (11:00 a.m. - 11:30 a.m.)
>
> Thank you.
>
> 1.  What is the nature of this meeting?
>     Follow-up to post convocation email
>
> 2.  Who will attend? Matthew Hawkins
>
> 3.  What are you expecting or hoping to get from this meeting? Exchanging new ideas.
>
> 4.  Are you going to provide an agenda and/or handouts? No

[Quoted text hidden]

--
**Matthew Hawkins**
**Desoto High School**
*Academic Academy*
Algebra II
Rm 226
(972) 230-0726 ext 3279



Exhibit 3 -Page 1 of 1



# High Flying Teacher Eagles

## CERTIFICATE

### OF EXCELLENCE

This certificate is awarded to

## Matthew Hawkins

in recognition of stellar performance, commitment, and service in providing high-quality instruction and demonstrating teacher excellence in DeSoto ISD during the 2022-2023 academic year.

**DR. VIOLET DEAN**

DESOTO ISD
CHIEF
HUMAN CAPITAL MANAGEMENT

110

Exhibit 4 -

Exhibit 4 -Page 2 of 2

# DeSoto Independent School District

*The mission of DeSoto ISD is to ensure students, without exception, learn and grow at their highest levels.*

March 28, 2023

Dear **Matthew Hawkins,**



DeSoto ISD is proud to announce that you have earned the designation of a HIGH FLYING TEACHER EAGLE!

DeSoto ISD's HIGH FLYING TEACHER EAGLES are individuals identified who exhibit a high level of achievement in criteria domains below:

- Student Academic Success
- Professional Competence
- Collaboration
- Attendance
- Buy in to the District Mission and Vision
- Adherence to the Educator Code of Ethics

The HIGH FLYING TEACHER EAGLE designation ensures you a contract with the DeSoto Independent School District for the 2023-2024 school year. We are excited to have you continue your employment with us.

As a HIGH FLYING TEACHER EAGLE, DeSoto ISD celebrated this esteemed achievement by announcing your designation at the March 27,2023 School Board Meeting.

Again, Congratulations and thank you for all you do for the students in DeSoto ISD!

Campus Principal

*The vision of DeSoto ISD is to inspire curiosity and consciousness, develop character, build courage, and nurture compassion.*

Exhibit 4 -Page 2 of 2

Exhibit 5 -Page 1 of 4

## T-TESS Summative

| Name: | **Matthew** **Hawkins** (10150270) | Appraiser: **James** **McBride** |
|---|---|---|
| Date: | **3/27/2023 (Revised: 4/6/2023)** | Score: **4.24** |
| School: | **DeSoto High School** | |
| Grade: | **Secondary** | Subject: **Mathematics** |

---

**DOMAIN 1: PLANNING**                                   Score: 4.25 (Accomplished)

Distinguished: 5.00 to 5.00
Accomplished: 4.00 to 4.99
Proficient: 3.00 to 3.99
Developing: 2.00 to 2.99
Improvement Needed: 1.00 to 1.99

| | Distinguished | Accomplished | Proficient | Developing | Improvement Needed |
|---|---|---|---|---|---|
| 1.1 Standards and Alignment: The teacher designs clear, well-organized, sequential lessons that reflect best practice, align with standards and are appropriate for diverse learners. | ✔ | | | | |
| 1.2 Data and Assessment: The teacher uses formal and informal methods to measure student progress, then manages and analyzes student data to inform instruction. | | ✔ | | | |
| 1.3 Knowledge of Students: Through knowledge of students and proven practices, the teacher ensures high levels of learning, social-emotional development and achievement for all students. | | ✔ | | | |
| 1.4 Activities: The teacher plans engaging, flexible lessons that encourage higher-order thinking, persistence and achievement. | | ✔ | | | |

Additional comments about Domain 1: Planning

---

**DOMAIN 2: INSTRUCTION**                                   Score: 4.4 (Accomplished)

Distinguished: 5.00 to 5.00
Accomplished: 4.00 to 4.99
Proficient: 3.00 to 3.99
Developing: 2.00 to 2.99
Improvement Needed: 1.00 to 1.99

Exhibit 5 -Page 1 of 4

Exhibit 5 -Page 2 of 4

| | Distinguished | Accomplished | Proficient | Developing | Improvement Needed |
|---|---|---|---|---|---|
| 2.1 Achieving Expectations: The teacher supports all learners in their pursuit of high levels of academic and social-emotional success. | | ✓ | | | |
| 2.2 Content Knowledge and Expertise: The teacher uses content and pedagogical expertise to design and execute lessons aligned with state standards, related content and student needs. | | ✓ | | | |
| 2.3 Communication: The teacher clearly and accurately communicates to support persistence, deeper learning and effective effort. | | ✓ | | | |
| 2.4 Differentiation: The teacher differentiates instruction, aligning methods and techniques to diverse student needs. | ✓ | | | | |
| 2.5 Monitor and Adjust: The teacher formally and informally collects, analyzes and uses student progress data and makes needed lesson adjustments. | ✓ | | | | |

Additional comments about Domain 2: Instruction

DOMAIN 3: LEARNING ENVIRONMENT                    Score: 4.33 (Accomplished)

Distinguished: 5.00 to 5.00
Accomplished: 4.00 to 4.99
Proficient: 3.00 to 3.99
Developing: 2.00 to 2.99
Improvement Needed: 1.00 to 1.99

| | Distinguished | Accomplished | Proficient | Developing | Improvement Needed |
|---|---|---|---|---|---|
| 3.1 Classroom Environment, Routines and Procedures: The teacher organizes a safe, accessible and efficient classroom. | | ✓ | | | |
| 3.2 Managing Student Behavior: | ✓ | | | | |

Exhibit 5 -Page 2 of 4

Exhibit 5 -Page 3 of 4

The teacher establishes, communicates and maintains clear expectations for student behavior.

3.3 Classroom Culture: The teacher leads a mutually respectful and collaborative class of actively engaged learners. — ✔

Additional comments about Domain 3: Learning Environment

---

DOMAIN 4: PROFESSIONAL PRACTICES AND RESPONSIBILITIES          Score: 4 (Accomplished)

Distinguished: 5.00 to 5.00
Accomplished: 4.00 to 4.99
Proficient: 3.00 to 3.99
Developing: 2.00 to 2.99
Improvement Needed: 1.00 to 1.99

| | Distinguished | Accomplished | Proficient | Developing | Improvement Needed |
|---|---|---|---|---|---|
| 4.1 Professional Demeanor and Ethics: The teacher meets district expectations for attendance; professional appearance; decorum; and procedural, ethical, legal and statutory responsibilities. | | ✔ | | | |
| 4.2 Goal Setting: The teacher reflects on his/her practice. | | ✔ | | | |
| 4.3 Professional Development: The teacher enhances the professional community. | | ✔ | | | |
| 4.4 School Community Involvement: The teacher demonstrates leadership with students, colleagues, and community members in the school, district and community through effective communication and outreach. | | ✔ | | | |

Additional comments about Domain 4: Professional Practices and Responsibilities

Exhibit 5 -Page 3 of 4

Exhibit 5 -Page 4 of 4

| Score: 4.24 |
| --- |

Signed: 11657                    4/13/2023              Signed: 11674                    4/14/2023
_____    _____      _____    _____
Matthew Hawkins              Date:                James McBride, Appraiser     Date:



Exhibit 5 -Page 4 of 4

Mail - Matthew Hawkins - Outlook

Exhibit 6 -Page 1 of 3

**Outlook**

## Re: Appreciation

**From** ██████████████████████

**Date** Wed 4/19/2023 3:08 PM

**To** Matthew Hawkins <matthew.hawkins@desotoisd.org>

Most definitely, I have a 28 year old therefore, I've encountered lots of teachers. I also have two sisters which both teach 6th grade. I often talk about the lessons apart from Algebra, ████ is learning being under your leadership. Keep up the good work and don't let up!

Sent from my iPhone

████████████

On Apr 19, 2023, at 2:47 PM, Matthew Hawkins <matthew.hawkins@desotoisd.org> wrote:

Thank you for getting in touch with me and for your kind words. I acknowledge that I am not infallible and there will be times when I may not handle situations as well as I should. However, as a teacher, my primary objective is to instill in my students a sense of responsibility for their actions and choices, and this remains my top priority, even if the wider school system may not be fully aligned with this.

Regarding ████, I wasn't entirely certain about the most effective way to address the situation, but I am glad to know that you recognize my intention and heart in the matter. Thank you again for your support and encouragement.

I am both humbled and grateful for the nomination for Teacher of the Year. It means a lot to me to know that my hard work and dedication are having a positive impact on my students and their families.

**Matthew Hawkins**
**Desoto High School**
Algebra II
Rm 1209
Zoom: 850 544 5654 P: Algebra2
(972) 230-0726 ext 1209

**From:** ████████████████████ >
**Sent:** Wednesday, April 19, 2023 1:47 PM

Exhibit 6 -Page 1 of 3

Exhibit 6 -Page 2 of 3

**To:** Matthew Hawkins <matthew.hawkins@desotoisd.org>
**Subject:** Appreciation

Hope all is well with you. Although I feel ▮▮▮ shouldn't have been marked absent yesterday, I respect what you stand for. Thanks for all of your hard work and if no one else didn't, I nominated you for teacher of the year!



Sent from my iPhone
▮▮▮▮▮

This e-mail may be privileged and/or confidential, and the sender does not waive any related rights and obligations. Any distribution, use or copying of this e-mail or the information it contains by other than an intended recipient is unauthorized. If you feel you have received this e-mail in error, please advise me (by return e-mail or otherwise) immediately. Information received by or sent from this system is subject to review by supervisory personnel, is retained and may be produced to regulatory authorities or others with a legal right to the information under the Public Information Act. The DeSoto

EXHIBIT 6

Exhibit 6 -Page 2 of 3

Case 3:25-cv-00652-D-BT    Document 3    Filed 03/18/25    Page 118 of 292    PageID 122

Independent School District does not discriminate on the basis of race, religion, color, national origin, gender, age, or disability in providing education services, activities, and programs, including vocational programs, in accordance with Title VI of the Civil Rights Act of 1964, as amended; Title IX of the Educational Amendments of 1972; and Section 504 of the Rehabilitation Act of 1973, as amended. You may contact DeSoto ISD Communications at 972.223.6666



Exhibit 6 -Page 3 of 3

## Matthew Hawkins

| | |
|---|---|
| **From:** | Kristi Primus |
| **Sent:** | Monday, December 19, 2022 11:59 AM |
| **To:** | DHS Faculty; DHS All Staff |
| **Subject:** | Updated Grading Policy |
| **Attachments:** | 22-23 Grading Guidelines pdf.pdf |

Teachers,

Please see the updated information concerning the grading policy sent last Friday. I have attached the full grading policy, however, see the changes indicated below concerning the 50 policy.

The DeSoto ISD District Grading and Reporting Guidelines have been revised to reflect a change in the lowest grade of a 50 that a student can receive on an assignment. The "Completion of Assignments and Procedures" and "Late or Missing Assignments (not related to an absence)" sections are shown below have been updated.

**Completion of Assignments and Procedures for Grades 6-12:**
- Assignments turned in one day after the due date will receive a maximum grade of 70.
- Assignments turned in two days after the due date will receive a maximum grade of 60.
- Assignments not received in two days will automatically receive a grade of 50.
- Provisions will be made to allow students the opportunity to make up two 50s in each subject per grade reporting period.

**Late or Missing Assignments (not related to an absence)**
Students must be given an opportunity to submit late or missing work not associated with an absence. Giving zeros as a grade for late work is not a best practice. It is recommended that parent call/notification be made prior to recording a grade of a 50, especially for students for whom the 50 will likely result in a failing. Please share the information with your campus staff and parents. The link below gives you access to all of the guidelines. https://drive.google.com/file/d/1l3_TYy1KQsETalbwTtzIXj11SoS3jWMg/view?usp=share_link

Please contact Dr. Felicia Johnson, at felicia.johnson@desotoisd.org if you have any questions.
With Service and Support,
Felica Johnson,
Executive Director of Research, Design, and Evaluation

**Kristi Primus, MEd**
**Associate Principal of Teaching & Learning**
**DeSoto High School**
**Ext 1502**



Exhibit 7 -Page 1 of 1

Exhibit 8 -Page 1 of 2

**Matthew Hawkins**

| | |
|---|---|
| From: | Kristi Primus |
| Sent: | Monday, May 20, 2024 12:16 PM |
| To: | DHS Faculty; DHS All Staff |
| Subject: | *REMINDER* 6th Six Weeks Grades DUE 5/24 |
| Attachments: | Posting Gradebook Cycle Averages – Frontline ERP_SIS (1) (1) (1).pdf; Finalizing Grades – Frontline ERP_SIS.pdf |

From: Stanley Taylor <stanley.taylor02@desotoisd.org>
Sent: Monday, May 20, 2024 12:05 PM
To: Kristi Primus <kristi.primus@desotoisd.org>
Cc: Jessica Prewitt <jessica.prewitt@desotoisd.org>; Jasen Campbell <jasen.campbell@desotoisd.org>
Subject: *REMINDER* 6th Six Weeks Grades DUE 5/24

## 2ND SEMESTER MP6

*These timelines have no EXCEPTIONS*
Friday MAY 24th MP6 Daily grades are due by 12:00pm (16 daily grades, 3 major grades and 8 grades for electives)
Thursday May 30th MP6 Semester 2 will conclude. Complete any Final Changes.... You should only have to input final exam grades and calculate the semester grade/final averages. Post and Finalize grades.
Friday May 31st Grade Verifications turned into grading clerk by 12:00pm

Remember: No grades lower than 50, No 69, No NG and No Blanks. Everyone needs a grade.

POSTING INSTRUCTIONS:
· IN MP6 TAB: Grade posted to Report Card (minimum 16 grades with 3 test grades)
REMEMBER TO: POST TO REPORT CARD and FINALIZE
· SAVE
· Enter Semester Exam grade in the EX2 grade column. If exempt, enter EX.
· Click on the S2 cell of the All column and click on the CALCULATE GRADE button at the bottom of the screen to calculate Semester 2 Grades.
· Click into the ALL column of the FIN COLUMN and then click on the CALCULATE GRADE to mass calculate the Final Averages.
*If you change a grade after calculating, recalculate Sem. grade, then FIN grade, and SAVE.
GRADES NEED TO BE:
· POSTED TO REPORT CARD

Exhibit 8 -Page 1 of 2

Exhibit 8 -Page 2 of 2

· POSTED TO 2ND SEMESTER EXAM
· POSTED TO 2ND SEMESTER
FINALIZE
FINALIZE

****Important! As with the Finalize button on the Report Card tab or Progress tab for a selected course/section, the Finalize All button should only be used after teachers have entered, verified, and posted grades. Once grades have been finalized, teachers cannot modify them. Only the grading clerk can change a grade that has been finalized***

**PLEASE REFER TO THE POSTINGTO GRADEBOOK & FINALIZING GRADES INSTRUCTIONS. I HAVE ATTACHED A COPY FOR YOU.**

Thank you,

*S. Taylor*



EXHIBIT 8

Exhibit 8 -Page 2 of 2

## Matthew Hawkins

| | |
|---|---|
| **From:** | Jocelyn Starling |
| **Sent:** | Sunday, September 24, 2023 4:59 PM |
| **To:** | Matthew Hawkins |
| **Subject:** | Re: ECHS Algebra I and II Students Meeting Follow Up |

Good evening,

Thank you for your response and documentation.

I know ▮▮▮▮▮▮▮▮▮▮▮ transferred in from the Algebra II courses that did not have teachers.

I will get with Mr. Polk and Mrs. Jackson to obtain the grade for the students for that time period. I am not sure how much access they had to the grade book.

Please let me know if I can be of any further assistance.

*Thanking you in advance,*
*Jocelyn L. Starling*
Associate Principal of Early College High School (ECHS)
DeSoto High School
600 Eagle Drive
DeSoto, TX 75115
jocelyn.starling@desotoisd.org
(972)230-0726 Ext.1702



---

**From:** Matthew Hawkins <matthew.hawkins@desotoisd.org>
**Sent:** Wednesday, September 20, 2023 6:31 PM
**To:** Jocelyn Starling <Jocelyn.Starling@desotoisd.org>
**Subject:** RE: ECHS Algebra I and II Students Meeting Follow Up

Good Evening,

I have attached failure emails and have provided responses to your inquiries.

Calculator Usage:
The statement suggesting that calculators are not to be used is a broad generalization. It's essential to differentiate between calculators and solvers, a distinction not always clear to both scholars and parents. To clarify, we adhere to the rule of using only calculators provided by our learning platform, which typically includes minimal scientific calculators or access to tools like Desmos. Calculators are made available when the platform deems them appropriate for specific questions. Most often, calculators are unnecessary because we focus on foundational skills. While refraining from calculator use, students gain valuable practice in fluency, numeracy, and mastering algebraic processes.

Additionally, various standardized tests, such as the ASVAB and the TSI, have specific no calculator policies. The ACT and SAT have both calculator-allowed and non-calculator sections, each with its own set of challenges. These tests place

time constraints that do not permit calculator-based answer elimination strategies, emphasizing the importance of fluency and proficiency.

Furthermore, the new STAAR test has moved more away from multiple-choice items, rendering calculator-based strategies less effective. Considering these factors, there is no alignment with our College and Career Military Readiness (CCMR) goal and emphasizing calculators when what students truly require is problem solving skills.

Recording Zeroes:
The recommendation to communicate when recording a zero is not a mandate. With numerous daily assignments, a single zero does not lead to automatic failure, as students have ample opportunities to recover. Almost all assignments, except scratch work, are graded instantly, providing students with immediate feedback. They are also granted unlimited attempts on warm-ups and ALEKS practices, allowing them to choose to invest more time in assignments, ask questions, and improve their averages before assignments expire. As a result, I exercised discretion in contacting parents. I frequently communicate with parents on how they can support their scholars in submitting assignments on time, seeking help, and taking advantage of major grade retake opportunities.

Late and Missing Work:
The policy states students are to submit their work within three days for late submissions. I have assignments due on the day they are assigned, with ALEKS assignments remaining open for seven days in late submission status before permanently closing. This gives students time to make up their assignments but not leave them open indefinitely.

Number of Grades:
District policy stipulates a minimum of two grades per week, but there is no cap on these grades. Our class typically includes a warm-up, daily activity/practice, and an exit ticket, all of which provide students with instant feedback. Leveraging technology, we can affirmatively answer the question "Is it a grade?" while ensuring timely feedback without burdening the teacher. This system underscores the importance and urgency of each task, as they all impact students' grades. The fourth grade is the scratch work from the daily work submitted by scholars counting as its own grade.

Exposing Statement:
I believe in maintaining academic integrity, where students refrain from cheating because they understand they will be held accountable. This encourages them to invest time in learning how to study, manage their time, seek help when needed, and utilize available resources effectively. It's important to note that I only mentioned scholars who appeared to lack effort or try based on data. Not all failing students are struggling, and not all struggling students are failing.


**From:** Jocelyn Starling <Jocelyn.Starling@desotoisd.org>
**Sent:** Tuesday, September 19, 2023 7:21 PM
**To:** Matthew Hawkins <matthew.hawkins@desotoisd.org>
**Subject:** ECHS Algebra I and II Students Meeting Follow Up

Greetings Mr. Hawkins,

Thank you for taking time out of your schedule on Friday to meet with me regarding the ECHS Algebra I and II students in your classroom.

In the meeting, we discussed the following,
1. Student failures at Progress Report time and their improvement since Progress Reports.
2. Blanketed Parent Communication that had been sent to All of your parents. I received a copy of the emails sent.
3. No direct communication had been sent regarding failures.
4. Academic Dishonesty communication was forthcoming, and I received that email as well.
5. You submit your Lesson Plans to the Math PIT.

6. You will send me Intervention Plans and Parent Communication information for students who will fail the six weeks by the end of day on Wednesday, September 19, 2023.

In reflecting on the meeting and reading the parent communication, I noticed you stated students cannot utilize calculators in your classroom. I was wondering why calculators are not allowed in your classroom when students can utilize them on the EOC and portions of the SAT and ACT? Wouldn't they need to be taught to utilize the calculator correctly?

I noticed in your gradebook that several students have multiple zeroes for various assignments. Were parents contacted regarding the students receiving a grade of zero?

**Please see the information from the District Grading Guidelines**
**Late or Missing Assignments (not related to an absence)** Students must be given an opportunity to submit late or missing work not associated with an absence. Giving zeros as a grade for late work is not a best practice. It is recommended that parent call/notification be made prior to recording a grade of a 50, especially for students for whom the 50 will likely result in a failing.

Also in the gradebook, I noticed on some days students are receiving four grades in one day. What is the reasoning behind the four grades in one day?

Lastly, you mentioned in the meeting that you are exposing students' deficits, and they are unwilling to try. Did you ever consider that students may not feel safe to fail, try, or ask questions because they are leaving feeling defeated and not with the confidence they can succeed in your classroom?

Again, I appreciate your time and I look forward to your responses to my questions and wonderings.

*Thanking you in advance,*
*Jocelyn L. Starling*
Associate Principal of Early College High School (ECHS)
DeSoto High School
600 Eagle Drive
DeSoto, TX 75115
jocelyn.starling@desotoisd.org
(972)230-0726 Ext.1702



057906

| WORK LOAD | DLB |
|---|---|
| REQUIRED PLANS AND REPORTS | (LEGAL) |

**Restrictions on Written Reports**

A board shall limit redundant requests for information and the number and length of written reports that a classroom teacher is required to prepare.

A classroom teacher may not be required to prepare any written information other than:

1. Any report concerning the health, safety, or welfare of a student;

2. A report of a student's grade on an assignment or examination;

3. A report of a student's academic progress in a class or course;

4. A report of a student's grades at the end of each grade reporting period;

5. A report on instructional materials;

6. A unit or weekly lesson plan that outlines, in a brief and general manner, the information to be presented during each period at the secondary level or in each subject or topic at the elementary level, unless the lesson plan is included in instructional material adopted by the board;

7. An attendance report;

8. Any report required for accreditation review;

9. Any information required by a district that relates to a complaint, grievance, or actual or potential litigation and that requires the classroom teacher's involvement; or

10. Any information specifically required by law, rule, or regulation.

A district may collect essential information, in addition to the information specified above, from a classroom teacher on agreement between the classroom teacher and the district.

**Paperwork Review**

A board shall review paperwork requirements imposed on classroom teachers and transfer to existing noninstructional staff a reporting task that can reasonably be accomplished by that staff. [See BAA]

*Education Code 11.164*

The commissioner of education may authorize special accreditation investigations in response to repeated complaints concerning imposition of excessive paperwork requirements on classroom teachers. *Education Code 39.075(b-1)*

Exhibit 10 -Page 1 of 1

EXHIBIT 10

Exhibit 10 -Page 1 of 1



# DeSoto High School

LETTER OF CONCERN

**DATE:**      Tuesday, November 28, 2023

**TO:**        Matthew Hawkins, Teacher

**FROM:**      Jocelyn Starling, Associate Principal

**CC:**        Campus Personnel File

**SUBJECT:**   **Failure to comply with official directives.**

This is a Formal Letter of Concern regarding your failure to comply with the official directive of submitting a Power Point driven lesson plan.

**October 26, 2023**
An email was sent advising that your lesson plans were not in compliance with the Power Point driven lesson plan requirements and that your lesson plans should contain the following elements: T.O.D.A.Y., DO NOW, 10-minute protocol, I DO, WE DO, YOU DO, and the Exit Ticket. An example of a Power Point driven lesson plan was provided for you to model, and a directive of an updated lesson plan, exemplar, and DOL were requested for you to submit to me and the PIT by 5PM on October 27, 2023.

**October 30, 2023**
You responded to the email stating that your lesson plans included the components of the T.O.D.A.Y., DO NOW, 10-minute protocol, I DO, WE DO, YOU DO, and the Exit Ticket, and included a link of your lesson plans that include a title slide, T.O.D.A.Y. slide, and agenda slide which included the following information: Bell Ringer, Fluency, I DO, YOU DO, WE DO, and DOL.

**October 30, 2023**
I sent a follow up email regarding the information you provided in the lesson plan and advised that you did not have individual slides for the following components of the lesson plan: DO NOW, 10-minute protocol, I DO, WE DO, YOU DO, and the Exit Ticket. A directive was given advising you to make the necessary corrections and to submit the corrected lesson plan, exemplar, and DOL to the PIT and myself by Tuesday, October



Exhibit 11 -Page 1 of 3



# DeSoto High School

31,2023 at 4PM, and I advised you to reach out to Mrs. Jackson for additional support if needed.

**October 31, 2023**
You sent an email that contained the following information.
I have completed my lesson plans in compliance with Texas Education Code 11.164(a)(6), which only requires teachers to provide a brief overview of each lesson. Texas Education Code. I have also followed the district given template for this information. I have attached my lesson plans to The PIT. I am confident in my ability to provide a high-quality education to my students without submitting a detailed lesson plan. I am available to discuss my teaching practices with you at your convenience.

**November 5, 2023**
I sent an email advising that we could meet on November 7, 2023 at 3:30PM to further discuss the information, and I followed the email with a calendar invite for the date and time from the email.

**November 7, 2023**
We met to discuss the campus requirements for a Power Point driven lesson plan by all teachers. I explained that the TEC requirement to provide a brief overview of the lesson was the minimal requirement for lesson planning, but the campus could require additional requirements for lesson planning. I followed up using the example of how the state has specific graduation requirements and school districts can add to the requirements, but not take away from them. You stated that you knew how to create a Power Point lesson plan, but you were not going to create one because you did not use it and it was illegal for the campus to require you to do so. At that point, I ended the lesson planning portion of the meeting and advised I would consult with Mr. Campbell and return to you with next steps.

In conclusion, your noncompliance does not meet the professional standards of our district to comply with official directives DFBB (Local) policy.

**The following action was unacceptable:**
1. Failure to complete the Power Point driven lesson plan weekly by the end of business on Friday.



Exhibit 11 -Page 2 of 3



# DeSoto High School

**Directive for immediate implementation:**
1. Complete a Power Point driven lesson plan weekly with a slide for each of the following: T.O.D.A.Y., DO NOW, 10-minute protocol, I DO, WE DO, YOU DO, and the Exit Ticket and submit it weekly by 5PM Thursday to the PIT and myself.

You are a valued member of the Early College High School staff, and your hard work and dedication is appreciated. I will continuously monitor your progress throughout the remainder of the school year regarding the above directive.

Please note that failure to comply with the above directive could result in additional disciplinary actions.

Your signature denotes you have received a copy of this memorandum. You understand that your signature does not necessarily indicate that you agree with its contents. You further understand that you have a right to respond in writing within 5 working days.

Matthew Hawkins, Teacher                     Date

_Jocelyn Starling_                           _11.28.23_
Jocelyn Starling, Associate Principal         Date

_Kristi Primus_                              _11/28/23_
Kristi Primus, Associate Principal (witness) Date

_teacher refused to sign_ _KP_ _11/28/23  10:56 pm_



Exhibit 11 -Page 3 of 3

Exhibit 12 - Page 1 of 1

 Outlook

---

## Instructional Plan

---

**From** Kristi Primus <kristi.primus@desotoisd.org>

**Date** Tue 2/27/2024 6:54 AM

**To**   Matthew Hawkins <matthew.hawkins@desotoisd.org>

**Cc**   Jasen Campbell <jasen.campbell@desotoisd.org>; Jocelyn Starling <Jocelyn.Starling@desotoisd.org>; Shnell Jackson <shnell.jackson@desotoisd.org>

Greetings Mr. Hawkins,

In efforts to get our students ready for the EOC and meet our 90-65-20 goal, Mrs. Jackson has been re-assigned to assist our students on the freshman wing. At this time, we are also scheduling her to assist on the main side in your Algebra 1 classes during 1st, 2nd and 4th period ( she will return to the freshman wing for all other periods).

She will conduct your instruction during the periods indicated. You will continue to facilitate the aggressive monitoring, provide group or individualized instruction, and all other tasks (attendance, grades, maintaining classroom discipline etc). You will continue to provide instruction for your Algebra 2 classes.

This plan will remain in place until after the EOC. If you have any questions or concerns, feel free to inquire. Thanks in advance for helping our students to WIN!

**Kristi Primus, MEd**
**Associate Principal of Teaching & Learning**
**DeSoto High School**
**Ext 1502**



EXHIBIT 12

**Matthew Hawkins**

| | |
|---|---|
| **From:** | Jasen Campbell |
| **Sent:** | Tuesday, March 26, 2024 6:41 PM |
| **To:** | Matthew Hawkins |
| **Cc:** | Jocelyn Starling |
| **Subject:** | Re: Support Plan |

Good evening Mr. Hawkins

I hope all is well. I wanted to follow up with you on our brief conversation today that stemmed from our meeting last Friday. After reflecting on our conversation and contemplating the calendar, I have decided to discontinue the teacher in need of assistance plan at this time. Based on our discussion, and the current EOC preparation (Lowman) activities occurring in your class, I have determined that the anticipated outcome would not be feasible to achieve at this time. My goal is for you to be successful. In lieu of the plan, I do want you to continue with the training that would be provided on the lesson cycle and engagement. I believe that they will help you greatly as you educate our students. After EOC has been completed, I would like to collaborate with you to see the strategies implemented in your instruction. I will send you a calendar invite so that you can provide me with a review of your lessons and the elements in ALEKS. I look forward to learning together.

Jassen Campbell
Principal
DeSoto HS

**From:** Jasen Campbell <jasen.campbell@desotoisd.org>
**Sent:** Thursday, March 21, 2024 11:28 PM
**To:** Matthew Hawkins <matthew.hawkins@desotoisd.org>
**Cc:** Jocelyn Starling <Jocelyn.Starling@desotoisd.org>
**Subject:** Re: Support Plan

Good evening Mr. Hawkins

I hope all is well. As we discussed in our meeting that led to the intervention plan discussion, the plan is based on ensuring that the elements of the lesson cycle are clearly present in your instruction. The lesson cycle is based on researched based practices and is geared to ensuring that students are successful in learning. As I observed in your classroom, the following parts of the lesson where not clearly represented :

1. Anticipatory Set (Hook)
2. We Do (Guided Practice)
3. You Do (Independent Practice)
4. Checks for Understanding

Exhibit 13 -Page 1 of 4

During the feedback session, you explained how you incorporated the elements of the cycle. Your explanation was that the elements were present in various portions of the lesson . The way you described the elements were not in alignment of the cycle and was not in alignment with best practice based on research. We discussed how you engaged the students as you transitioned from the Do Now. There was not an anticipatory set (hook) provided to engage students. You went directly into the direct teach (I Do). During this portion of the lesson, there were no checks for understanding observed. The students then were given modules/ exercises to complete in ALEKS. When asked about the We Do. You explained how it was all in ALEKS. I explained to you that the We Do should consist of the students and teacher working together to solve the problem, thus giving you and the student the opportunity to discuss and deepen their understanding. Based on your explanation as well as the observation of the lesson, the We Do and the You Do appear to be completing the module in ALEKS. We also discussed the elements of the Independent Practice which is commonly referred to as the You Do. I explained that this was an opportunity for students to practice the skill by incorporating what they have learned free of aids. This is where the productive struggle would occur. As I reviewed your observation data, and listened to your understanding of the lesson cycle, it became clear that I needed to provide you with support. Thus, the intervention plan is based on the lesson cycle.  The plan is intended to assist you in enhancing your understanding and implementation of the lesson cycle so that students will be more successful.

When it comes to limiting the use of ALEKS. It is a district approved platform, but it is not Tier I instruction. Tier 1 instruction is provided by the teacherand provides all students with high-quality, initial classroom instruction tied to a guaranteed and viable curriculum powered by research-backed strategies. ALEKS should be used to support the learning, but not as the replacement for instruction from the teacher. When I look at the work of John Hattie on effect sizes, teachers' roles in instruction impacts students' achievement greatly.

The goal of the intervention plan is to provide you with the support needed to ensure that you are successful as the teacher in providing Tier I instruction to your students. If you would like to discuss further, I will make myself available after school tomorrow. You are welcome to come by. I look forward to working together to ensure that you and our students are successful.

Jasen Campbell
Principal
DeSoto HS

---

**From:** Matthew Hawkins <matthew.hawkins@desotoisd.org>
**Sent:** Wednesday, March 20, 2024 10:13 PM
**To:** Jasen Campbell <jasen.campbell@desotoisd.org>
**Cc:** Jocelyn Starling <Jocelyn.Starling@desotoisd.org>
**Subject:** RE: Support Plan

Good Evening,

I am honestly confused about the Teacher in Need of Improvement Plan. All domains suggesting improvement have been addressed by the structure of my Instruction.  I achieve this by leveraging technology in my classroom. I meticulously implemented the District's designated Instructional Tier 1 resource, ALEKS to specifically address these domains.

**Planning Dimension 1.1:**

Exhibit 13 - Page 3 of 4

I plan well organized lessons that follow the district's scope and sequence. I start planning with the end in mind and create the DOL in ALEKS. After the DOL is created, I record myself working the DOL. I explain every thought process and logic used.  Next,  I create the warm-up thinking about what from the student's prior knowledge and skill would need to be refreshed or used as a scaffold for students to have success on the DOL.   The skill sets used in one lesson will be utilized in the following lesson so assignments created have scaffolding embedded.

Starting with ALEKS as the end in mind is beneficial for cohesion of my lesson cycle as it already addresses the alignment issues, has explanations for every step of every question, and it 1 click translates everything to other languages for EB students making the DOL more appropriate for diverse learners. My Exemplar video explaining each question type also helps differentiate for visual learning students.

## Planning Dimension 1.4
My lessons have several points of engagement, some being informal like choral classroom responses during we-do sections of instruction. 5 points of monitored documented engagement with 4 of them being digital footprints. The warm-up has a digital footprint. During the direct-teach, students are taking notes (notebook physical footprint), the DOL digital footprint, the scratch work submission to Google Classroom ( digital and physical footprint) and the EXIT Ticket or Snapshot ( digital footprint). All daily assignments have unlimited attempts while the assignment is available. At minimum assignments are available for 48 hrs. and DOLS are available for 7 days. This promotes students' persistence and achievement.  ALEKS adds high order thinking and rigor by the problems it provides.

## Instructional Dimension 2.1
I support all learners in their pursuit of high levels of academic success. I equip every student with the resources and direct instruction for them to be capable. I designate a significant portion of class time for students to work on their academic success.  I aggressively monitor and assist students that have misunderstandings and are too afraid to ask for help. I make myself available for students to ask questions and provide tutoring for students that still want/need assistance.

## Instructional Dimension 2.3
All daily assignments have unlimited attempts so that students can earn the grade they desire and get as much practice as they wish on any particular objective. Even after assignments have expired and the student can no longer change their grade on those assignments, students are encouraged to enter review mode for that assignment in order to continue practicing the standard. This supports persistence, deeper learning, and effective effort.

## Instructional Dimension 2.4
Students get differentiated instruction in ALEKS. When students begin using the program, they are given a needs assessment. This assesses students' areas of need then gives students choices in Topics of skills they should have the foundation for but need to work on. Students are assigned 4 - 10  topics to complete a week. Their selected topics will include all of the embedded notes, steps, examples, instant feedback of if the student was right or wrong, and an explanation of why they were right or wrong. ALEKS translates the entire program into other languages for EB students. The videos I created for DOLS are another layer of differentiation for visual learners.

## Instructional Dimension 2.5
I collect formal digital footprint data almost 4 times daily. Through Warm-up, ALEKS DOL, Google Classroom Scratchwork  submission, Snapshot and team tests in Eduphoria or Schoolcity. I use this data to create seating charts and move lower students to more accessible areas of the classroom where they can be monitored and redirected quickly. I also use data over the warm-up to see if more time is needed on the warm-up or should a mini lesson take place before the lesson because the warm-up is showing the prior knowledge needed for the lesson is not where it needs to be.

**Part A**

Exhibit 13 - Page 3 of 4

Exhibit 13 -Page 4 of 4

Part A focuses on the PowerPoint lesson. Per our meeting on Dec 14th 2023 discussing the paperwork reduction act, it was stated that the PowerPoints were to be created as a team during PLC? As of March 20th 2024 still not 1 of these PowerPoint lessons have been created in PLC. The Solving Quadratic Equations lesson is the only one that was started but it too was vastly incomplete by the end of PLC.

Why is the District designated Tier 1 Instructional resource ALEKS to be excluded?

**Part B**
I regularly use hooks but not every lesson needs a designated hook. Hooks that are disconnected from the learning objective are an off task distraction. I prefer these types not to be used. I always use a scaffolding warm-up and this warm-up in most cases can be considered as an engaging activity leading into the direct instruction or hook.
To be frank, I'm concerned with the use of the word "engagement".  Many interchange the words engaging and fun. Regarding the hook specifically, The hook can be an attention getter but is not inherently engaging. Matter of factly, engagement is simply students interacting with instruction. All engagement is not equal as there are several different strategies that can be used to engage learners. Analog Multiple response strategies and checks for understanding are useful but pale in comparison to the ability to see each student's progress instantaneously in an overview in real time. How then would it be beneficial to regress back to the honor system asking students thumbs up or thumbs down questions such as how well do you feel you understand xyz? I do use choral response and Quizizz type response cards for multiple response strategies. In doing so, I am able to address students individually. When students are not making progress or missing questions, I am able to see it all in real time. Consequently, this allows other students to keep moving forward consistently with few interruptions.

There are several checks for understanding within each class. During the warm-up for example, I monitor their progress on the fly and aggressively monitor. During direct instruction and during we-do segments, I take questions allowing choral responses. During the DOL, I monitor student progress live and aggressively monitor (laps) while students are given feedback instantly on the platform.

All of this has not only been in place, but was intentionally planned before the first day of instruction in addition to my 10 years of experience in education. Please help me understand the rationale of this plan?

**From:** Jasen Campbell <jasen.campbell@desotoisd.org>
**Sent:** Wednesday, March 6, 2024 9:53 PM
**To:** Matthew Hawkins <matthew.hawkins@desotoisd.org>
**Cc:** Jocelyn Starling <Jocelyn.Starling@desotoisd.org>
**Subject:** Support Plan

Good evening Mr. Hawkins

I hope all is well. As per our conversation last Friday in supporting you in the lesson cycle. Please review the support plan and let me know your thoughts. We will schedule a meeting for Friday to review. Please ignore the dates. I will adjust them. I look forward to meeting with you on Friday.

Jasen Campbell
Principal
DeSoto HS

Exhibit 13 -Page 4 of 4

**Name:**   Matthew Hawkins                                    **Appraiser:** Jasen Campbell

**Campus:** DeSoto High School                              **Assignment/Grade:** Algebra I & II

**Period of Intervention:** 4 weeks                        **From:** March 4, 2024 **To:** April 5, 2024

## INTERVENTION PLAN FOR TEACHER IN NEED OF ASSISTANCE

1. **Domain(s) in which the teacher is in need of assistance.**
**Planning Dimension 1.1:** The teacher designs clear, well-organized, sequential lessons that reflect best practice, align with standards and are appropriate for diverse learners.
**Planning Dimension 1.4:** The teacher plans engaging, flexible lessons that encourage higher-order thinking, persistence and achievement.
**Instructional Dimension 2.1:** The teacher supports all learners in their pursuit of high levels of academic and social-emotional success.
**Instructional Dimension 2.3:** The teacher clearly and accurately communicates to support persistence, deeper learning and effective effort.
**Instructional Dimension 2.4:** The teacher differentiates instruction, aligning methods and techniques to diverse student needs.
**Instructional Dimension 2.5:** The teacher formally and informally collects, analyzes and uses student progress data and makes needed lesson adjustments.

**Professional-improvement activities and dates for completion.**

A.   The teacher will meet with the Instructional Coach (Ms. Bailey) for mini professional development session on the Lesson Cycle. During the planning time teacher will create key components of the lesson cycle.  During the lesson creation sessions, the teacher will create and practice the I Do (Direct teach), We Do (Collaborative), and the You Do (Independent Practice). Teacher will create PowerPoint, tiered independent practices (ALEKS cannot be used), and exemplars for all three phases of the lesson. **(Due: March 8, 2024)**

B.   The teacher will meet with the Instructional Coach (Ms. Bailey) for mini professional development session on engagement. During the planning, teacher will focus on the hook, checks for understanding, and multiple response strategies, and aggressive monitoring (Laps).  Teacher will attend session with the I Do, We Do, You Do, and tiered practice already created. The session will concentrate on embedding a hook, checks for understanding, Multiple response strategies, and laps (Aggressive monitoring) to improve student engagement. Teacher will demo with the CIC and incorporate strategies within instruction.  **(Due: March 22, 2024)**

C.   Teacher will video himself providing instruction for one class period incorporating the lesson cycle and all strategies within this plan. Teacher will analyze video, document successes and opportunities to improve. Teacher will create plans to strengthen areas of improvement before the next lesson. Teacher create a chart to document successes, opportunities to improve, and interventions to improve areas of concern. (Video will be watched with CIC or assistant principal) **(Due: March 29, 2024)**

2. **Evidence that will be used to determine that professional-improvement activities have been completed.**

   a.   Lesson components created and implemented in instruction and Meeting confirmation (Protocol) from Instructional Coach. Walkthrough observation of the I Do, We Do, and You Do. **(Due: March 22, 2024).**

   b.   Lesson components created and implemented in instruction and Meeting confirmation (Protocol) from Instructional Coach. Walkthrough observation of learned strategies (Hook, Checks for understanding, Laps (Aggressive monitoring), and MRS) within instruction. **(Due: March 29, 2024)**

   c.   Teacher will analyze videos and submit critique chart and intervention strategies. Teacher will implement strategies to improve practice. **(Due: April 5, 2024)**

3. **Directives for changes in teacher behavior and time lines.**

   a. Teacher will provide tier 1 instruction based on the lesson cycle and its components.
   b. Teacher will **daily** align all objectives, instruction and assessments to state, and district curriculum showing consistency in **alignment between March 4th – April 5th.**
   c. Lessons will be well planned, aligned, and **implemented each day** unless rare circumstances occur which may prevent follow-through. If this occurs, lesson will be adjusted accordingly to reflect changes.
   d. Lessons will be well structured and implements a lesson objective, hook, I do, we do, you do (Aleks cannot be used), exemplars, laps (Aggressive monitoring), Checks for understanding, Multiple response strategies, and a DOL.

---

4. **Evidence that will be used to determine if teacher behavior has changed.**

*Walkthrough observations, completion of the plan, submission and implementation of plan and activities. CIC Coaching and session notes,*
*Teacher will receive Proficient or above in every domain of spot observation at the end of the plan.*

_____    _____
Signature of Appraiser        Date

_____    _____
Signature of Principal        Date

My appraiser, principal, and I have discussed this intervention plan.  My signature does not indicate whether I agree or disagree with this plan.

_____    _____
Signature of Teacher        Date

**Name: Matthew Hawkins**                    **Appraiser:  Jasen Campbell**

Exhibit 14 -Page 3 of 3

**Campus:** DeSoto High School

**Assignment/Grade:** Algebra I/ II

**Period of Intervention:** 4 weeks

**From:** March 4, 2024 **To:** April 5, 2024

## INTERVENTION PLAN FOR TEACHER IN NEED OF ASSISTANCE

This plan has been successfully completed. _____

This plan has not been successfully completed. _____

This plan was not successfully completed for the following reasons:

Further action to be taken:

_____

Signature of Appraiser        Date

_____

Signature of Principal        Date

My appraiser and I have discussed the evaluation of the completion of this plan.  My signature does not indicate whether I agree or disagree with the evaluation of this plan.

_____

Signature of Teacher        Date

EXHIBIT 14

Exhibit 14 -Page 3 of 3

notta

## Eagle Dr

⏰ Wed, 02/26 21:54PM · 45mins

## Transcript

Matthew Hawkins 03:18

Thank you.

Joselyn Starling 03:52

We are here to go on the intervention plan. The dates and time lines have been opened, have been adjusted. The plan will be from March 25th through April 17th.It will cover the domains of planning, 1.1 and 2 t-tas. 1.4, instructional 2.1, instruction 2.3, instruction 2.4, and instruction 2.5. The improvement activities and dates for completion are first, you'll meet with Miss Bailey. For many, professional development sessions on the lesson cycle. During the planning time, you will create key components of the lesson cycle. You will create, during the lesson creation sessions, the teacher will create and practice the I Do or a Teach We Do collaborative. You do independent practice. You will create PowerPoint-tiered independent practices. Alex will not be a part of the I Do, You Do, We Do, I'm sorry, the I Do, We Do, You Do. And exemplars for all three phases of the lesson. The due date for this will be March 28th, 2024.B, you will meet with Miss Bailey for professional development, professional development, professional engagement. During the planning, teacher will focus on the goods, check for understanding, multiple response strategies. And aggressive monitoring labs. You'll attend the session with the I Do or a Teach We Do and tier practice already created. The session will concentrate on getting a good check for understanding, multiple response strategies and labs to improve student engagement. You will download this information from CIC and incorporate strategies within the instruction as the April 5th, 2024. The next portion, you

Powered by Notta.ai

Exhibit 15 -Page 1 of 24

will video yourself providing instruction from one class period, incorporating a lesson cycle and all strategies within the plan. You will analyze the video, document successes and opportunities for improvement. You will create the plans to strengthen areas of improvement for the next lesson. Create a chart to document successes, opportunities to improve and interventions to improve areas of concern. The video will be watched with Miss Bailey or myself and that's due by April 12th.Any questions or questions?

Matthew Hawkins 06:43

coming from the 1.1, 1.4, 2.1, 2.3, 2.4, 2.5. Where are these coming from?

Joselyn Starling 06:50

See you next time.

Matthew Hawkins 06:51

I know they're from T-Tests, but as far as domains which teacher is in need of assistance, where is that part coming from?

Joselyn Starling 06:59

So when we met, based on your walk-throughs and observations, not observations, but the walk-throughs that you received this school year.

Matthew Hawkins 07:09

Hmm, well, so what was on those walkthroughs that those were needed all of those were needed for domains which walkthrough Because I have all the walkthroughs if you definitely take a look Because I really feel like all these have been addressed. I've sent you an email Addressing every last thing one of those domains and this is not This This is not Needed like all these are addressed and then the email I sent you back in September actually addresses like how does the structure of my?Classroom is it's addressed every last single one of these hard So I'm just like, could you please just let me know which, where is this coming from? So this from your walkthroughs, whose walkthroughs? Cause I like that also, cause someone needs to be able to speak to that.

**notta**

Like you just, oh, I'm throwing something on a paper. It's not, so where's it coming from? It says from somewhere.

Joselyn Starling 08:07

All right, so it's very, I mean, I'm not the only person that has had walkies in your class, as well as me, you met with me and Ms. Primus, you met with me, met with me and Ms.Primus, you met with Mr. Campbell, I was on the part on the meeting in December, and then you met with me and Mr. Campbell, where we went through the feedback when we were in your classroom.

Matthew Hawkins 08:32

No, we weren't necessarily talking about feedback about our classroom. But I'm saying the meetings that we had, the meetings we had before were regarding the PowerPoint lesson plans and the legality with the Teacher Paperwork Reduction Act. That's what they were talking about. They were talking about nothing of walk-throughs or anything else.So like, so all those other meetings, along with this Primus, that was all about the lesson plans and the lesson plans were supposed to be part of the PLC, which have not been done. There has been zero lesson plans that have never come out of a PLC, and I'd go on, zero completed all year. So my lessons have been in all year. They've been there. They show exactly the breakdown of what we're doing inside the lesson and everything else. So that's the part, it's like, okay, so where is all this going from? Where's that documentation or where is that actual pulled from and whose recommendation is this? And we can have those conversations, but we need to have those conversations.

Joselyn Starling 09:31

Again, when we were in the week, me, you and Mr. Kim, our last meeting that we had, me and him were both did a walkthrough in your class together. During the feedback session, he led the feedback session, and we talked about the I do, you do, we do, instruction and engagement. And so that was, and he also looked at the walkthroughs that had previously been done in your classroom.so based on that information and that conversation along with the other walkthroughs that were completed throughout the semester prior to then these are the things that need to be addressed.

Matthew Hawkins 10:22

Powered by Notta.ai

Exhibit 15 -Page 3 of 24



So you're saying there was a walkthrough where you, Mr. Campbell came in and with that walkthrough, there was a decision that was already made before that walkthrough occurred. There was a decision already made. It was a parent meeting and a decision had already been made before that walkthrough.

Joselyn Starling 10:42

There was a parent meeting about this.

Matthew Hawkins 10:45

Mmm, about something, yes.

Joselyn Starling 10:49

the parent meeting that me and you have with the parent.

Matthew Hawkins 10:52

No, no, it's something separate. It was something a student had already brought up and a parent had brought up about a meeting with parents. So there was already, I don't know, students had already known that I was going to be pulled from my class for whatever reason. Okay, I'm not going to-

Joselyn Starling 11:09

I don't know what you're talking about. No, I mean, I'm not. I don't know what I know.

Matthew Hawkins 11:16

So when I come in on a Monday Tuesday and they're putting Miss Jackson my classroom, you do nothing of any of this

Joselyn Starling 11:24

Powered by Notta.ai

Exhibit 15 -Page 4 of 24

Exhibit 15 -Page 5 of 24

notta

when she watched the class while you did the walk-through for me and no we don't have to email them it's time you said yes you knew nothing nothing of this nothing

Matthew Hawkins 11:33

absolutely nothing. You said what? You knew nothing of this.

Joselyn Starling 11:39

Of what that she was doing pullouts

Matthew Hawkins 11:42

It wasn't a pullout.

Joselyn Starling 11:44

Right, so Ms. Primus sent the email, Mr. Campbell addressed that, that we weren't, that that email shouldn't have been sent and that that's not what was going to take place.

Matthew Hawkins 11:55

So, I'm sorry, so you know nothing of that email or anything?

Joselyn Starling 11:58

I saw the email that you saw and then we addressed it in that meeting and so

Matthew Hawkins 12:05

never it was never fully addressed it said we would revisit it but it wasn't fully addressed so it's like it's just news to you okay this is

Exhibit 15 -Page 6 of 24

notta

**Joselyn Starling 12:13**

No, I mean, I guess I'm not understanding the question. So when did you know about that?

**Matthew Hawkins 12:17**

that.

**Joselyn Starling 12:18**

Before you guys revise

**Matthew Hawkins 12:20**

the plan, like that whole situation.

**Joselyn Starling 12:29**

No, I'm not being funny, I don't know what you're talking about. You're talking about, when did I know that you were getting...

**Matthew Hawkins 12:37**

So you got an email pops up, you knew nothing about the email. There was nothing that I'm saying decisions were made before you and Campbell had even came into my classroom. And I wanted to know based off of what that's that's my question.

**Joselyn Starling 12:52**

Okay, so that's I guess that's what I'm confused of. What decisions were made prior to me and Mr Campbell doing the walkthrough.

**Matthew Hawkins 13:00**

Powered by Notta.ai

Exhibit 15 -Page 6 of 24

All this had already been made before you guys did your walkthrough.

Joselyn Starling 13:09

that I'm aware of. No, I mean, I'm not being funny. I don't. I don't know what.

Matthew Hawkins 13:17

So, Alex cannot be used. Why is Alex being excluded from this plan?

Joselyn Starling 13:25

It can be used, but it can be used after you utilize it all.

Matthew Hawkins 13:29

is, Alexia, why is it excluded from this plan? Now I'm saying it's a tier one instructional resource designated by the district.Why can it not be used in this plan? And I'm about to go through all these domains and we'll talk about every last single one and how they're all addressed by using the district tier one instruction that we have. So, but you can finish answering that question.

Joselyn Starling 13:55

habits can be used after you complete a complete lesson cycle.

Matthew Hawkins 14:01

Alex is part of the lesson cycle, tier one.

Joselyn Starling 14:06

So it is a supplemental resource that you can

Powered by Notta.ai

Exhibit 15 -Page 8 of 24

**notta**

**Matthew Hawkins 14:08**

It's not as if it's here or not.

**Joselyn Starling 14:11**

So you're saying that Alex provides direct instruction?

**Matthew Hawkins 14:14**

does all the above especially for differentiation and provides direct instruction yes it does and that's why we pay for it just like y'all use ingenuity just like and they you have a sub in there and you got an ingenuity going on or just like y'all but

**Joselyn Starling 14:34**

That's different because it's not a certified teacher. You're a certified teacher, so there was no difference between the I do and the we do. You work, you did your direct instruction, and then there was no, we work on the problems together, and then you walk around to make sure everybody's doing the instruction, that everybody is in the lesson together, and then the I do, the independent practice, you just went straight from your direct teach and put them on Alex for 40 minutes.

**Matthew Hawkins 15:10**

Mm-hmm

**Joselyn Starling 15:11**

So there's not a difference.

**Matthew Hawkins 15:13**

There is a huge difference. So if I were giving a worksheet, yes, that would be an issue. Because, OK, they have a worksheet. What do they do with the worksheet? How are they going to get feedback on this worksheet? How do we know if we're right or wrong?

Powered by Notta.ai

144

Exhibit 15 -Page 8 of 24

Exhibit 15 - Page 9 of 24

# notta

How do they get direct instant responses? How do I monitor and know where students are, what they know, what they don't know? What if they don't know how to do this? That those questions would be an issue if I were getting it.However, not giving worksheets. We're using a platform called the Alex that, hey, it has the whole lesson, all the notes, everything already embedded in it as well. We already did the lesson for one way of the instruction represented. However, some people don't need that way of instruction because they've got Alex, and it has all the stuff in there anyway. When you go in, you're practicing. You're practicing it. It's telling you if you're already wrong, instant feedback. I can monitor everything. I see where students are. I see who's accessing. I see who hasn't accessed, regardless of what it is. Also, there's a supplemental video in Google Classroom that explains every last single thing again. So why would I need to spend time re-explaining things before we get to the practice when we've already done it and what we do is you sitting there practicing, I'm going through the we do. We do the we do together while I'm on the board. I'm like, hey, core response. So now we've done this, what's our next thing? Core response. We're getting feedback. There's engagement. Students are responding. OK, we're going to go and go to the practice because the practice is still embedding part of the we do. It's like it's still the we do, but it's more catered towards my skill set and my practice. It's all intertwined, and it's all integrated in a platform. I'm not doing worksheets.We're not just writing out the textbook. We're using integrated technology, which means a lot of this stuff, this older stuff we're doing, it doesn't apply to the situation. What type of sense does that make? So as we go through these domains, domain one, the teacher designs clear, well-organized sequential lessons that reflect best practices and standards, aligned standards and appropriate for diverse learners. Alex differentiates. They have five topics that they work on. They work on different topics at the same time. While everyone is doing it, also those topics is not like, oh, I'm just giving you something you don't know how to do. Have the lessons for those students as they work. So they can work on stuff that's approachable. They did their assessment, these assessments at the beginning. All that's embedded, that's why we pay money for it. Also, it translates to English, to Spanish, other languages, everything else, all right there, differentiates, all of that. Are we aligned? Yes, that's why it's a district tier one approved instruction.


Matthew Hawkins 17:25

So if I'm using Alex, and when I start my lessons, I start off by building my assignment in Alex. So I know exactly, we look at the scope and sequence, we go to Alex, we build the lesson, start with the end of mine, and then we go ahead and record the video.So I know exactly what I'm about to teach, so that the yoga that they're about to do in Alex, it all makes sense. So, they go into Alex, they go practice. I don't see how it's not aligned, I don't see how it's not differentiated, I don't see how it's, whatever, domain.


Powered by Notta.ai

Exhibit 15 - Page 9 of 24

Exhibit 15 -Page 10 of 24

**notta**

Joselyn Starling 17:54

of the work then that means that I could then then what are you doing as the teacher?

Matthew Hawkins 18:03

I'm providing the environment for instruction. The whole lesson, everything is me setting it up and putting it in motion.If I had a flipped classroom, we discourage flipped classrooms here. Is that discouraged? We said, no flipped classrooms. You can't have the students go and work at, and then come in and we just have a study group, like you're working, you're developing your skills, you're being overseen. You're like, we don't do that here. That's not a thing. That would be similar, although we have an instructional piece, sort of like a flipped classroom, if you look at it that way, but all the components are.

Joselyn Starling 18:35

I did a flip classroom. I did still didn't all of

Matthew Hawkins 18:39

are is that the flip classroom discouraged here and we say well we can't do that if you don't flip classroom you're gonna get this you need help wait is that what we're doing

Joselyn Starling 18:48

But everything that you just said, that you just explained, Alex does everything instead of you doing and showing the students. I did show the students. So you're saying that you're saying...

Matthew Hawkins 19:03

take up all day doing it. It doesn't take long. We're not doing much but the knowledge part, we don't have a whole bunch and we need to work on skills. So, I don't need to be up there forever.Just like, let's extend this out. Okay, Johnny, come up and do the board.

Powered by Notta.ai

Exhibit 15 -Page 10 of 24

Exhibit 15 -Page 11 of 24

**notta**

We got too many kids sitting idle. We don't have time for that. So, let's get to the skill part. So, I'm gonna get up there for maybe 15 minutes. If that go through the material. You have questions definitely asked. We're gonna do some core responses. We're

Joselyn Starling 19:32

He was like, is there any questions? One person said...

Matthew Hawkins 19:34

No, that one the core response. The core response is like while we're solving out what's the variable, the variables that, what's happening to the variable, the variables being multiplied by 3 then subtracted by 2. Okay, well it's the last thing. The last thing was subtracting 2.We're gonna add 2 and that's core response. We're going through the steps, the process, which we've been doing all year and then we go through those processes. That's our we do. We are doing it together. It's engagement. They are asked to respond and give feedback. That is engagement. When they're doing notes, that is engagement. Something that they're tasked to do. I go through before we start.

Joselyn Starling 20:11

I'll...

Matthew Hawkins 20:12

How do I know if all the students are getting it?

Joselyn Starling 20:14

No, that's not bad, that's not bad. How do I know they really have questions on that? No.Go ahead. How do I know? I was just thinking when you talked about notes, I was like, so how do you know that everyone is following you on the board if you're there, you're not? I mean, you can't see everyone in the classroom. And then so, and then, but back to what you, I mean, that was just, I mean, I was having the thoughts. OK.

Powered by Notta.ai

Exhibit 15 -Page 11 of 24

Exhibit 15 -Page 12 of 24

**notta**

Matthew Hawkins 20:43

to be on task. Definitely, I do monitor, take breaks. I'm not going to be at the long, so it's not like they're going to be able to be out the whole time. But before we get started, make sure we have our pencils, paper, whatever. Try to make sure 100% that two minute time as we're transitioning from the warmup into the direct teach section, you know? So most students will be engaged and actually taking notes. They're going to do core responses. Are all the students participating in core responses? Well, here's the thing. We can say that we do core responses, we don't. There's not trackable. But what I do know is trackable engagement. When I have a warmup, I know exactly who logged in, how long they've been logged in. I know exactly what grade they got. Oh, when we get to the Alex, I know exactly if you logged in, how long you logged in when you were there. And I also see it in real time. It's not like I have to wait for them to submit it. I see it while they're there. So as soon as we get to the Alex, I pull up my Alex. I'm going to say, okay, who's on Alex? Who's not? Start walking around with students that are not redirect. All that stuff. Getting instant feedback. You know if they're right or wrong. Like that's domain 1.4, 2.1, 2.3, infinite attempts. That's persistence. I'm encouraging resistance. Hey, you have unlimited attempts. You got one week. And when you need to do this, you need to ask questions. Ask questions. Watch the video. Watch the video. YouTube, keep trying. You want to look at examples in Alex. Keep watching examples in Alex. But most of the time it's not as issue of, oh, I don't know because I don't know. It's like, oh, I don't care. That's a completely different thing. And we're dealing with that separately. But they have everything available. How do I make sure that the students are able to get all the assistance? I support them in everything that we're doing. They have all the resources that they need. I'm available to them. If they have questions, I come to them and ask even if they don't have questions while I redirect them and everything else, that's all taken care of. So every last single one of these is taken care of and built into the system that I already told you at the beginning of the year.

Joselyn Starling 22:25

again so instead of building your your

Matthew Hawkins 22:29

I built my system to take care of these.

Joselyn Starling 22:31

Powered by Notta.ai

Exhibit 15 -Page 12 of 24

So instead of you build your home, everything that you were going to teach, you're putting into Alex and letting Alex do the work instead of actually doing it in front of the kids.

Matthew Hawkins 22:45

I'm doing the work in front of the kids. I don't understand that part, you're saying? I mean, well you, we were talking

Joselyn Starling 22:50

you said I build out my lesson and out it.

Matthew Hawkins 22:54

Yes, the DOL, the Demonstration of Learning, the Practice Inside Alex, yes.

Joselyn Starling 23:00

your I do we do you do is all in Alex

Matthew Hawkins 23:04

It's not all in Alex. It's all based off the Alex. So when I'm actually up doing the lessons, I'm framing things how Alex is going to sort of be looking at it. So when you go to out, it's like, what is it? I never seen this. Like you're familiar to the approach that we're getting so you can get to where you need to get inside the platform. Um, so yes, if Alex is not giving you a calculator, I'm not going to start off with the calculator. It's the requirement is that you know how to do certain things, non-calculator, calculator, whatever. If this is the day we're not using calculator, we're going to go through everything non-calculator. So when you get to Alex, because you're only supposed to use what it has available, you're not going to have a calculator in Alex. So you need to know how to do this legitimately or whatever else it is, like by hand, no calculator, like that type of thing. So that's how I approach things.And it's all like all these are addressed. Alex is the

Powered by Notta.ai

Exhibit 15 - Page 13 of 24

Exhibit 15 -Page 14 of 24

**notta**

Joselyn Starling 23:57

It's a tool, but it does have stuff.

Matthew Hawkins 24:01

It is pretty much the lesson as long as you're segwaying and integrating the lesson into it. It's intergrated.It's called integration It's integrated at the lesson When I had worksheets I did something completely different. Yes, we're gonna spend some time more time on the board and we'll have to do some more, you know Responses multi-tiered, you know responses and quick checks and all that other type of stuff because we don't have the technology to leverage We're trying to get all that instantly.I'm sitting there looking at like, why do I need to continue thumbs up thumbs? Why do I gotta do that? Like I can see I can see what you're doing I can see exactly what I can see how long you're doing it. I can see when you cheated through it I can see everything so I don't need those things I don't need to waste everyone else's time trying to do those things and make this some, you know, early 2000s classroom Which is definitely not we're one-to-one technology now A lot of the systems that we're trying to put in place do not fit where the kids are What we have available to us and we're not maximizing our potential But even if I am or not flip classroom, you know send someone off like this doesn't make sense It doesn't even know why like what so with Alex since it's tier one It's not something I'm just pulling off the shelf like I'm using this and it's not a lot No district said hey use this this has everything you need the reason why

Joselyn Starling 25:14

They said use this for the I doo dee doo dee doo.

Matthew Hawkins 25:17

I'm not using for the I do we do you do I use it for the I do

Joselyn Starling 25:21

Okay, but there I mean

Powered by Notta.ai

Exhibit 15 -Page 14 of 24

notta

**Matthew Hawkins 25:22**

Sorry, I'm gonna use it for the you do the you do also parts of the we do because the question bank instead of going to The board and working a question bank Let's go ahead and do corresponds for a redo Let's go ahead and work together on the board sort of what the I do for the we do and then you get to go To your practice. It's still a we do per se because I do is never

**Joselyn Starling 25:42**

But that's that there was no clear difference between your we do and you do.

**Matthew Hawkins 25:48**

you're worried about semantics that's not how this doesn't wait it's a semantic thing I do means I'm gonna go practice I practice

**Joselyn Starling 25:56**

After.

**Matthew Hawkins 25:57**

So there are still. Collaborative, collaborative, we've done it. We have. Yes. Yes. Well, I'm saying we do chorus. That's not collaborative.

**Joselyn Starling 26:06**

that I'm at that it's semantics but I don't know you're saying you're saying that I

**Matthew Hawkins 26:11**

I do, since they're doing the I do and outtakes.

Powered by Notta.ai

Exhibit 15 -Page 15 of 24

Exhibit 15 -Page 16 of 24

**notta**

Joselyn Starling 26:15

You said the I do is what you, the we do and the you do, there's no, you said they're doing that in the 40 minutes or whatever that you said.

Matthew Hawkins 26:24

15, 20 minutes for the lesson, yes. That's, I do what we do. Back to back, real quick, core response.

Joselyn Starling 26:32

no clear difference between the two.

Matthew Hawkins 26:36

clear very clear when I'm doing it I'm just going through when we're doing it I'm asking I'm probing questions that's we do I'm probing questions they're giving responses that's we as soon as that's over we go to the you do which is them in Alex working but it's still sort of what we do because they're still able to ask questions they can work together like it's just something in my classroom I allow them to work together just because I do or it's independent practice me oh yeah you gotta be by yourself you're doing this works you by it does not have to be that y'all don't think any other teacher for oh we're doing group work like we're working on time when we're working together there's nothing wrong with that it's also not wrong if they have assistance if the program is helping them and giving them feedback that's not oh you should be doing this by yourself is I that doesn't make any type of sense I do this is you working on your skill sets you get feedback if you need to go back and you know get retouched it can reteach the video can reteach I can reteach you can ask someone else to help you retain you get all that at the moment so why is it I you have to be so separated and isolated the we do is not long it doesn't have to be all isolated and separated and distinct you know it's something for you to develop your skill sets and you're building your document or your demonstration of one it doesn't have to be when is it ever when people are doing practices unless we're doing a snapshot like but still even if it's not what is this like really oh no you're you're a you do is not it's not completely separate they're getting too much up on the on the you do here you go really you're here's a Tina because if you do they get too much up on the you do really that's where we are it makes it make no sense to me all these are addressed all right I know every last single thing about all of this stuff multi-tiered the whole you know core responses how it's a you know yeah engagement pieces I don't know this is sort of

Powered by Notta.ai

Exhibit 15 -Page 16 of 24

comical but all I was asking about this is who put this together who's this who is who typed this document did someone email it to you Someone type this document, put the plan in place, put Ms. Bailey in there, put, you know, Alex can't be used. Someone did this. I'd just like to know who that person is so we can talk a little bit more and hopefully get some more understanding and clarify some things.Do we know who typed this? Yes, I mean Mr. Campbell worked on the collaborative. Okay. Okay. So why was, so if you worked on, so why was this, where did the suggestion of Alex not be used? Was that from Ms. Bailey?

Joselyn Starling 29:45

No, Miss Bailey has not seen this. But I'm saying,

Matthew Hawkins 29:48

that from her preference or whatever. Where does the Alex Snapp use come from and whose idea was it to put that in there?

Joselyn Starling 29:58

No, this is not from Miss Bailey. It was based on what us seeing in the classroom is that the students are sitting on Alex for 40 minutes.And instead of the complete lesson cycle being worked through, because you're saying, so when you're up doing your I do, but you're saying it's I do, we do, and then the we do, you do is together. So your I do, you do.

Matthew Hawkins 30:26

It's an I do but we do you can also view it as a we do but it's technically an I do It's just I do you still get assistance just because you're working with someone or whatever But the teacher but the teachers aren't involved necessarily with the whole class doing it. That's the difference Well, I work with an individual student.Yes, I would do a pull-out, but the teacher is not directing the I do I'm not involved at all as far as facilitating it. I'm floating around aggressive on it Yes, see I'm not facilitating the you do I'm aggressively monitoring so I'm not like The head honcho on it Do we do? It's still sort of me what we're doing together. I'm guiding it So we get the eye you're on your own I'm coming around see how you're doing Going on you work with partner you can you know you use

notta

the video you use Alex like but it's you You Thank you. So what was the reason for putting Alex y'all saying I was too much time on Alex that how you felt? Why is that?

Joselyn Starling 31:46

because you spent, you're putting them on Alex for 40 minutes instead of the we do, we're working them together. You're aggressively walking around doing your

Matthew Hawkins 31:56

I always aggressively walk around I was pretty sure you've heard thousands of complaints about me aggressively walking around redirect students they just wish I'll leave them alone I'm that guy

Joselyn Starling 32:07

No, actually that way.

Matthew Hawkins 32:08

Yeah, they're like, why is he messing with? He's always walking around and redirecting, it's time to throw away phones and phones.

Joselyn Starling 32:15

I've never had them complain about you walking around with them. I mean, that is not the plan I've received.

Matthew Hawkins 32:23

and they can still get dressed up even after they come in. They put on hats and caps and beanies and putting on Crocs back on and putting on earbuds and they get those, they come out and they get redirected back to their assignment and they're getting help and they don't want it.Yeah, that's what I do. All class is walk around the classroom. That's impressive. I don't know if you've ever seen that. That's not a company I've ever

Powered by Notta.ai

Exhibit 15 -Page 18 of 24

**notta**

seen. Oh, I'm surprised. I thought that'd be the number one. But yeah, so that's, I don't know. This doesn't make sense to me. I'm saying, but would you agree that all those are addressed? No, but we can agree with your discipline. OK. I'm saying, which part could you disagree with? The tier one instruction being embedded, so it's like an extension of the classroom and the lesson cycle. How can you say that the lessons are not sequential, they're not aligned, and they're appropriate for diverse learning? How could you say that with everything that the class is offering, Alex included, because it's district tier one. How can you say that's something that's not being provided to the student?

Joselyn Starling 33:33

Because I don't see a clear distinction between the lesson cycle. So I can't determine the difference between your we do and you do, even your I do and we do, me personally.

Matthew Hawkins 33:50

So when I'm probing questions and we're doing what we do, you don't see that that's what we do. I've already done the I do. So you're saying the we do and the I do, you do. You're confused.

Joselyn Starling 34:00

I'm not confused I don't see so I see your you do is I'm doing 40 minutes on the Alex whatever there is for me there's no clear distinction between the I do and we do because when you're working through a problem and and you know you're going through all of the steps and then you finish and say are there any questions so I don't where you're talking with so I don't see a clear distinction between the I do

Matthew Hawkins 34:36

No, we do the core response. After we finish it, I'll ask before we go on to the next question, are there any questions on this one before we go on the next one, because we're going to keep them moving?That's all it is, but they already did a core response, which is a we do, a call for engagement. Is it not?

Joselyn Starling 34:55

Powered by Notta.ai

Exhibit 15 -Page 19 of 24

Exhibit 15 -Page 20 of 24



Yes, a foreign response is a type of event.

Matthew Hawkins 34:57

is a call for engagement. So how is that, so I'm talking about one-one. How are we not aligned? You're saying Alex is not aligned? Are we not sequential? Are lessons skipping beats? Are we not organized? Do we not use timers? Do we not know what's happening? The assignments ain't up, it's just disorganized chaos and there's a big time.No, no, no, I'm sorry, let's not want the main one. The dimension one with my plan? Is that happening? Yes, ma'am.

Joselyn Starling 35:33

We can, you can ask me a question, I gave you the answer, we can agree. No, no, that's not good enough.

Matthew Hawkins 35:41

but I need specific what part do you disagree with like oh I don't agree but you have to be articulate what you don't agree with already articulated how I covered all these you're saying I disagree but where

Joselyn Starling 35:55

I don't see the difference between your eyes. That has nothing to do with pain. It's part of the lesson.

Matthew Hawkins 35:59

It has nothing to do with planning dimension one zero things to do I do we do you had nothing to do with planning dimension one Nothing to do with planning dimension 1.4 has nothing to do with 2.1 Nothing to do with 2.3 nothing to do with 2.4 nothing to do with 2.5 I'm talking about these ones regardless of how you feel about I do we do you do what does that have to do with any of these dimensions up here that are listed I know that's your disagreement and I know you say you don't see it But what does that have to do with any of these dimensions that you put up here that are in need of improvement?

Powered by Notta.ai

Exhibit 15 -Page 20 of 24

Exhibit 15 -Page 21 of 24

**notta**

**Joselyn Starling 36:43**

because I don't clearly see in your lesson, even like you give us a template that we've added and we've rehashed this several times. And so I don't see in the lesson planned out the I do, we do, you do.I don't see what you're putting in front of students. I don't have access to Alex. I don't see what you're putting in front of students. You can submit to me your lesson and I can be able to go through it and say, okay, he has this rather I do this rather we do. You've never submitted the lesson to me. You sent a agenda to me.

**Matthew Hawkins 37:22**

It's a brief overview of the lesson, which is what's legal.

**Joselyn Starling 37:27**

Okay, you say an agenda.

**Matthew Hawkins 37:31**

Right, and I are talking to Mr. Campbell. He's supposed to be giving me back on that. He ain't got very much yet, but we've been waiting on that.And I've been, okay. So also, Mr. Campbell's like, well, that's not supposed to be happening. We're supposed to be building these PowerPoints and all these lessons inside of PLC. Haven't happened yet either. So what you're getting is, okay, this is what I'm gonna do, because I was the one who's not my only prep, by the way. So I'm doing this twice. We ain't got one of them done in PLC. Oh, so you want me to go home and do two of these by myself, what type of business does that make? When it's not necessary to facilitate instruction where students can learn, you're burning time. And also, it's illegal if you look at the state law, which I've already brought up to Mr. Campbell. He's looking at that and he's still like, oh, so at this point, like I'm saying, it feels like retaliation. Retaliation, I believe. Yeah, well, Ms. Bailey, you and Mr. Campbell, I'll tell you, it feels like, well, I could be wrong, but when you're putting all this up here and you can't feel like, oh, I don't see no lessons, so you ain't turn them in. I said, hey, that's illegal, but I'm still providing instruction to the students.

**Joselyn Starling 38:32**

Powered by Notta.ai

157

Exhibit 15 -Page 21 of 24

notta

you're providing.


Matthew Hawkins 38:37

and we can't go above it. I'm saying, but we're supposed to have them in POCs. Why are we not getting them in POCs? I would love to know that question.Why are we spending so much time sitting around talking about data and all this other stuff? Well, let's sit down and put a lesson together. One of these PowerPoint lessons that we're supposed to present. We've had half of one finish, and Sandals had to go home and finish it on his own. Like, we barely get him touched. Like, and that's something that's kind of like, oh, look into it, and here we go. So, that's not on me. We're told that if you get here, we're supposed to do this as a team. You don't have to worry about that. It's gonna be done for you. What happened to that? Because I'm not supposed to be submitting these. They're supposed to be submitted by the team. The team's supposed to get one. We all do the same thing. Has not happened. You've been in the POCs. Hasn't happened.


Joselyn Starling 39:16

So what?


Matthew Hawkins 39:30

Wait, if you tell me, oh, it's not in your lesson, we're supposed to be doing those together. So that's a different issue, completely different issue.But I still don't see, even if you don't see it or not, it has zero to do with any of these domains, zero. I do, we do, you do, is not in one of these domains. If you tell me where it is, I definitely would like to see it because I've looked forward and backwards, sideways and up and down.


Joselyn Starling 40:08

You mean for it to be the most insightful to be spelled for it to say I do we do you do yeah in the demands


Matthew Hawkins 40:14


Powered by Notta.ai

Exhibit 15 -Page 22 of 24

notta

So okay, the teacher is not planning, so where's the, I do.

Joselyn Starling 40:19

You're saying the word.

Matthew Hawkins 40:20

No, no, no, no, just that, that whole format. Because if I had a flipped classroom, it's not going to be, I do what you do, you do nothing. If I had a flipped classroom. That's why I asked the question of, are we opposed to flipped classrooms?Because they're not going to follow that mode or that format. That's one way to run a classroom. There's thousands of other ways to run a classroom. So are we saying, oh, no flipped classroom? Because they're not going to look at it like that anyway. So anyone doing a flipped classroom would have the same issue. Unless they had full-blown lesson plans, if that was the case. But that's a lesson plan issue, which is a legal issue, and I already talked to Mr. Campbell about that. He's working on that. So, but I'm saying you would have the same issue with any teacher that was doing flipped classroom. But that doesn't fit with any of these domains that you're accusing me of not having, you know, together or needing of assistance. Has zero to do. So that's what I'm trying to see. Like, where is that? Even if I didn't do, I didn't do, you do, we do. But I do. But if I didn't, what is, what is the issue on this? Do they not have engagement? We have several, several spots of engagement. Warm up engagement. As we transition, notes, we got engagement. Core response, we got engagement. Practice, we got engagement. A to T, we got engagement. And I get grades too. You asked me, why you got so many grades? Oh, there's several parts of engagement in my lessons. Like when I'm playing this stuff, several points of engagement. Every point of engagement is also traceable. I know exactly what they're doing and why not? So they're asking, am I going to get it right for this? I put the grades in. That's why I got some of the most grades out of everybody in the building. Because I know what engagement looks like. My, my lessons are engaging.Are they fun? Not necessarily safe, but that's fun. It's math. It is what it is. But yes, engagement, you have a lot of stuff that you're going to be doing. That's aligned with our demonstration of learning, what you need to accomplish. Like, it's all there. And I have bundles of data and samples and everything. I've been tracking this since the beginning of the year. We had this conversation back in August. I got all of it. So to say that, oh yeah, there's no engagement. Plenty, plenty of engagement. Are they having the most fun? It's math. It's going to be what it's going to be. But it's engagement because we're tracking it and they have to respond. They have to do something. Non-engagement is, oh, you cover the classroom. You sit down. I get up there, I talk. You leave. You're engaged. You're asked to do nothing the whole class. That's a zero engagement. You got it? There's more.

Powered by Notta.ai

Exhibit 15 -Page 24 of 24

**notta**

There's something for you to do. That's engagement. Oh, let's get our notes. Let's engage. You're going to take these notes. Oh, oh, you're going to respond. We're going to do core response. Engagement.

Matthew Hawkins 42:54

You know what? Are you going to do this practice? Engage. Like, this, and that is, that's how I have an engaging lesson. Something builds fun. We're entertained.We're entertained. So, but I guess we agreed to disagree. But we need to definitely spell these out. I need to know. I honestly, I need to know. I'm just that type that I have to, like, you can probably tell. I'm like, I want it to be, I want it to be in order. I want it to be right.I want it to be sexist. I want it to be, well, we can be our best and we can like do our thing and be, maximize our potential. That's, that's me. Like, I'm all about us being our best selves and, you know, especially us. I don't know. Can we talk with Mr. Campbell?

Powered by Notta.ai

Exhibit 15 -Page 24 of 24

## Exhibit A—Employee Complaint Form—Level One

To file a complaint, please fill out this form completely and submit it by hand delivery, electronic communication at Grievances@DeSotoISD.org, or U.S. mail to the Human Resources Department within the 10-day timeline established in District policy DGBA(LOCAL). All complaints will be heard in accordance with DGBA(LEGAL) and (LOCAL) or any exceptions outline therein.

Name:                  Matthew Hawkins

Address:               618 Bluechalk Dr Cedar Hill, TX, 75104

Telephone
Number:                972-639-4284

Email Address:         matthewhawkinsus1@gmail.com

Position/Campus/
Department:            Teacher/DHS ECHS/ Math

If you will be represented in presenting your complaint, please identify the person representing you. If the person representing you will be participating by telephone conference call, please check the box below. The District will inform you if the equipment necessary for telephone representation is unavailable.

         Representation will be by telephone conference call.

Please note: You must designate a representative who will be participating in person or by telephone with an advance notice of at least three days, or the District may reschedule the conference or hearing to a later date.

Name:

Exhibit 16 -Page 1 of 7

Addr
ess: _____

_____

Telep
hone
Num
ber: _____

Email
Addr
ess: _____

The date of the event or action that gave rise to this complaint
_____03/06/2024_____

Please provide a detailed factual description of the decision or circumstance(s) that gave rise to this complaint. (Use additional pages if necessary)

Disagreements with Ms. Starling:

Throughout the 2022-2023 and current 2023-2024 school years, I have had several disagreements with Ms. Starling, Associate Principal of Early College High School (ECHS), regarding policy interpretations, calculator use, and number of assignments given.

Lesson Plan Policy Dispute:

On October 26th, 2023, Ms. Starling expressed concerns that my lesson plans were not full, detailed PowerPoints. She attached an exemplar as a reference.

I disagreed with this expectation, as it went beyond the state's limitations. In a meeting on November 7th, 2023, I cited Board Policy DLB, which outlines the maximum requirements for lesson plans. I argued that this policy establishes a ceiling, not a floor, for lesson plan detail.

_____

Exhibit 16 -Page 2 of 7

Exhibit 16 -Page 3 of 7

Ms. Starling disagreed, stating the district could add to the policy's requirements. To support my position, I highlighted a specific provision within Policy DLB that, in my interpretation, served as a protection against additional expectations.

Follow-up Meetings and Write-up:

A follow-up meeting on November 28th, 2023, included Ms. Primus, Associate Principal of Teaching and Learning. Ms. Primus did not have an interpretation of Policy DLB, however she stated that Dr. McCloud was aware of the detailed lesson plan practice at the high school level.

Despite this, I continued to believe the practice conflicted with Board Policy DLB. Unfortunately, Ms. Starling issued a write-up regarding my use of non-detailed lesson plans.

Following the write-up, I expressed my desire to resolve the legal issue and write-up internally. I sought a clear path forward that addressed both the policy violation and the write-up itself.

Meeting with Principal Campbell:

On December 14th, 2023, I met with Principal Campbell to discuss the lesson plan policy dispute and a separate attendance policy concern discussed with Ms. Starling.

Regarding the lesson plans, Mr. Campbell stated that shared team PowerPoints were to be developed during Algebra 1 PLCs (Professional Learning Communities). However, I clarified that such PowerPoints were never created in PLCs. He requested additional time to investigate the PLC lesson plan approach and promised to follow up on both the policy concern and the attendance policy issue.

On January 29th, 2024, Mrs. Jackson's role was revised, and Ms. Bailey began facilitating Algebra 1 PLCs. This shift in personnel involved in my case suggests a possible change in tactics used to pressure me regarding lesson plans and teaching methods.

Specific Disagreements with Ms. Bailey:

During a classroom walkthrough on February 12th, Ms. Bailey interrupted my lesson on Graphing Quadratic Equations. She insisted I teach calculator use on a question designed to be completed by hand. I explained our plan to eventually integrate calculators but prioritize foundational skills without them, as the assessment requires non-calculator solutions for specific problems.  In a PLC meeting on February 14th, Ms. Bailey raised her voice and expressed her belief that I was "hurting" students by not teaching calculator methods immediately. I reiterated our district's CCMR goals and explained our intention to focus on calculators after establishing a strong foundation in graphing by hand,

Later in the same meeting, while discussing a "grow and glow" activity for another teacher, I mentioned the value of having students work through problems by hand to understand solution reasonableness (TEKS processing standard A.1B). Ms. Bailey again became irate, stating that

Exhibit 16 -Page 3 of 7

reasonableness was not part of the TEKS A.7a and "terrible advice" when graphing quadratics. She argued that students should simply use calculators.

These incidents with Ms. Bailey highlight a clear disagreement about teaching methods. My approach prioritizes aligning with district goals and established TEKS standards, while Ms. Bailey appears to advocate for a calculator-focused approach that could potentially conflict with those guidelines.

On February 26th, 2024, I learned about a parent meeting that had taken place with the principal. Students seemed to already be aware of what was taking place behind the scenes.

The following day, I received an email informing me that Mrs. Jackson would be taking over instruction for my Algebra 1 classes. This sudden change, particularly without prior discussion, raised concerns for me.

In a meeting on February 27th with Mr. Campbell and Ms. Starling, the focus shifted to data and ECHS students surpassing the school's "90-60-20" goal. While I acknowledged the importance of these goals, I explained that my primary focus had been on meeting district CCMR (College & Career Military Readiness) board goals. My approach prioritized developing foundational skills and preparing students for the TSI assessment, a non-calculator standardized test.

The conversation then revisited the use of calculators in class, a topic I previously debated with Ms. Starling and Ms. Bailey. Finally, I inquired about the follow-up promised by Mr. Campbell after our December meeting regarding the lesson plan policy and attendance concerns. He again stated he would get back to me.

On March 6th, 2024, I received an email notification placing me on a "teacher in need of improvement" plan. Given my positive evaluations last year and experience as a seasoned teacher with almost a decade in the profession, I believe this recent action is retaliatory in nature. The sequence of events, particularly the sudden shift in instructional focus, the reassignment of my classes, and now the improvement plan, all suggest a targeted response to my previous disagreements with Ms. Starling, Ms. Bailey, and Principal Campbell.

I am confident that a review of Board Policy DLB and the sequence of events will demonstrate a conflict between policy and administrative expectations. Additionally, the timing of the recent actions raises serious concerns about potential retaliation.

_____

_____

_____

Explain specifically how you were harmed by this decision or circumstance.

Exhibit 16 -Page 4 of 7

The write-up for non-compliance and subsequent improvement plan negatively impacts my professional reputation.  These actions, particularly given my positive past evaluations, suggest a performance issue that is not accurate. This has been damaging to my morale.

The reassignment of my Algebra 1 classes to Mrs. Jackson disrupts the learning environment for my students.  We lose the continuity and established rapport built throughout the school year. This negatively impacts their academic progress.

In addition to these specific harms, the overall situation creates a stressful and hostile work environment.  I am committed to providing a quality education to my students, and these actions make it more difficult to achieve that goal.

_____

_____

_____

Please describe any efforts you have made to resolve your concerns and the responses to your efforts. Please include dates of communication and with whom you communicated regarding your concerns.

October 26th, 2023

Recipient: Ms. Starling (Associate Principal, ECHS)

Effort: Discussed concerns about detailed lesson plan expectations exceeding Board Policy DLB. Cited the specific provision within the policy that I believed protected against additional requirements.

Response: Ms. Starling disagreed, stating the district could add to the policy's requirements.

_____

November 28th, 2023

Recipient: Ms. Primus (Associate Principal, Teaching & Learning)

Effort: Expressed a desire to resolve the legal issue and write-up internally. This included seeking next steps and a path forward that addressed both the policy violation and the write-up itself

Response: Next Steps Campbell and McCloud

_____

Exhibit 16 -Page 5 of 7

Date: December 14th, 2023

Recipient: Mr. Campbell (Principal)

Effort: Inquired about the lesson plan DLB policy and attendance policy concerns.

Response: Mr. Campbell stated he would get back to me, but no further communication occurred.

Please describe the outcome or remedy you seek for this complaint.

Given my positive evaluations and the sequence of events, I request the removal of the "teacher in need of improvement" plan, write-up, and  reassignment of classes.

Complainant, please note:

*A complaint form that is incomplete in any material way may be dismissed but may be refiled with all the required information if the refiling is within the designated time for filing a complaint.*

*Attach to this form, the exhibit list and any documents you believe will support the complaint; if unavailable when you submit this form, the exhibit list and documents may be presented no later than the Level One conference. After the Level One conference no additional documentation can be submitted unless you did not know the documentation existed before the Level One conference.*

*Please keep a copy of the completed form and any supporting documentation for your records.*

| Employee Signature | Matthew Hemker | Date Submitted | 03/08/2024 |

_____    _____

Signature of Employee's Representative

_____    _____



Exhibit 16 -Page 7 of 7

Exhibit 17 -Page 1 of 2



# DeSoto Independent School District

April 8, 2024

<u>Via Email and CMRRR</u>
Matthew Hawkins
Bluechalk Drive
Cedar Hill, Texas 75104

RE:    **IN THE MATTER OF THE GRIEVANCE for Matthew Hawkins**

**Summary of Grievance Hearing**:

A Level I grievance hearing was held at DeSoto High School Principal Suite by Principal

Jasen Campbell, on Thursday, March 28,2024 at 2:30 p.m. Also present were grievant

Matthew Hawkins.

**Summary of Grievance**:  Grievant states he has had disagreements with administration throughout the year. The first being in regards to lesson plan expectations. Grievant believes that the expectations contradicted state and district policy. Grievant later met with Associate administrator on the issue and received a write-up for none compliance. Grievant then receives communication of his classes were being reassigned. Grievant is then placed on a growth plan and believes that he is meeting the requirements.

**Summary of Relief Sought**:    Grievant seeks to have the removal of the teacher in need of improvement plan, write-up, and reassignment of classes.

**Findings of Fact and Conclusions:** Prior to the grievance hearing, several of the grievant concerns were addressed and resolved. After meeting with Mr. Hawkins on March 22nd, I determined that the teacher in need of assistance plan be discontinued. This was communicated to Mr. Hawkins on March 26th in person and via email. I lieu of the plan, and based on our previous meeting it was determined that we would collaborate on strategies and the use of ALEKS. It was also determined that professional development sessions would be needed on the lesson cycle and engagement. Based on the information present I find the following:

1. The write-up provided to Mr. Hawkins was based on the lesson plan.

2. It was communicated by administration that the Algebra classes would be reassigned.

The mission of DeSoto ISD is to prepare each student academically and socially to be a problem solver and productive citizen for a 21st century global society.

200 East Belt Line Road, DeSoto, Texas 75115  •  972.223.6666  •  www.desotoisd.org
Dr. D'Andre J. Weaver, Superintendent  •  dandre.weaver@desotoisd.org            Exhibit 17 -Page 1 of 2

## Decision:

Based on my review of the information presented at the Level I hearing and any independent investigation of the facts that I conducted, I make the following decision regarding this grievance:

It is my decision to grant that removal of the write up for the lesson plan from the teacher's file. The campus does not require a lesson plan, but an actual lesson which is student facing. The rational is to minimize the excess paperwork and allow teachers to spend their time creating the actual lesson.

It is my decision to grant that the reassignment of students should not have occurred. It was communicated among administrators for the reassignment not to occur. That communication was communicated to you in the conference on February 27th but was not communicated to the instructional coach. The instructional coach should have done pull-outs to support students in need of assistance. This support was provided for all Algebra teachers.

Any relief not expressly granted is hereby denied."

Signed this 8th day of April, 2024

**Hearing Officer's Signature**

ASSIGNMENT AND SCHEDULES

DK
(LOCAL)

---

**Note:** This local policy has been revised in accordance with the District's innovation plan.[1]

---

**Superintendent's Authority**

All personnel are employed subject to assignment and reassignment by the Superintendent or designee when the Superintendent determines that the assignment or reassignment is in the best interest of the District. Reassignment shall be defined as a transfer to another position, department, or facility that does not necessitate a change in the employment contract of a contract employee. Any change in an employee's contract shall be in accordance with policy DC.

Any employee may request reassignment within the District to another position for which he or she is qualified.

**Campus Assignments**

The principal's criteria for approval of campus assignments and reassignments shall be consistent with District policy regarding equal opportunity employment, and with staffing patterns approved in the District and campus plans. [See BQ series]  In exercising their authority to approve assignments and reassignments, principals shall work cooperatively with the central office staff to ensure the efficient operation of the District as a whole.

In accordance with the District's local innovation plan exemption regarding SBEC certification [see DBA], the Superintendent shall have the authority to approve a request by the principal for an individual with experience in a career and technical education (CTE) field or experience in fine arts, athletics, or languages other than English to teach a course related to that field. [See DBA]

**Supervising Related Employees**

A District employee shall not directly supervise an individual related within the first or second degree by blood or marriage. [See DBE (EXHIBIT)]

Grandfathered Employees

The provisions of this policy addressing related employees shall not apply to persons employed or assigned prior to the initial adoption date of the provisions at SUPERVISING RELATED EMPLOYEES.

**Supplemental Duties**

Noncontractual supplemental duties for which supplemental pay is received may be discontinued by either party at any time. An employee who wishes to relinquish a paid supplemental duty may do so by notifying the Superintendent or designee in writing. Paid supplemental duties are not part of the District's contractual obligation to the employee, and an employee shall hold no expectation of continuing assignment to any paid supplemental duty.

---

DATE ISSUED: 8/22/2017
LDU 2017.01
DK(LOCAL)-X

Adopted:

1 of 2

Exhibit 18 -Page 1 of 2

Exhibit 18 -Page 2 of 2

057906

ASSIGNMENT AND SCHEDULES

DK
(LOCAL)

| | |
|---|---|
| **Work Calendars and Schedules** | Subject to the Board-adopted budget and compensation plan and in harmony with employment contracts, the Superintendent shall determine required work calendars for all employees. [See DC, EB]

Daily time schedules for all employees shall be determined by the Superintendent or designee and principals. |

---

[1] Innovation Plan: https://www.desotoisd.org



DATE ISSUED: 8/22/2017
LDU 2017.01
DK(LOCAL)-X

Adopted:

2 of 2

171

Exhibit 18 -Page 2 of 2

DeSoto ISD
057906

ACADEMIC ACHIEVEMENT                                                          EIA
GRADING/PROGRESS REPORTS TO PARENTS                                     (LOCAL)

| | |
|---|---|
| **Relation to Essential Knowledge and Skills** | The District shall establish instructional objectives that relate to the essential knowledge and skills for grade-level subjects or courses. These objectives shall address the skills needed for successful performance in the next grade or next course in a sequence of courses. |
| | Assignments, tests, projects, classroom activities, and other instructional activities shall be designed so that each student's performance indicates the level of mastery of the designated District objectives. |
| **Guidelines for Grading** | The Superintendent or designee shall ensure that each campus or instructional level develops guidelines for teachers to follow in determining grades for students. These guidelines shall ensure that grading reflects a student's relative mastery of an assignment and that a sufficient number of grades are taken to support the grade average assigned. Guidelines for grading shall be clearly communicated to students and parents. |
| | The District shall permit a student who meets the criteria detailed in the grading guidelines a reasonable opportunity to retake a test for which the student received a failing grade. |
| **Progress Reporting** | The District shall issue grade reports/report cards every grade reporting period on a form approved by the Superintendent or designee. Performance shall be measured in accordance with this policy and the standards established in EIE. |
| Interim Reports | Interim progress reports shall be issued for all students after the third week of each grading period. Supplemental progress reports may be issued at the teacher's discretion. |
| Conferences | In addition to conferences scheduled on the campus calendar, conferences may be requested by a teacher or parent as needed. |
| **Academic Dishonesty** | A student found to have engaged in academic dishonesty shall be subject to grade penalties on assignments or tests and disciplinary penalties in accordance with the Student Code of Conduct. Academic dishonesty includes cheating or copying the work of another student, plagiarism, and unauthorized communication between students during an examination. The determination that a student has engaged in academic dishonesty shall be based on the judgment of the classroom teacher or another supervising professional employee, taking into consideration written materials, observation, or information from students. |

DATE ISSUED: 10/3/2013                    Adopted:                         1 of 1
UPDATE 98
EIA(LOCAL)-X                                    172                  Exhibit 19 -Page 1 of 1

ACADEMIC ACHIEVEMENT                                                    EIA
GRADING/PROGRESS REPORTS TO PARENTS                                  (LEGAL)

**Grading Policy**

A district shall adopt a grading policy, including provisions for the assignment of grades on class assignments and examinations, before each school year. A district grading policy:

1.  Must require a classroom teacher to assign a grade that reflects the student's relative mastery of an assignment;

2.  May not require a classroom teacher to assign a minimum grade for an assignment without regard to the student's quality of work; and

3.  May allow a student a reasonable opportunity to make up or redo a class assignment or examination for which the student received a failing grade.

*Education Code 28.0216*

**Finality of Grade**

An examination or course grade issued by a classroom teacher is final and may not be changed unless the grade is arbitrary, erroneous, or not consistent with the district grading policy applicable to the grade, as determined by the board.

A determination by the board is not subject to appeal.

This subsection does not prohibit an appeal related to a student's eligibility to participate in extracurricular activities under Education Code 33.081.

*Education Code 28.0214*

**Student Election Clerks**

A student who is appointed as a student election clerk under Election Code 32.0511, or as a student early voting clerk under Election Code 83.012, may apply the time served toward:

1.  A requirement for a school project at the discretion of the teacher who assigned the project; or

2.  A service requirement for participation in an advanced academic course program at the discretion of the program sponsor or a school-sponsored extracurricular activity at the discretion of the school sponsor.

*Education Code 33.092*

**Progress Reports**

A board shall adopt a policy that:

1.  Provides for a conference between parents and teachers;

2.  Requires a district, at least once every 12 weeks, to give written notice to a parent of a student's performance in each class or subject; and

DATE ISSUED: 11/21/2023                                              1 of 3
UPDATE 122
EIA(LEGAL)-P                          173                    Exhibit 20 -Page 1 of 3

ACADEMIC ACHIEVEMENT                                                    EIA
GRADING/PROGRESS REPORTS TO PARENTS                          (LEGAL)

3.  Requires a district, at least once every three weeks, or during the fourth week of each nine-week grading period, to give written notice to a parent if a student's performance in a foundation curriculum subject [see EHAA] is consistently unsatisfactory, as determined by the district.

The notice required by items 2 and 3 must provide for the signature of the student's parent and must be returned to the district.

A district that uses an electronic platform for communicating student grade and performance information to parents may permit a parent to sign a required notice electronically, so long as the district retains a record verifying the parent's acknowledgment of the required notice. A district that accepts electronic signatures must offer parents the option to provide a handwritten signature.

"Parent" includes a guardian, conservator, or other person having lawful control of a student.

**Exceptions**

These requirements do not apply to a student who:

1.  Is 18 or older and living in a different residence than the student's parents;

2.  Is married; or

3.  Has had the disabilities of minority removed for general purposes.

*Education Code 28.022*

**Dyslexia Progress Reports**

For information regarding required progress reports for students receiving dyslexia instruction, see EHB.

**Notice of Performance Rating**

The first written notice of a student's performance that a district gives during a school year under Education Code 28.022(a)(2) [see Progress Reports, item 2, above] must include a statement of whether the campus at which the student is enrolled has been awarded a distinction designation under Education Code Chapter 39, Subchapter G or has been identified as an unacceptable campus under Education Code Chapter 39A, and an explanation of the information's significance. [See AIB] *Education Code 39.361*

**Notice of Student Performance**

The district shall provide a record of the comparisons of student performance made under Education Code 39.034 and provided to the district under Education Code 39.302 in a written notice to the student's parent or other person standing in parental relationship.

For a student who failed to perform satisfactorily as determined under either performance standard under Education Code 39.0241 on an assessment instrument administered under Education Code

DATE ISSUED: 11/21/2023                                                   2 of 3
UPDATE 122
EIA(LEGAL)-P                              174                    Exhibit 20 -Page 2 of 3

EXHIBIT 20

ACADEMIC ACHIEVEMENT                                                    EIA
GRADING/PROGRESS REPORTS TO PARENTS                                   (LEGAL)

39.023(a), (c), or (l), the district shall include in the notice specific information relating to access to educational resources at the appropriate assessment instrument content level, including assessment instrument questions and answers released under Education Code 39.023(e).

*Education Code 39.303*



Exhibit 21 -Page 1 of 2

## Matthew Hawkins

| | |
|---|---|
| **From:** | ███████████████ |
| **Sent:** | Wednesday, November 20, 2024 9:29 AM |
| **To:** | Matthew Hawkins |
| **Subject:** | Fw: Math teacher changes |

Mr. Hawkins,

Thank you for reaching out. I know you're frustrated, and you have every right to be. I'm forwarding the email I sent to Dr. Darden regarding ██████ experience and our concerns about the changes in her math class. I hope it provides *some* context.

Dr. Darden mentioned in his response that the decision to reassign you was student-led, student-inspired, and not based on parent complaints. However, I found this confusing, given that he shared in the parent GroupMe that the scratch work from certain students clearly indicated cheating. It feels inconsistent, especially since ██████ mentioned that a month or so ago, Dr. Darden visited her classroom and expressed clear regret about moving you, noting that your coursework was rigorous. I agree wholeheartedly—it's one of the reasons we advocated for ████ to stay in your class.

All of this has left me feeling as confused as you are about the rationale behind the reassignment. Please let me know if there's anything else I can do to support you in gaining more clarity.

Wishing you the best,

███████

----- Forwarded Message -----
**From:** ███████████████████████
**To:** Leon Darden <leon.darden@desotoisd.org>
**Sent:** Thursday, September 5, 2024 at 11:43:41 AM CDT
**Subject:** Math teacher changes

Dr. Darden,

I am writing to express my deep concern and disappointment regarding the recent decision to remove Mr. Hawkins from his position.

Mr. Hawkins has been a significant asset to our daughter's education. For years, she struggled with math, and it was under Mr. Hawkins's guidance last year that she made tremendous strides, achieving a Masters level score on the STAAR exam for the first time. His commitment to her success, both in and outside the classroom, is something that cannot be easily replaced. We believe in his teaching methods, and we have seen the positive impact they have had on her understanding and love for the subject.

We are particularly concerned that the district has chosen to make this change in response to vocal criticism from some parents. While we understand that every student's experience is different, we feel that Mr. Hawkins should not have been removed based on complaints without exploring alternative solutions that balance the needs of all students. Bowing to the loudest voices in the room is a concerning trend, and it feels as though the district is making decisions that fail to consider the needs of students who were excelling under his instruction.

Where is the plan to address parents and students who *are* happy with Mr. Hawkins? (see attached) We feel blindsided. We deserve an explanation just as much as those parents who wanted to see him gone. What exactly is the problem?

Parents in GroupMe were concerned about Mr. Hawkins giving out blanket 0s for academic dishonesty. Why, then, is a blanket score of 100 now given to students? That does not promote accountability or true learning. At a minimum,

Exhibit 21 -Page 1 of 2

Exhibit 21 -Page 2 of 2

students should've been retested or directed to complete the assignments in the presence of proctors. If they didn't cheat, they should have no problem replicating the results.  I think we know why that didn't happen.

We are also worried about who we are being told is the replacement for Mr. Hawkins. From what we understand, Coach ████████ is not certified to teach math beyond the 8th-grade level, and we fear that this will negatively impact our daughter's academic progress. With that in mind, we would like to request a schedule change that allows our daughter to remain in Mr. Hawkins's class. We have been extremely happy with him as her math teacher, and we would prefer to continue with the methods and structure that have proven effective for her.

We would appreciate your assistance in addressing this matter.

Thank you for your time and understanding. We look forward to hearing from you soon.

Sincerely,

████████



Exhibit 21 -Page 2 of 2

## Matthew Hawkins

| | |
|---|---|
| **From:** | Matthew Hawkins |
| **Sent:** | Tuesday, November 19, 2024 8:06 AM |
| **To:** | ███████ |
| **Subject:** | RE: Thank You! |

Good Morning ██████████,

I'm writing to follow up on ████ reassignment from my Algebra II class. As you may know, I was reassigned in August, and since then, I've been trying to gather information about the circumstances surrounding this decision. Unfortunately, despite repeated requests, the district has not provided me with any details, including any communication they may have had with parents about the reassignment.

I'm wondering if you happen to have received any communication from the school or district regarding my reassignment and ████ subsequent placement in a different class. If you did, and if you're comfortable doing so, would you be willing to forward that email to me?

Any information you could provide would be greatly appreciated as I continue to seek clarity on this matter.

Thank you for your time and consideration.

Matthew Hawkins
Desoto High School
Algebra II
Rm 2103
(972) 230-0726

**From:** ████████ <██████████████████
**Sent:** Tuesday, December 19, 2023 10:38 AM
**To:** Matthew Hawkins <matthew.hawkins@desotoisd.org>
**Subject:** Re: Thank You!

> You don't often get email from tandrrashad@yahoo.com. Learn why this is important

Mr. Hawkins,

You're very welcome. Thank you for working so hard with Layla. She was nervous about high school math, but each day we know she's in good hands.
I hope the principals told you how many parents at the last PTA meeting sang you praises. You are truly appreciated. We hope you enjoy your Christmas.

All our best,

████████████

Exhibit 22 - Page 1 of 2

Exhibit 22 -Page 2 of 2

On Dec 19, 2023, at 9:45 AM, Matthew Hawkins <matthew.hawkins@desotoisd.org> wrote:

██████████

Please tell ███ another HUGE thank you from me for her sweet message and the awesome Amazon gift card!

Wishing you guys a Merry Christmas full of joy, laughter, and lots of love!

Matthew Hawkins
Desoto High School
*Academic Academy*
ECHS Algebra I & II
Rm 1806
(972) 230-0726 ext 1806

<image001.png>

This e-mail may be privileged and/or confidential, and the sender does not waive any related rights and obligations. Any distribution, use or copying of this e-mail or the information it contains by other than an intended recipient is unauthorized. If you feel you have received this e-mail in error, please advise me (by return e-mail or otherwise) immediately. Information received by or sent from this system is subject to review by supervisory personnel, is retained and may be produced to regulatory authorities or others with a legal right to the information under the Public Information Act. The DeSoto Independent School District does not discriminate on the basis of race, religion, color, national origin, gender, age, or disability in providing education services, activities, and programs, including vocational programs, in accordance with Title VI of the Civil Rights Act of 1964, as amended; Title IX of the Educational Amendments of 1972; and Section 504 of the Rehabilitation Act of 1973, as amended. You may contact DeSoto ISD Communications at 972.223.6666

Exhibit 22 -Page 2 of 2



# DeSoto Independent School District

The mission of DeSoto ISD is to ensure students, without exception, learn and grow at their highest levels.

**DATE: 11 November 2024**

**RE: IN THE MATTER OF THE GRIEVANCE for MATTHEW HAWKINS**

**Summary of Grievance Hearing:**

A Level II Grievance Hearing was held at the DeSoto ISD Administration Building by Gene Morrow Jr., on 25 October 2024 at 3:40 pm. Mr. Hawkins was present at the hearing and represented himself.

## Summary of Grievance

Mr. Hawkins was reassigned from teaching ECHS Algebra II Honors & ECHS Geometry Honors to Algebra II on 30 August 2024. Mr. Hawkins filed a Level I Grievance which was heard on 20 September 2024 by Dr. Darden. In the Level I Grievance Mr. Hawkins sought the following relief:

- Reinstatement to his previous teaching assignment of Algebra II Honors & Geometry II Honors at theECHS
- A formal investigation in the complaints to determine their validity and address any legitimate concerns
- An apology letter to the parents of his students acknowledging the mishandling of the situation and clarifying the reasons for his reassignment

On 14 October 2024 Dr. Darden returned the decision of the Level I Grievance in which the grievance was denied in its entirety.

## Facts and Findings

Following the Level II Grievance Hearing, the hearing officer reviewed the accompanying documents submitted by Mr. Hawkins and investigated the concerns expressed by Mr. Hawkins. Based on that review, the hearing officer was able to determine the following:

- Both Mr. Campbell and Dr. Darden received complaints from parents and students regarding Mr. Hawkins and those classes.
- Some complaints were made to the District Administrative offices
- The complaints were validated when campus administrators spoke directly to the parents and students
- Policy DK (Local) is applicable and was followed in the reassignment. The principal, in this grievance is the superintendent's designee.
  https://pol.tasb.org/PolicyOnline/PolicyDetails?key=362&code=DK#localTabContent

The vision of DeSoto ISD is to inspire curiosity and consciousness, develop character, build courage, and nurture compassion.

200 East Belt Line Road, DeSoto, Texas 75180 • 972.223.6666 • www.desotoisd.org
Dr. Usamah Rodgers, Superintendent of Schools • Usamah.Rodgers@desotoisd.org
Exhibit 23 - Page 1 of 27

Exhibit 23 -Page 2 of 27

# DeSoto Independent School District

The mission of DeSoto ISD is to ensure students, without exception, learn and grow at their highest levels.

## Superintendent's Authority

All personnel are employed subject to assignment and reassignment by the Superintendent or designee when the Superintendent determines that the assignment or reassignment is in the best interest of the District. Reassignment shall be defined as a transfer to another position, department, or facility that does not necessitate a change in the employment contract of a contract employee.

Any change in an employee's contract shall be in accordance with policy DC.

## Campus Authority

The principal's criteria for approval of campus assignments and reassignments shall be consistent with District policy regarding equal opportunity employment, and with staffing patterns approved in the District and campus plans. [See BQ series] In exercising their authority to approve assignments and reassignments, principals shall work cooperatively with the central office staff to ensure the efficient operation of the District as a whole.

## Decision:

Based on the review of information (oral & written) presented during the Level II hearing and the subsequent facts gained during the investigation conducted by the Level II hearing officer, I make the following decision regarding this Level II Grievance:

It is the decision of the hearing officer to uphold the Level I decision. This decision is based on, but not limited to the aforementioned policy DK (Local) and a completed independent investigation. Any relief not expressly granted is hereby denied.

To appeal a Level Two decision, or the lack of timely response after a Level Two conference, please fill out this form completely and submit it by hand delivery, electronic communication at Grievances@DeSotoISD.org, or U.S. mail to the Superintendent or Human Resources Department within the 10-day timeline established in District policy DGBA(LOCAL). Appeals will be heard in accordance with DGBA(LEGAL) and (LOCAL) or any exceptions outlined therein

Gene Morrow Jr.
Level II Hearing Officer

The vision of DeSoto ISD is to inspire curiosity and consciousness, develop character, build courage, and nurture compassion.

Exhibit 23 -Page 2 of 27

**DeSoto ISD**

**057906**

**PERSONNEL-MANAGEMENT RELATIONS**

**EMPLOYEE COMPLAINTS/GRIEVANCES**

**DGBA**

**(EXHIBIT)**

**Exhibit B-Level Two Appeal Notice**

To appeal a Level One decision, or the lack of timely response after a Level One conference, please fill out this form completely and submit it by hand delivery, electronic communication at Grievances@DeSotoISD.org, or U.S. mail to the Human Resources Department within the 10-day timeline established in District policy DGBA(LOCAL). Appeals will be heard in accordance with DGBA(LEGAL) and (LOCAL) or any exceptions outlined therein.

**Name:** Matthew Hawkins

**Address:** 618 Bluechalk Dr. Cedar Hill TX 75104

**Telephone Number:** 972-639-4284

**Email Address:** matthewhawkinsus1@gmail.com

**Position/Campus/Department:** Teacher/DHS/Math

If you will be represented in presenting your complaint, please identify the person representing you. If the person representing you will be participating by telephone conference call, please check the box below. The District will inform you if the equipment necessary for telephone representation is unavailable.

☐ Representation will be by telephone conference call.

Please note: You must designate a representative who will be participating in person or by telephone with an advance notice of at least three days, or the District may reschedule the conference or hearing to a later date.

**Name:** N/a

**Address:** N/a

**Telephone Number:** N/a

Exhibit 23 -Page 3 of 27

**Email Address:N/a**

**The name of the Level One Hearing Officer:** Leon Darden

**Date of conference:** September 20th, 2024

**Date you received the Level One decision:** October 14th, 2024

**Please explain specifically how you disagree with the outcome at Level One:**

I disagree with the Level 1 outcome for the following reasons:

1. The decision ignores FNG (the complaint process) and complaints being handled first on the lowest level.

2. The Level 1 response states the reassignment was the principal's determination and decision, which violates the implied law of 26.003(a)(2). It also violates Policy DK, which states that reassignments are under the authority of the superintendent or designee, not the principal.

3. The decision negatively impacts the campus' educational environment, my professional reputation, and student entitlement, strongly suggesting that the reassignment was not "in the best interest of the district," as required by Policy DK.

x☐ Attach a copy of the original complaint and any documentation submitted at Level One.

x☐ Attach a copy of the Level One response being appealed, if applicable.

**Employee Signature:** *Matthew Hawkins*

**Signature of Employee's Representative:** N/a

**Date Submitted:** 10/15/2024

**Complainant, please note:**

A complaint or appeal form that is incomplete in any material way may be dismissed but may be refiled with all the required information if the refiling is within the designated time for filing a complaint or appeal.

Please keep a copy of the completed form and any supporting documentation for your records.



# DeSoto Independent School District

**DATE: 10-14-2024**

**RE:    IN THE MATTER OF THE GRIEVANCE for** Mr. Matthew Hawkins

**Summary of Grievance Hearing:**

A Level I grievance hearing was held at DeSoto High School by Dr. Leon Darden, on

September 20th, at 3:30p.m. Also present was Mr. Matthew Hawkins, grievant.

**Summary of Grievance:**
Mr. Hawkins was reassigned from teaching ECHS Algebra 2 Honors & ECHS Geometry Honors to Algebra 2 on Friday, August 30, 2024.

- The reason provided by Mr. Campbell was an "overwhelming" number of complaints.
- He also mentioned a video showing students outside my classroom expressing frustration about dress code enforcement and receiving zeros on tests for academic dishonesty (not submitting scratch work or issues with it).
- Mr. Campbell indicated that the decision was not solely his and that higher authorities and the board were involved.
- After my reassignment, all my students were given 100s for the 1st marking period, even though there were 3 weeks left and some students had issues with cheating.
- I am facing challenges in establishing classroom expectations due to the unique circumstances at the school. My new students have not had a consistent teacher all year and are resistant to structure and accountability, such as seating charts, dress code enforcement, and tardiness policies. They are already talking about complaining because they heard about what the other students did and do not want to be held accountable.

**Summary of Relief Sought:**
- Mr. Hawkins requests a reinstatement to his previous teaching assignment of ECHS Algebra 2 Honors & ECHS Geometry Honors.
- Mr. Hawkins also requests a formal investigation into the complaints to determine their validity and address any legitimate concerns.
- Mr. Hawkins requests that an apology letter be sent to the parents of his students acknowledging the mishandling of this situation and clarifying the reasons for his reassignment.

The mission of DeSoto ISD is to prepare each student academically and socially to be a problem solver and productive citizen for a 21st century global society.

200 East Belt Line Road, DeSoto, Texas 75115 • 972.223.6666 • www.desotoisd.org
Dr. Usamah K. Rodgers, Superintendent • Usamah.rodgers@desotoisd.org

184     Exhibit 23 -Page 5 of 27

## Findings of Fact and Conclusions:

I find that the following local policy supports the principal's decision to reassign the grievant.

*Policy DK https://pol.tasb.org/PolicyOnline/PolicyDetails?key=362&code=DK#localTabContent*

> All personnel are subject to assignment and reassignment by the superintendent or designee
>
> when the superintendent or designee determines that the assignment or reassignment is in
>
> the best interest of the district. Reassignment is a transfer to another position, department, or
>
> facility that does not necessitate a change in the employment contract. Campus
>
> reassignments must be approved by the principal at the receiving campus except when
>
> reassignments are due to enrollment shifts or program changes.

## Decision:

Based on my review of the information presented at the Level I hearing and any independent investigation of the facts that I conducted, I make the following decision regarding this grievance:

It is my decision to deny the grievance in its entirety as the grievant claim is without merit, due the afore mentioned policy.  Any relief not expressly granted is hereby denied

Signed this 14th day of October, 2024.

*Leon J. Darden, Jr.*

**Hearing Officer's Signature**



# DeSoto Independent School District

**DATE: 10-14-2024**

**RE:    IN THE MATTER OF THE GRIEVANCE for** Mr. Matthew Hawkins

**Summary of Grievance Hearing:**

A Level I grievance hearing was held at DeSoto High School by Dr. Leon Darden, on

September 20th, at 3:30p.m. Also present was Mr. Matthew Hawkins, grievant.

**Summary of Grievance:**

Mr. Hawkins was reassigned from teaching ECHS Algebra 2 Honors & ECHS Geometry Honors to Algebra 2 on Friday, August 30, 2024.

- The reason provided by Mr. Campbell was an "overwhelming" number of complaints.
- He also mentioned a video showing students outside my classroom expressing frustration about dress code enforcement and receiving zeros on tests for academic dishonesty (not submitting scratch work or issues with it).
- Mr. Campbell indicated that the decision was not solely his and that higher authorities and the board were involved.
- After my reassignment, all my students were given 100s for the 1st marking period, even though there were 3 weeks left and some students had issues with cheating.
- I am facing challenges in establishing classroom expectations due to the unique circumstances at the school. My new students have not had a consistent teacher all year and are resistant to structure and accountability, such as seating charts, dress code enforcement, and tardiness policies. They are already talking about complaining because they heard about what the other students did and do not want to be held accountable.

**Summary of Relief Sought:**

- Mr. Hawkins requests a reinstatement to his previous teaching assignment of ECHS Algebra 2 Honors & ECHS Geometry Honors.
- Mr. Hawkins also requests a formal investigation into the complaints to determine their validity and address any legitimate concerns.
- Mr. Hawkins requests that an apology letter be sent to the parents of his students acknowledging the mishandling of this situation and clarifying the reasons for his reassignment.

The mission of DeSoto ISD is to prepare each student academically and socially to be a problem solver and productive citizen for a 21st century global society.

200 East Belt Line Road, DeSoto, Texas 75115  •  972.223.6666  •  www.desotoisd.org
Dr. Usamah K. Rodgers, Superintendent  •  Usamah.rodgers@desotoisd.org

186

Exhibit 23 -Page 7 of 27

Exhibit 23 -Page 8 of 27

## Exhibit A—Employee Complaint Form—Level One

**Name:** Matthew Hawkins

**Address:** 618 Bluechalk Dr., Cedar Hill, TX

**Telephone Number:** 972-639-4284

**Email Address:** matthewhawkinsus1@gmail.com

**Position/Campus/Department:** ECHS & P-TECH, DeSoto High School

**If you will be represented in presenting your complaint, please identify the person representing you:** I will represent myself.

**The date of the event or action that gave rise to this complaint:** 08/30/2024 (Friday)

**Please provide a detailed factual description of the decision or circumstance(s) that gave rise to this complaint:**

- I was reassigned from teaching ECHS Algebra 2 Honors & ECHS Geometry Honors to Algebra 2 on Friday, August 30, 2024.
- The reason provided by Mr. Campbell was an "overwhelming" number of complaints.
- He also mentioned a video showing students outside my classroom expressing frustration about dress code enforcement and receiving zeros on tests for academic dishonesty (not submitting scratch work or issues with it).
- Mr. Campbell indicated that the decision was not solely his and that higher authorities and the board were involved.
- After my reassignment, all my students were given 100s for the 1st marking period, even though there were 3 weeks left and some students had issues with cheating.
- I am facing challenges in establishing classroom expectations due to the unique circumstances at the school. My new students have not had a consistent teacher all year and are resistant to structure and accountability, such as seating charts, dress code enforcement, and tardiness policies. They are already talking about complaining because they heard about what the other students did and do not want to be held accountable.
- The prevailing culture, where students without teachers receive free grades and leniency, creates an environment where students with a teacher feel unfairly treated and resentful.
- The students' threats of complaints seem to be motivated by a desire to maintain the status quo of minimal expectations and accountability.
- If parents were filing complaints, they should have followed the proper channels first.

Exhibit 23 -Page 8 of 27

- Texas Education Code Sec. 26.003 (Rights Concerning Academic Programs): states that principals can only change a student's schedule on parental request if it does not negatively affect other students. My reassignment has negatively impacted the other students who are now without a consistent teacher.

**Explain specifically how you were harmed by this decision or circumstance:**

- The reassignment negatively impacts my professional reputation.
- It implies a deficiency in my teaching or classroom management without a proper investigation or evaluation.
- The lack of due process is concerning, as I was not given a chance to address the complaints or understand the specific issues.
- The subsequent grading practices undermine my authority and efforts to maintain academic integrity.
- The reassignment undermines my ability to effectively manage my classroom and teach my students.
- It sends a message that student resistance to basic rules and accountability can lead to a teacher's removal, creating a detrimental learning environment for all.
- The lack of support in addressing the challenging school culture and student resistance to basic expectations makes it difficult for me to effectively fulfill my teaching duties.
- The reassignment, based on complaints arising from my attempts to establish necessary classroom expectations, punishes me for upholding academic integrity and creates a hostile working environment.

**Please describe any efforts you have made to resolve your concerns and the responses to your efforts:**

- I questioned the validity of the complaints and the lack of investigation during my conversation with Mr. Campbell on 08/30/2024.
- I also expressed concerns about the potential use of AI to generate complaints and the lack of verification.
- I have not received any further response or explanation regarding the reassignment.

**Please describe the outcome or remedy you seek for this compliant:**

- I request a reinstatement to my previous teaching assignment of ECHS Algebra 2 Honors & ECHS Geometry Honors.
- I also request a formal investigation into the complaints to determine their validity and address any legitimate concerns.
- I request that an apology letter be sent to the parents of my students acknowledging the mishandling of this situation and clarifying the reasons for my reassignment.

- ○ I request that the district address the systemic issues contributing to the current school culture, including the lack of teacher coverage and the practice of giving free grades to students without teachers.
- ○ I urge the district to provide support and resources to teachers facing challenges in establishing classroom expectations and maintaining academic integrity in this environment.
- ○ I request that the district address the issue of parents and students bypassing proper channels for complaints and ensure that future concerns are handled through established procedures, as outlined in the Texas Education Code and district policies.

Complainant, please note:
A complaint form that is incomplete in any material way may be dismissed but may be refiled with all the required information if the refiling is within the designated time for filing a complaint.

Attach to this form, the exhibit list and any documents you believe will support the complaint; if unavailable when you submit this form, the exhibit list and documents may be presented no later than the Level One conference. After the Level One conference no additional documentation
can be submitted unless you did not know the documentation existed before the Level One conference.

Please keep a copy of the completed form and any supporting documentation for your records.

Employee Signature                                          Date Submitted 09/09/2024



# Desoto High School

# ECHS Honors Algebra II Syllabus 2024-2025

## Course Title:

ECHS Honors Algebra II

## Teacher Contact Information:

**Mr. Matthew Hawkins** (Room 228)
School Phone: (972) 230 – 0726 ext: 3228
Email: matthew.hawkins@desotoisd.org

## Course Description:

**Algebra II** builds upon foundational concepts introduced in Algebra I. Students will delve deeper into **algebraic reasoning**, **functions**, and **data analysis**. Through rigorous problem-solving and critical thinking, students will develop a strong algebraic foundation for future mathematical studies.

## Course Topics:

- Functions and their graphs
- Linear equations, inequalities, and systems
- Quadratic functions and equations
- Polynomial functions
- Rational expressions and equations
- Exponential and logarithmic functions
- Radical functions
- Probability and statistics
- Data analysis and modeling

## Required Materials:

- School Issued Device
- Pencil/Pen
- Spiral Notebook or Composition Book
- Graph Paper (optional)

## Classroom Rules of Conduct:

1. Be on time and prepared for class.
2. Have materials ready at the beginning of each class.
3. Raise your hand and wait to be called on to ask questions.
4. Respect the classroom environment.

## Grading Policy:

- Minimum of **2 daily grades** per week and **3 major grades** per grading period.
- **Daily grades:** 60% of overall grade.
- **Tests:** 40% of overall grade.
- **Retesting:** Allowed on grades below 70% (capped at 70%).
- **Make-up work:** For excused absences must be completed on time.

## Late Work Policy:

Assignments accepted up to **3 days** after being notified of lateness, highest possible grade being **70%**. For excused absences, make-up work policy will apply.

Exhibit 23 -Page 12 of 27

B3

## Homework Policy:

Homework enhances skill retention and is used to assess understanding. Parents should provide a supportive environment for completing homework, which counts as a **daily grade**.

## Attendance Policy:

According to Texas State law, each student must attend **90%** of class days to qualify for graduation. Absences are counted if a student is not present or arrives **5 minutes** after the tardy bell.

## Electronic Device Policy:

**All cell phones must remain off and out of sight during class.** Headphones/earbuds are not allowed. Violations will result in confiscation and disciplinary action.

## Passes:

Students should remain in class during instructional time. Only **one student** may leave at a time. Excessive restroom use may revoke privileges.

## Academic Dishonesty/Cheating/Plagiarism Policy:

**Students are expected to produce their own original work.** Academic dishonesty, including the use of unauthorized aids like solvers, AI, or calculators (except as explicitly permitted), will result in disciplinary action and a zero for the assignment. **Students must demonstrate their own thinking and problem-solving processes.**

## Google Classroom:

Assignments will be posted and submitted through Google Classroom. **Students must submit legible pictures of their handwritten work with their name and proper heading on each**

Exhibit 23 -Page 13 of 27

**page.** Students will receive two grades for each assignment: one for the accuracy of their answers and another for the quality and completeness of their submitted work.

---

## Google Classroom Codes:

2nd Period: h33jugt

3rd Period: 7eb55rw

5th Period: 66kbx4m

6th Period: tg55wd3

---

## Textbook and Resources:

We will be using the McGraw Hill virtual textbook, which is also embedded in our Tier 1 Learning platform, ALEKS. Calculators may be used only when explicitly allowed within the ALEKS platform or when using a testing version of Desmos. **Students may be asked to explain their work at any time.**

---

## Communication:

**My preferred method of communication is email. Please feel free to contact me with any questions or concerns.**

*C1*

## Exhibit C - Follow-Up Email to Mr. Campbell Regarding "Overwhelming Complaints"

**Date:** August 31, 2024

**Time:** 10:37 AM

**Sender:** Matthew Hawkins (matthew.hawkins@desotoisd.org)

**Recipient:** Jasen Campbell

**Subject:** Follow-Up on Overwhelming Complaints

**Content of Email:**

Good Morning Mr. Campbell,

I'm writing to follow up on our brief conversation yesterday regarding the "overwhelming" complaints filed with the district. Reflecting on your question and my interactions with students during the first week of school, I have some observations and concerns to share.

Students expressed frustration with me during week 1 for enforcing dress code policies, such as prohibiting slides, crocs, athletic pants, and requiring collared shirts under hoodies. I also asked them to remove headphones, earbuds, and head coverings. Unfortunately, many students would undo these corrections as soon as I turned my back, requiring further redirection. The students were vocal about their displeasure with these expectations, and several mentioned filing complaints with the district.

I'm concerned that many of these complaints may be generated using AI. Several students have access to AI tools and their parent's email accounts, making it easy to flood the district with convincing complaints from seemingly legitimate sources. I believe this highlights a larger issue. With the rapid advancement of technology, we need safeguards in place to handle a flood of information, especially when it might originate from a single source and be amplified through echo chambers or technology.

I made a point to not upload any grades until August 26th to give students time to acclimate and complete assignments. I didn't receive any parent contact about grades until after they were posted. Actual parent concerns focused primarily on the lack of school-issued devices and the plan for students without them. There is a major difference between a "concern" and a "complaint". The parents I communicated with were satisfied when I addressed their concern.

The implications of this are significant. If we lack proper checks and balances to verify the validity and source of complaints, students could effectively dictate school culture on a whim. Our current system is vulnerable to being overwhelmed by a large volume of complaints, potentially leading to hasty and emotional responses before proper investigation. Unfortunately, this mirrors the challenges I face in the classroom regarding academic integrity.

Exhibit 23 -Page 15 of 27

## Matthew Hawkins

| | |
|---|---|
| **From:** | ███████████████████████ |
| **Sent:** | Thursday, August 22, 2024 6:29 PM |
| **To:** | Matthew Hawkins |
| **Subject:** | Re: From: Matthew Hawkins Course:13069/3 - ECHS-ALGII HRN |

Thank you for the update.

On Wed, Aug 21, 2024 at 10:51 PM Matthew.Hawkins@desotoisd.org <Matthew.Hawkins@desotoisd.org> wrote:

Good Evening Parents,

As we continue our school year, I wanted to provide you with an update on our scholars' Geometry and Algebra 2 Honors class.

To accommodate the recent schedule changes and technology distribution, I have reopened all assignments from the beginning of the year. This will give our scholars the opportunity to complete any missed work and ensure they are on track.

Please note that all assignments must be completed by August 25th.

After this deadline, we will wrap up any remaining review concepts from previous years and begin delving into new material.
I am excited about the upcoming school year and look forward to partnering with you to support our scholars' academic success.

**Matthew Hawkins**

**Desoto High School**

*Academic Academy*

ECHS Honors Algebra II & Geometry

Rm 120

(972) 230-0726

*E2*

## Matthew Hawkins

From:      Matthew Hawkins
Sent:      Wednesday, August 28, 2024 12:33 PM
To:        ███████████
Subject:   RE: From: Matthew Hawkins Course:13069/1 - ECHS-ALGII HRN

Good Afternoon,

███ has been doing well in Algebra 2. However, I did have one observation regarding his recent scratch work with some unusual formatting and lack of work. I've marked a zero on it for now and would like to have a conversation with ███ to discuss my observations and clarify any questions.

I appreciate your understanding and support. Please feel free to reach out if you have any questions.

Matthew Hawkins
████████████████
ECHS & P-TECH
Honors Algebra II & Geometry
Rm 228
(972) 230-0720



From:      ██████████████████
Sent: Wednesday, August 28, 2024 9:10 AM
To: Matthew Hawkins <matthew.hawkins@desotoisd.org>
Subject: Re: From: Matthew Hawkins Course:13069/1 - ECHS-ALGII HRN

Good morning,

Is ████████████ giving you excuses or not completing his work?

On Wed, Aug 28, 2024 at 7:59 AM Matthew.Hawkins@desotoisd.org <Matthew.Hawkins@desotoisd.org> wrote:

Good Morning Honors Algebra II and Geometry Parents,

**Findings of Fact and Conclusions:**

I find that the following local policy supports the principal's decision to reassign the grievant.

*Policy DK https://pol.tasb.org/PolicyOnline/PolicyDetails?key=362&code=DK#localTabContent*

> All personnel are subject to assignment and reassignment by the superintendent or designee
>
> when the superintendent or designee determines that the assignment or reassignment is in
>
> the best interest of the district. Reassignment is a transfer to another position, department, or
>
> facility that does not necessitate a change in the employment contract. Campus
>
> reassignments must be approved by the principal at the receiving campus except when
>
> reassignments are due to enrollment shifts or program changes.

**Decision:**
Based on my review of the information presented at the Level I hearing and any independent investigation of the facts that I conducted, I make the following decision regarding this grievance:

It is my decision to deny the grievance in its entirety as the grievant claim is without merit, due the afore mentioned policy.  Any relief not expressly granted is hereby denied

Signed this 14th day of October, 2024.

*Leon J. Darden, Jr.*
**Hearing Officer's Signature**

EXHIBIT 23

Exhibit 23 - Page 18 of 27

I am writing to address some concerns regarding scholar accountability and resource utilization as we navigate the start of the school year.

Technology Access and Assignments:

While we are working to resolve a temporary shortage of school-issued laptops, please be assured that all assignments can be completed on personal devices, including cellphones. Scholars can also access technology through the school's computer lab or the public library.

I have noticed that some scholars are not maximizing their time in class and are citing technology issues as the reason for incomplete work. I want to emphasize that lack of a school-issued device is not an acceptable excuse for not completing assignments.

Scratch Work and Academic Integrity:

I am also observing a concerning trend of missing or incomplete scratch work, as well as instances of work that appears to be generated using unauthorized solvers, calculators, or AI. To maintain academic integrity, scholars will receive a zero for assignments without scratch work or with evidence of illegitimate work.

Expectations and Resources:

I encourage all scholars to actively participate in class and utilize available resources. If they are struggling with a question, they should:

- Review exemplar videos in Google Classroom or ALEKS examples
- Ask me for assistance during class time
- Attend tutoring on Thursdays from 3:20 - 4:10 PM. (Scholars should request a pass beforehand.)

Please note: Tutoring is dedicated to improving skills and understanding, not grade checks or corrections.

Missed Assignments and Moving Forward:

I am currently developing a plan to address missed assignments for scholars with legitimate technology issues. Once I have identified all affected scholars, I will contact those parents separately. In the meantime, it is crucial that scholars stay focused on current instruction. Math builds upon itself, so success on current assignments and tests indicates mastery of previous skills.

I need your partnership to ensure all scholars are maximizing their learning potential. Please discuss these expectations with your scholar and encourage them to take ownership of their academic progress.

Thank you for your continued support.

Matthew Hawkins

████████████████

ECHS & P-TECH

Honors Algebra II & Geometry

Rm 228

2

## Exhibit F - Interaction with Student SF106217

**Date:** September 12, 2024

**Time:** During passing period between classes

**Location:** School hallway

**Description of Interaction:**

Student SF106217 approached me in the hallway and said, "Oh Mr. Hawkins, you're over here now. You thought I was playing with you, but I went and filled out that form."



61

## Exhibit G - Parent Communication Regarding Dress Code and ID Policy

**Date:** September 13, 2024

**Time:** 3:48 PM (Initial notification), 4:03 PM (Parent response)

**Platform:** Schoolstatus

**Content of Communication:**

- **Initial Notification:**

  This is Matthew Hawkins from DeSoto High. ███ was out of dress code with sweatpants. He has received a referral.

- **Parent Response:**

  Mr. Hawkings what you are NOT going to do is pick my son out every day on some bs first it was I'd card now your sending me a referral for sweat pants what you won't do is label or try to label my black kid who's not a troublesome kid by filing these referrals on stuff that DONT MATTER LIKE ID AND SWEAT Pants when he doesn't do what he's supposed to do and not following directions and NOT doing his work then contact me I want to make something VERY CLEAR we have family on the school board so these referrals you are filing on ██████████ IS NON SENSE it's looking like you HAVE NOTHINH ELSE BETTER TO DO at this point and can't find ANYTHING on my son but some bs to file against him!



This is Matthew Hawkins from Desoto High. ███████ received a referral for no ID today.

delivered                    sent Sep 16 2024 03:50:29 pm

Are you kidding me

It's at the end of the day and you giving out referrals for no ID and you the only one out the whole day that's doing this and it's his last class. Do we need a parent teacher conference?

                    sent Sep 16 2024 03:53:36 pm

Exhibit 23 - Page 22 of 27

201

Exhibit H - Parent Email Regarding Student Transfer Notification
Date: September 5, 2024

Time: 3:19 PM

Sender: ███████████████████

Recipient: Matthew Hawkins (matthew.hawkins@desotoisd.org)

Content of Email:

Good afternoon,

I received notice last night from ███████ he was being transferred from your class. I haven't heard anything negative from him about you. He stated he had no problems in the class and did learn from you. I hope this bump along the road doesn't disrupt you but only molds you for the best that is up ahead for you. Thank you for always being responsive and willing to help when I had concerns with him last school year. We appreciate all that you have done with and for him in his academic journey.

Best regards,

███████████████

## Exhibit J - Meeting with Dr. Leon Darden, Director of ECHS & P-TECH

**Date:** August 26, 2024

**Time:** 7:30 AM to 8:00 AM

**Location:** 228

**Summary of Conversation:**

- **Incident Discussion:** The meeting began with a discussion about a student refusing to remove their headphones.
- **Schedule Change Concerns:** Dr. Darden inquired about the high number of student requests for schedule changes from my classes.
- **Inconsistent Expectations:** I explained the challenges stemming from inconsistent teacher expectations regarding dress code, IDs, tardies, and cellphone usage. I highlighted that other teachers were more lenient, creating an environment where students in my class felt unfairly treated.
- **Grading Practices:** Dr. Darden questioned the frequency of grades in my class. I explained my practice of assigning grades for warm-ups, demonstrations of learning, and scratch work to encourage student engagement and accountability.
- **Academic Dishonesty:** I emphasized the lack of integrity checks and consequences in other classes, leading to a culture where cheating was prevalent. Dr. Darden mentioned that some students who complained to him also admitted to cheating.
- **Dr. Darden's Acknowledgment:** Dr. Darden acknowledged the validity of my concerns about cheating and recognized the rationale behind my structured classroom approach.

Exhibit 23 -Page 24 of 27

Exhibit 23 - Page 25 of 27



Exhibit 23 - Page 25 of 27



EXHIBIT 23

| | Name | Type | Start | Due | Status | Details ⓘ | Report |
|---|---|---|---|---|---|---|---|
| | Initial Knowledge Check | Knowledge Check | - | - | Open | | 🔼 |
| ⠿ | Evaluating Expressions | Homework | 08/17/2024 12:00 AM | 08/25/2024 11:59 PM | Closed | 9 Questions Est. Time: 11m 30s | 🔼 |
| ⠿ | Solving Absolute Value Equations | Homework | 08/17/2024 12:00 AM | 08/25/2024 11:59 PM | Closed | 12 Questions Est. Time: 11m | 🔼 |
| ⠿ | Solving Equations | Homework | 08/17/2024 12:00 AM | 08/25/2024 11:59 PM | Closed | 11 Questions Est. Time: 11m 30s | 🔼 |
| ⠿ | Solving Inqualities | Homework | 08/17/2024 12:00 AM | 08/25/2024 11:59 PM | Closed | 14 Questions Est. Time: 15m | 🔼 |
| ⠿ | 10 Topics ALEKS Week of 08/19 - 08/25 | Topic Goal | 08/19/2024 9:08 AM | 08/25/2024 11:59 PM | Closed | 10 Topics | 🔼 |
| ⠿ | Compound and Absolute Value Inequalities | Homework | 08/26/2024 12:00 AM | 08/26/2024 11:59 PM | Closed | 12 Questions Est. Time: 19m | 🔼 |
| ⠿ | Chapter 1 Review | Homework | 08/27/2024 12:00 AM | 08/27/2024 11:59 PM | Closed | 11 Questions Est. Time: 16m 30s | 🔼 |
| ⠿ | Chapter 1 Test | Test | 08/28/2024 8:35 AM | 08/28/2024 9:16 AM | Closed | 11 Questions Est. Time: 16m 30s | 🔼 |
| ⠿ | Attributes of Functions | Homework | 08/29/2024 12:00 AM | 08/29/2024 11:59 PM | Closed | 8 Questions Est. Time: 10m 30s | 🔼 |
| ⠿ | 10 Topics Week of 08/26 - 09/01 | Topic Goal | 08/26/2024 8:12 AM | 09/01/2024 11:59 PM | Closed | 10 Topics | 🔼 |
| ⠿ | Chapter 1 ReTest | Test | 08/28/2024 3:20 PM | 09/01/2024 11:59 PM | Closed | 11 Questions Est. Time: 16m 30s | 🔼 |
| ⠿ | Graphing Functions | Homework | 09/03/2024 12:00 AM | 09/03/2024 11:59 PM | Open In Late Submission | 7 Questions Est. Time: 14m | 🔼 |
| ⠿ | Transformations | Homework | 09/04/2024 12:00 AM | 09/04/2024 11:59 PM | Closed | 7 Questions Est. Time: 13m 30s | 🔼 |
| ⠿ | Composition of Functions | Homework | 09/05/2024 12:00 AM | 09/05/2024 11:59 PM | Closed | 6 Questions Est. Time: 15m | 🔼 |
| ⠿ | Inverse Functions | Homework | 09/06/2024 12:00 AM | 09/06/2024 11:59 PM | Closed | 5 Questions Est. Time: 13m | 🔼 |

Copyright © 2024 McGraw Hill - ALEKS® is a registered trademark of ALEKS Corporation. Terms of Use Consumer Purchase Terms Privacy Center

Exhibit 24 -Page 1 of 1

**Matthew Hawkins**

| | |
|---|---|
| **From:** | Matthew Hawkins |
| **Sent:** | Thursday, October 24, 2024 10:54 AM |
| **To:** | Lawrence Davis |
| **Subject:** | Level 1 Record |

Good Morning,

I am writing to formally request a copy of the Level 1 record related to my active complaint. Please let me know if there is any additional information required to process this request.

Matthew Hawkins
Desoto High School
Algebra II
Rm 2103
(972) 230-0726

Exhibit 24 -Page 1 of 1

# DeSoto Independent School District

The mission of DeSoto ISD is to ensure students, without exception, learn and grow at their highest levels.

**DATE: 11 November 2024**

**RE: IN THE MATTER OF THE GRIEVANCE for MATTHEW HAWKINS**

**Summary of Grievance Hearing:**

A Level II Grievance Hearing was held at the DeSoto ISD Administration Building by Gene Morrow Jr., on 25 October 2024 at 3:40 pm. Mr. Hawkins was present at the hearing and represented himself.

## Summary of Grievance

Mr. Hawkins was reassigned from teaching ECHS Algebra II Honors & ECHS Geometry Honors to Algebra II on 30 August 2024. Mr. Hawkins filed a Level I Grievance which was heard on 20 September 2024 by Dr. Darden. In the Level I Grievance Mr. Hawkins sought the following relief:

- Reinstatement to his previous teaching assignment of Algebra II Honors & Geometry II Honors at theECHS
- A formal investigation in the complaints to determine their validity and address any legitimate concerns
- An apology letter to the parents of his students acknowledging the mishandling of the situation and clarifying the reasons for his reassignment

On 14 October 2024 Dr. Darden returned the decision of the Level I Grievance in which the grievance was denied in its entirety.

## Facts and Findings

Following the Level II Grievance Hearing, the hearing officer reviewed the accompanying documents submitted by Mr. Hawkins and investigated the concerns expressed by Mr. Hawkins. Based on that review, the hearing officer was able to determine the following:

- Both Mr. Campbell and Dr. Darden received complaints from parents and students regarding Mr. Hawkins and those classes.
- Some complaints were made to the District Administrative offices
- The complaints were validated when campus administrators spoke directly to the parents and students
- Policy DK (Local) is applicable and was followed in the reassignment. The principal, in this grievance is the superintendent's designee.
  https://pol.tasb.org/PolicyOnline/PolicyDetails?key=362&code=DK#localTabContent

The vision of DeSoto ISD is to inspire curiosity and consciousness, develop character, build courage, and nurture compassion.

200 East Belt Line Road, DeSoto, Texas 75115  •  972.223.6666  •  www.desotoisd.org
Dr. Usamah Rodgers, Superintendent of Schools  •  Usamah.Rodgers@desotoisd.org

Exhibit 25 -Page 1 of 2

# DeSoto Independent School District

The mission of DeSoto ISD is to ensure students, without exception, learn and grow at their highest levels.

## Superintendent's Authority

All personnel are employed subject to assignment and reassignment by the Superintendent or designee when the Superintendent determines that the assignment or reassignment is in the best interest of the District. Reassignment shall be defined as a transfer to another position, department, or facility that does not necessitate a change in the employment contract of a contract employee.

Any change in an employee's contract shall be in accordance with policy DC.

## Campus Authority

The principal's criteria for approval of campus assignments and reassignments shall be consistent with District policy regarding equal opportunity employment, and with staffing patterns approved in the District and campus plans. [See BQ series] In exercising their authority to approve assignments and reassignments, principals shall work cooperatively with the central office staff to ensure the efficient operation of the District as a whole.

## Decision:

Based on the review of information (oral & written) presented during the Level II hearing and the subsequent facts gained during the investigation conducted by the Level II hearing officer, I make the following decision regarding this Level II Grievance:

It is the decision of the hearing officer to uphold the Level I decision. This decision is based on, but not limited to the aforementioned policy DK (Local) and a completed independent investigation. Any relief not expressly granted is hereby denied.

To appeal a Level Two decision, or the lack of timely response after a Level Two conference, please fill out this form completely and submit it by hand delivery, electronic communication at Grievances@DeSotoISD.org, or U.S. mail to the Superintendent or Human Resources Department within the 10-day timeline established in District policy DGBA(LOCAL). Appeals will be heard in accordance with DGBA(LEGAL) and (LOCAL) or any exceptions outlined therein

Gene Morrow Jr.
Level II Hearing Officer

The vision of DeSoto ISD is to inspire curiosity and consciousness, develop character, build courage, and nurture compassion.

Exhibit 26 -Page 1 of 2

**Matthew Hawkins**

| | |
|---|---|
| **From:** | Matthew Hawkins |
| **Sent:** | Wednesday, October 30, 2024 3:47 PM |
| **To:** | Christopher Polk |
| **Subject:** | Situation Report - 10/30/2024 - Classroom Disruptions and Potential Policy Violations |
| **Attachments:** | 10_30 Violations.xlsx |

Good Afternoon,

I am writing to formally report situation that occurred today, October 30, 2024, at approximately 10:45 am in my classroom. The incident involved three students:

- K███ M███ ███ : Out of dress code (no collar and no ID)

- N███ W███ ███ : Out of dress code (wearing sweats)

- J███ R███ ███ : Out of dress code (wearing athletic pants)

I followed established procedures by sending the students to the counseling office to obtain IDs and receive dress code referrals. During our recent class meetings, Mrs. J███ reiterated that students with dress code violations would receive referrals and could potentially be sent home. Our policy also states that if students cannot immediately address the dress code issue, parents will be contacted to bring a change of clothes. If the issue cannot be immediately rectified, the student will be placed in In-School Suspension (ISS) for the remainder of the day.

However, Mr. Medina arrived at my classroom with the three students and reprimanded me for sending them to the counseling office. He instructed me to allow them into my classroom without addressing the dress code or ID violations. I informed him of the policies regarding dress code and student accountability, but he stated he would only address the ID issue.

Upon their return, student K███ M███ made several disruptive comments, including, "They were talking about you in the office...how you about to get fired...that's why you were removed from the early college side, they can't stand you." He continued to disrupt the testing environment by repeatedly requesting to leave and speak with his counselor and you. Due to his persistent disruptions and refusal to be redirected, I eventually allowed him to leave.

Student N███ W███ also refused to sit in her assigned seat and disrupted the testing environment. Despite my redirection, she continued to disrupt the class, and I gave her the option to either return to her seat and work on her test or be removed from the classroom. She chose to leave.

This behavior directly violates the DeSoto ISD Student Code of Conduct, specifically the sections regarding "Disregard for Authority." The Code of Conduct states: Students shall not: Fail to comply with directives given by school personnel.

I am formally requesting your intervention in this matter. The students' blatant disregard for school policies and my authority as their teacher, coupled with Mr. Medina's apparent unwillingness to enforce or assist with

Exhibit 26 -Page 1 of 2

Exhibit 26 -Page 2 of 2

policies, has created a hostile learning environment. I believe this incident warrants further investigation and potential disciplinary action.

Matthew Hawkins
Desoto High School
Algebra II
Rm 2103
(972) 230-0726



Exhibit 26 -Page 2 of 2

## DeSoto ISD Student Handbook

Prior review will not be required for:

- Distribution of materials by an attendee to other attendees of a school-sponsored meeting intended for adults and held after school hours
- Distribution of materials by an attendee to other attendees of a community group meeting held after school hours in accordance with policy GKD(LOCAL) or a noncurriculum-related student group meeting held in accordance with policy FNAB(LOCAL)
- Distribution for electioneering purposes during the time a school facility is being used as a polling place, in accordance with state law

All non-school materials distributed under these circumstances must be removed from district property immediately following the event at which the materials are distributed.

### Dress and Grooming (All Grade Levels)

The district's dress code teaches grooming and hygiene, prevents disruption, and minimizes safety hazards. Students and parents may determine a student's personal dress and grooming standards, provided that they comply with the following:

| ITEMS | ALLOWED | NOT ALLOWED |
|-------|---------|-------------|
| TOPS/SHIRTS | Solid color green, gold, black, white, or gray shirt with collar; Small logo (1 inch or less) located on the chest is acceptable; Long sleeve or short sleeve polo or button up shirt is acceptable<br><br>All shirts/blouses/tops must cover cleavage, the entire back and midriff. The middle section (midriff) must remain covered at all times including during reasonable movements.<br><br>The layering of shirts or tops is acceptable provided the combination of clothing meets the dress code standards throughout the school day. | • Sleeveless, tanks/camis, tube or halter tops<br>• Crop tops or low-cut shirts<br>• Lewd or inappropriate text/graphics<br>• Tops or shirts with holes in them<br>• Transparent and/or see-through material is considered unacceptable unless worn over another article of clothing that meets dress code. |

50

Exhibit 27 -Page 1 of 3

## DeSoto ISD Student Handbook

| | | |
|---|---|---|
| **BOTTOMS** | Black, khaki, gray, navy, or olive pants, shorts, capris, skirts, jumpers; Shorts at least fingertip length; Cargo pants; Cargo shorts at least fingertip length; Skirts and jumpers at least knee length all the way around; A belt if needed to prevent pants from dragging or sagging; pants must be worn at the natural waist<br><br>Shorts or skirts must be no shorter than 2 inches from the top of the knee.<br><br>Dresses, skirts, skorts, and shorts length must be measured from the top of the slit.<br><br>Spandex, tights, leggings/jeggings, and yoga style clothing are allowed only if they are worn under pants, shorts, skorts, dresses, and skirts that are the length of a horizontal ID card from the knee all the way around. | • Wind pants, yoga pants, athletic pants/shorts, sweat pants, or knit jogger pants<br>• Leggings or tights may not be worn as pants<br>• Jeans and pants with holes or frayed material, which reveals any area of skin or undergarments above fingertip length.<br>• Skirts that do not fit at the waistline.<br>• Pajamas, bathrobes, and/or sleepwear.<br>• Visible underwear.<br>• Visible sliding/biking/compression shorts.<br>• Gym uniforms/athletic shorts. |
| **SHOES** | Shoes must be worn at all times. Shoes must have a closed-toe and a closed-heel. | • Stiletto heels<br>• Open-toe and/or Open-heel<br>• Shoes with wheels<br>• Steel-toe boots/shoes<br>• Slippers, house shoes, sandals or flip flops |
| **OUTERWEAR: SWEATERS, SWEATSHIRTS, JACKETS,** | Any color of outerwear. Outwear must be appropriately sized. Our standardized colors are preferred. | • Lewd or inappropriate text/graphics<br>• No hoods are allowed on the head while inside the building |

51

Exhibit 27 -Page 2 of 3

## DeSoto ISD Student Handbook

| COATS, HOODIES | Solid color green, gold, black, white, or gray collared shirt must be worn under sweaters, cardigans, hoodies, or sweatshirts. | |
|---|---|---|
| HATS, BASEBALL CAPS, HEADWRAPS, SUNGLASSES, BLANKETS | | • Sock hats (only permitted outdoors)<br>• Bonnets<br>• Bandanas<br>• Sunglasses (unless medical documentation is provided or administrator approved)<br>• Blankets or throws<br>• Caps, hats, berets, head scarfs (unless for medical or religious reasons), hoods (hoodie), Du rags, kerchiefs, or visors. |

**Please note: DeSoto ISD will prohibit backpacks the last week before winter break, the day before spring break, and the last two weeks of the spring semester.**

**Campus administration has final judgment on whether or not a student is in compliance with the dress code. DeSoto ISD believes that school performance and student success are enhanced by appropriate dress and good grooming. Students are expected to be in dress code beginning on the first day of school. Violations of the dress code shall be handled at the campus level. The Student Dress Code has been developed in accordance with FNCA Legal.**

If the principal determines that a student's grooming or clothing violates the school's dress code, the student will be given an opportunity to correct the problem at school and return to the classroom. If the problem cannot be corrected at school, the principal will work with the student and parent to obtain an acceptable change of clothing for the student in a way that minimizes loss of instructional time.

The student dress code does not prohibit principals from allowing extracurricular groups to wear uniforms on days stipulated by the principal or special celebrations which involve dress such as crazy hat day or 50s day, etc.

**Spirit Fridays**

*Acceptable Dress*

52

Exhibit 27 -Page 3 of 3

discipline form, including detentions and parent contacts, and submitted to the discipline office).

If it becomes necessary (moderate to major offenses) to send the student to the office, please follow one of the procedures below. Please send office referral and follow one of the techniques below:

1. Call the office or send someone to get an administrator to report to your classroom and request that the student be removed from class.
2. Bring the referral to the office at the end of the day or during the teacher conference period.

**NEVER LEAVE STUDENTS UNATTENDED.**

## STUDENT NON-NEGOTIABLES

All students are expected to follow these rules at all times while on school property: 1. No public display of affection such as holding hands, kissing, and other inappropriate physical contact. —Failure to adhere to this rule will result in a referral being written and consequences will be issued.
2. Respect all adults and peers. —Failure to adhere to this rule will result in a referral being written and consequences will be issued.
3. Follow the district dress code policy and **wear ID badges at all times.** —Failure to adhere to this rule will result in a dress code referral being written and consequences will be issued.
4. Get to class on time and be in your seat when the bell rings. Each teacher will give you specifics as to what is expected. —Failure to follow this directive will result in consequences being issued.
5. No electronic devices or any other non-school related items are permitted unless used for instructional purposes with the teacher's permission. Failure to adhere to this rule will result in a referral being written and consequences will be issued. (All electronic devices are to be turned into the house office). There is a $15 fee for parents to pick up the device.

### CONSEQUENCES FOR NOT HAVING/WEARING ID BADGE

Students will not be allowed in class. Appropriate administrative actions will be taken.

The first ID badge is free and thereafter each badge will cost $5. Students may purchase a lanyard for $1. Students must also present and ID badge to ride the bus. Temporary badges cost $1. Students needing badges must report to the library prior to entering the gym or **1st period**. No writing/marking of any sort or additional pictures can be made on the badge. Students must display their ID badge at all times on the upper torso.

### DRESS CODE CHECKS
Students who are caught out of the dress code before school begins will be given an opportunity to call their parents and/or correct the situation.

24

Exhibit 28 -Page 1 of 2

## *ISS PROCEDURES*

All teachers are to upload work for students for ISS in an electronic folder weekly. Please pick up student work for students in the ISS room from Ms. Iesha Dotsy. **DO NOT** send students to pick up the ISS work. It is important that the teacher makes time to come  and pick up the work for students as soon as possible. Otherwise, the work will be placed  in teacher mail boxes.

Teachers may request students from ISS. Communication should be made between the assigning administrator, ISS teacher and the Classroom Teacher. ISS teacher will provide the procedure for this process. A support staff will escort the students to the class. The teacher will keep the students in class until the support staff returns to retrieve them. The students will not be allowed to go to class when the teacher is absent.

## DRESS AND GROOMING OF PROFESSIONAL PERSONNEL

Adults should model appropriate dress and behavior at all times. Also, professional dress allows individuals to present themselves so that the best possible impression is made. **At a minimum**, teachers are expected to follow the standards established for student  dress. This includes wearing skirt/dress of appropriate length for female teachers.

See District Professional Guidelines, also applies to Paraprofessionals at DHS

Teachers should dress professionally as appropriate for their teaching assignment. Each day, teachers and paraprofessionals must be well-groomed. Clothing should be free of wrinkles and be representative of professional dress for our academic institution. No flip flops are to be worn. Athletic attire may not be worn during instructional periods. Appropriate (no jeggings, no holes, no skin showing) denim can be worn on Fridays with college/spirit/Greek paraphernalia.

All male teachers will wear collared shirts for the 2024-2025 school year. Coaches may not wear athletic wear during instructional periods unless they are a teacher of record of an athletic class.

## DUTY

Teachers are <u>expected</u> to participate in duty supervision as assigned and requested by administration. Duty assignments will rotate on a reasonable and fair basis. Faculty/staff members are expected to be on duty at all assigned times to supervise the safety and security of DHS students. All staff will actively monitor and move students during passing periods by standing at their door. <u>Morning duty begins at 6:45am.</u>

## EQUIPMENT, SCHOOL OWNED

It is essential that each teacher accept responsibility for school equipment SUCH AS A LAPTOP. Failure to maintain proper supervision and to see that such equipment is returned to proper storage may result in damage to valuable property. This care must be extended to physical facilities such as classrooms, auditorium, gyms, and cafeteria, as well as any movable equipment.

In the event that it is necessary for you to check-out a piece of school equipment for use at an off-campus activity, you will be required to check it out through the office manager. All technology equipment will be checked out through the library. Some equipment check out may require you to have insurance coverage in the event of theft or loss.

25

Case 3:25-cv-00652-D-BT    Document 3    Filed 03/18/25    Page 217 of 292    PageID 221
Exhibit 29 -Page 1 of 1

 **Outlook**

---

### January 7 Campus PD

---

**From** Jasen Campbell <jasen.campbell@desotoisd.org>
**Date** Tue 1/7/2025 10:40 AM
**To** DHS All Staff <dhsstaff@desotoisd.org>

Good morning Eagle Nation

I hope that everyone is enjoying their morning professional development. This evening, we will meet with our appraissers to go live with instruction. The evening session will start promptly at 12:30pm. Please see the room assignments below:

Polk - 2201
Mathis - 1715
Bailey - 1206
West - Courtroom
Campbell - 2118
EC - Student Union

At 3:30pm, all Men of DHS will meet in the Community room for a special presentation.

Jasen Campbell
Principal
DeSoto HS

EXHIBIT 29

Exhibit 29 -Page 1 of 1

notta

**Men's meeting**

🕐 Mon, 03/03 17:38PM · 32mins

# Transcript

**Jasen Campbell 00:05**

Good evening, sir. Good evening, gentlemen. Good evening. Good evening. Happy New Year once again. This is not a very long meeting. I know you've had a long day of in need. But there are a couple times and points in our quest as an institution, that we have to come together. I know that society will say a whole lot of things about women's rights, women's movement, the me too, and all those things. And everything will be very pro-won. And society has forgotten about the brother. And that we are the foundation of all. And so, it didn't mean we were going well and great, but it's kind of observed in our campus and our school. And there's a missing element that we have to speak to. And so, in my mind, you know, we always, the one on the forefront, the first one shot, the first one, have to deal with the foolishness, the first one to have to deal with life. And that didn't just begin from school. That goes through life. As men, we have issues, we have concerns, we have situations. And so, a part of us being who we need to be, on every campus, we have to work with our people. Because we are the backbone, regardless of what society will say. We love our women, we love our children, but it's a man's world. And so, a few years ago, I had an opportunity to work at another campus. And at this other campus, I learned of a program called And I believe that it will do us a very, very solid, it would help bring us together here at DeSoto High School. When we're not together, nothing's together, regardless of what society will say. And in my belief, I believe that as men, we have to come together, and we have to lead the campus, and we have to guide the ship. And that's not a just mister counter, that's all of us. We do that together. Y'all see me, I've been around me for two and a half years. I'm not a guy who's just going to say do it my way if we just push through. I do value each and every one of you, and you are important to what we are and who we are as a school. But, we have to come together. And I thought of Men 33, because as I talk to a lot of us, I get a chance to kind of get pieces of what everybody goes through. And it's a lot. It's a lot in this room that we go through, through our conversations that, guess what, there's no manual kind of stuff. And if we're not connected as men, as brothers, we walk and do this stuff, by ourselves, and there's no light to it. And so, today, I was able, at that time, I thought of Men 33, and I thought of Chief ▮▮▮▮▮▮. This is Chief ▮▮▮▮▮▮▮▮▮▮, retired, retired twice, and he helped to implement this program at my last campus. And today, it really can kind of introduce it to see if it's something that you all are interested in doing here. I believe it will be a great help. We've got men of all ages in this room. Some of us, some have been around for a short while trying to figure out life.

**Jasen Campbell 04:32**

Some have been around midway, still trying to figure out life. And some have been through it all and still figure out life. But together, as we come, if you're interested, I just want you to hear about this program as an opportunity for us to come together as men and to deal with our issues and be able to help one another to kind of help build our culture as a staff. We're very large campus, and so it's times I don't even get a chance to see some of y'all even know each other in the room. But, because I'm moving around, I get a chance to see some of you and get to hear from you. But I think it's an opportunity for us to be able to come together and coordinate each other. We're all not doing that for us. It's us. And so, with that, I'm going to make it over to Chief ▮▮▮▮▮ And so, he's going to kind of give us an overview of the program and give you a golden day to figure out if it's something you want to be a part of. So...

**Presenter 05:42**

I was educated so I know about time, I know at the end of the day everybody is ready to go, so I know everybody is ready to go. But Mr. Campbell reached out to me right before the holiday break and it was amazing when he called and he said, he's going to have a meeting with you because I want to talk about this mentoring program. So right before he had did that I was already praying and asking what is my next step? Where do I head at next? Where do I go now? Right? I retired from the United States Navy with 22 years of service and I served in education for 14 years. I went to high school in JROTC program and served Mr. Campbell. And so now in my retirement I said, okay, mentorship is what I do, it's my passion, it's what I love. So because I believe that what we've been given that we've got to give back to someone else and we've got to give back to our young men. That's my total focus is male youth and mentorship and just youth, male in general. Now, DeSoto High School has a championship resume. Y'all pay a degree, y'all champion. I did my research. Y'all three times state champions, you won in 2016 and then you went back to back and you won in 22 and you won in 23. So what tells me that you have a

Powered by Notta.ai

notta

But not only are y'all supposed to be building champions on the football field and on the basketball court and on the gridiron or on the diamond or in the crash room. But you guys are here to build champions alive, right? You guys were created as men. You was created for more than what we just see ourselves doing right now. And so what I believe is one of the biggest things that we can do as men is to mentor someone else. But in order for us to be able to mentor someone else, we first got to work on ourselves. Because the truth be told, everybody in here has been broken. Everybody in here has dealt with something. Everybody in here either had a struggle, a flaw, an imperfection or an addiction, all right? Every day that you get up and you come here to school and you try to teach these kids, but you still got your own life you got to deal with. You still got to worry about your own family, your own kids and your own struggles and your own bills. And so guess what? You as a man, you ain't got nobody to talk to, so you carry the load all on yourself. You got to carry the load for your family, you got to carry the load for these kids and you ain't got an outlet. You don't have no one that you can share with, no one that you can pour out to. So what we do is we wake up in the morning, we put a smile on our face and come up here to school.

Speaker 3 08:38
Well, it's.

Presenter 08:39
suffering. You hurt me. We going through. But as men we was taught you got to be strong. You can't cry. You can't mumble. You can't complain. You got to suck it up. And the problem that has done for us is it has hurt us as men. Because now you got men that's in their 30s, 40s, 50s, and 60s that's struggling from even childhood trauma and issues that we never dealt with and now we're men and it's at the forefront. And so we struggle in that then. And so what the 33 program does, what the men's 33 program does, is they help us as men to come together to have a space that we can talk and share with one another to work out issues that we deal with and we can't share with nobody else. Gives you a safe place where you can share your most deepest thoughts, your problems, and just struggle. I got anybody in fraternities in here, any fraternities? Okay I know I got Q's and noops and alphas and capitals and all that. It's a brotherhood, right? Y'all build up each other. That's what men's 33 is. It's a brotherhood. It's men coming together to first make themselves better. Because if y'all want to make these kids here at this school any better, then you're going to be healed yourself. You're going to have to deal with some of the issues that you deal with that you may be healed and that you may be able to let go that you can become a better man for the young men at this school. And not just the men at this school, but for your own children. How many of you got kids? For your own, yeah. Because guess what? Because if we don't change the generational curse, we're going to pass it down to our children. And then our son's going to be just like us. And then his son's going to be just like them. So it has to start somewhere, right? It has to start somewhere to where we begin to deal with the issues and what we struggle with and what we deal with so we can start to begin to get healing for ourselves. And I'm so passionate about this program because when I moved out here from the United States Navy when I retired I came out here to teach ROTC, I joined Concord Church. And so we went through this men's ministry, me and Mr. ████ back there, we went through this men's ministry that was called Men's 33. Now in 842 I think I got my life together. I think I'm doing pretty good. I got the retirement on me, got a couple of checks coming in. I was great. Then I started going through this program and then realized I still had some issues about life. Some struggle that I was still dealing with that what I did was brush them under the rug. And I thought I was successful. I retired from the United States Navy. I was doing good. I'm an educator. I'm an administrator at the church. But I was dealing with issues that I didn't share with no one else. And guess what? At that age of 42 all those issues came back to the forefront and I couldn't handle when it took place a depression. That program right there saved me, brought me back as a man, helped me with the very things I was struggling with. But it was somebody helping me to become a better man. 33 was just the program that saved me at the age of 42.

Presenter 12:16
And gave me another opportunity. And so as my pastor, Pastor ████ was teaching this program and we went through it and I began to heal and deal with some father issues because my dad was never there. So before he would even, we would reconcile before he would die. He would have cancer. And the program that they taught me said if you have a problem with your father you got to go back and talk to him. And I'm like why I got to go talk to him. He the one that was never there. But he said I don't care who was there for. You got to talk to him. I was able to reconcile with my father before he would pass away. And had I not done that, gentlemen, I would have still been struggling with that to this day. That's what 33 does. Open up these wounds and these issues that we deal with that we can be able to handle them and talk about them and get some things right. Do some forgiveness. Do some cleansing and all of that stuff.

notta

Exhibit 30 -Page 3 of 6

That's what 33 is about. And so once I went through the program, I started teaching at Wilma Hunter High School, and we had the young men of the high school go through it.

**Presenter 13:20**

The first year we had 33 graduates from the class, and those kids that was in that program went on to do great things. So we saw that the program was working at the school, and we did men's 33 for mentorship for our male youth. We did it for 10 years consecutive, and it was successful. Mr. ████r was there at the time with us as well, and then when COVID went hit, we took the men through it. Mr. Campbell said, well, hey, the kids are not here. How about we take the men through it? And guess what, we did it online, and we took the men through it, and we saw the reward for the men going through it.

**Speaker 3 13:56**

who made his early career.

**Presenter 14:03**

And these young men like to hit this school because y'all know better than anybody else. We look good on the football field. We look good on the basketball court. We look good on the baseball field, right? What about the classroom? Where they're struggling and they cannot be educated if they're dealing with emotion issues. If they're dealing with emotional stuff, how can we even educate them? They're worried about where they're going to eat, how they're going to eat, their being effused and all this stuff right here. And they need men, you, to mentor them. I just overheard Mr. Anderson talking about mentorship and we was coming up. We had people that mentored us and it's a lacking mentorship in the day. We're going to see this right quick because I ain't going to hold you long, but I just want to... I'm passionate about it because I want to push it to you because there are great men in this room and what you have in your gifts and your talent, you got to be able to give it to these young people. But you, too, got to be good. You, too, got to heal for some things that you're dealing with and this is what 33 does, right? I want to go through it right quick. I want to run through a couple of little things because I like to show facts. Like I said, I was an educator and I taught Naval Science over at Wilma Hunter High School, so I always believe in a little PowerPoint presentation.

**Speaker 1 15:28**

We'll be right back.

**Presenter 15:28**

See your name, Jess, you're out. Okay, all right. So, the state of manhood, right? Manhood is in a state of confusion.

**Speaker 1 15:39**

Thank you.

**Speaker 3 15:40**

No, no, here we go.

**Presenter 15:44**

state of confusion, what society is saying, right? The man taking out of the home now, where do the man stand at? And so now, the man is just standing in confusion. Where is my position, where is my place? Where do I stand at as society, in my family, in this world? We're in a state of confusion, all right? So, the impact of a man. Another thing here, adolescence. When we was 18, we was out of the door. You got young men now, they ain't walking out of the door till they're 30 years old. Because they're not being taught to be men. They're not being mentored, right? And so now they're 30 years old, he's still staying with a mom and them. Because they're in a state of confusion. They think they're supposed to stay young all their life. Marriages, you don't want to decline. It used to be, you get married, you get a home, white picket fence and all that. No, you don't see that anymore. Why? The camp already said it. Women think they don't need a man. Mr. ████ was talking about it earlier. I was killed husband, Mr. ████ right? So, but it's on the climb. And the influence of a man and the family. It used to be the man was the man of the family. You respected the man in the house, that you don't see that in this day and time. You can't even find the man in the house in this day and time. And so why the family's failing? Because the man is not there. And who was created to cultivate this land? It was the man. It was our responsibility. And that's the state that we're in when it comes to manhood right now. Thank you. Here's a fact, 57.6% of black children, 31.2% of Hispanics, and 20.7% of white children are living without their biological father. No man in the house. So mom being grown up by their uncle, granddaddy, doing the best that he can, or guess what, it's just a woman in the house doing the best she can. She got a work, he 14 now, he the man in the house, so he ain't coming to this school and this is nothing you say because he's the authority in the house. And that's what we're struggling with right here. Why? Because there's no fathers in the house.

Exhibit 30 -Page 3 of 6

Powered by Notta.ai

notta

Exhibit 30 - Page 4 of 6

because, you know they're more. They don't have a dad. And that's why they're struggling to reach the manhood. That's your percentage right there, gentlemen. And look at it. And this is not a black-white thing, it's a mad thing. It's a universal thing. It's a life thing for 57% of black children struggling, but all of them. Not just us, everybody got a percentage here that the man is missing. And so now what? They need mentors. If they ain't got a man in the house, they need someone that can tell them what to do. And y'all know for a fact that if you tell these young men what to do, and they respect you because they will, they'll listen to you. These kids want to be instructed. They want some structure, but they got to know that somebody cares for them, somebody loves them, right? Black youth. Black youth were 4.7 times more likely to be incarcerated than white youth, right?

Presenter 19:14

You see the different disparities of our kids going to juvenile, going to jail, going to prison, but once again it goes back because they don't have a mentor. They don't have a man in the house. That's why these numbers are so high. When you get mentors and you get men to stand up and be men and take back these young men, you'll see these numbers come down. A significant portion of males lack mentorship, and Mr. ███ was talking about it a little earlier, lack mentorship. Studies indicate that about 52% of men do not have a mentor. By the shorthand, do anybody here have mentors?

Speaker 3 19:58

I mean, mental health is good.

Presenter 19:59

Okay, good. All right, now I saw a handbrake, but guess what? That wasn't even 50% of this room. And I don't care what age we are, everybody needs a mentor. It says that you should either have a mentor, right? To lead you, you should have a peer mentor walking beside you, and then you should have a young man that's behind you that you're mentoring. And that's the protocol to mentorship. I'm 57 years old, and I still call men to this day when I got problems in situations that's too big for me to handle, or I'm struggling about something. Because I need advice from another man that has experience that has been there and done that. We all need mentorship, and this is where we fall in short at, 52% of men do not have mentors. And that's what we want to build, gentlemen. We want to do this right here, this 33 series, The Journey, to where, guess what? When you get this right here, now you're equipped, and then you want to take the same thing, and then you're going to be able to mentor these young men who are at the school. Because now you're going to have the tools that you need to work with through the Men's 33 program.

Speaker 3 21:19

Thank you.

Presenter 21:24

True fact, we talked about this, women are beginning to outlead men. Women are beginning to outlead men. 66% of women graduated from college compared to 58% of men. Almost 47% of U.S. workers are women. 47% are women in the workplace. 39% of women work in occupations where women make up at least three quarters of the workforce. Ladies and gentlemen, if you don't see it, what they're trying to do is make them mad in this state. That's not new. Nothing new at all. Nothing at all. And society continues to just push the man to the side. And then guess what? If we don't stand up and meet a man that women call to me, that's exactly where we gonna be at. On the outside looking in. Because this is what taking place. You see it in the schools, you see it in churches, everything. Now, is there a fault? Is some of this our fault? We don't took a back seat. We gotta look at some of this and say, what have we done to even put ourself in this position? And I'm not saying this classroom right here, me and here, but look at our young men now. They lazy. They don't wanna work, they wanna feel entitled. Every one of you had to get up and go to work to make a life for yourself. This generation coming behind us, they don't see that. by a big margin. And that's why a mentor should be needed because you got this feeling that if you don't work, you don't eat, period. Society don't care nothing about us. If you don't work, you don't eat. And so these are the numbers right here. These are the facts. This is where we're at.

Speaker 3 23:35

Alright, we play a unique role.

Presenter 23:37

I want I'm not gonna kill all of your time. Okay, not gonna kill all of your time I know you guys attack. But here it is. Here's what the program does. Here's what 33 the journey does, right? We're building man We're gonna validate who you are and why you were created because each and every last one of us could create with gifts and talents that God gave

Exhibit 30 - Page 6 of 6

EXHIBIT 30

Exhibit 30 -Page 5 of 6

we talk about is between us Right now go up and don't go outside the classroom. It don't go outside of the building You don't go pillow talk to your girl. Come on, man, you know, Ronnie got problems. No, we don't do that Well, we talk about in here as men we stay here, right? So allow a place to heal from the wounds because we all got big thing We talk about in this book also allow them to make war with sexual sick men and we screw up with anything You struggle with sex a lot of times a man downfall Is sex? That's how that's up. You can't really get us with no alcohol. You can't get us with no weed, right? You only know cigar you put that up anytime, but that's it That's that killer right there. Yeah, that has destroyed a lot of men Okay, and I and I love to be transparent when I talk I Tell people Anytime I ever struggled at any time I ever failed in life. It's not that God took me through a test But it's because of decisions I made when it came to this right here He never took me to a test where oh, I'm just gonna let you struggle No, anytime I went down or I failed it because my own doing my own demise Because I struggle with sex and I struggle with lust and I struggle with that I got to be transparent right Because everybody got a screw and if you don't handle that they get a destroy you because the enemy don't want to see you be successful So what he's gonna do you the very thing that you struggle with to be your downfall And that's what you have to face head-on and a lot of times for the men This is what we fall right here. We can beat a lot of things, but they ain't found a way to beat that yet Right, so we're gonna talk about that, right? Hard to heart the next so we can get it. All right, so Hard to heart what we deal with is the issue of the heart y'all And all our wounds are from the heart everything generated from the heart It's a hard issue what we deal with what we struggle with and if we can fix that thing right there Then we can fix our heart. We can be better Maybe better about kids be better for your wife be rather be better for her your family, you know Educating the school everything but the heart has to be fixed Right. This is the very thing that keeps everything running But we put so much dirt on it so much cold on it until it has the layers have to come back off of it It's a hard issue, but when we start to get this heart right to deal with some things Man,

Presenter 26:56

you will see a difference and you're gonna feel better I promise you that me gonna reconcile with my father before he was that but the best thing I could have ever done But if I wouldn't have did that I was Still living with that Their heart is then when we start taking that off we won't get better and when you get better You will be able to do the same thing. We jump in because the same thing you struggle with the same thing He's running within his car

Speaker 3 27:25
OK? Thank you.

Presenter 27:33

So, going to 33, it's gonna make a greater impact. It's gonna make a greater impact. So, going through this program, I believe, right, that the impact you're gonna make, if you plan to be a part of this, it is not only gonna make an impact in this school, but in this community. So, I stayed here in this so long. It's gonna make an impact in the school. It's gonna make an impact in your own house. You're gonna be able to now run in your house and leave your house as a man for those that are married, the way you was created to do, and what you've been called to do. That's what it's gonna do for you. It's gonna transform you. It's gonna give you a voice in the community. It's gonna redeem marriages, right? But most importantly, it's gonna raise leaders. Leaders with good character, leading by example. Because it's done with the old days, doing as I say, not as I do. Kids see you from a far away, and they know if you phony or not. But when they see you leading by example, they gonna wanna follow you. And so, I would say, one of the biggest things that you can invest in that's free, that this don't cause you nothing, but a little time. It's 30th degree. Thank you. And I want to just give you the manhood definition, because we'll talk more about that in a minute. Here's the manhood definition, real men reject passivity, accept responsibility, lead courageously, and invest internally. The question is, what are you going to leave behind? What are you going to leave in between the dash? From now until you get ready to leave here, what are they going to say about you? Will your name still be out of the mouths of young people? It was a Sergeant Major Wilson, ROTC Savannah Jordan, 1984-86. He was the very one that made sure I did not quit school because I was going to drop out and continue just to do that dope thing. Because it was easy, and it was money. And Sergeant Major ███ told me, you're not going to drop out, and if I have to put my in your butt every day, I will. You can feel it in the breaks. And because of him, thirty-something years later, his name still come out of my mouth, and he's long gone to heaven now. But he saw something in me I did not see in myself, and he took a chance on me. And because of him, I can stand here now as a success story, or retire two years, or retire twice in a lifetime, and only at the age of fifty-six. Because somebody saw something in me. Is your name going to be the same? Are these kids going, when you long gone, are they still going to call Mr. Cooper? I remember Mr. Cooper. He's my band director. Yeah, I went to college because of him. Yeah, Mr. ███, Mr. Campbell was my principal. Will your name still echo out of the mouths of people when you're gone? Because success is not you just gaining wealth, gentlemen. That's called selfishness.

Exhibit 30 -Page 5 of 6

Powered by Notta.ai

you're long gone, that you still risk. I hope that you got to be a part of this program. I hope to see each and every last one of you. Man, come take the journey with me.

Presenter 31:23

I promise you, the program is fun. You're going to learn about each other. As Mr. Campbell said, half of y'all don't even know each other anymore. Alright, let's come together to build a brotherhood. With all these returnings I've got in here, let's make this thing even better. Let's build a whole brotherhood of 33 series. I thank y'all for your time. I appreciate y'all. I hope to see you soon.



EXHIBIT 30

Powered by Notta.ai

Exhibit 31 -Page 1 of 5

This transcript was exported on Jan 25, 2025

09-17-2024 at 8:39

**Matthew Hawkins (00:02):**

Good morning. This is Matthew Hawkins from DeSoto High School. I was trying to get in contact with a,

███████████

**Ms.R███ (00:09):**

This. Is she?

**Matthew Hawkins (00:10):**

Yes. Oh, Ms. Ra███ I got your message asking for me to return your call.

**Ms.R███ (00:17):**

Yes. I think I left you a voicemail last week as well.

**Matthew Hawkins (00:24):**

Yes. I didn't get a chance to review the voicemail. I don't think I saw the notification, but I was just calling to address your concerns.

**Ms.R███ (00:34):**

Yes. Okay. I'm listening.

**Matthew Hawkins (00:41):**

I was going to let you state your concerns. I'm not exactly sure what your concern is.

**Ms.R███ (00:47):**

My concern would be you're writing him up for an ID and sweatpants you. You're making referrals on his ID and his sweatpants. Is he disrupting your class?

**Matthew Hawkins (01:03):**

The out address code is a disruption to the learning environment

**(01:10):**

It's not, it's not a disruption at all and I highly believe that. You believe that as well. Good morning.

**(01:25):**

So it's disrupting me as we enter the classroom and I have to check these things and file these things and document, but it is a requirement that all students come and dress code.

**Ms.R███ (01:38):**

It's a requirement. But you, him referral, you are writing him a referral every day as if that's what you're looking for.

**Matthew Hawkins (01:47):**

This transcript was exported on Jan 25, 2025

I am,

Ms.R█████ (01:48):

And I've done my research on Mr. Hawkins as a teacher in itself. It's like you pride yourself on making referrals. It's like you're looking for reasons to write someone up in your class. You don't do it just to my son.

Matthew Hawkins (02:14):

Would that not show consistency?

Ms.R█████ (02:19):

No. That means you're overbearing.

Matthew Hawkins (02:21):

Well, it's following the district's expectations that

Ms.R█████ (02:26):

No it means you're overbearing

(02:27):

No, and you're looking

(02:28):

For reasons. Hold on. First of all, those are black children that go to that school

Matthew Hawkins (02:36):

So they can't meet expectations. So black children

Ms.R█████ (02:38):

They can meet expectations, but it's like that's what you look for. Every time my son come in that classroom, you're going to see if he's out of dress code, you're looking to see if he got his badge. You're looking to see something so that you can write a referral. I heard that you got removed from the other whatever. Was it the STEM or something? Or they sent you back, they sent to the high school because of your overbearing This of the things that you're doing,

Matthew Hawkins (03:05):

Enforcing the school's policies.

Ms.R█████ (03:07):

Let me say something. Lemme say something and lemme make it very clear. ████████████ have a parent that care. These were referrals that you writing upon him. He's not disrupting your class. He's not disrespectful. When you can write a referral to say, oh, he's disrupted my class. Then we can have a conversation in reference to that. But you looking for every day with those kids that come to that thing

This transcript was exported on Jan 25, 2025

that come to your class every day? You're writing kids up every day. Anybody that comes in your class, you look for a problem to write a referral against them. There's something wrong with you.

(04:00):

███████ kind of got people on the board. He got family members thater about him. He got a mama and a daddy that care about him and you writing a referral on him on something that doesn't even make sense. So again, I've done my research. So going forward when he's disrupting a class, you can write a referral, but writing a referral on my son because he don't have an ID and he Oh, oh, you got on hands because you're looking for it when they come in your classroom. That's what you looking for. You looking for that.

Matthew Hawkins (04:58):

Ms. Ra████

Ms.R████ (05:00):

Go ahead. I'm listening.

Matthew Hawkins (05:03):

Alrighty. So are expectation is that students are in dress code and it's not even my

Ms.R████ (05:10):

Expectation. You're the only teacher that's overbearing and doing

Matthew Hawkins (05:12):

It. No. No. It's not overbearing. It's

Ms.R████ (05:14):

Just Yes, it is. You don't have life. Teach them damn kids. Them something. Teach 'em.

Matthew Hawkins (05:20):

Teach

Ms.R████ (05:20):

'em.

Matthew Hawkins (05:21):

I am trying to teach them. I am. I'm doing these things. I'm just saying that the whole thing is there's class and

Ms.R████ (05:28):

There's math that you don't have. Nothing else better to do than write referrals. Clearly that's how you do.

This transcript was exported on Jan 25, 2025

Matthew Hawkins (05:33):

That's not, I do 'em. At the end of the day, I document 'em.

Ms.R▓▓▓▓ (05:36):

I

Matthew Hawkins (05:36):

Keep a very short seat.

Ms.R▓▓▓▓ (05:37):

I you're the only,

Matthew Hawkins (05:38):

And then I'm going to go ahead and make it out away.

Ms.R▓▓▓▓ (05:40):

That's doing that. You are the only one.

Matthew Hawkins (05:44):

Why is that the case? That's definitely something I'm looking into need to, because we have policies and procedures.

Ms.R▓▓▓▓ (05:50):

What it says something about you

Matthew Hawkins (05:52):

Does it or is there a spirit of excellence if that's what we we're.

Ms.R▓▓▓▓ (05:56):

No, that's not. It's overbearing and don't have a life, do what you're supposed to do is teach them damn kids. So

Matthew Hawkins (06:02):

Ms. Ra▓▓▓▓ I have a question for you then.

Ms.R▓▓▓▓ (06:06):

There's nothing that we need to discuss, as I stated, continue with the referrals because I'm one of the ones that's going to go to the board on you. I'm one of the ones that's going to take it to the extreme of the extreme about her kids, and that's what I'm telling you.

Matthew Hawkins (06:22):

Ms. Ra▓▓▓▓ is there an issue with Eliza being address?

This transcript was exported on Jan 25, 2025

Ms.R▮▮▮▮ (06:26):

There's nothing. So keep on with ▮▮▮▮▮▮▮▮▮▮ I'm one of those parents that care about my child, my child. So keep on. Have a good day.



# notta

**R█████ Father Call**

🕐 Mon, 03/03 17:33PM · 7mins

# Transcript

**R█████s father 00:04**
So.

**Matthew Hawkins 00:05**
This is Matthew Hawkins at Soto High School.

**R█████'s father 00:10**
Yeah, I know. All she said, it do say homework, but like I was saying, like, just let me talk, like what I was saying. It say homework, but you're saying it's not homework, okay? Computer, I don't know y'all need photography or whatever, but it say homework. So she wants to do it. Taking up my daughter, when she get home, it's okay. Like y'all need to stop treating these kids like it's an institution. That's why I put schools up now. Like it's trash, public school or trash. Like they really is like stop treating them like they in an institution. Like they can't do nothing. They can't do nothing. Like if she want to do it at home, it's homework, and she can prove that it's homework, it's okay. Let them have free time sometimes.

**Matthew Hawkins 00:58**
Thank you.

**R█████'s father 01:01**
But y'all don't treat these kids like that's why a lot of these kids end up going up to the teachers, like it'd be y'all. If y'all learn how to fall back and just do what y'all supposed to do, y'all job would be a lot easier, man. Make y'all job work. I can't hear you.

**Matthew Hawkins 01:23**
I'm not saying anything. Everything you said you wanted to finish up wasn't even

**R█████'s father 01:27**
Uh, it got to understand that like, like y'all into your comfort type, like quit your kids. Like it's, it's like this shit, it takes me the most. Like, like it's school, but y'all didn't, you know, what y'all treated like. And y'all didn't stop it. It's homework. Let us do it at home. Guess what? Homework, and you should mark it whatever you want to mark it on you. Just make your job easy. You don't have to fuss with them kids. You yell before a show. She choose not to do it. Okay. J'Kai, you want to do it. I don't want to sit and make your child. You see what I'm saying? Make your job easy.

**Matthew Hawkins 02:09**
All right, Dad, so did you have any more other point? I don't want to cut you off, but I didn't want to speak to.

**R█████'s father 02:14**
Are you good? You good? I'm going to sing now. You good? You good?

**Matthew Hawkins 02:17**
Alrighty, so the whole thing is that, you know, while we have work to do, like, first, the phones, all that's not even supposed to be a thing. So being on Netflix, like, that's not supposed to be happening during the school day if they have no work to do at all. That's not supposed to be something that's happening inside during school hours, period. So, you know, so she has assignments that she's supposed to be working on that is classwork that's working on right now that she's supposed to be doing. And I come around, she's watching a movie on Netflix. So I'm like, hey, let's go ahead and get to this. I was like, no, man, I'm doing like all that. I'm like, hey, first off, since I'm trying to prepare for the future, procrastination is not, is not the best practice. You could do it later, but a lot of students don't do it later. And they want to dig in themselves in some type of way. So we're not going to practice, oh, it's going to choose to procrastinate for the sake of procrastinating, because the time will spend the same. You could do the work now. And then you could use the time that you're trying to spend later, you know, watching your video, just flip time around, which will be a teachable moment, managing your time, well, and stuff like that. That's part of the school is to give the students educate necessarily on the content area, but also in just skills, period.

EXHIBIT 32

Exhibit 32 -Page 1 of 2

Powered by Notta.ai

something you're not supposed to be doing. So administration comes in my classroom, they phone, she got work, she got to do, and she's not doing it. It's like, why are you just letting them do that? So that's my whole thing of just making sure holding them accountable. Hey, this is what you got to work on. Let's put it up. If technically I'm supposed to take this ice up, send it down to the office because she's off task on a device without permission. And it'll be $15 for her to get it back.

**R█████n's father 03:55**

Oh, I see how y'all running. Every time they're like a system, oh, OK. I'll get it here.

**Matthew Hawkins 04:00**

So I'm saying, I'm not trying to take your device, I'm saying, let's get to work, let's get to work. It's not even all that, just let's do the work, let's knock it out, and let's move on. You have time to do it now, but this time is a lot for you to do it now, not to be watching licks at school to learn and practicing. If you get stuck on something, ask a question, it's when you have the time to do it. And so you go on, I don't know how to do it. You have time right now, I'm here for you to ask questions, you can get the help to make sure you can do the work, you can understand the work, get the best grade possible. Like that's what this time is for. So when she's at home with y'all, y'all like, oh me, I don't know how to do it, why don't you ask your teacher? She's burning time, watching Netflix. Like, so that's, I'm trying to avoid both situations for you guys once she gets home. She's like, I don't know how to do it, I'm telling, because I don't know what I'm doing. You're not maximizing your time in class, you've had all this done before you even left the classroom. So I'm trying to, it's preventative, but it's also, it's a lack of policy things. So it's not beneficial for her in any way to encourage it. So I'm like, okay, let me go ahead and make sure she understands it. Cause we can't just be on our phones anyway, watch Netflix off task, and we got work to do. Yeah, that doesn't make sense to me. Like, I'm saying as far as you guys, you guys wanted to have an education, that's why she's here, that's why she's spending these eight hours in the building. So it needs to make sense at the end of the day.

**R█████'s father 05:20**

Yeah, that was really too much for them kids anyway. I'm a title, I'm a title to them.

**Matthew Hawkins 05:25**

I appreciate it. Thank you, sir. And she walked off, hoping to come back. No one told her to go down the hallway. Now she's about to be absent while we were talking. She was supposed to be talking with us. And she went down the hallway. They're not at lunch or nothing. I don't know where she went. So now she's roaming the hall.

**R█████'s father 05:41**

How are you going to be absent? I'm going to go for college to the school. Okay, all right.

**Matthew Hawkins 05:45**

Yeah, I'm saying she'll be absent because she's supposed to be in class right now. And just because she, you know, feels that whatever you should, we walked out so we could talk to you and get clarity, you know, get that situation together because she was like, no. And now just walked off. So she's like not in the classroom. She's not supposed to be, she's not supposed to be in the hallway. She asked, she just disappeared. So, you know, that's a different issue. So we've got to track out, but she needs to make sure she's in class. She's supposed to be in class.

**Ro█████n's father 06:12**

Okay, uh, I'll bring you a call, sir.

**Matthew Hawkins 06:14**

Thank you.

Exhibit 33 -Page 1 of 3



| user_that_made_ student_name | contact_name | direction | created_at | contact_phone | communication_t | body |
|---|---|---|---|---|---|---|
| Hawkins, Matthe' D | | outbound | 2024-09-19 08:3: | | sms | This msg is from Matthew Hawkins at DeSoto ISD. Msgs via SchoolStatus use standard text msgs from your mobile plan. Respond with STOP to block this conversation. Respond with INFO to receive a contact card for this contact. |
| Hawkins, Matthe' D | | outbound | 2024-09-19 08:3: | | sms | This is Matthew Hawkins from DeSoto High. Please message me when you arrive at the office as my classroom phone if offline. |
| Hawkins, Matthe' D | | incoming | 2024-09-19 09:4 | | call | |
| Hawkins, Matthe' D | | incoming | 2024-09-19 09:4 | | call | |
| Hawkins, Matthe' D | | incoming | 2024-09-20 08:4 | | call | |
| Hawkins, Matthe' D | | incoming | 2024-09-20 08:5 | | call | |
| Hawkins, Matthe' D | | outbound | 2024-10-15 12:0 | | sms | This is Matthew Hawkins from Desoto High. C did not return to class from C lunch, has been marked absent, and documented for skipping. |
| Hawkins, Matthe' D | | outbound | 2024-10-15 12:1 | | sms | This msg is from Matthew Hawkins at DeSoto ISD. Msgs via SchoolStatus use standard text msgs from your mobile plan. Respond with STOP to block this conversation. Respond with INFO to receive a contact card for this contact. |
| Hawkins, Matthe' D | y | outbound | 2024-10-15 12:1 | | sms | This is Matthew Hawkins from Desoto High. C did not return to class from C lunch, has been marked absent, and documented for skipping. |
| Hawkins, Matthe' D | | inbound | 2024-10-15 12:1 | | sms | C said he's in lunch now . I'm about to call school |

Exhibit 33 -Page 1 of 3

Exhibit 33 -Page 2 of 3

The seniors are testing today and he's in your class all morning? I called and he's in lunch now .

We are in our test holding house all morning as the campus is on a partial lockdown. Lunch started at 11: 28 and we concluded lunch at 11:58. He should be back in class now.

This is Matthew Hawkins from DeSoto High. O█ just returned to class announcing to his friends that when I talk with you about what his is doing that you don't care. He is boasting in openly about his behavior.

I will see you tomorrow. It may be very best to make some changes. We will decide after we meet . I request an administrator to be present .

I called the office to request support as well .



| | | | | | |
|---|---|---|---|---|---|
| Hawkins, Matthe█ D█ O█ | | inbound | 2024-10-15 12:1█ | | sms |
| Hawkins, Matthe█ D█ O█ | | incoming | 2024-10-15 12:1█ | | call |
| Hawkins, Matthe█ D█ O█ | | outbound | 2024-10-15 12:1█ | | sms |
| Hawkins, Matthe█ D█ O█ | | outgoing | 2024-10-16 11:4█ | | call |
| Hawkins, Matthe█ D█ O█ | | outbound | 2024-10-16 11:4█ | | sms |
| Hawkins, Matthe█ D█ O█ | | inbound | 2024-10-16 11:5█ | | sms |
| Hawkins, Matthe█ D█ O█ | | inbound | 2024-10-16 11:5█ | | sms |

Exhibit 33 -Page 2 of 3

Exhibit 33 -Page 3 of 3



Morning Mr. Hawkins please confirm you made aware to an administrator to be present for our meeting. For us to meet today I need an administrator or ███ counselor present . I called yesterday several times with no response  from the school. Any interaction /conversation with you will be with an admin . I have been informed you are not well approachable from other parents and coaches . Thank you , ███████ ██

This msg is from Matthew Hawkins at DeSoto ISD. Msgs via SchoolStatus use standard text msgs from your mobile plan. Respond with STOP to block this conversation. Respond with INFO to receive a contact card for this contact.

This is Matthew Hawkins from Desoto High. ███ received a dress code violation for sweats today.

This is Matthew Hawkins from Desoto High. ███ received a dress code violation for sweats and no collar or spirit shirt today.

Exhibit 33 -Page 3 of 3

## notta

T█████ Meeting

🕐 Mon, 03/03 17:36PM · 58mins

# Transcript

**Speaker 1 03:48**

Okay. All right. I'll make sure she gets it. Thank you. Have a good one. How are you? How are you?

**Speaker 1 04:41**

I hope we got delivered again.

**Speaker 1 04:46**

Yeah. Right. Okay. But we want to have a look at it. Okay. Come on through. Okay. Okay. Yes, please.

**Speaker 1 07:02**

Thank you.

**Speaker 1 08:35**

Hey, how you doing? How you doing? Sit. Thanks man, I'll beat it. It's very serious.

**Speaker 1 09:25**

That's the way they're going to do it in our work environment. . . . . Yeah, I haven't looked at it on the ground.

**T█████'s Mom 10:44**

Hi.

**T█████'s Mom 10:47**

beyond your return.

**T█████'s Dad 10:55**

What class did you make me make?

**T█████ 10:56**

Second period.

**T█████'s Dad 10:56**

What's that?

**T█████ 10:59**

Chemistry. She said we only had a final. It's OK. You had a winner? A final. It's on group class. Come on, baby. You know, you'd be excused.

**Christopher Polk 11:15**

I know it's been a long time coming. But where now he is, he's just kind of discussed some concerns. It's an opportunity for Mr. Hawkins to hear you all's concerns and anything that you all want to share with him. And then, likewise, for him to share any concerns that he has in class regarding █████. And ultimately, the goal is to find a positive solution as to where we go from here. So I did want to give you all the opportunity to kind of share some of the things that you all have discussed with me. And also to give Mr. T█████ here an opportunity to speak as well. And then Mr. Hawkins will share what he has. OK. You want to start out, Mom?

**T█████'s Mom 12:19**

I'll let you start off and I will chime in.

**T█████'s Dad 12:23**

Well, I'm Pops, and with me it's, let me turn it over and go. It's a simple thing, and we kind of spoke on the phone already. I'm like, I deal with the kids too, and I know that I'm not gonna ever just say my kid is not, you know, ain't nothing wrong, or it's something that he can't, it's some things he can't correct. I don't know, I know. But I just want to, I'm on the level of

Exhibit 34 -Page 1 of 12
EXHIBIT 34

Powered by Notta ai

or if your son is coming and sitting in my barber seat, I'm looking out for the best for him because I know what the world got for him if we don't come together as a village, as men, and help our boys. So, my thing is, and what I'm hearing is, it's almost like, it's like no, it's like a situation where he's coming to me saying, Dad, I'm doing what I'm supposed to do, this last situation, I'm doing what I'm supposed to do, and I got called out still again. And it was by another kid pointing out something on him. And it wasn't you pointing it out, it was the kid pointing out, and you pulled him in a correction meeting, I guess I want to say, outside the classroom because of what the kids said. And I'm just trying to find out what's going on with that type of situation. I know it was something before that about the badge. And we had a meeting with Mr. Pope, and Mr. Pope told us that it was no badge, what you call it? The lanyards. It was no lanyards here for him to have. And I know every day when I bring him to school, his badge is in his backpack on the side because he didn't have a lanyard. So, it's just little things like that. And I didn't really think it should have gotten to this point. So, that's where I'm at right now. You know, Miss T████r, she got more things, you know.

### T████'s Mom 14:40

Yeah, so some of the things that I wanted to address here in the meeting is like the text messages I'm receiving. One being the him leaving class one minute early. And you're saying, oh, I'm going to write him up, you know, for leaving. And it was probably a few seconds early. Now, my issue with that is addressing. You don't have to text me about things like that if you address it. And it's not an ongoing issue. And so I don't see why there would be a need to have a referral if you're able to manage his behavior. And that's not a reoccurring issue. So that was one. And then number two, what just to piggyback off of what he was saying, you singled him out regarding the air pods when there were from what I'm hearing and gathering other students that had the same thing going on. They had the air pods there, excuse me, their beats on. But you told him he needed to take his out. Now, my question for you would be, OK, when you say that students can get on their phones, do you want them playing their phones out loud where other students can hear it after they have finished their assignment and they are on task? Like, is it a requirement? Is that an expectation? Like, it wasn't clear communication on what you expected to be done once you were on or if they were on task and completed their assignment. So that's my question for you for that. And then regarding the issue of you calling him out based on the information from other students, I expect you as the leader of the class from the instructor to make those decisions outside of the students. So if you're going to call him out, call him out because that's what you need to do. And that's what you see fit, not because of what the other students have brought to your attention. And now you feel like you need to address that. So those are some of the issues that I had initially. And then just kind of it feels like you're nitpicking. And then when I did talk to you about getting assistance or, you know, us aligning with you being a certain because I know him, I know he slacks off, you know, and I'm not foreign to that. But when I come to you for assistance and for us to team up, it doesn't seem like you're willing to do that. And to have a partnership and assisting me with that effort. So I felt like it was very lackluster. It was very removed and emotionless. And so I should be feeling like that with his instructors, especially the males.

### T████'s Dad 17:03

And to piggyback off of that, that's exactly what I was talking about initially when we had the phone call. You know, and we was like, man, you know, the village, like I even said that, you know, and it was more so like a, well, I mean, hey, you know, I'm going to try, but if I, you know, I mean, you know, it was, it was, that's the way I felt when I got off the phone and I wasn't supposed to be on the phone because I was driving the bus. I wasn't even supposed to be on the phone, but that's what I felt. I felt the same way, like a, and I could be wrong, you know what I'm saying? And I don't have a problem with admitting if I'm wrong or my son is wrong, but I should not feel like that, especially in the climate we end today with black males. You understand what I'm saying? And because I deal with black males every day, I cut hair to our own barbershop and I deal with kids. I've been dealing with kids for 20 some years. I've raised kids, kids, they got kids now. So I just want to feel like, man, he got my, he got my back and he got my son back up there and he didn't feel like that.

### T████'s Mom 18:04

And as a previous instructor, I had a classroom. So I knew about classroom management and the expectations. My expectation is for you to deal with situations, you know, firsthand and in a confidential manner. If you're addressing him, address him. Not all of the students at the same time. So if you're gonna pull him out and have a conversation with him, have that conversation with him, but not in the presence of other students to make sure that we remain confidential and that there are no issues. Because it caused controversy and chaos in the hallway against my son because you brought all of them out at the same time. And so I don't feel like that was fair to him, you know, that you all kind of like ganging up on him. If that's how the issue or the situation transpired. If that's not how it transpired, that's fine. But when I had conversations with my students, I would tell them to hit the door one at a time. Because what I'm saying to that student is for that student

notto

confidential situation. And so that's what I'm expecting as far as you being an instructor here at DeSoto because I've worked here and I know the expectations. I know that they're aligning that still, you know, today. If that's not the case, we have an issue with DeSoto ISD, not just you. So those are some of the things that I wanted to address with you as the instructor. It's a few things that I need to address like with administration. But so I just wanted to get your feedback and your take on how we're feeling and what our viewpoint is. And maybe you can shed some light on like what we're seeing and not seeing.

**Matthew Hawkins 19:45**

Absolutely, absolutely. So I understand you guys' concerns in the community, all those things. So my thing with the dress code issues, the ID violations, it's all part of instilling discipline, learning how to be a productive citizen. It's the foundation. These are small things. Yesterday he didn't have his ID. Today he doesn't have his ID.

** 20:08**

And then I went down here and got a temporary. Because I accidentally... I've forgot it on my night stand.

**T█████'s Dad 20:15**

Not to cut y'all off, but what is up with the

**T█████ 20:17**

No, I looked in my own old drawer and I got my lanyard now. I had one.

**T█████'s Dad 20:23**

I think you need to correct that situation.

**T█████ 20:25**

All right.

**Christopher Polk 20:26**

And then, you know, I tell students this is, the one thing that, and you're a male, so I know the females, they may change purses to, you know, a certain thing, but typically you always have your backpack, correct me? So at the end of the day, just put your lanyard in your backpack. Yeah. Put your lanyard in your backpack. Cause I've been there. I know you at home, you just take it off. It's easy to forget, but you always have your backpack with you, at least you shouldn't. So just, that's a quick fix for that.

**Matthew Hawkins 20:56**

So with that, the expectation is that ID's are out of this ball. It's a simple thing and when students come in, I make sure that that's happening and I let them know, hey, this is the expectation. You're supposed to wear this all day. I know like it looks like everybody's doing whatever else, but this is a personal integrity thing at this point. And also you're going to be held accountable for this expectation. It's not a small thing. It's nothing to buck at. Like just wear your ID, you're good for the rest of the day. And I make sure you're good as soon as you come in the door. So the day in question, the most recent one that we have not had a chance to talk about, he came in, he took his ID right off, put it back in his bag. He had his AirPods in when he walked up. He took those off when he came in, but when I saw him, he had them back in. So it's like, okay. So I actually pulled him one individually into the hall. I asked him to come to the hall. He wasn't the only student that I pulled in the hall by himself either. There were other students that I pulled in the hall. So I pulled him in the hall. He was like, wow, why didn't you talk to me? I'm like, it's not not everybody else, but it's coming out to the hall. So I'm talking like, so at this point, it just seems like rebellion in his subordination. Like I made sure you were right before you walked into my classroom. You know the expectations, but you're choosing to do what you want to do. So I need you to go ahead and correct it. You're actually spending energy, time, and effort to undo what was already right. If you did nothing, you would have been fine. I had nothing to say to you. So then he went ahead and was like, all right, man, whatever. So he put his stuff back on and came back in the room. This is like, during the time they're working on their warmup, I'm about to do a lesson. So there were other students I had to talk to. Same issue, there's an insubordinate, rebellious thing. I don't know, we're working on it. So during the lesson, I was working on the lesson. There were some other kids being in disruption, whatever else. So I finished the lesson. I'm addressing, I'm redirecting. As soon as the lesson's over, I'm like, okay, we need to talk. So D████ has got his AirPods back in. Like this, during the lesson, I look back there, but I waited until I finished my instruction before I addressed all of this.

**Matthew Hawkins 22:54**

Exhibit 34 -Page 3 of 12

Powered by Notta.ai

So those students, and they're like, well, why y'all is doing this, that, or the, okay, actually, I'm gonna address all of y'all, because all of y'all are doing things that are disrupting my lesson. So this was a different conversation about the lesson in general, and us not being on task during the lesson. So I was pointin' all the students that that was relevant to, and D▮▮ ▮▮ with his AirPods, after I already addressed him that day, and all the other previous days, was an issue. So when I pulled him in the hall, he's like, man, I ain't takin' this, he walked off. So that's what happened when I was trying to address him. We never really got a chance to address D▮▮▮. So that's what that one was. With the other situations, and I know we had conversations before, so I asked you the very first time we actually talked on the phone, do you know what number ▮▮ is?

**T▮▮'s Mom 23:40**
It's three six seven four and that's the information I gave you when we were on the phone. Yes

**Matthew Hawkins 23:45**
Is that you at all? No, it's 367. Okay. And so, in the...

**T▮▮'s Mom 23:49**
system, it should have been updated.

**Matthew Hawkins 23:51**
Right. I was just wondering if that was anybody else. So that was the number I was actually messaging back in September about D▮▮▮. So I was sending a message. OK, he was our address code. No caller today. This was in September. And then the first response I got back was from this number because it was wrong in the system. So I was texting somebody. I'm like, I don't know who this is. What's the response that let me scroll down. So these were the response I was getting. I got I don't care back from this number. And that was the number in the system. So I'm like, OK, so he was giving me a little attitude about whatever. We're like, oh, I don't care. You call my like it was that type of thing. So the next time on September 23rd, I sent out a he's no caller. He's wearing sweatpants without a dress code.

**T▮▮'s Dad 24:30**
Oh, what is that issue stuff?

**Matthew Hawkins 24:32**
Yeah, that's what that's the message I got back, which is coming from the number that was attached. Yes. So that's why I asked. I'm like, hey, I'm sending messages like I haven't heard back from you. I'm not like I'm messaging you and I'm getting these responses back. So I'm like, I'm going to pull back. No, no, no, no. I don't know who that was. So then when I when we finally got the number corrected, then we started actually able to have dialogue. But those are the responses I was getting back early while I was having issues with D▮▮▮. So do you have to.

**T▮▮'s Mom 25:02**
You shared that information with me.

**Matthew Hawkins 25:06**
I asked about the number because I was going to go into it and as soon as you say that that was not your number, I was like, you know what?

**T▮▮'s Dad 25:11**
Yeah, but it's like, but see, you had that, that's from September. Yes. You know what I'm saying? So you might have had that, that perception.

**Matthew Hawkins 25:18**
I did.

**T▮▮'s Dad 25:18**
That's what I'm saying.

**Matthew Hawkins 25:20**
I did.

**T▮▮'s Dad 25:20**
So that's why we would have needed you to say something earlier.

Exhibit 34 -Page 4 of 12

Powered by Notta.ai

notta

Exhibit 34 - Page 5 of 12

I was, but then I started texting dad. So that's when I started putting you on. Instead of talking to mom, I started just texting you, but I didn't get responses back on dad.

**T████'s Dad 25:31**
What's the number?

**Matthew Hawkins 25:32**
Your number, ████████████████ So they got your number in here for on two.

**T████'s Mom 25:39**
I'm not sure what what system are you this is

**Matthew Hawkins 25:42**
school status this is it just pulls what we have on our

**T████'s Mom 25:49**
Those are not the numbers. And then on the student portal, that's not the number.

**Matthew Hawkins 25:54**
Whenever I talk to you the number change like you're able to change the number

**Turner's Mom 25:59**
But ████ has not been in the system. I don't know how.

**Matthew Hawkins 26:04**
Was that an old number? That's an old number. Okay, so maybe...

**T████'s Mom 26:08**
That was my the remember you ████████████ and I was ████████████

**T████'s Dad 26:12**
Okay, okay, so maybe maybe it's her old number, but my number is seven nine five five years ago

**T████'s Mom 26:21**
still in the system, but we don't have it on our side at ████ anywhere.

**Matthew Hawkins 26:25**
Okay, but I was reaching out just so you know, I was reaching out. Hey, we're having this issues like coming in sweatpants and athletic wear no collar I'm like, hey, let's get this and I was getting those responses. So I'm like, okay for this student Let me go ahead and focus elsewhere. Um, you know, i'm gonna do what I do. So with that situation, um Where there was something academically it wasn't us not right, right When I talked to her I figured that was the case because I asked her about the first thing I asked was about the number because i'm Okay, is this you or is this his number or like whose response usually parents would just be like you got the wrong number Like I usually don't write those type of responses So I was confused. It seems a very personal inquiry response. Like somebody has that line. I don't know so I was confused. Um So with that, um You we had the conversation it was about zeros and it was just more so like i'm not asking a lot I'm really not just coming to come to school with dress code. If you don't have a lanyard, let's get a lanyard It's a dollar, you know They have them in the office. I know you guys are saying that mr Pope was saying they don't yeah, they do they don't depends on the day of the week But the end of the day if it's an issue we can just get a lanyard They don't they don't cost much and like you said, it's like it's not a financial issue So let's get them in compliance. Make sure he has it. Let's move on to other things It doesn't have to be a big old thing about dress code and id. This is simple So that's why i was like I it's not that I don't have compassion for him Like I think we're focusing on the small things i'm gonna focus on these small things because small things become into big things later If we don't let the small things go especially for shaping young men Like the smallest thing is the thing that can get you messed up in the future So let's make sure that we're crossing our t's dotting our eyes. We're on point. That's my expectation And it's a it should be a school-wide expectation. You can make the argument. Well, why arent the other teacher? It's it's an integrity thing, you know what the expectations are let's make sure we're doing that's where I sit but we also talked about His grades there were a lot of grades not coming in there were a lot of zeros in that season So how my grading is set up the students have access to the assignments that are open And while they're open

accessing your work If you want a certain grade go in there work on it ask questions But when I asked the █████ if he asked questions, he's like nah, man, I got no questions Or if i'm trying to redirect him he's off task He's like man. I can do it later. He says I got so much time. I can do it later Like there's that type of attitude of oh i'm gonna do it whatever Whenever and that leads us into this most recent situation on the last class.

**Matthew Hawkins 28:58**

We were in there With his uh, his air pods. I don't think he got sent out or anything. I don't think i've been contacting you about it But he was he was on his airpods like hey remove your hair. It's like well i'm done. I'm done my work Oh, that's what you were talking about when he's done so The issue with that is I don't believe he was and that's part of the issue. Were you done?

**T██████ 29:20**

Yes. I was done.

**Matthew Hawkins 29:20**

What does that mean?

**T██████ 29:23**

What do you mean was that mean

**Matthew Hawkins 29:24**

so we're studying we're preparing for our test chapter seven test You're done with your review. What does that mean?

**T██████ 29:32**

Go work on my five topics and I did

**Matthew Hawkins 29:34**

no, no, what does being done with your review mean? Um, you're prepared to take your test.

**T██████ 29:41**

Yeah, and the test is today

**Matthew Hawkins 29:42**

the test is today, but I have issue

**T██████ 29:45**

Huh?

**Matthew Hawkins 29:46**

I have issue This is my issue. This is my issue All right You ready D█████ when you did your review, did you use paper or pencil?

**T██████ 29:55**

No, I didn't use paper or pencil.

**Matthew Hawkins 29:56**

Alright so here we go. So this is one of the questions that you answered and like you would not be done if we were actually maximizing our time with integrity. So this question right here, you knocked this out in 42 seconds. Can you show me your process? You finished the review in like 2.5 minutes pretty much like 10 minutes max, finish the whole review. Some of those questions are slated a lot longer than that. So if you are actually studying then you should be able to blow this out of the water. So I'm saying that there's probably not integrity in your practice and you're sitting around acting like you're done trying to do other things but you still need to study. You need to do your work. You're not actually authentically doing your work. That's what I'm saying. Can you show us? Here it is. You finished this. This is from your review.

**T██████ 30:50**

To show you how I did the work.

**Matthew Hawkins 30:51**

You answered it in 42 seconds.

Powered by Notta.ai

notta

T█████ 30:54

Okay I'm not going to lie but I did use chatgbt and I did use ai but I'm not the only one that's doing it.

T█████'s Dad 31:01

Hey hey hey hey hey hold on. This ain't got nothing to do with nobody else. We ain't here talking about D████████. You D████ Not

Matthew Hawkins 31:08

when I'm trying to redirect you. You're like I'm done. I got nothing else to do. You're not studying. You're not doing what you're supposed to do. So therefore you're gonna have a lot of time. If you're allowed to use chatgpt you might as well go get your masters tomorrow and then have it write your dissertation next week. You'd be a doctor by next week if we let you clep through and use that platform. That is not you. That is not your skill set. That's not your work. So all this free time you think you have is you not actually applying yourself which is causing some of our issues as well.

T█████s Dad 31:39

So let me say something. So what he's so what we've got numbers mixed up and all this kind of stuff so we're not knowing I'm not getting these messages but what he's trying to do is help you out as a black man. You blocking him. Because your attitude. Hey I don't want to hear nothing. This is the time for you to be silent. I'm you understad. I told you don't embarrass me. I told you that. I don't like being embarrassed brother. You open your ears close your mouth open your eyes. You listen to this man. Do you understand what I'm saying man. You're wasting my time. That's how I'm feeling right now. You're wasting my time. I got other things I got to do. You get your head at your ass for real. I'm not this man is trying to teach you. He's getting paid to do that. You lose this this little phony little attitude stuff. You lose that bruh. Lose it. Because you losing you losing education right now because of that phony attitude. All that pretty hair stuff you got going. You know me. I would cut that crap off bro. I'll take that. Give me the chain. Give me the chain right now. I will undress you man. You got two years man. You got two years to get it man. And then you out here in the real world. And I apologize to you because this is not the way he's raised. He don't do me like that. You up here. Kids do things away from the house. You know. Hold on. Hold on.

T█████s Dad 33:38

I'm sorry. Say man. Don't. No more. This is it. You understand what I'm saying. Any other time. It's over man. Chat gpt aint teaching you nothing. It's not teaching you man. This man is trying to teach you. He's breaking down a lesson so you can learn the concepts. Take it serious. Because if you don't you'll be out here lost. Go ahead. I'm sorry.

T█████s Mom 34:22

So I'm gonna address both sides. You, I told you, I don't mind bringing my work up here. Now, if you can't get it together, we can go to class together until you know how to do it by yourself. So this is your week to get it together. After that, I'm gonna rearrange my schedule to accommodate yours. For you, Mr. Hawkins, I understand your position. So my only issue with that is when I'm coming to you for this information, this is what I need to hear from you. This is what I need to be receiving in detail, which is what I was asking you for. But when we were having those conversations, I didn't get any of this. And so I want to make sure that going forward, this is what I'm getting, because I'm digging, I'm looking to you for assistance, and that's what you're doing, but you're not telling me that. So, all right, now it looks like there's a difference of opinion for you saying that, okay, yes, I was telling you everything, all of this.

T█████s Dad 35:38

Well, it's impossible for him to show you to show us this on and not to understand what you said. It's impossible for him to show us that he's doing this on the phone.

T█████s Mom 35:48

No, I asked questions about his grades. What are they looking like? What are they doing? What are they losing? And that's the information.

T█████s Dad 35:56

going out for him because he's directly with us but we we're not seeing him we know

T█████s Mom 36:01

I'm on the phone with him. I know, I get that. I'm reaching out to him, so if I'm reaching out, that's what I need to be receiving in great detail.

Exhibit 34 -Page 7 of 12

Powered by Notta.ai

notta

I wanted to have these conversations with you, you wanted to have them with the principal present. We would have had this conversation a long time ago, but we've been trying to meet this way because you refuse to have the conversation with just us.

**■■■'s Mom 36:22**

Well, no, initially I did have a conversation with you. And when I had that initial conversation with you and I asked you for the assistance to redirect him, to make him more accountable, that's not what I received from you. What you were telling me was that if I met with, you know, what was it? It was a word you use. But if I met with that, then you know, and I redirect and you know, then that's pretty much it. It is what I got from you.

**Matthew Hawkins 36:52**

No, I think he misunderstood what I was trying to say. Because the issue was he wasn't doing the assignments at all. He was not doing them. So I was redirecting him and telling him to do it. He's like, no, I'll do it later. You know, whatever else. And I got other students. So I walk around and I'm like, all right, do your work. I'll do it later. The issue was, oh, he's just going to do chat later or whatever else, not actually put any work into it, not asking any questions. That was part of it, but he was refusing to do work in class. And that's all I control is him doing work in class. But the other elements of it that would have been those conversations you were talking about, well, it was mostly about dress code and stuff. And you were insisting, I'm like, hey, let's focus on like having the conversation be like, I want to have a principal present. So we would have been able to go in deeper detail. That conversation was mostly just about missing grades and why he got zeroes. That conversation.

**■■■ s Mom 37:41**

about bringing Mr. Polk in was because of the response that I received from you where it seemed like we were not going to be able to build a partnership to make sure that he's going down the right path because it seemed like you were emotionless and removed based on our first conversation. So if that's what I needed to know, I feel like that's what you should have relayed on the phone during our initial conversation so that I wouldn't have reservations about your ability to instruct and lead in the manner I'm feeling like it needs to be done because you're doing that, but you didn't communicate that to me.

**Matthew Hawkins 38:17**

I would just say I attempted to communicate that with you and I was also trying to continue the conversation because usually the conversation you're like Well, I'm gonna do x y and z. Good day. Like that's usually how it ends and the conversation stopped early They stopped early like well I'm gonna do x y and z good day instead of getting clarification going deep asking as many questions as you would like to ask Because I can only go far as soon as you cut me off. You're like, well, I'm done with this conversation I'm gonna do this like the the communications get blocked Instead of going deeper into the communication

**■■■'s Mom 38:49**

And based on the conversations that we had, I never cut you off and say, okay, I'm done with the conversation. I've never stated I'm done with that.

**Matthew Hawkins 38:59**

Our text threads are all dead.

**■■■ s Mom 39:01**

Okay, let's go ahead and pull up there. But what I want to make sure is clear is that when I'm asking the questions, I need the details. I need all of the information, not picking and choosing or cutting, leaving stuff out. Tell me what you just told me just now. Like that's what I needed to hear during our initial conversation and I didn't get that. So again, that was not cutting you off during our initial conversation. I was coming to you for assistance and help and guidance. Cause like I said, I know how he can slack off and he can be lazy. But when I met with someone that feels, it feels like you're less than helpful, why would I continue a conversation if it feels like I'm not gonna get the assistance that I need? So that's why I was like, okay, well let's bring some more people in and then we can have other witnesses and guidance or information advice from other individuals if what I'm saying is not relevant or it's not getting through to you. Like I need the assistance. If it's not gonna be provided by you, then let me reach out to another party to get the assistance that I need. It's what I was saying in that initial conversation and what I was addressing.

**■■■ Dad 40:18**

And I think that maybe sometimes, and I don't like phones like that because sometimes the conversation gets lost on

Exhibit 34 -Page 8 of 12
Powered by Notta.ai

person. So on the phone, and we're looking for passion, and we listen to that, and it's like, okay, it's not connected. But now, that's why I like face-to-faces, because I get to see your facial expression, I get to hear you. Thank you. Thank you.

**T_____s Mom 40:48**

even sound the same. Like in person, when I was talking to you on the phone, you don't sound the same in person as you do over the phone. Over the phone, you sound very nonchalant, uncaring.

**Christopher Polk 41:03**

And so if I can interject this, this is why I wanted us to meet, because that was the thing that I told y'all in our initial meeting. We've had several of these and it's totally different when everybody gets around the table and we are able to actually see who you're talking to and really see as laid back as he may appear, you can see he's very meticulous. He's very meticulous because he's been where they have yet to go. And he knows, especially a young black man wanting to aspire any type of greatness. Those hurdles that people will try to put in their way. But if you're tight, you're tight. And that stands the test of time. That's the standard of excellence. And so I'm hearing on both sides that there was some, you have a perception or had a perception, Mr. Hawkins had one. But as we're moving forward, I think you've made it very clear, not just to Mr. Hawkins, but to everybody else around the table, you're serious about your baby's education. And you just want, like right now, he gave you receipts that can't be refuted. And you just want that response to match your concern. I get that. I get that. But I think going forward, I think it's clear that, hey, you wanna be laid out if he's really slacking. I hope after this here, we won't have these issues. Because the four of us, we're on one team. And as Team D____, we want you to be great. But who has to want you to be greater than we do?

**T_____ 43:09**

Myself.

**Christopher Polk 43:10**

Yourself. Don't block your support. Let me tell you, when I was your age and younger, I didn't like these type of teachers. I didn't because I was stuck in my ways. But as an adult, if I had children, my nieces and nephews, I would want them to have somebody like this because this is who prepares you for the real world. The real world is not going to appease to your flesh. It's not gonna appease to what is easy to D____. It's not gonna appease to that. Building discipline, building self-control, that's an uncomfortable process, but it's necessary. It's necessary. So the people who represent that don't shun them. We understand it. You a young man, you got your ways. We've all been there, but we're trying to give you foresight into where you're headed. And this discipline is what's gonna make you stand the test of time. Are you understand what I'm saying?

**T_____ 44:24**

Yes, sir.

**T_____s Dad 44:25**

I told you before, you engage with your teachers. Your teachers are really your friends. Not the ones that walk in the halls with you. I graduated from here when it was 70% white though. It was really tough. It's not tough like that no more. I don't, this is no knock at the system, but it's not like it used to be. So you actually got a leg up. You got a black man that's here that, I didn't have that. Engage, man. You got Mr. Polk, you got, engage, man. Engage. And it's gonna be all right. You know what I'm saying? And to me, I think it's more so like a fear. You have a fear of being challenged. Open up, man, it's all right. Open up, it's all right. You can let this man challenge you because it is not gonna do anything but make you better.

**Christopher Polk 45:18**

dad so we got a couple minutes um i do want to give mom and dad just and i told y'all this was gonna happen i did it's a lot of things because i have

**T_____ Mom 45:35**

I had reservations, it was like...

**Christopher Polk 45:39**

this is what happens when everybody gets around the table and Mr. Hawkins is able to hear your concerns and then in return he's able to share those returns things come to life. What do y'all need from Mr. Hawkins? Let Mr. Hawkins know what do y'all going forward, what do you all need from him?

**Turner's Mom 46:05**

Powered by Notta.ai

**T███'s Dad 46:16**

No. Ain't no pushback no more.

**T███'s Mom 46:19**

But even if that were, like, I don't need you to call me, get him together while he is here on your watch. And then you can communicate to me if he continues to give you resistance. And then I can push on my end. But again, we shouldn't have that issue. But I need him because I know he gets off task as do, like, majority of the students. So I just need for you to make sure that he is in line. He's doing what he's supposed to do. He is academically sound so that I can push, like I said, on my end for him to do the same. Also, what do they, so I had questions for that. What are they supposed to be using in the classroom as part of their tools? So, like, they're supposed to be doing their assignments. Are they to have Chromebooks? Are they to have their phones? Do they have books? What are they supposed to be?

**Matthew Hawkins 47:21**

just the SRL they need is their Chromebook. The calculator is embedded if there is a calculator being used. It's in the platform or desmos. That's it. Their phones, since some of the students still do not have Chromebooks for whatever reason, you know, I do try to make that exception. We have a lot of students coming in, a lot of Chromebooks are missing, so I try to allow them to use that to access the platforms because I don't, I'm not printing copies. Like, you know, we have copy limits and it's not a good situation, so I need them to be able to access the platform. And if I had to fight them on the cell phones instead of just completely cutting it off and they can't access the work, I'll just bite that bullet. But so, but if he has a Chromebook it should just be that. We don't need a phone or anything else for our work in this paper and pencil.

**T███s Mom 48:13**

Okay.

**T███'s Dad 48:15**

I just want to, I want you to call me. I want you to text me if you got pushed back. Get my number.

**Matthew Hawkins 48:22**

We got to get this number correct because I've been texting. I'm like, I ain't heard back from dad.

**T███'s Dad 48:26**

You've been texting. But I just want like the extension of what she's saying, you know, be, you have, you have the rings. He's, I want you to be an extension of us. I'm here though. I'm up here. I drive, like I said, I drive buses for the district. So, and I'm not far away. I'm right down the street. I own a business outside of this. So I can, I can always get away if I need to, but you utilize my, my phone once you get it correct. You realize.

**Matthew Hawkins 48:55**

Let me put this in here. So what is it?

**T███'s Dad 48:58**

████████████. But I'm, I'm, I'm that's, that's why I didn't have a whole lot of complaints because I know my son and I know that I knew that once, once the teacher got in here, it was going to be some things that wasn't, you know, wasn't told. I know it, you know what I'm saying? So that's, and the reason why I say, text me, get at me, because this, I'm, I'm, if it's a problem, then I can escalate. She's the escalate. I'm the, you know, you know, no knock on your hands, but I'm going to get at him. He know that. I'm going to get at him. He actually told me this. Yeah, I'm going to get him. I don't, I don't really play. I don't have, I don't have those type of feelings like that. I know that he's 16 years old and I know 16 year old kids, young males, especially we slack, man. You know, if there's nobody, nobody's on us or if we got somebody like she will, she can be his attorney and he know that if he wants somebody to go to the back for him and he's still slacking, but he ain't, he's not, he's not telling that he's not forthcoming on that. She's going to go to the back for him. I'm going to challenge him first. And then I'm going to go to bed because I know him. You know what I'm saying? This is mama, mama's his best of baby. You know what I'm saying? That's, that's my son. Okay, so

**T███'s Mom 50:24**

I'm not saying that he won't you know leave stuff out but I'll tell him hey okay don't don't make me look stupid what happened mom and this happened and so it's more so leaning towards him doing what he's supposed to do and he's backed

EXHIBIT 34

Powered by Notta.ai



Exhibit 34 - Page 11 of 42

**T█████s Dad 50:47**

Well, see, with me, he's not going, it's like, you know.

**Christopher Polk 50:52**

Don't put mom in it, predicament. Look, the best way that you can support her is █ telling, as much as possible, any opportunity that you would put her in the position to where she would have to feel that she would back you. Even when you ain't all the way right, don't put it in that predicament.

**T████r's Dad 51:21**

Don't put us. I don't, yeah,

**Christopher Polk 51:24**

Do you need anything from Mr.Hawkins?

**T█████ 51:29**

I'm basically just wanting the same thing that they're telling me that I need. Just, if I push back, which there is no, there's not gonna be any more pushback, but just fight and fight. Just fight and...

**T█████'s Dad 51:44**

But I'm gonna tell you this. This is the pushback, and honestly, the pushback comes because he knows he has an attorney. Honestly, just being honest. We deal with these kids all the time. Mama is usually the ones, she's very strong on her kid. The dads, we come in and I'm like, okay, I got a little bit, but let me see what you're talking about. Do you know what I'm saying? So, he knows that. That's gonna bring attitude. That's gonna bring a little pushback when I know I could go home and tell my mom and she gonna push, you know, for me. He don't do me like that, so that's what I'm saying. So, that's the reason why I want to know. Now I'm glad we got this communication link back up so I could know, because I'm gonna call him. Come with me. What's going on? And I could look at him because he's my son, that's my blood. I could look at him and I could tell when you know it. I could tell when he bullcrapping. You know what I'm saying? But when I'm hearing it from his mom, I got to, I'm taking on a whole nother, I'm taking a whole nother, I'm taking it different because it's coming from her. You know what I'm saying? So, I'm like, okay, well, I need to look, I'm looking at it different, but when I'm talking to him, I can see it. I already knew it. I already knew it. That's why mine was minimal. When I first started, I was minimal because I wasn't like, I need to hear you first. You know what I'm saying? I really wish you would have started out first because then we wouldn't even, some of this, we wouldn't even went down some of this road. You know what I'm saying? But, it's him. It's all him.

**Christopher Polk 53:10**

What do you need from mom, dad, and D████?

**Matthew Hawkins 53:13**

D████, we gotta start doing our work, man. That's the biggest issue, is you want to do what you want to do. You've been coming into class in dress code. Be an example, just wear your stuff. And I know you have a lot of peer pressure because everybody, I'm sorry, this school, we're out of order. And everybody seems to be doing their own thing. My students are going to be the leaders. That's just it. I'm growing leaders. You're all going to lead this thing. We're going to get this thing together. But you have to have integrity in that. So, while you're doing your work, that's going, all this extra time you think you have, you're not going to have it. Therefore, you're going to be busy working on stuff. And then, hopefully, you start asking questions.

**T████'s Dad 53:51**

Oh, you're not asking questions.

**Matthew Hawkins 53:52**

No. He's not going to ask questions if he ain't doing the work. There's nothing to think about.

**T████'s Dad 53:58**

And then he been disengaged, too.

**Matthew Hawkins 54:00**

Yeah, because he already knew he was going to run the AI. So, like, you're completely out of it. Like, oh, I don't care. I'm

Powered by Notta.ai

need to know this. I don't need to know this. Because you're going to have someone to do this. You're not about to run the AI anyway. You have that already in your mindset. Now, with that not being in your mindset, you're going to have to hold yourself accountable and actually learn and go through that learning process and grow. And I'm there for you to ask questions. I'm confused on this, Mr. Hawkins. How do I do this? How do they get here? Those questions that actually help your foundation and your education, where are you going to be so much better than everybody else in here? Just because everybody else is cheating don't mean everybody else is going to be at the same place. As soon as you all get out of this building, everybody's going down in flames. Because they've been cheating. And those tests, when they got all the security cameras all around you, you're not on your own device. You think they're going to pass any of those tests? How many kids here are not going to be able to pass those tests? Most of them. So the ones that actually know how to do what they're supposed to do are going to be the leaps and bounds ahead of everyone else. And, I don't want to get political, but diversity, equity, and inclusion is gone. So you're going to have to stand on your own merits. So you're really competing against everyone else. You're in the prime example. You're in a prime position to benefit yourself. Maximize it.

T████'s Dad 55:22
That's right.



T████s Dad 55:25
But apply it, and I promise you, you're gonna be more proud of yourself. Apply it. I had to change. When I was up here, I was getting ready to, I saw a lot of kids not graduating. I was a sophomore, and I saw a whole lot of kids. We had an English teacher, her name is ██████, and ██████████, and they did not play. You know what I'm saying? These ladies, they felt like 200 and something kids, man. It was crazy. Parents are up here, the kids crying in the hallway, and all that type of stuff. And I saw that, and I was like, I'm not going through that. And I changed my game up my junior year. I got serious, I started engaging with my teachers, and I'd raised my GPA up from 2.5 to 3.7, 3.8, quick. It was, you know what I'm saying? So, I know, that's the reason why I'm telling you, engage, talk to the teachers, ask them questions. You know what I'm saying? They gonna, with doing that, they're gonna be comfortable with giving you, you know, extra time outside of the class, all types of stuff, man. You might be able to get that number and talk to them, you know, but I did it, so I know that it works. I know it. You just gotta do it, man. Being cool don't go so far, man. Appreciate you, Miss Polk. Good to meet you, Miss. Thank you, I'm so sorry.

T████'s Mom 56:42
Still working



T████r's Mom 56:45
Uh, so we have a minute with

T████'s Mom 56:46
Yeah, yeah, please. I feel good now.

Christopher Polk 56:49
I had his teacher to go ahead and mark him present. No, that's me. Oh, okay. You got this test? Then he's here. Oh, okay. Okay. How long do you have? It's only 50 minutes. Okay. Give us five minutes. All right. What's up? I see the favors or parents to open up your room. Okay. So that should be getting started. Thank you.

Exhibit 34 -Page 12 of 12

Powered by Notta.ai

Exhibit 35 -Page 1 of 2

in any class for the semester if they:

- have five or fewer tardies in that class and
- meet one of the following academic/average/absence criteria in that class. o 95-100 semester grade average and no more than three (3) absences and five (5) or fewer tardies
  - o 90-94 semester grade average and no more than two (2) absences and five (5) or fewer tardies
  - o 85-89 semester grade average and no more than one (1) absence and five (5) or fewer tardies
  - o 80-84 semester grade average and no (0) absences and five (5) or fewer tardies

Missing class for the following reasons does not count as an absence from the class toward the semester exam exemption:
- College days, provided the proper paperwork is turned in
- School-related field trips
  - o Testing
  - o ARD meetings
  - o UIL athletic, music and academic events
  - o Religious Holiday Missing class for the reasons listed below does count as an absence from class toward the semester exam exemption:

Excused absences or unexcused absences including:
- doctor appointments,
- suspension / in school suspension,
- illness,
- skipping,
- absent from AEP – excused or unexcused,
- death in the family,
- emergency removal,
- dress code violation – in office or sent home. The above lists are not inclusive of all absences that could affect the semester exam exemption policy.

## SCHEDULE CHANGE POLICY

No schedule change is to be made without the principal's final approval. The counselors and the principal will do all leveling. Teachers are not to initiate any changes on their own. If you have concerns, bring it to the attention of the principal. Class loads will be leveled by the beginning of the third week of school. Some schedule changes will need to be made in athletics, band, and in areas where there is overcrowding. All schedule changes must have the approval of the building principal. We will make every effort to not allow any schedule changes, unless absolutely necessary, after August 26, 2024.

Unless a student has conflicts in regards to "too many classes" or "not enough classes", the student will follow the schedule given him/her for the first week of school. Any special requests for particular teacher/teachers will only be taken into consideration during the third week of school. Requests must be submitted in writing and the principal will

42

Exhibit 35 -Page 1 of 2

Exhibit 35 -Page 2 of 2

approve/disapprove the request depending on the reasons for the request. No student will be moved if it creates overcrowding or affects the learning of other students. If the request is approved, the student may not be moved until the third week of school when all leveling of classes will have been completed. Unless there are extenuating circumstances, students may not make schedule changes after the third week of school.

All teachers at the DeSoto High School are highly skilled and qualified and they place the needs of students as their top priority. All core curricula teachers, academic and Pre-AP, will be teaching the same objectives at the same time and all will be testing at the same time. All students will be well-prepared for the EOC.

## SCHOOL CALENDAR
See page 67

DeSoto High School
Faculty/Staff Handbook

## SCHOOL FACILITIES
Because of extensive use of the facilities by the school groups and civic organizations, it is necessary its use be planned in advance and scheduled on the school calendar (Mrs. McDonald). This includes any use of facilities before, during, or after school hours. Please leave the area clean after the completion of a program.

All classroom and teacher center doors should be locked when not in use. Before you leave in the afternoon, lock your classroom.

## SITE-BASED DECISION MAKING COMMITTEE (SBDM)
The SBDM team is an advisory team that is responsible for approving the campus budget, monitoring the campus plan of action, and discussing and advising administration on any campus issue. Mr. Jasen Campbell the administrative liaison for SBDM.

Committee Members –
    Jasen Campbell Administrative Representative- Interim Chair
        Administrative Representative
Vacant Community Representative- Vice Chair
Vacant Chair
Vacant Community Member
Vacant Community Member
Vacant Parent
Vacant Parent
Vacant Student
Vacant Teacher Representative
Vacant Paraprofessional Representative

Meeting Dates for 2024-2025- All meetings will be held in the courtroom.

## SECRETARIES' DESKS
Although we welcome your assistance in the front office, please be respectful. Do not sit at their desks, look through their personal belongings (on top of or in their desks), in the area, or borrow their supplies. If you need to take a phone call, please use the courtesy

43

Exhibit 35 -Page 2 of 2

Exhibit 36 -Page 1 of 1

| First Name | Last Name | Period | ID | Moved to | |
|---|---|---|---|---|---|
| **1st Semester** | | | | | |
| K█ | L█ | 1st | █████ | Mat██████ m██ N█████ | No Meeting |
| Z█ | H█ | 1st | █████ | Mat██████ m██ N█████ | No Meeting |
| L█ | S█████ | 1st | █████ | Mat██████ m██ N█████ | No Meeting |
| C█ | K█ | 3rd | █████ | Mat██████ m██ N█████ | No Meeting |
| J█ | F█ | 3rd | █████ | Mat██████ m██ N█████ | No Meeting |
| J█ | S█ | 3rd | █████ | Mat██████ m██ N█████ | No Meeting |
| M█ | T█ | 3rd | █████ | F████ S████ | No Meeting |
| A█ | V█████ | 3rd | █████ | Mat██████ N████ | |
| T█ | W█████ | 3rd | █████ | F████ S████ | No Meeting |
| T█ | S█████ | 4th | █████ | Mat██████ m██ N█████ | No Meeting |
| K█ | S█████ | 4th | █████ | Mat██████ m██ N█████ | No Meeting |
| A█ | M█████ | 5th | █████ | F████ S████ | No Meeting |
| J█ | M█████ | 6th | █████ | F████ S████ | No Meeting |
| T█ | W█████ | 7th | █████ | Mat██████ m██ N█████ | |
| A█ | M█████ | 7th | █████ | Mat██████ m██ N█████ | No Meeting |
| **2nd Semester** | | | | | |
| A█ | Ma█ | 7th | █████ | Mat██████ m██ N█████ | |
| J█ | S█████ | 7th | █████ | Mat██████ m██ N█████ | No Meeting |
| E█ | S█████ | 7th | █████ | Mat██████ m██ N█████ | |
| C█ | S█████ | 1st | █████ | Mat██████ m██ N█████ | No Meeting |
| T█ | G█████ | 4th | █████ | F████ S████ | No Meeting |
| J█ | R█████ | 4th | █████ | Mat██████ m██ N█████ | |
| N█ | W█████ | 4th | █████ | F████ S████ | No Meeting |

Exhibit 36 -Page 1 of 1

## Matthew Hawkins

| | |
|---|---|
| **From:** | Alma Murphy Goss |
| **Sent:** | Monday, February 10, 2025 3:02 PM |
| **To:** | Matthew Hawkins; Braxton Holman |
| **Cc:** | Jasen Campbell; Kellie Washington |
| **Subject:** | FW: S███ C███ |

Dear Mr. Hawkins and Mr. Holman,

S███ C███ has been transferred out of your class effective today, 2/10/25.  But because she was not getting inclusion support her grade must be change to at least a 70%.  To get this change Mr. Holman you must get the work from Mr. Hawkins that she needs to do to make this happen.  If we did not follow her IEP, and we did not, because you told me you had not been in the class to give her the support, by law we can not fail her.  Mr. Holman, please let me know the intervention and steps you guys are going to take to make this grade change happen ASAP.  I need his grade change to be made by Wednesday, 2-12, 2025
I do not what a 58 nor 38 to follow her to her new class.  I am enclosing the email I sent to you guy on 1/28.
Mrs. Goss


From: Alma Murphy Goss
Sent: Tuesday, January 28, 2025 9:08 AM
To: Braxton Holman <braxton.holman@desotoisd.org>; Matthew Hawkins <matthew.hawkins@desotoisd.org>
Cc: Christopher Polk <christopher.polk@desotoisd.org>
Subject: S███████

Mr. Holman,

I just finished meeting with S█████ and her mother and Mr. Polk.  Please go to your Math class, with Mr. Hawkins and check on S█████ today and every day.  Let us be proactive rather than reactive.  This is the fourth time they have been up here.  Let's make it their last time by being in the classes,  and giving S█████ the support her IEP states.  You need to work with Mr. Hawkins and this failing grade must be changed  by doing whatever intervention that is needed for the change in grade.

Please call me to discuss this matter ASAP!

I am including Mr. Hawkins in this email.

Mrs. Alma Goss
SPED Department Chair

1
249

Exhibit 37 -Page 1 of 1

Exhibit 38 -Page 1 of 1



Exhibit 38 -Page 1 of 1

Exhibit 39 -Page 1 of 26

**notto**

## Level 3 Hearing

⏰ Tue, 02/25 15:05PM · 67mins

## Transcript

Board President 16:36

This one now is 5-13. I'll call on Level 3 grievance is ordered under DGBA for Matthew Hopkins. At this time, I'll turn it over to the legal counsel at the Invermeers.

Board Counsel 16:49

Thank you, Madam President. All right, good evening, everybody.We are here today, Monday, February 24, 2025, for the hearing of Level 3 for Mr. Matthew A. Hawkins. The hearing will be conducted in accordance with Sections 551074 and 5510821 of the Texas Open Meetings Act. In accordance with Board Policy DGBA, this hearing is being recorded, and this recording, along with any exhibits presented today, will be the official record for this hearing.I'm gonna ask that each person only speak when it's your turn to speak, and so that our recording can be as clear as possible, and that you direct all communications to myself. Are we expecting anybody on Zoom? Is there gonna start here? Oh, okay. And are we gonna be after this? At this time, will the employee or the employees representative please state their name for the record?

Matthew Hawkins 17:51

Matthew Hawkis.

Powered by Notta.ai

Exhibit 39 -Page 1 of 26

notta

**Board Counsel 17:53**

At this time with the administration and administration's representative, please state your names for the record.

**Administration Counsel 17:58**

I'm Tanya LaMartineur with Fermo, Hamilton, Moraffi, and Castillo.

**Dr. Leon Darden 18:02**

Dr. Leon Darden

**Board Counsel 18:03**

All right, I'm just going to ask that y'all speak a little louder, right, just so we can get the agreements recording as clear as possible, okay? Thank you. At this time, I'm going to ask each member of the board whether he or she is able to serve as an impartial member of the hearing body today, and a lively decision based solely upon the evidence presented at this hearing. Is there any member tonight that may not act in such a manner? If you are, you may be excused this time.All right, being that there are none, I'm now going to instruct the parties as to the procedures to be followed in this hearing. The hearing will be conducted in accordance with district policy governing employees, DGBA. Mr. Hawkins will present his position first, including a discussion of any evidence he wishes to offer. Administration will then present whatever evidence they desire to rebut Mr. Hawkins' case or to otherwise support the administration's position. All documents considered at prior hearings are before the board for its consideration. The board may consider as part of the deliberations, the timeliness and relevance of all that correspondence. Tonight, the trustees will serve as a panel of judges and are to remain impartial. The parties or their representatives may not ask the trustees any questions. The rules are as follows. Only one person speaks at a time with no interruptions. Objections will be addressed to me for my decision. The parties or their representatives are not to argue directly with each other. While this hearing is not a formal court of law, I'll rule the evidentiary objections to the best of my ability. The hearing participants should conduct themselves with common courtesy and respect for the rights of others. Unduly repetitious or relevant statements will be ruled out of order either upon my objection or the objection of any party. Because this is just one agreement that we're gonna be listening to, I'm gonna allow each side 10 minutes for the agreements,



followed by a two minute rebuttal period, okay? Mr. Hawkins, do you want any count down to let you know you have a minute or two up in your 10 minutes?

Matthew Hawkins 20:07

That's fine. That'll be great. I don't have the binder that you guys have. Here you go. This is it? Yes. Thank you.

Board Counsel 20:25

documents that were presented at level 1, level 2, or any documents of the administration supplanted 72 hours before the hearing tonight.

Matthew Hawkins 20:34

Mmm.

Board Counsel 20:38

At this time, does the administration have any questions for tonight's grievance? No, sir. No questions? Mr. Hawkins, do you have any questions tonight before we proceed?

Matthew Hawkins 20:50

Yes, I didn't get a chance to review, were there any documents added to the Level 2 record? Because I requested a Level 2 record from HR on November the 12th, and I received that record.So there's a lot more documents here than were in that record. That should have been the complete Level 2 record.

Board Counsel 21:10

Okay, so I don't know if there is any additional documents in there. There is an index that you see at the second page, and that lets you know what's in here, which are the initial emails, the level one hearing, level two hearing, level two GGB form, level two hearing

Powered by Notta.ai

Exhibit 39 -Page 3 of 26

notta

schedule, the notice, the response, level three, and of course the work policies that are part of the employee handles. Yeah.

Matthew Hawkins 21:33

I'm already seeing documents that I have not seen in here already, so that will be a violation of the record. I'm already seeing one right here from Gene Moro, no actually that is mine, I don't have that in my record though, it wasn't submitted as a part of the record.So I did send this, but it was not part of the record that I was sent from HR, that was part of the official level two. So are there any other records that were not part of the level two sent from HR when I asked for the complete level two record that should have had all the documents?

Board Counsel 22:12

So the level 2 record is separate from the level 3 record. The level 3 record is its own record that's not level 2.

Matthew Hawkins 22:19

It will be once it's completed, but however, as far as the documents that are supposed to be included in the record, it's only supposed to entail the documents that were presented at the end of Level 2 record.

Board Counsel 22:30

So they were emailed to you by Yolanda Smith the entire file.

Matthew Hawkins 22:40

if I ever received a recent email from her. Thank you. All right, what was that email sent from Ms. Smith?

Board Counsel 23:03

Powered by Notta.ai

Exhibit 39 -Page 4 of 26

Exhibit 39 -Page 5 of 26

**notta**

But at the look of the index though, is there an objection to something in the index in there? Did you want to object?

**Matthew Hawkins 23:09**

I haven't got a chance to go through it all yet.

**Board Counsel 23:20**

So just based on the index, it wouldn't be anything improper if you call number one, number two, and number three documents. Yeah. And the board policies are incorporated just because of board policies. Gotcha.

**Matthew Hawkins 23:37**

I'll make an objection, but I'm just relating that to be known that this is not the record that I will proceed. Okay. Don't follow your question. There's documents here.

**Board Counsel 23:45**

It is overridden, but it is noted for the record, okay? Any other questions? That's all.That's it, all right. So being that there are no other questions at this time, Mr. Hawkins, you may begin with your 10 minutes for your presentation.

**Matthew Hawkins 23:59**

Alrighty, good evening members of the board. My name is Matthew Hawkins. I'm a employee of DeSoto ISD. Been in DeSoto ISD for almost a decade now. We are here for just appealing the level two decision for my reassignment from DeSoto Early College High School, the distinct organization to the DeSoto High School. I believe this reassignment was discriminatory, retaliatory, and it violated my due process rights.Just to recap, I've been in the district for nine years to make sure our students are more than successful for the real world, and I make sure that, you know, all of our students learn about the highest level. I very, very much value the mission and division of DeSoto High School, and I want to see it fulfilled. And the only way it can be fulfilled is if we do our part and do what we're supposed to do on all levels. So the grievance started with the

Powered by Notta.ai

Exhibit 39 -Page 5 of 26

situations that occurred. So around, I guess this will be indexing a link plate. I always have to get my grounded on how this is laid out so you guys can reference with me. Alright, so on... who's marking? Yeah, I will let you guys just go through. The organization of this is different. So our issue started with the beginning of the year. I sent out my syllabus to the students, letting them know our expectations, according to grading, all that type of stuff. So I did include that into my original grievance. The first three weeks of school, we were going through class, students using technology, and then as we got to the third week of school, that's when I was able to start importing grades. There was a technology issue or shortage at the campus, so I sent emails to take care of that, and then we were scheduled to take our first test. During our first test, I found that several students had cheated on the test. I assigned grades of zero. Previously before that, I did send an email out to parents letting them know I was seeing behavior that was not conducive for students where they were not being honest on their assignment. The next day, I was reassigned to the general high school.I had a meeting with Dr. Kam on our professional development day that Friday, and I was told there were too many complaints, and I was reassigned. After he told me there were too many complaints, I let him know that I had issues with academic integrity with students, and they were assigned zeros because of such, and he was like, well, we'll look into that. So after my reassignment, I got no feedback, nothing came, no information, no improvement plan, no nothing, just nothing, and here we are. I still have not heard anything. Then later, while I was working on the other side of campus, I found that the students were given 100s in the grade book for their progress report and their threats, but my reputation was tarnished. Students began to disrespect me at unbelievable levels because they felt like, well, complaining is the way. I complain. I get a free grade. I complain. I get a pass. This teacher is holding me accountable.


Matthew Hawkins 28:02

I don't want to be held accountable. I can get to another class. I can do what I want to do. So that's when I could see the damage that happened to my professional reputation by the decisions of the administration, just making a random decision, no due process, no looking into the situations, violating state law as far as grades. We have board policy, EIA, local and legal, local, legal. The teacher's grades are final, unless there is some type of due process in changing those grades, which was not followed. The teacher's determination for local, the teacher's determination if a grade was academic dishonest, that's in the privilege and the discretion or under the professional judgment of the teacher. That clearly was not followed.During the level, I put in the grievance, during the level one grievance, there were no documents added as far as in response, I stated my concerns. The only explanation I got, so I still not received an explanation, was a teacher can be reassigned if the administration or principal or designee finds that this reassignment is in the best interest of the district. That was the reasoning given for the

Exhibit 39 -Page 7 of 26

notta

reassignment, was just that we could. We have the authority. They appealed to authority without listing out any legitimate complaints, issues, nothing to work on, nothing to rebuttal, nothing to actually go into due process for, so I can actually have a defense because my reputation was destroyed, and there was nothing in the level one. So the level one's already looking like a sham, the whole grievance process is like we're going to do administratively what we want to do. So we continue on, level two grievance, files, appeal, go into level two, level two upholds the determination of level one grievance. There's no due process, again documents were asked for, there were no documents added to the record, it's just a decision was made. And there's nothing to validate, substantiate, or whatever else at level two. So I repeal level two, and here we are going into level three. So this whole process has shown me that, you know, the whole grievance, it was a sham to begin with, unfortunately. There are no documents stating what the issue was of why my reassignment was, why my reputation in the district has been destroyed, what's the purpose, nothing. No areas of growth, because usually there's always some type of growth plan or whatever else. So which brings me to retaliation and discrimination, that's what the parents have told me, if this is actually based on parental and student complaints, it's because you are a black man, and you are holding these black students accountable, and that's an issue. Black students can't rise to the occasion, they can't meet the expectations of the board. That's what's recorded in my conversations with parents on my new side of campus, as they're being held to the same standards that they're supposed to be held, that the board has set out that students should be in dress code, they should wear the ID, they should have academic integrity.

Matthew Hawkins 31:46

So that's what they've told me. So that's the, and if the reason for the reassignment to begin with is due to too many complaints from parents, and parents have spoken that it's because you are holding black kids accountable, then we have a major issue. So that's where, oh I see this going. So I understand the board, you guys have your decisions to make tonight, whatever decision that you make, this doesn't end tonight, unfortunately. We have a lot more work we need to do, so I'm going to yield my time.

Board Counsel 32:24

So you can't carry time over, but you still have two minutes for a bottle out.

Matthew Hawkins 32:27

Powered by Notta.ai

Exhibit 39 -Page 7 of 26

notta

That's fine.

Matthew Hawkins 32:27

Thanks for watching!

Board Counsel 32:28

At this time of administration, you may present your case, ten minutes left.

Administration Counsel 32:31

Thank you, Mr. Ramirez. President McKissick, Dr. Rogers trustees, thank you for the opportunity to present tonight on behalf of the administration.We're here today to discuss agreements filed by Mr. Matthew Hawkins, under board policy DGBA. Mr. Hawkins filed his level one grievance on September 9, 2024, in response to a change in his employment. Specifically on August 30, 2024, he was reassigned from teaching Algebra 2 honors and geometry honors at Early College High School to teaching the regular Algebra 2 class at Desoto High School. Mr. Hawkins's request of remedies, which can be found on page 3 and 4 of the record, consists of reinstatement to his previous teaching role, a formal investigation into complaints filed against him, and an apology letter sent to the parents of his former students. It's first to be noted that the process of employee reassignment is governed by board policy DK Local, which can be found on page 85 of your record. Under this policy, all personnel are subject to reassignment when it is in the best interest of the district. The district is not required to provide justification for such reassignment. Rather, it's the decision of the superintendent, along with any of her designees, to evaluate any surrounding applicable circumstances and determine if a reassignment would be in the best interest of the district. That being said, Mr. Hawkins's level one grievance conference was heard on September 20, 2024, by Dr. Leon Darden, the director of Desoto ISD, ECHS, and P-TECH programs. Dr. Darden issued a response on October 14, 2024, in which he denied the grievance in its entirety, finding that the claim was without merit, because the job reassignment was made pursuant to board policy DK Local.As previously stated, this policy allows, among other things, that all personnel are subject to reassignment by the superintendent or her designee when it's determined that such assignment is in the best interest of the district. Such reassignments are only appropriate if the transfers to another position, department, or facility that does not necessitate a change in the employment contract. The decision to reassign Mr. Hawkins was based upon numerous complaints by parents and students regarding his performance as their teacher. Some of these complaints focused on his

Powered by Notta.ai

Exhibit 39 -Page 8 of 26

Exhibit 39 - Page 9 of 26

enforcement of the dress code policy in this classroom. Of greater concern to the district, however, were the complaints received regarding the grading policies of the assignments given in his class. His honors algebra two syllabus, which he has attached into his level one record, so it's on page five of your record, includes a grading policy which coincides with the district's grading and reporting guidelines, which is actually at the end of your record on page 102. This policy states, among other things, that students must receive a minimum of two daily grades per week and three major grades per grading period. Although a maximum limit for the amount of grades is not provided, the guidelines do state that grading must be consistent as possible from teacher to teacher and from school to school within the district to assure fairness.

Administration Counsel 35:11

Mr. Hawkins has stated that students in his class were given grades for warmups, demonstrations of learning, and scratch work to encourage student engagement and accountability. This led to students in his class having approximately 70 grades per month, which is an amount that far exceeds the minimum grade requirement, which was only eight grades per month.Additionally, due to concerns of academic dishonesty, Mr. Hawkins began issuing grades of zero for students who failed to submit scratch work or who submitted scratch work that he deemed to be incomplete. Because students taking Mr. Hawkins's classes at ECHS had him as a teacher for two years in a row, he was decided by district administrators that it was in the districts and Mr. Hawkins's best interest to reassign him to a different role, thereby giving him a clean slate with new students who had not yet had him as a teacher. The reassigned class was in the same subject matter and Mr. Hawkins's salary was not reduced or adjusted in any way. Mr. Hawkins's reassignment was handled consistently within the parameters of board policy DK Local. As such, because his reassignment was deemed to be in the best interest of the district, the request for reinstatement in his prior teaching position was denied.A formal investigation of the complaints against Mr. Hawkins was unnecessary as both Principal Campbell and Dr. Darden had previously received many complaints over the past few years for both parents and students regarding his classes. Both of these administrators had follow-up communications and meetings with every parent and student who filed a complaint. A formal investigation, therefore, was not conducted in response to his grievance as the administrators had been actively investigating these complaints prior to his reassignment.On October 15th, Mr. Hawkins filed a level two appeal form, which is on page 34 of your record. His appeal was based on three enumerated issues he had with the level one outcome. First, he stated that the decision ignored board policy F and G and complaints being handled first at the lowest level. Second, he alleged that Principal Campbell did not have the authority to issue his reassignment. Finally, he claimed that his reassignment was not in the best interest of the district as required by board policy DK.Mr. Hawkins's level two appeal conference

notta

was held on October 25th by Mr. Gene Morrow, the executive director of student services and operations. Mr. Morrow issued his decision on November 11th, and that's found on page 40 of your record. In his response, he upheld the level one decision, thereby once again denying Mr.Hawkins's grievance in its entirety. While Mr. Hawkins claimed that the level one decision ignored board policy F and G, this policy pertains to grievances filed by students and parents. Because this policy can only be invoked by students, it is inapplicable to Mr. Hawkins's grievance as an employee. Rather, this grievance has abided by the procedures laid out in board policy DGBA. Mr.

Administration Counsel 37:47

Hawkins next alleged that Principal Campbell did not have the authority to issue his reassignment. However, Principal Campbell was designated by Superintendent Dr. Rogers to provide the reassignment. Pursuant to board, once again, board policy DK local, Dr. Rogers had the authority to delegate another administrator to carry out actions on her behalf. In his role as principal of DeSoto High School, Principal Campbell had been given the continued authority by Dr. Rogers to assign and reassign teachers to further the best interest of the district. Principal Campbell therefore acted within his delegated authority when he presented Mr. Hawkins with his reassignment.Mr. Hawkins additionally claims that the reassignment by Principal Campbell was the violation of Texas Education Code section 26.003. This statute, however, provides a parent with the right to provide their student, sorry, protect their student from reassignment, but it does not give rights to a teacher to prevent his own employment reassignment. Finally, Mr. Hawkins alleged that his reassignment was not in the best interest of the district. Contrary to his beliefs, however, the decision to reassign Mr. Hawkins was carried out after careful deliberation by district administration to ensure that the district's best interest were served. Although the complaints received against Mr. Hawkins were taken into consideration when his reassignment was decided, those factors did not make a difference when it comes to the requirements of Board Policy DK Local. Reassignments are not given as a means of retaliation or punishment. In fact, Mr. Hawkins could have been reassigned absent any complaints, but rather simply because it was deemed to be in the best interest of the district. On November 14th, Mr. Hawkins filed his level three appeal form, which is on page 43 of your record. Here he claims that he disagrees with the level two outcome because it is based on an incomplete investigation based on an inapplicable policy, is not in the best interest of the district, does not address the violation of the district grading policy and Board Policy EIA, and does not address the violation of due process rights. Mr. Hawkins has continued to request a formal investigation into the legitimacy of the complaints filed against him by both students and parents. As previously discussed, a formal investigation following the receipt of his grievance has been unnecessary as the administration, including Principal Campbell, Dr. Darden, and Mr. Morrow had previously received numerous complaints in which follow-up

Powered by Notta.ai

Exhibit 39 -Page 10 of 26

Exhibit 39 -Page 11 of 26

**notta**

communications with the parents and students had occurred. Also as previously discussed, it was determined that reassigning Mr. Hawkins to teach the regular Algebra 2 class at DeSoto High School was in the district's best interest, as required by Board Policy DK Local.The allegations that the district failed to properly review the complaints against him is not true.

Administration Counsel 40:11

They may not have been reviewed to his liking, but I want to remind you all that the accused has not been to choose the method of the investigation. Instead, the administration reviewed the matter in a way that they deemed appropriate to review the complaints.I have spoken to numerous district administrators, including Dr. Darden, Principal Campbell, and Mr. Morrow. There has been an ongoing review into these complaints for the last few years. In reviewing these complaints and speaking with the complaining parents and students, the administration deemed that it was sufficient to take the actions that they deemed appropriate. Regarding Mr. Hawkins' allegations pertaining to a violation of the district's grading policy, I must note that we cannot talk about individual students during this grievance due to FERPA concerns. All we can address tonight is that the superintendent has been made aware of the complaints, and she will be making her own review of these allegations.However, I would like to remind the board that these are not relevant for tonight's grievance, which pertains to Mr. Hawkins' reassignment. In conclusion, the district respectfully requests that the board find that Mr. Hawkins' grievance is without merit, and to therefore uphold the level two grievance decision. Thank you.

Board Counsel 41:10

All right. Mr. Hawkins, you have two minutes for rebuttal. You may begin.

Matthew Hawkins 41:14

I appreciate all those explanations, but we have not talked about the 100s given to students. Grades are supposed to be indication of students mastery, blanketing, giving students 100s, and destroying my reputation for it is shocking to the conscience.Also, the law, as far as assignments for parents, is an implied law that students have a right not to be reassigned due to other parents' complaints. There were several students of mine that were reassigned that did not want to be reassigned and that violated their rights, so there is an implied right that a teacher cannot solely be reassigned due to parental complaints.There has to be some other reason. The violation of, oh, there's no

Powered by Notta.ai

Exhibit 39 -Page 11 of 26

Exhibit 39 -Page 12 of 26

reason to do an investigation, it was not necessary. There was a grievance last year for retaliation that I did not follow or push through from Principal Campbell and others, and that now we hold the superintendent in liability as far as the final policymaker because he used her authority for an illegal retaliatory, discriminatory reassignment and violation of due process that we have just heard you mention.It was not necessary. These were necessary to look into because the severe damage to my reputation is unexcusable. I yield the rest of my time.

Board Counsel 42:37

All right, administration, you have two minutes for your rebuttal.

Administration Counsel 42:40

Thank you. And once again, regarding the grades issued to students, we unfortunately cannot address this matter here, but Dr. Rogers will be reviewing this matter.The implied right that Mr. Hawkins speaks of does not apply here as the students themselves were not reassigned to a different class. Rather, their teacher, Mr. Hawkins, was reassigned pursuant to board policy. Mr. Hawkins has expressed that his reassignment negatively impacted his professional reputation and applied a deficiency in his teaching or classroom management. He has also stated that he felt a message had been sent to students that resistance to basic rules and accountability can lead to a teacher's removal. However, there's nothing here to support this claim. As I have reiterated over and over today, Board Policy DK Local allows for the reassignment of personnel for no other reason than if for being in the district's best interest. Mr. Hawkins's reassignment from teaching Honors Algebra II and Honors Geometry at ECHS to teaching the regular Algebra II class at DeSoto High School was not a punishment. It was not retaliatory. Rather, the district followed the procedures laid out in Board Policy DK and reassigned a teacher just as they have done hundreds of times before to better serve the district. As a reminder, the Board does not have the authority to remedy this or any other grievance absent any violation of Board Policy. Therefore, I once again ask the Board to uphold the Level II grievance response and deny this grievance in its entirety. Thank you so much for your time.

Board Counsel 43:56

All right, thank you administration. At this time, the board does have the floor. If they'd like to ask any clarifying questions about the issues presented, you may do so at this time.

Powered by Notta.ai

Exhibit 39 -Page 12 of 26

notta

Board Member 1 44:06

Thank you. Mr. Hawkins, we have a couple of questions for you. You said the students were cheating, were found cheating. What kind of evidence did you have that that group of students had a collective or a group effort to cheat? How do you know that? What's your evidence of that?

Matthew Hawkins 44:30

when I how my classroom set up the students have to submit scratch work so all the assignments I have their scratch work and what they did I also have them working a platform with Alex so I can see the time stamps how long they spent working on certain problems so when they're finishing the hardest problems in 35 seconds which has seven steps is out of it too it clearly indicates cheating so I can easily go back to the scratch work and I can see that oh there's really no scratch work here either you're Einstein you should be in college level courses or there's academic dishonesty here because the time stamps don't make sense

Board Member 1 45:03

So there's a possibility.

Matthew Hawkins 45:06

No.

Board Member 1 45:06

So it's impossible for someone to do what they need? No. That's what you said.

Matthew Hawkins 45:10

Yes, because I know my content, and also I know the student's ability. So also, I go up to him and ask, how do you do this? Oh no, man, it's none of your business. That type of stuff. So clearly, you did not do this. You have not mastered this objective. You don't

Powered by Notta.ai

Exhibit 39 -Page 13 of 26

notta

deserve the 100. You are not a 100 student. It's dishonest for me to let you have that mantle of, oh, I'm a straight A student, but you know nothing. It's troublesome. So that's how. And it was looking at the time stamps at Alex, looking at their scratch work, and also looking at the student's ability, it does not make sense of how fast they were completing the work.

Board Member 2 45:46

I have a question. Um, it was said that these complaints were being investigated into Mr Hawkins for years. Did I hear that?

Administration Counsel 45:56

Yes, ma'am, there have been complaints received for the last few school years.

Board Member 2 45:59

And he was not giving any type of, he wasn't written up, he wasn't giving a growth plan. Well, how will we rectify this before actually moving him?

Administration Counsel 46:09

As far as I'm aware, a growth time was submitted to you before, are you able to speak on that?

Dr. Leon Darden 46:16

Yes, it was. There was a growth plan that was submitted. But it was subsequently taken away by Principal Campbell for some reason. But yes, there was a growth plan that was initially implemented.

Board Member 2 46:32

So it was initiated but then it was canceled.

Powered by Notta.ai

Exhibit 39 -Page 14 of 26

notta

Superintendent Dr. Usmah Rogers 46:36

to happen.

Superintendent Dr. Usmah Rogers 46:37

During this year, there was a growth plan, there was a step that was supposed to occur. As Mr. Hawkins mentioned, he filed agreements about the evaluation at the growth plan last year. There was an administrator that is no longer with us that missed some steps with the growth plan. And Mr. Hawkins returned to the position, however there were conversations at the beginning of the year regarding the expectations that were held with Dr. Darden. So there were conversations about reassignments. There were things that were documented about reassignments. And this incident and the change occurred early in the school year because these students would of had Mr. Hawkins for two consecutive years and they started the year expressing concerns.

Board Member 2 47:27

But we have no documentation that we can see as far as tracking this ongoing issue.

Superintendent Dr. Usmah Rogers 47:36

that is not a part of this record there is documentation of concerns with the evaluations and things from last school year this initial story this concern occurred at the start of the school year there was a major campus disruption which we felt the change was not only in the students best interest but Mr. Hawkins best interest so that he would not as a teacher spend the entire school year dealing with complaints from students and parents so it wasn't a one-sided we feel like this we felt like it would be a fresh start for him to teach his class without these major parent concerns.

Board Member 2 48:19

How many complaints, we're saying we're hearing multiple complaints, how many complaints from parents, how many complaints from students?

Superintendent Dr. Usmah Rogers 48:29

Powered by Notta.ai

Exhibit 39 - Page 15 of 26

Exhibit 39 -Page 16 of 26

notta

One particular day, the day of this incident, there was an entire thread of hearing complaints and concerns and calls. So I feel that at least five in one day.

**Board Member 2 48:42**

Do we have that but we not privy to that that was not a part of

**Superintendent Dr. Usmah Rogers 48:47**

record because at the time that the decision was made to vote him for the class, it was also for his best interest to as a teacher to have a successful school year and to give him a fresh start.Remember this is August 30th, school started August 2 weeks in, 3 weeks in.

**Board Member 2 49:09**

So, when he was transferred to a generally irregular ed class, who's in that class now? Do we have a sub? A long time sub?

**Dr. Leon Darden 49:19**

No, her name is, uh, this is a teacher, full-time teacher.

**Board Member 2 49:22**

Initially when he left was there a period where there was a long time so but do we initially have a teacher ready to go?

**Dr. Leon Darden 49:29**

She was a long time.

**Board Member 3 49:53**

Exhibit 39 -Page 17 of 26

notta

Mr. Hawkins, I wanted to ask, you said that you worked in DeSoto for nine years? Yes, ma'am. Were you in the same content the whole nine years?

Matthew Hawkins 50:03

Yes, ma'am. Algebra 2. Not necessarily ECHS, but algebra 2.

Board Member 3 50:08

You taught regular algebra too and then eventually you started teaching the honors.

Matthew Hawkins 50:16

Ms. Batiste, before she transferred, she really wanted me back for ECHS because she liked my approach for discipline and structure for the ECHS students. So she recommended me.That was for last year, so the first year was under Ms. Starling.

Board Member 3 50:34

Okay and do these students take the AP? Is it honors and AP? Is this the same with?

Matthew Hawkins 50:40

They're taking, their goal is TSI and then also that we can't have the AP designation due to funding. It's a, the AP changed the rules.

Superintendent Dr. Usmah Rogers 50:51

hmm. I'm just with incorrect. If all students couldn't take the test like they they have to take the AP thing about students could take the AP thing. So with with the well, I don't want to go down a rabbit hole.I'm trying to do what you said. Oh, yeah.

Matthew Hawkins 51:08

Powered by Notta.ai

Exhibit 39 -Page 17 of 26



It's not an AP program. We don't have the title in title.


**Board Member 3 51:23**

Okay, so can we get the content like what were the complaints for these complaints about behavior of student? Well, I guess the parents are complaining.So is it complaints that what is teacher not grading the work? Is the teacher waiting until the last minute to input the grades and then now the students are failing, they don't have an opportunity to make work up? Like what type of complaints?


**Matthew Hawkins 52:01**

As far as I know, because all those things, as far as structure, are solid. So what I stated in here, I know you guys can get a chance to read it, was there is there is a discrepancy with how I structure my classroom, because I'm doing everything the board in the school district says.This is what a classroom should look like. You know, students should be and wear their IDs. They should have their collared shirts. And I'm dress coding. I'm making sure they're wearing their IDs on their lanyard displayed all day. I'm making sure their headphones are put away. They hate it. They're like, all the other classes, I can come in with my sweats and my crocs. And no one says anything to me. Administrators don't say anything to me. And you're the one saying, I got to be here on time. You're counting me tardy. You're holding me accountable. I don't want to be in your class. I can go somewhere else and be in a room with a sub and get a free grade, because the class with no sub, they get free grades. You have me doing work, doing all this. There's a discrepancy at the high school of students not wanting that accountability. Most of them do not want a teacher. They're better off not having a teacher because they get free grades.


**Board Member 3 53:00**

okay but just just one last question um not to go into the content of of your i guess is it a tina plan i'm not sure what it would have been was it um to improve your instruction no okay i have a clarifying question um about the you mentioned the 100s so were you saying the students were receiving 100s before you came into the regular class or they would receive


**Matthew Hawkins 53:32**


Powered by Notta.ai

Exhibit 39 -Page 18 of 26

Exhibit 39 -Page 19 of 26

notta

So the students that were cheating that received zeroes when I was removed that class where I had my grades All of their grades were wiped and there were everyone in the ECHS classes were given 100s so not addressing the The cheating not addressing any academic dishonesty. They wiped all the grades through gave all the students 100s, which made it look like There was some finding that I did some wrong and my grading was wrong because like why would the school district?The teacher gave us zeroes. He was contacting parents. Let her know. Hey, there's this issue with this kids test Hey, there's this issue with this kids test the teacher was removed and then we're rewarding everyone with 100 students that cheated got 100s Yes, that's what happened

**Board President 54:17**

I have one more follow-up question. So I'm reading one of your emails that's in exhibit one or two, yellow one, on page 12 specifically. In your statement, you were talking about technology and I heard you say that technology is basically a part of your class and expectations. So there's a line in here that says, I want to emphasize the lack of school-issue device is not an acceptable excuse for not completing assignments.Thinking of those students that did not have the device, did you provide any alternative method or a way for them to be able to still maintain the high level of rig?

**Board President 54:58**

that you have expected, but still accommodate them without having needs to pick up.

**Matthew Hawkins 55:02**

Yes, ma'am. They were going to the computer lab. So there would have been more documentation if we had those conversations and actually sat down and was like, okay, what's going on? It was an email sent out that I didn't add to the grievance, but it was asking Ms. Starling about, let me figure out which students do not have devices so I can come up with a specific plan about makeup work for them. But all students that did not have advice were allowed to go to the computer labs and work. And, you know, also all the platforms are accessible on their phones, so I give them access to their phones or whatever else. But I was really trying to hop her down, and that's what the main message of that was, because I said, hey, if you don't have a device, there's going to be a plan for you if you do not have a device as far as making up stuff.But there were several students in the class that did have devices that were not bringing their devices charged, that would sit in the classroom and not do their assignments, be like, I ain't doing none of this, and then complaining and saying they need more time. And I'm like,

Powered by Notta.ai

    Exhibit 39 -Page 19 of 26

Exhibit 39 - Page 20 of 26

**notta**

you're not maximizing the time that you have. So that's why I sent that email out to parents, so the ones that do have what they need to be successful are on task and not blowing the school year, waiting for the technology issue.It was like, oh, well, there's no technology for everybody. I guess the school year is awash. There was that attitude. I was trying to rein that in.

**Matthew Hawkins 56:16**

Thank you.

**Speaker 6 56:16**

So I just have a couple of clarified questions myself. I think it was brought up that you said that policy was ignored, FNG. And you felt that Mr. Kevin didn't have the authority to discipline or not discipline, but to reassign. So let me get the question.So after hearing statements tonight around those two items, do you understand that they did have the authority because it was designated to them to reassign you?

**Matthew Hawkins 57:05**

There's actually two policies in here. So if you look at the response from Dr. Darden, it says superintendent or designee. And then on the one that Gene Morrill put in, the policy that says superintendent. So I was just stating that it will be the superintendent's decision.So since it's Dr. Darden's response that the principal had authority, the policy on the website does not say superintendent or designee has the authority. It has to be a termination by the superintendent. That's what I was stating. That's what I was saying. Because both policies are there. You can look at the wording. There's actually two different ones. Yes, one of them that.

**Board Member 1 57:44**

So you recognize that both policies are there? No. Did you just say both policies are there? I'm saying the one on the web.

**Matthew Hawkins 57:52**

Powered by Notta.ai

Exhibit 39 - Page 20 of 26

Exhibit 39 -Page 21 of 26

website just says superintendent makes the determination. The other one says superintendent or designee makes it.Where is that one at? Then I'm saying where did you see it at first? The one from the website. Superintended.

Board Member 1 58:03

Where did you see the one that says superintendent or designee? When Dr. Darnin sent it. When Dr. Darnin sent it. Yeah. So he did leave you positive.

Matthew Hawkins 58:11

That was when he refused or cut the... But he gave you the policy. As far as the response? You said he saved you the policy, right? No, it was the response to my level one denial.He put that as the reason, it's like, oh, this is the authority of the principal, he can reassign. So that's when I saw it.

Board Member 1 58:29

being referred to a policy.

Matthew Hawkins 58:31

That's the poly series referred to. That's what the response is from Dr. Darden as far as my level one.But you're talking about F and G, right? I was just talking about it would be advised that those complaints were handled at the lowest level with the teacher. It said the board wishes or encourages that all complaints be handled at the lowest level. All the parents that I had communicated with, they understood exactly what I was doing and they appreciated it as far as the ones that I actually talked to. And that's what I was referring to for F and G, like why word did not pass down to me. And I wasn't told anything about handling specific complaints.

Board Member 1 59:07

One last one. What does not in the best interest, what does in the best interest of the district means to you?

Powered by Notta.ai

Exhibit 39 -Page 21 of 26

Exhibit 39 -Page 22 of 26

**notta**

**Matthew Hawkins 59:14**

And the best interests of the district means it follows our mission and our vision of Minnesota ISD. As far as we're helping all students learn and grow at their highest level and be the best member of society that they can, meaning that we're upholding academic integrity.Everyone in the district. Administration, parents, teachers, everyone. So for a reassignment that encourages, OK, you're going to be reassigned. They've got a bunch of zeros. We don't give them all hundreds. That is not in the best interest of the district.And it also killed my reputation, my professional reputation. So like that's, that makes sense.

**Board President 59:52**

Are you a chapter 21 employee? I'm sorry.

**Matthew Hawkins 59:55**

Yes, ma'am.

**Superintendent Dr. Usmah Rogers 59:57**

I have a question for Mr. Hopkins and the student because what is not discussed is the day that we met to confirm about the reassignment was a major school disruption about some issues in the campus with grades and there were about 50 students that were there contacting if it was a major disruption about something that our concern was not just about students having zero but him also having an effective school year given that he had these students two years in a row and those complaints were and the students were having an uprising about whatever was transitioning in the classroom.So it wasn't a arbitrary decision about Mr. Hopkins is giving these students zeros and we're not supporting him because the initial concerns were redirected but at the point that that redirection turned into a major campus disruption we did have a conversation about reassignment which is in our authority.So with the major campus disruption being centered around grades how was that result? The major campus disruption wasn't just about grades it was about the entire thing and the concerns that we had received started with the summer about Mr. Hopkins returning as the mad teacher for the collegiate students and concerns about the students having him for two years in a row in parents feeling like there was an aggression.The original conversation that we had was let's work through the process let's give the teacher a chance they could get in conversations. Mr. Darden had a conversation with Mr. Hopkins level setting about expectations.So what

Powered by Notta.ai

Exhibit 39 -Page 22 of 26

was the habitation was he failing to do something when you said about expectations? I'm going to defer that to the Kansas administration but I think at the point when you had students and parents threatening to write it about practices in a classroom. What were those practices? About grades that the students scratch paper being graded having 70 grades per six weeks that if one step or something wasn't done there were multiple complaints so in the best interest of Mr. Hopkins and the students he was reassigned to a math class his contract was not impacted his subject wasn't changed is our authority.We had the right to reassign a teacher and so for his safety and for the well being of the students it was reassigned. So for administration are syllabus approved by administration prior to distribution? We'll be right back.

Superintendent Dr. Usmah Rogers 01:02:53

They are approved.

Superintendent Dr. Usmah Rogers 01:02:54

Thank you. So someone on that major class campus disruption day, because it sounds like that was a big ordeal. What calm they've been. So like, so his, his men reassigned. No, it made it just nothing. No, the parents were redirected to the campus administration, which was Mr. Darden and Mr. Campbell. And they, they had met with Mr. Hopkins and talked to him about the concerns.And it was concluded that the best interests who handled that situation to very resolve and calm was to reassign Mr. Hawkins to a bad vacancy that we had in the other side of the campus. And then what, what his grades changed. I was just made aware of the grading. And so I would be researching that matter and we will address that in accordance with our policy.

Board Member 1 01:03:48

This one, I want just for consistency purposes, have you always assigned 70 assignments in nine years you've been here?

Matthew Hawkins 01:03:55

My grade books have been around 40, it's just that we're swapping from AB to just every day all students come every day.

Exhibit 39 -Page 23 of 26

Exhibit 39 -Page 24 of 26

notta

**Board Member 1 01:04:03**

Let me ask in a different way. Has your assignments always been 1,000% above expectations?

**Matthew Hawkins 01:04:15**

Yes. Really? Yes. I was going to say, the reason is I'm... I'm talking. You don't need to go on the front. Yeah.

**Board Member 2 01:04:22**

so you're giving my boy two grades every day mr.

**Matthew Hawkins 01:04:28**

It's two and it's scratch work. So the scratch work, it's really one grade, but you turn that scratch work on the county separately so I can keep track of it.So you have a warm up and then practice every day. And it's graded automatically on the computer, so it's not any extra work on me.

**Board Member 2 01:04:43**

You say one more practice and sprint. Yeah, so it's.

**Matthew Hawkins 01:04:46**

There's two grades, but it's really three. You have two assignments, a four-minute warm-up, and then you have a 20-minute. Well, actually, the practices, I put those in here so you can see the time wait. They're like 11 minutes long.So you have a warm-up that's like four minutes, and a practice that's like 11 minutes, and you turn it into scratch work because you're supposed to do screen-to-scratch, which all of our PDs have been talking about. Oh, screen-to-scratch, screen-to-scratch. Mr. Hawkins does it better than anyone else. I'm getting reassigned for screen-to-scratch.

Powered by Notta.ai

Exhibit 39 -Page 24 of 26

notta

Board Member 2 01:05:11

Is there a seat that you can match back with like the work of the student being tracked back to the actual problem that there's a teacher that refers that if you gave a grade, this is the team that's receiving a grade? Yes, ma'am. This first paper.

Matthew Hawkins 01:05:28

Yes, ma'am.

Board Member 2 01:05:33

What taste is that?

Matthew Hawkins 01:05:36

We wouldn't see anything.

Board Member 2 01:05:38

So you don't have a particular one now.

Matthew Hawkins 01:05:41

Oh, it just depends on what assignment.

Board Member 2 01:05:42

Okay.

Board President 01:05:46

Are there any additional questions for Mr. Hopkins or the administration?

Powered by Notta.ai

Exhibit 39 -Page 25 of 26

notta

Board Counsel 01:05:55

All right, being that there are none, then the time is now 6.02 p.m. This grievance comes to a conclusion.The board will remain in executive session to deliberate the outcome of the decision. They will go into open session and take any action that needs to be appropriate for tonight.Thank you all. Thank you. That's amazing.

Superintendent Dr. Usmah Rogers 01:06:20

We bring you down, it's on.

Exhibit 40 -Page 1 of 3

State of Texas

Date Issued : **05-16-2024**

County of Dallas

## ONE YEAR TERM CONTRACT

## CERTIFIED PROFESSIONAL

The BOARD OF TRUSTEES (hereinafter, Board) of DESOTO INDEPENDENT SCHOOL DISTRICT (hereinafter, District), hereby employs the undersigned professional Employee, **Matthew Hawkins** and Employee accepts employment in the position of **Certified Professional;** on the following terms and conditions:

1. Employee shall be employed on a **10** month basis for the **2024 - 2025** school year, according to the start and end dates set by the District as they exist or may hereafter be amended. The District will provide Employee with the start and end dates by the penalty-free resignation date (see Tex. Educ. Code Section 21.210). The District may extend the end date in a school year to the extent the District adjusts the instructional schedule due to a school closing resulting from disaster, flood, extreme weather conditions, fuel curtailment, epidemic, pandemic, or other calamity.

2. The Board shall pay Employee in twelve installments an annual salary according to the compensation plan adopted by the Board. In the case of full-time classroom teachers and librarians, compensation shall not be less than the state minimum salary. Employee's salary includes consideration for any assigned duties, responsibilities, and tasks, regardless of the actual number of hours or days (including days not designated on the school calendar) that Employee works during the Contract, except as provided in the District's supplemental duty schedule. Employee's salary shall be reduced for absences in excess of authorized, paid leave.

3. This contract does not cover assignments of or payments for supplemental duties. Any such payments are not included as part of the annual salary under this contract. This contract does not create a property right to continued employment in any supplemental duty.

4. Employee shall be subject to assignment and reassignment of positions or duties, additional duties, changes in responsibilities or work, transfers, or reclassification at any time during the contract term.

5. The District shall provide benefits to the Employee as provided by state law and Board policy. The District reserves the right to amend its policies at any time during the term of this Contract to reduce or increase these benefits, at the Board's sole discretion.

6. Employee shall comply with, and be subject to, state and federal law and District policies, rules, regulations, and administrative directives as they exist or may hereafter be amended. Employee shall faithfully perform to the satisfaction of the District all duties set forth in the job description or as assigned.

Exhibit 40 -Page 1 of 3

7.    This contract is conditioned on Employee's satisfactorily providing, prior to the first day of instruction and throughout the Contract period, the certification, service records, teaching credentials, and other records and information required by state and federal law, the Texas Education Agency, the State Board for Educator Certification, the State Board of Education, or the District. Employee agrees to maintain any applicable certification, permit or licensure requirements throughout the term of this Contract. If you fail to fulfill the requirements necessary to extend a temporary or emergency certificate or permit, or if your certification or permit expires, is canceled, is relinquished, is suspended, or is revoked, the District may provide you with notice that this Contract is void pursuant to Texas Education Code section 21.0031. False statements, misrepresentations, omissions of requested information, or fraud by Employee in or concerning any required records or in the employment application may be grounds for nonrenewal or termination.

**Criminal History Review**. As required by law and/or the District, Employee agrees to submit to a review of his/her state or national criminal history record information. Employee hereby represents that he/she has made written disclosure to the District of any conviction for a felony or an offense involving moral turpitude. The Employee understands that a criminal history records acceptable to the District, at its sole discretion, is a condition subsequent to this Contract. The Employee also agrees that, during the term of this Contract, the Employee will notify the Superintendent, in writing, of any arrest, indictment, conviction, no contest or guilty plea, deferred adjudication or other adjudication of the Employee for a felony or offense involving moral turpitude. Employee agrees to provide such notification within seven calendar days or any shorter period specified in policy by the Board of Trustees.

8.    Employee shall satisfactorily submit or account for all grades, reports, school equipment, or other required items at the end of the contract term. Employee agrees that the last salary payment under this contract is conditioned upon receipt from Employee of all such items. The Employee agrees that the District may deduct the value of any lost or damaged school equipment from the Employee's final paychecks for the fiscal year in which the loss or damage occurs. The Employee also agrees that the District may deduct any wage overpayments from one or more of the Employee's paychecks.

9.    In accordance with Texas Education Code, Chapter 21, Subchapters E and F, the Board may terminate this contract and discharge Employee or suspend Employee without pay during the term of this contract for good cause as determined by the Board. A suspension without pay may not extend beyond the end of the school year.

10.   The Board may terminate this contract and discharge Employee during the term of the contract if it determines that a financial exigency requires a reduction in personnel. Financial exigency resulting in a reduction in personnel constitutes good cause for termination or nonrenewal, as applicable.

11.   A determination by the Board that a program change requires that the contract of Employee be terminated during the contract term constitutes good cause for termination or nonrenewal, as applicable.

12.   Employment in federally or categorically funded positions is expressly conditioned upon the availability of full funding for the position. If full funding becomes unavailable, the Employee is subject to termination or nonrenewal, as applicable.

13.   The Board has not adopted any policy, rule, regulation, law, or practice providing for tenure. No right of tenure nor any other contractual obligation, other expectancy of continued employment, or claim of entitlement is created beyond the contract term.

14.   Renewal or non-renewal of this contract shall be in accordance with state law; Texas Education Code, Chapter 21, Subchapter E; and Board policy.

Exhibit 40 -Page 2 of 3

15. Employee may be released from this contract only in accordance with Texas Education Code 21.210 or with    District approval, pursuant to local policy. Upon such release, the Board shall continue to make regular payroll   disbursements to Employee until any due and owing salary amount is fully paid.

16. This contract is subject to all applicable federal and state laws, rules, and regulations. Invalidity of any portion of   this contract under the laws of the State of Texas or of the United States shall not affect the validity of the remainder of the contract. Texas law shall govern this Contract, and venue for any disputes arising hereunder shall be in Dallas County, Texas, unless otherwise provided by law.

17. This contract combines and supersedes all prior agreements and representations concerning employment.  No amendments to this contract shall be binding unless reduced to writing and signed by both parties.

18. This offer of employment for the **2024 - 2025** school year shall expire unless this contract is signed and returned to  the Superintendent on or before **05-24-2024**. Failure to return the signed contract by this date shall constitute a   rejection of the employment offer and the Employee' s resignation from current employment, if any, at the end of the   existing contract term.

I have read this contract and agree to abide by its terms and conditions:

05-16-2024

**Dr. Usamah Rodgers**                                        **Date**

**Superintendent of Schools**

279

Exhibit 40 -Page 3 of 3

driver, drivers of large vehicles, or drivers of vehicles used in the transportation of hazardous materials. Teachers, coaches, or other employees who primarily perform duties other than driving are subject to testing requirements if their duties include driving a commercial motor vehicle.

Drug testing will be conducted before an individual assumes driving responsibilities. Alcohol and drug tests will be conducted when reasonable suspicion exists, at random, when an employee returns to duty after engaging in prohibited conduct, and as a follow-up measure. Testing may be conducted following accidents. Return-to-duty and follow-up testing will be conducted if an employee who has violated the prohibited alcohol conduct standards or tested positive for alcohol or drugs is allowed to return to duty.

All employees required to have a CDL or who otherwise are subject to alcohol and drug testing will receive a copy of the district's policy, the testing requirements, and detailed information on alcohol and drug abuse and the availability of assistance programs.

Employees with questions or concerns relating to alcohol and drug testing policies and related educational material should contact hr@desotoisd.org.

## Health Safety Training
*Policies DBA, DMA*

Certain employees who are involved in physical activities for students must maintain and submit to the district proof of current certification or training in first aid, cardiopulmonary resuscitation (CPR), the use of an automated external defibrillator (AED), concussion, and extracurricular athletic activity safety. Certification or documentation of training must be issued by the American Red Cross, the American Heart Association, or another organization that provides equivalent training and certification. Employees subject to this requirement must submit their certification or documentation to DeSoto ISD Director of Nursing or the Director of Sports Medicine by December 1, 2024.

School nurses and employees with regular contact with students must complete a Texas Education Agency approved, Online training regarding seizure disorder aware-ness, recognition, and related first aid.

## Reassignments and Transfers
*Policy DK*

All personnel are subject to assignment and reassignment by the superintendent or designee when the superintendent or designee determines that the assignment or reassignment is in the best interest of the district. Reassignment is a transfer to another position, department, or facility that does not necessitate a change in the employment contract. Campus reassignments must be approved by the principal at the receiving campus except when reassignments are due to enrollment shifts or program changes. Extracurricular or supplemental duty assignments may

Exhibit 41 -Page 2 of 2

be reassigned at any time unless an extracurricular or supplemental duty assignment is part of a dual-assignment contract. Employees who object to a reassignment may follow the district process for employee complaints as outlined in this handbook and district policy DGBA(Local).

An employee with the required qualifications for a position may request a transfer to another campus or department. A written request for transfer must be completed and signed by the employee and the employee's supervisor. A teacher requesting a transfer to another campus before the school year begins must submit his or her request by submitting a transfer request for the desired position in TEAMS. Requests for transfer during the school year will be considered only when the change will not adversely affect students and after a replacement has been found. All transfer requests will be coordinated by the DeSoto ISD Human Resources office and must be approved by the receiving supervisor.

## Workload and Work Schedules
*Policies DEAB, DK, DL*

**Professional Employees.** Professional employees and academic administrators are exempt from overtime pay and are employed on a 10-, 11-, or 12-month basis, according to the work schedules set by the district. A school calendar is adopted each year designating the work schedule for teachers and all school holidays. Notice of work schedules including start and end dates and scheduled holidays will be distributed each school year.

Classroom teachers will have planning periods for instructional preparation including conferences. The schedule of planning periods is set at the campus level but must provide at least 450 minutes within each two-week period in blocks not less than 45 minutes within the instructional day. Teachers and librarians are entitled to a duty-free lunch period of at least 30 minutes. The district may require teachers to supervise students during lunch one day a week when no other personnel are available.

**Paraprofessional and Auxiliary Employees.** Support employees are employed at will and receive notification of the required duty days, holidays, and hours of work for their position on an annual basis. Paraprofessional and auxiliary employees must be compensated for overtime and are not authorized to work in excess of their assigned schedule without prior approval from their supervisor. See Overtime Compensation on page 27 for additional information.

## Breaks for Expression of Breast Milk
*Policies DEAB, DG*

DeSoto ISD is designated as a Texas Mother-Friendly Worksite. The district supports the practice of expressing breast milk and makes reasonable accommodations for the needs of employees who express breast milk. A place, other than a multiple user bathroom, that is shielded from

Exhibit 42 -Page 1 of 7

PERSONNEL-MANAGEMENT RELATIONS                                      DGBA
EMPLOYEE COMPLAINTS/GRIEVANCES                                    (LOCAL)

| | |
|---|---|
| **Complaints** | In this policy, the terms "complaint" and "grievance" shall have the same meaning. |
| Other Complaint Processes | Employee complaints shall be filed in accordance with this policy, except as required by the policies listed below. Some of these policies require appeals to be submitted in accordance with DGBA after the relevant complaint process: |

1. Complaints alleging discrimination, including violations of Title IX (gender), Title VII (sex, race, color, religion, national origin), ADEA (age), or Section 504 (disability), shall be submitted in accordance with the DIA series.

2. Complaints alleging certain forms of harassment, including harassment by a supervisor and violation of Title VII, shall be submitted in accordance with the DIA series.

3. Complaints concerning retaliation relating to discrimination and harassment shall be submitted in accordance with the DIA series.

4. Complaints concerning instructional resources shall be submitted in accordance with the EF series.

5. Complaints concerning a commissioned peace officer who is an employee of the District shall be submitted in accordance with the CKE series.

6. Complaints concerning the proposed nonrenewal of a term contract issued under Chapter 21 of the Education Code shall be submitted in accordance with DFBB.

7. Complaints concerning the proposed termination or suspension without pay of an employee on a probationary, term, or continuing contract issued under Chapter 21 of the Education Code during the contract term shall be submitted in accordance with DFAA, DFBA, or DFCA.

| | |
|---|---|
| **Notice to Employees** | The District shall inform employees of this policy through appropriate District publications. |
| **Guiding Principles** Informal Process | The Board encourages employees to discuss their concerns with their supervisor, principal, or other appropriate administrator who has the authority to address the concerns. Concerns should be expressed as soon as possible to allow early resolution at the lowest possible administrative level. |
| | Informal resolution shall be encouraged but shall not extend any deadlines in this policy, except by mutual written consent. |

PERSONNEL-MANAGEMENT RELATIONS                                    DGBA
EMPLOYEE COMPLAINTS/GRIEVANCES                                  (LOCAL)

| | |
|---|---|
| Direct Communication with Board Members | Employees shall not be prohibited from communicating with a member of the Board regarding District operations except when communication between an employee and a Board member would be inappropriate because of a pending hearing or appeal related to the employee. |
| Formal Process | An employee may initiate the formal process described below by timely filing a written complaint form. |
| | Even after initiating the formal complaint process, employees are encouraged to seek informal resolution of their concerns. An employee whose concerns are resolved may withdraw a formal complaint at any time. |
| | The process described in this policy shall not be construed to create new or additional rights beyond those granted by law or Board policy, nor to require a full evidentiary hearing or "mini-trial" at any level. |
| **Freedom from Retaliation** | Neither the Board nor any District employee shall unlawfully retaliate against an employee for bringing a concern or complaint. |
| **Whistleblower Complaints** | Whistleblower complaints shall be filed within the time specified by law and may be made to the Superintendent or designee beginning at Level Two. Timelines for the employee and the District set out in this policy may be shortened to allow the Board to make a final decision within 60 calendar days of the initiation of the complaint. [See DG] |
| **Complaints Against Supervisors** | Complaints alleging a violation of law by a supervisor may be made to the Superintendent or designee. Complaint forms alleging a violation of law by the Superintendent may be submitted directly to the Board or designee. |
| **General Provisions** Filing | Complaint forms and appeal notices may be filed by hand-delivery or by electronic communication, including email and fax. Hand-delivered filings shall be timely filed if received by the appropriate human resources department by the close of business on the deadline. Filings submitted by electronic communication shall be timely filed if they are received by the close of business on the deadline, as indicated by the date/time shown on the electronic communication. |
| Scheduling Conferences | The District shall make reasonable attempts to schedule conferences at a mutually agreeable time. If the employee fails to appear at a scheduled conference, the District may hold the conference and issue a decision in the employee's absence. |

DATE ISSUED: 6/5/2024                    Adopted:                    2 of 7
UPDATE 123                              11/18/2024
DGBA(LOCAL)-X                              283                    Exhibit 42 -Page 2 of 7

PERSONNEL-MANAGEMENT RELATIONS                                    DGBA
EMPLOYEE COMPLAINTS/GRIEVANCES                                   (LOCAL)

| | |
|---|---|
| Response | At Levels One and Two, "response" shall mean a written communication to the employee from the appropriate administrator. Responses may be hand-delivered, sent by electronic communication to the employee's email address of record, or sent by U.S. Mail to the employee's mailing address of record. Mailed responses shall be timely if they are postmarked by U.S. Mail on or before the deadline. |
| Days | "Days" shall mean District business days, unless otherwise noted. In calculating timelines under this policy, the day a document is filed is "day zero." The following business day is "day one." |
| Representative | "Representative" shall mean any person who or an organization that does not claim the right to strike and is designated by the employee to represent him or her in the complaint process.<br><br>The employee may designate a representative through written notice to the District at any level of this process. The representative may participate in person or by telephone conference call. If the employee designates a representative with fewer than three days' notice to the District before a scheduled conference or hearing, the District may reschedule the conference or hearing to a later date, if desired, in order to include the District's counsel. The District may be represented by counsel at any level of the process. |
| Consolidating Complaints | Complaints arising out of an event or a series of related events shall be addressed in one complaint. Employees shall not file separate or serial complaints arising from any event or series of events that have been or could have been addressed in a previous complaint.<br><br>When two or more complaints are sufficiently similar in nature and remedy sought to permit their resolution through one proceeding, the District may consolidate the complaints. |
| Untimely Filings | All time limits shall be strictly followed unless modified by mutual written consent.<br><br>If a complaint form or appeal notice is not timely filed, the complaint may be dismissed, on written notice to the employee, at any point during the complaint process. The employee may appeal the dismissal by seeking review in writing within ten days from the date of the written dismissal notice, starting at the level at which the complaint was dismissed. Such appeal shall be limited to the issue of timeliness. |
| Costs Incurred | Each party shall pay its own costs incurred in the course of the complaint. |

DeSoto ISD
057906

Exhibit 42 -Page 4 of 7

PERSONNEL-MANAGEMENT RELATIONS
EMPLOYEE COMPLAINTS/GRIEVANCES

DGBA
(LOCAL)

| | |
|---|---|
| Complaint and Appeal Forms | Complaints and appeals under this policy shall be submitted in writing on a form provided by the District. |
| | Copies of any documents that support the complaint should be attached to the complaint form. If the employee does not have copies of these documents, they may be presented at the Level One conference. After the Level One conference, no new documents may be submitted by the employee unless the employee did not know the documents existed before the Level One conference. |
| | A complaint or appeal form that is incomplete in any material aspect may be dismissed but may be refiled with all the required information if the refiling is within the designated time for filing. |
| Audio Recording | As provided by law, an employee shall be permitted to make an audio recording of a conference or hearing under this policy at which the substance of the employee's complaint is discussed. The employee shall notify all attendees present that an audio recording is taking place. |
| **Level One** | Complaint forms must be filed: |

1. Within 10 days of the date the employee first knew, or with reasonable diligence should have known, of the decision or action giving rise to the complaint or grievance; and

2. With the lowest-level administrator who has the authority to remedy the alleged problem.

All employees shall file Level One complaints with the human resources department.

If the only administrator who has authority to remedy the alleged problem is the Superintendent or designee, the complaint may begin at Level Two following the procedure, including deadlines, for filing the complaint form at Level One.

If the complaint is not filed with the appropriate administrator, the receiving administrator must note the date and time the complaint form was received and immediately forward the complaint form to the appropriate administrator.

The appropriate administrator shall investigate as necessary and schedule a conference with the employee within ten days after receipt of the written complaint. The administrator may set reasonable time limits for the conference.

Absent extenuating circumstances, the administrator shall provide the employee a written response within ten days following the conference. The written response shall set forth the basis of the decision. In reaching a decision, the administrator may consider infor-

DATE ISSUED: 6/5/2024
UPDATE 123
DGBA(LOCAL)-X

Adopted:
11/18/2024

285

4 of 7

Exhibit 42 -Page 4 of 7

PERSONNEL-MANAGEMENT RELATIONS
EMPLOYEE COMPLAINTS/GRIEVANCES

DGBA
(LOCAL)

mation provided at the Level One conference and any other relevant documents or information the administrator believes will help resolve the complaint. The Level One administrator shall prepare and forward a record of the Level One complaint to the human resources department.

**Level Two**

If the employee did not receive the relief requested at Level One or if the time for a response has expired, the employee may request a conference with the Superintendent or designee to appeal the Level One decision.

The appeal notice must be filed in writing, on a form provided by the District, within ten days of the date of the written Level One response or, if no response was received, within ten days of the Level One response deadline.

After receiving notice of the appeal, the human resources department shall forward a record of the Level One complaint to the Level Two administrator. The employee may request a copy of the Level One record.

The Level One record shall include:

1. The original complaint form and any attachments.

2. All other documents submitted by the employee at Level One.

3. The written response issued at Level One and any attachments.

4. All other documents relied upon by the Level One administrator in reaching the Level One decision.

The Superintendent or designee shall schedule a conference within ten days after the appeal notice is filed. The conference shall be limited to the issues and documents considered at Level One. At the conference, the employee may provide information concerning any documents or information relied upon by the administration for the Level One decision. The Superintendent or designee may set reasonable time limits for the conference.

The Superintendent or designee shall provide the employee a written response within ten days following the conference. The written response shall set forth the basis of the decision. In reaching a decision, the Superintendent or designee may consider the Level One record, information provided at the Level Two conference, and any other relevant documents or information the Superintendent or designee believes will help resolve the complaint.

Recordings of the Level One and Level Two conferences, if any, shall be maintained with the Level One and Level Two records.

DATE ISSUED: 6/5/2024
UPDATE 123
DGBA(LOCAL)-X

Adopted:
11/18/2024

5 of 7

PERSONNEL-MANAGEMENT RELATIONS                                    DGBA
EMPLOYEE COMPLAINTS/GRIEVANCES                                    (LOCAL)

**Level Three**        If the employee did not receive the relief requested at Level Two or if the time for a response has expired, the employee may appeal the decision to the Board.

The appeal notice must be filed in writing, on a form provided by the District, within ten days of the date of the written Level Two response or, if no response was received, within ten days of the Level Two response deadline.

The Superintendent or designee shall inform the employee of the date, time, and place of the Board meeting at which the complaint will be on the agenda for presentation to the Board within 60 days of the appeal receipt.

The Superintendent or designee shall provide the Board the record of the Level Two appeal. The employee may request a copy of the Level Two record.

The Level Two record shall include:

1.    The Level One record.

2.    The notice of appeal from Level One to Level Two.

3.    The written response issued at Level Two and any attachments.

4.    All other documents relied upon by the administration in reaching the Level Two decision.

The appeal shall be limited to the issues and documents considered at Level Two, except that if at the Level Three hearing the administration intends to rely on evidence not included in the Level Two record, the administration shall provide the employee notice of the nature of the evidence at least three days before the hearing.

The District shall determine whether the complaint will be presented in open or closed meeting in accordance with the Texas Open Meetings Act and other applicable law. [See BE]

The presiding officer may set reasonable time limits and guidelines for the presentation, including an opportunity for the employee and administration to each make a presentation and provide rebuttal and an opportunity for questioning by the Board. The Board shall hear the complaint and may request that the administration provide an explanation for the decisions at the preceding levels.

In addition to any other record of the Board meeting required by law, the Board shall prepare a separate record of the Level Three presentation. The Level Three presentation, including the presentation by the employee or the employee's representative, any pre-

057906

PERSONNEL-MANAGEMENT RELATIONS
EMPLOYEE COMPLAINTS/GRIEVANCES

DGBA
(LOCAL)

Exhibit 42 -Page 7 of 7

sentation from the administration, and questions from the Board with responses, shall be recorded by audio recording, video/audio recording, or court reporter.

The Board shall then consider the complaint. It may give notice of its decision orally or in writing at any time up to and including the next regularly scheduled Board meeting. If the Board does not make a decision regarding the complaint by the end of the next regularly scheduled meeting, the lack of a response by the Board upholds the administrative decision at Level Two.



| DATE ISSUED: 6/5/2024 | Adopted: | 7 of 7 |
|---|---|---|
| UPDATE 123 | 11/18/2024 | |
| DGBA(LOCAL)-X | 288 | Exhibit 42 -Page 7 of 7 |

057906

STUDENT CONDUCT                                                     FNCA
DRESS CODE                                                        (LOCAL)

**Purpose**              The District's dress code is established to teach grooming and hygiene, instill discipline, prevent disruption, avoid safety hazards, and teach respect for authority.

**General**              Students shall be dressed and groomed in a manner that is clean
**Guidelines**           and neat and that will not be a health or safety hazard to themselves or others. The District prohibits any clothing or grooming that in the principal's judgment may reasonably be expected to cause disruption of or interference with normal school operations.

                         The District prohibits pictures, emblems, or writings on clothing that:

                         1.   Are lewd, offensive, vulgar, or obscene.

                         2.   Advertise or depict tobacco products, alcoholic beverages, drugs, or any other substance prohibited under FNCF(LEGAL).

                         The student and parent may determine the student's personal dress and grooming standards, provided that they comply with the general guidelines set out above and with the student dress code outlined in the student handbook.

**Extracurricular**      The principal, in cooperation with the sponsor, coach, or other per-
**Activities**           son in charge of an extracurricular activity, may regulate the dress and grooming of students who participate in the activity. Students who violate dress and grooming standards established for such an activity may be removed or excluded from the activity for a period determined by the principal or sponsor and may be subject to other disciplinary action, as specified in the Student Code of Conduct. [See FO series]

DATE ISSUED: 5/3/2007                      Adopted:                     1 of 1
UPDATE 80
FNCA(LOCAL)-A                                  289                  Exhibit 43 -Page 1 of 1

JS 44 (Rev. 04/21) (TXND 4/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Matthew Hawkins

## DEFENDANTS

DeSoto Independent School District, DeSoto Independent

**(b)** County of Residence of First Listed Plaintiff    **Dallas County, Texas**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    **Dallas County, Texas**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

RECEIVED

MAR 18 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Pro Se

Attorneys *(If Known)*

3-25CV0652-D

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product / Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability / ☐ 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & / Pharmaceutical Slander / Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability / ☐ 368 Asbestos Personal ☐ 340 Marine / Injury Product ☐ 345 Marine Product / Liability | | ☐ 835 Patent - Abbreviated New Drug Application ☐ 840 Trademark | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | Liability / **PERSONAL PROPERTY** ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | Product Liability / ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal / Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury / ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | Exchange |
| | ☐ 362 Personal Injury - / Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment / ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ / Sentence | | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations / ☐ 530 General | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - / ☐ 535 Death Penalty Employment / **Other:** | **IMMIGRATION** ☐ 462 Naturalization Application | 26 USC 7609 | Agency Decision ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities - / ☐ 540 Mandamus & Other Other / ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | State Statutes |
| | ☐ 448 Education / ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from Another District *(specify)*  ☐ 6 Multidistrict Litigation - Transfer  ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
U.S. Civil Statute: 42 U.S.C. § 1983 – Violation of Due Process and Equal Protection Title VII of the Civil Rights Act of 1964 – Discrimination and Ret

Brief description of cause:
Plaintiff was retaliated against and reassigned in violation of due process protections, suffered reputational damage due to the district's actions, and

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
$2,500,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
03/18/2025

SIGNATURE OF ATTORNEY OF RECORD
*Matthew Hawkins*

**FOR OFFICE USE ONLY**

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)  Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)  County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)  Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.  Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.  Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.  Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. **Click here for:** Nature of Suit Code Descriptions.

**V.  Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.  Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.  Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.  Related Cases.** This section of the JS 44 is used to reference related cases, if any. If a related case exists, whether pending or closed, insert the docket numbers and the corresponding judge names for such cases. A case is related to this filing if the case: 1) involves some or all of the same parties and is based on the same or similar claim; 2) involves the same property, transaction, or event; 3) involves substantially similar issues of law and fact; and/or 4) involves the same estate in a bankruptcy appeal.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

Attachment to Civil Cover Sheet (JS-44)

List of Defendants:

DeSoto Independent School District

DeSoto Independent School District School Board

Dr. Usamah Rogers, Superintendent (official and individual capacities)

Jasen Campbell, Principal (official and individual capacities)

Jocelyn Starling (official and individual capacities)

Kristi Primus (individual capacity only)

Dr. Leon Darden (official and individual capacities)

Gene Morrow (official and individual capacities)

Jorge Medina (official and individual capacities)

Christopher Polk, Assistant Principal (official and individual capacities)

Alicia Bailey (official and individual capacities)

Alma Murphy-Goss (official and individual capacities)